UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAIQUAN ALLAH,

Plaintiff,

-against- 9:23-CV-00785 (LEK/ML)

RYAN LAWSON, *et al.*,

Defendants.

---

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

Plaintiff Jaiquan Allah commenced this action pro se against Ryan Lawson, Aragona, Stratta, Grimmick, Anthony Torrisi, Thomas Pleat, Adam Molesky, Carol Ann Cavanaugh, Bonnaci, Lacosse,[1] Andrew Cohen, and Paul Spadinger (collectively, "Defendants"), asserting claims pursuant to 42 U.S.C. § 1983. Dkt. No. 34 ("Amended Complaint").

Presently before the Court is Defendants' motion for summary judgment. Dkt. No. 95 ("Motion"). Plaintiff filed a response, Dkt. No. 103 ("Response"), Defendants filed a reply, Dkt. No. 107 ("Reply), and Plaintiff filed a sur-reply, Dkt. No. 112 ("Sur-reply"). On July 8, 2026, the Honorable Miroslav Lovric, United States Magistrate Judge, issued a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c), recommending that the Motion be granted in part and denied in part. Dkt. No. 117 ("Report and Recommendation"). Defendants

[1] Plaintiff named "Lacozzi" as a Defendant in the Amended Complaint. Am. Compl. at 1. Plaintiff later referred to this Defendant as "Lacoozi." *Id.* at 11. The correct name is "Lacosse." Dkt. No. 23-10 at 1 n.1; Dkt. No. 25-9 at 1 n.1.

timely filed objections, Dkt. No. 118 ("Objections"), and Plaintiff did not file a response, *see* Dkt.[2]

For the reasons that follow, the Court adopts in part and rejects in part the Report and Recommendation.

## II. BACKGROUND

The Court assumes familiarity with the background detailed in the Report and Recommendation. R. & R. at 2–30.

## III. LEGAL STANDARDS

### A. Standard Governing Review of Decisions Rendered by Magistrate Judges

"Rule 72 of the Federal Rules of Civil Procedure and Title 28 United States Code Section 636 govern the review of decisions rendered by Magistrate Judges." *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 191 F. Supp. 2d 404, 405 (S.D.N.Y. 2002); *see also* 28 U.S.C. § 636; Fed. R. Civ. P. 72. Review of decisions rendered by magistrate judges are also governed by the Local Rules. *See* L.R. 72.1. 28 U.S.C. § 636 states:

> Within fourteen days after being served with a copy [of the Magistrate Judge's report and recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1)(C).

When written objections are filed and the district court conducts a *de novo* review, that "*de novo* determination does not require the Court to conduct a new hearing; rather, it mandates

[2] Page number citations to the parties' filings refer to their PDF pagination.

that the Court give fresh consideration to those issues to which specific objections have been made." *A.V. by Versace*, 191 F. Supp. 2d at 406 (emphasis in original).

"A proper objection must be specific." *Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F. 4th 349, 359 (2d Cir 2025). "To be 'specific,' the objection must, with particularity, 'identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection.'" *Nutt v. New York*, No. 12-CV-385, 2012 WL 4006408, at *1 (N.D.N.Y. Sept. 12, 2012) (quoting N.D.N.Y. L.R. 72.1(c)).

"The district court may adopt those portions of a report and recommendation to which no timely objections have been made, provided no clear error is apparent from the face of the record." *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009). "When a party makes only conclusory or general objections . . . the Court will review the [report and recommendation] strictly for clear error." *N.Y.C. Dist. Councils. of Carpenters Pension Fund v. Forde*, 341 F. Supp. 3d 334, 336 (S.D.N.Y. 2018) (quoting *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009)). Further, "[a] proper objection must be timely. Failure to timely object may 'operate as a forfeiture of further judicial review' of the magistrate judge's decision." *Nambiar*, 158 F.4th at 359 (cleaned up) (citing *Mario v. P&C Food Mkts.*, 313 F.3d 758, 766 (2d Cir. 2002)).

**B. Standard Governing Motions for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Taggart v. Time, Inc.*, 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing a court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The nonmoving party may not rely on "mere conclusory allegations, speculation or conjecture," *Fischer v. Forrest*, 968 F.3d 216, 221 (2d Cir. 2020) (quoting *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996)), and must present more than a mere "scintilla of evidence" supporting its claims, *Anderson*, 477 U.S. at 252. At the same time, a court must resolve all ambiguities and "draw all reasonable inferences in favor of the nonmoving party," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), and "eschew credibility assessments," *Amnesty Am. V. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)). Thus, a Court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Additionally, because Plaintiff proceeds pro se in this matter, the Court "must construe his submissions liberally and interpret them 'to raise the strongest arguments that they suggest.'" *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). "Only 'if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,' will the court affirm summary judgment." *Id.* Because Plaintiff's pro se Amended Complaint was sworn under penalty of perjury, *see* Am. Compl., the Court has considered it "as evidence for summary judgment purposes." *Brandon v. Kinter*, 938 F.3d 21, 26 n.5 (2d Cir. 2019).

## IV. DISCUSSION

Defendants object to six parts of the Report and Recommendation: (1) the First Amendment retaliation claim against Stratta and Pleat based on the May 20, 2023, use of force incident should be dismissed for failure to show adverse action and causation, Obj. at 5–7; (2) the Fourth Amendment unlawful strip frisk claim against Aragona and Pleat based on the May 14, 2023, incident should be dismissed as they were justified to perform a routine strip search, *id.* at 7–9; (3) the Fourteenth Amendment excessive force claims against Stratta, Pleat, Bonnaci, Lacosse, Lawson, Spadinger, and Cohen for use of force on May 20, 2023, should be dismissed as their use of force was objectively reasonable, and because Plaintiff failed to indicate personal involvement of Defendants, *id.* at 9–13; (4) the Fourteenth Amendment failure-to-intervene claim against Grimmick for use of force on May 20, 2023, should be dismissed as he was not present during the use of force incident, *id.* at 14; (5) the Fourteenth Amendment Equal Protection Claim against Lawson should be dismissed in conjunction with the dismissal of the excessive force claims, *id.* at 14–15; and (6) the Defendants are entitled to qualified immunity as to the excessive force claims, *id.* at 15–16.

The Court addresses each objection in turn.

**A. Retaliation Claim Against Stratta and Pleat**

The Report and Recommendation recommends that the Motion as to the First Amendment retaliation claim against Stratta and Pleat be denied as "Defendants' moving papers do not set forth any argument with respect to the retaliatory use of force claim" and Plaintiff's security risk group ("SRG") status did not permit retaliation. R. & R. at 46. Defendants object and state that they previously disputed both adverse action and causal connection, and that Plaintiff's SRG status supported their previous assertions. Obj. at 5–6.

The Court agrees that Defendants' moving papers did not set forth any argument with respect to the retaliatory use of force claim on May 20, 2023. R. & R. at 46; *see* Mot. at 14–17; Reply at 6–8. Defendants ask the Court to view their argument offered in the Reply as having properly disputed the retaliatory use of force claim for the incident on May 20, 2023. Obj. at 5 (citing Reply at 6–8). However, the Court fails to see how Defendants' statements that they "conduct[] these routine measures for any other similarly situated inmate" and these were "standard procedures taken by Correction Officers in accordance with the policies of the facility" are applicable to this claim involving Stratta and Pleat's unprovoked retaliatory beating of Plaintiff. Reply at 7–8; Obj. at 5; Dkt. No. 95-3 at 58–59. Even if Defendants did dispute adverse action and causal connection in their Reply, a district court has discretion to consider an argument raised for the first time in a reply brief in support of a motion for summary judgment. *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005). Similarly, "[i]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not." *Tevac, Inc. v. Dynamics eShop, Inc.*, No. 19-CV-3650, 2022 WL 4483439, at *3

(E.D.N.Y. Sept. 27, 2022) (quoting *Zhao v. State Univ. of N.Y.*, No. 04-CV-210, 2011 WL 3610717, at *1 (E.D.N.Y. Aug. 15, 2011)). Assuming arguendo that the argument was not forfeited, the Motion still fails for the reasons that follow.

"To sustain a claim for retaliation in violation of the First Amendment under § 1983, a prisoner must demonstrate '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Walker v. Senecal*, 130 F.4th 291, 298 (2d Cir. 2025) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)). Here, both parties agree that the first element is satisfied. Obj. at 6. However, Defendants argue that there was neither adverse action nor causal connection. *Id.* at 6–7.

"Adverse action" is present if the retaliatory conduct is of the "type that would deter 'a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). This test applies even if the plaintiff was "not himself subjectively deterred." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004). "We look to the specific circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Walker*, 130 F.4th at 298 (cleaned up) (quoting *Hayes*, 976 F.3d at 272).

Defendants argue that the conduct here, a shakedown and mandatory strip frisk for an SRG inmate on May 20, 2023, was not adverse action as the conduct "would have occurred absent the protected activity." Obj. at 6. However, Plaintiff alleges far more than just a standard SRG shakedown and strip frisk. On May 20, 2023, Plaintiff alleges that as he was subjected to an unprovoked retaliatory beating. Dkt. No. 95-3 at 58–59; Am. Compl. at 11.

Courts have differed as to whether a strip search alone could be considered an adverse action. *Compare Pizarro v. Bd. of Correction*, No. 16-CV-2418, 2018 WL 3462512, *6 (S.D.N.Y. July 17, 2018) (holding that plaintiff failed to show how a routine and ordinarily lawful strip search where plaintiff was not singled out would deter a typical prisoner from exercising his rights), *with Johnson v. Naqvi*, No. 18-CV-694, 2021 WL 1723773, at *8–9 (D. Conn. Apr. 29, 2021) (explaining that a strip search could deter a typical prisoner from exercising his first amendment rights, especially when that search was neither routine nor ordinary and plaintiff was singled out). However, an unprovoked retaliatory assault certainly is an adverse action. *See Cosby v. Russell,* No. 10-CV-595, 2012 WL 1514836, at *11 (N.D.N.Y. Feb. 8, 2012), *report and recommendation adopted*, No. 10-CV-595, 2012 WL 715250 (N.D.N.Y. Mar. 5, 2012). Plaintiff's claim regarding the retaliatory assault sufficiently describes adverse conduct that would deter a reasonable inmate from exercising his constitutional rights. *See Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002).

"To satisfy the causation requirement, allegations must be 'sufficient to support the inference that the speech played a substantial part in the adverse action.'" *Davis*, 320 F.3d at 354 (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)). A "court may consider a number of factors, including 'any statements made by the defendant concerning his motivation' and 'the temporal proximity between the protected activity and the defendant's adverse action.' *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quoting *Williams v. Muller*, 98-CV-5204, 2001 WL 936297 at *3 (S.D.N.Y. Aug. 17, 2001)). An inmate first bears the burden of making sufficient allegations, and then the defendant can show that the adverse action would have occurred regardless, such as by showing that the inmate committed the alleged actions that resulted in the adverse action. *See Holland v. Goord*, 758 F.3d 215, 226 (2d Cir. 2014). "Courts

must approach prisoner retaliation claims with 'skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Walker*, 130 F.4th at 298 (quoting *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015)); *see Hayes*, 976 F.3d at 272.

Defendants object that "Plaintiff has pleaded no facts describing that, during the use of force incident on May 20, 2023 the Defendants made any references to grievances or indicated in any way that the use of force was connected to Plaintiff's exercise of his First Amendment rights," and that "for the use of force incident on May 20, 2023, Plaintiff only alleges the use of racial slurs, not that there was a relationship between the use of force and the protected action." Obj. at 7. Defendants note in their statement of material facts, Dkt. No. 95-24 ("Defendants' Statement of Material Facts" or "DSMF") ¶ 98 that Plaintiff admitted in his deposition that none of the officers involved in the incident on May 20, 2023, mentioned Plaintiff's prior grievances, Dkt. No. 95-4 at 137.

Despite Plaintiff's failure to properly dispute this alleged admission, Resp. at 25, Defendants do not meet their burden to establish that there is an absence of a genuine issue for trial. "[I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts" and "must be satisfied that the citation to evidence in the record supports the assertion." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production,

then 'summary judgment must be denied *even if no opposing evidentiary matter is presented*.'" *Id.* (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)).

To support the assertion that "Plaintiff admits that not a single guard involved in the May 20th incident mentioned any of the grievances or the slip and fall," DSMF ¶ 98, Defendants point to Plaintiff's deposition testimony:

> Q. . . . During that search did any of the guards that searched your cell mention grievances?
>
> A. There was so much going on that day that I don't remember. I can't answer that. . . .
>
> Q. Okay. Did any of them make any threats to you about grievances?
>
> A. They made some threats to me. I don't know if it was just only about grievances, but there was definitely some—yes. Yes, I believe so, yes.

Dkt. No. 95-4 at 137. These statements do not sufficiently support Defendants' assertion. Plaintiff further testified that the word grievance "could have been mentioned," that he was "pretty sure it was mentioned," and that he "heard something around those lines." *Id.* at 141–42. Thus, the fact remains in dispute regarding whether Defendants referenced Plaintiff's grievances.

Additionally, Plaintiff alleges that temporal proximity and the pattern of Defendants' conduct is sufficient to show causation. Sur-reply at 2–3; Dkt. No. 95-4 at 135–36. "[W]hile we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation . . . we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013). However, an alleged retaliatory beating where one officer was aware of the protected conduct can be sufficient for an inference of a causal connection. *Espinal*, 558 F.3d at 129 (holding the passage of six months between dismissal of a

lawsuit, where one officer was a defendant, and an allegedly retaliatory beating by officers is sufficient to support an inference of a causal connection).

Therefore, even if Defendants' arguments were not waived, in "draw[ing] all reasonable inferences in favor of the nonmoving party," *Reeves*, 530 U.S. at 150, the Court finds that there remains a genuine dispute of material fact concerning causation. *See Espinal*, 558 F.3d at 129; *Brandon*, 938 F.3d at 43 (statements referencing grievances were "sufficient to create a genuine dispute of material fact as to retaliatory intent and causation").

After reviewing the Report and Recommendation and the corresponding relevant filings, the Court agrees with Judge Lovric that there exists a genuine dispute of material fact concerning whether an adverse action was taken, and whether there was a causal connection between the protected conduct and the adverse action. As such, the Court denies the Motion as to the retaliation claim.

**B. Unlawful Strip Frisk Claim Against Aragona and Pleat**

The Report and Recommendation recommends that the Motion as to the Fourth Amendment unlawful strip frisk claim against Aragona and Pleat be denied as a genuine issue of material fact remained regarding the justification of the strip search. R. & R. at 47. Specifically, the Report and Recommendation found that statements Plaintiff attributed to Aragona created a genuine issue of material fact as to whether the search was retaliatory. *Id.* Plaintiff alleged that "Defendant Aragona express[ed] disappointment that Plaintiff's strip search did not reveal contraband," and when Plaintiff "responded to Defendant Aragona that he intended to file another grievance about the strip search, that Defendant Aragona said 'you still haven't learned your lesson about filing grievances!'" *Id.* (citing Am. Compl. at 10). The Report and Recommendation, taking these statements into account, concluded that a reasonable jury could

find that the search was retaliatory. *Id.* Defendants object and state that the strip search was done to all 6-West inmates to find contraband smuggled through visitation and that any such statements did not indicate or change the justification for the strip search. Obj. at 8.

Inmates retain a limited right to bodily privacy under the Fourth Amendment. *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). "The prison context does affect, however, the way that courts must analyze alleged violations of this Fourth Amendment right." *Id.*

> Courts assessing an inmate's claim that officers infringed his or her right to bodily privacy must undertake a two-part inquiry: (1) First, the court must determine whether the inmate has exhibited an actual, subjective expectation of bodily privacy; and (2) second, the court must determine whether the prison officials had sufficient justification to intrude on the inmate's fourth amendment rights.

*Id.* (cleaned up) (quoting *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992)). Defendants' moving papers and objections only challenge the second question. *See* Mot. at 18; Obj. at 7–9. In this context, "courts apply one of two separate but overlapping frameworks" focusing on whether the inmate's Fourth Amendment claim challenges a prison policy or whether the claim challenges an isolated search. *Harris*, 818 F.3d at 57; *see Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."); *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (explaining the test for challenging an isolated search).

*1. Challenge to Prison Policy*

Defendants assert two policies they followed as justification for conducting the search. One is Albany County Correctional Facility's ("ACCF") SRG policy ("SRG Policy") allowing for random strip searches. Mot. at 18; DSMF ¶¶ 4–5; Dkt. No. 95-14; Reply at 8. The second policy noted is ACCF's policy on contraband control ("Contraband Control Policy"). Reply at 8–9. The SRG Policy states: "Random strip or pat searches may be conducted." Dkt. No. 95-14 at

3. However, contrary to the policy, Defendants plainly state that the search was not random. DSMF ¶¶ 87–88. Instead, Defendants imply that the search was based upon reasonable suspicion generated from missing contraband from a smuggling incident. Reply at 8–9. Thus, the SRG Policy is not applicable. *See* Dkt. No. 95-14 at 3.

Turning to the second policy, the Contraband Control Policy was first mentioned in the Reply. Reply at 8–9. Defendants did not mention the policy in the Motion regarding Plaintiff's Fourth Amendment claim, Mot. at 18, nor did Defendants mention the policy in their objections, Obj. at 8–9. A district court has discretion to consider an argument raised for the first time in a reply brief in support of a motion for summary judgment. *Ruggiero*, 424 F.3d at 252; *see also Garcia v. Sistarenik*, 603 F. App'x 61, 63 (2d Cir. 2015) ("[T]he argument is forfeited, because [movant] raised it for the first time in his reply brief in support of his motion for summary judgment."). The Reply offers little explanation as to the full extent of the policy, and the record likewise provides no further clarity. Reply at 8–9. Without such information, the Court cannot be sure whether Defendants correctly followed the Contraband Control Policy. The record does not note whether there is a written policy like the SRG Policy, Dkt. No. 95-14, or whether it is an unwritten policy. The Court is also not confident that Plaintiff had enough notice or opportunity to dispute the validity of the policy. Given these factors, combined with Defendants not objecting to using the isolated search test, *see* Obj. at 8–9, the Court need not address Defendants' argument relating to the Contraband Control Policy.

*2. Challenge to Isolated Search*

As neither policy is applicable, the Court looks to whether the search of Plaintiff was a valid isolated search. "Courts must consider [1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it

is conducted." *Harris*, 818 F.3d at 58 ("Because [plaintiff] challenges an isolated search rather than a policy (indeed, neither party identifies [the relevant policy]), *Bell's* four-factor test governs the present analysis.") (citing *Bell*, 441 U.S. at 559).

a. Scope of Intrusion

When considering the scope of the intrusion, courts have considered (1) the type of search, and (2) the person who performs the search. *Harris*, 818 F.3d at 58.

> A "strip search," though an umbrella term[,] generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

*Id.* (quoting *Cookish v. Powell*, 945 F.2d 441, 444 n.5 (1st Cir. 1991)).

Here, Plaintiff alleges, and Defendants have not disputed, that there was a visual cavity search. Am. Compl. at 10; Mot. at 18; DSMF ¶ 87. A visual cavity search is invasive. *Harris*, 818 F.3d at 58. Under this prong, it is also important who performed the search. Inspections of the naked body are considered a greater invasion when viewed by a member of the opposite sex. *Id.* (citing *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994)). "Here, Plaintiff (male) alleges that Defendant Pleat (a male officer) conducted the visual inspection." Dkt. No. 66 at 26.

b. Manner in Which the Search was Conducted

"A strip search conducted in a professional manner is more reasonable than one that is not." *Harris*, 818 F.3d at 59–60. However, "verbal threats alone do not make a search unreasonable." *Spann v. Romana*, No. 26-CV-5483, 2026 WL 2364085, at *3 (S.D.N.Y. Aug. 12, 2026). "While 'indefensible and unprofessional,' allegations of verbal threats and verbal abuse are not sufficient to transform an otherwise lawful strip search into one proscribed by the Constitution." *Jenkins v. City of New York*, No. 18-CV-7024, 2020 WL 6700087, at *3

(E.D.N.Y. Nov. 12, 2020) (quoting *Jermosen v. Coughlin*, 878 F. Supp. 444, 449 (N.D.N.Y. 1995)).

Here, it remains unclear from the record, viewed in the light most favorable to Plaintiff, why Pleat used verbally aggressive orders. Plaintiff alleges that upon entering the room for the search, Pleat was "threatening and harassing" him and "threatened to spray Plaintiff." Am. Compl. at 10. However, verbal threats and verbal abuse, while unprofessional, without more are not enough to make the strip search unconstitutional. *Jenkins*, 2020 WL 6700087, at *3.

c. Justification for Initiating the Search

The Court next assesses the record evidence supporting Defendants' justification for the search. *See Harris*, 818 F.3d at 60. In particular, "[w]hether an officer is searching for contraband is highly relevant to the reasonableness inquiry." *Id.* at 62 (citing *Lee v. Downs*, 641 F.2d 1117, 1120 (4th Cir. 1981)).

> Further, the Supreme Court has cautioned that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities," and thus officers' actions are entitled to deference by the court, unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response. . . ."

*Torres v. City of New York*, No. 17-CV-6604, 2019 WL 7602181, at *11 (S.D.N.Y. Aug. 14, 2019), *report and recommendation adopted*, No. 17-CV-6604, 2019 WL 4784756 (S.D.N.Y. Sept. 30, 2019) (quoting *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328 (2012)).

Defendants state that "there was a 'strip search' of the SRG inmates on the 6-West housing unit by Sgt. Aragona due to the concern of 'contraband being smuggled into the facility during [inmate] visits,'" which was caught on jail camera. DSMF ¶¶ 87–88; Dkt. No. 95-9 at 12. Plaintiff maintains that this search was retaliatory, R. & R. at 23, but admits that all 6-West

inmates were strip searched except one who did not go to recreation that day. Dkt. No. 95-3 at 54. Additionally, Plaintiff admits that an inmate not from 6-West was searched after going to recreation that day. *Id.* Plaintiff disputes Defendants' justification, arguing that less intrusive means could have been taken to find contraband if any such contraband existed, such as through reviewing surveillance cameras. Sur-reply at 3. Plaintiff also argues that, because no contraband was recovered and no inmate was charged with possession of contraband, there was no contraband. *Id.* The Report and Recommendation found that Aragona's two alleged statements, expressing disappointment in the strip search failing to reveal contraband, Am. Compl. at 10, and Aragona stating, "you still havent learned your lesson about filing grievances," *id.*, created a genuine issue of material fact and a reasonable jury could find that the search was retaliatory. R. & R. at 47; Am. Compl. at 10.

While there remains some dispute of fact as to whether there was contraband, the Court finds that the actions taken by Defendants are generally consistent with actions taken to control contraband. Defendants have met their initial burden by providing multiple accounts showing correctional officers searched all the 6-West inmates to find smuggled contraband. Dkt. No. 95-9. Plaintiff admits he was not singled out, Dkt. No. 95-3 at 54, and the inmate who did not go to recreation was not strip searched. *Id.* Even after "draw[ing] all reasonable inferences in favor of the nonmoving party," *Reeves*, 530 U.S. at 150, the statements Plaintiff attributes to Aragona, the lack of recovered contraband, and the lack of charges against any inmate, Sur-reply at 3, are not enough to allow a reasonable jury to find that a search of all 6-West inmates was retaliatory. Plaintiff has not explained how the search of all of 6-West amounted to retaliation against him individually, nor has Plaintiff offered evidence suggesting that the search was conducted for any reason other than for contraband control. *Cf. Pizarro*, 2018 WL 3462512, at *6 ("Plaintiff never

provides any evidence to demonstrate why searches of all the inmates in a housing unit would prevent [him] from freely asserting his . . . First Amendment rights."). As such, Plaintiff has not done more than prove that "there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

Officers are entitled to deference in policies to detect and deter the possession of contraband in their facilities, unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response." *Florence*, 566 U.S. at 328 (quoting *Block v. Rutherford*, 468 U.S. 576, 584–85 (1984)).

As there is no more than "some metaphysical doubt" that Defendants searched the 6-West inmates to find contraband, *Matsushita*, 475 U.S. at 586, and as there is not substantial evidence on the record to suggest Defendants exaggerated their response, the justification factor weighs in favor of Defendants.

d. Place in Which the Search was Conducted

The Second Circuit has held that searches "conducted in the presence of only those individuals needed to conduct the search" are more reasonable than those "conducted in the presence of unnecessary spectators." *Harris*, 818 F.3d at 62. Based on Plaintiff's allegations, it appears that Pleat and Aragona were the only individuals present for the visual body cavity search which was completed in the male booking strip room. Am. Compl. at 10; Dkt. No. 95-3 at 53.

Therefore, the Court finds that there is no genuine dispute of material fact regarding justification for the search, *see* Obj. at 9, or as to the other three factors. *See Harris*, 818 F.3d at 58. As the factors weigh in favor of Defendants, and considering the deference afforded to

correctional officers with contraband control searches, *see Florence*, 566 U.S. at 328, the Court grants the Motion as to the unlawful strip frisk claim.

### C. Excessive Force Claims Against Stratta, Pleat, Bonnaci, Lacosse, Lawson, Spadinger, and Cohen

The Report and Recommendation recommends that the Motion as to the Fourteenth Amendment excessive force claim against Stratta, Pleat, Bonnaci, Lacosse, Lawson, Spadinger, and Cohen be denied as genuine issues of material fact remain as to whether the use of force on May 20, 2023, was objectively reasonable, and because Plaintiff sufficiently implicated each Defendant in the alleged attack. R. & R. at 52, 54. Defendants make four objections. Obj. at 9–13. The Court addresses each objection in turn.

Defendants first object to how the Report and Recommendation weighed the evidence presented. Obj. at 9. On review, Defendants ask the Court to "objectively weigh all of the evidence presented, including such evidence that directly contradicts Plaintiff's version of the events . . . [including] video recordings made available during the discovery process." Obj. at 9. However, the referenced videos "Medical Shower Area_J- Med Hallway 2 V5" and "Medical Area_J – Med Holding V5," Obj. at 9, contain no exhibit citation, nor can the Court locate them within the listed exhibits or remaining record. "[Defendant] . . . did not upload the video to the docket, provide Chambers a copy of the video, or manually file the video with the Clerk's office. Therefore, the [video] is not part of the summary judgment record, and the Court may not consider it in ruling on [Defendant's] motion for summary judgment." *Goffredo v. Wal-Mart Stores E., L.P.*, No. 15-CV-00704, 2017 WL 706598, at *5 (D. Conn. Feb. 22, 2017). As such, neither the video nor its description, *see* Obj. at 9–10, resolves the genuine issue of material fact.

Defendants further object to the weight of the evidence, stating the Report and Recommendation did not account for the totality of the circumstances when analyzing the use of force. *See* Obj. at 10. Under the Due Process Clause, pretrial detainees are protected from "the use of excessive force that amounts to punishment." *Frost v. New York City Police Dep't*, 980 F.3d 231, 251–52 (2d Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). A pretrial detainee, unlike a convicted prisoner, need not show that a defendant-officer knew his use of force was excessive. *See Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). Rather, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim." *Id.* at 389. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham*, 490 U.S. at 396).

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* at 397. "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell*, 441 U.S. at 540, 547). "An officer's actions can amount to punishment if they are taken with 'an expressed intent to punish.'" *Frost*, 980 F.3d at 252 (quoting *Bell*, 441 U.S. at 520). "But even 'in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate nonpunitive governmental purpose or

that the actions appear excessive in relation to that purpose.'" *Id.* (quoting *Kingsley*, 576 U.S. at 398).

Judge Lovric exhaustively considered the evidence in reaching the conclusion that a reasonable jury could find the actions of Stratta, Pleat, Bonnaci, Lacosse, Lawson, Spadinger, and Cohen served no legitimate penological purpose. R. & R. at 49–52. Judge Lovric offers the parties' differing accounts of the events leading up to and during the use of force incident on May 20, 2023. This includes Defendants' account where Plaintiff became aggressive, was pepper sprayed and handcuffed, and eventually placed in a restraint chair, R. & R. at 49–50; Dkt. No. 95-21 at 1, and Plaintiff's account where some Defendants took him to a room with no camera and immediately physically assaulted him, including kicking and punching, and later banging his head against the shower and chipping his tooth. R. & R. at 50. Thus, given these starkly different versions of events, the Report and Recommendation properly concluded that a genuine dispute of material fact existed as to the objective reasonableness of the use of force on May 20, 2023.

Third, Defendants object that the Report and Recommendation improperly allowed Plaintiff to engage in a group-pleading approach in identifying what actions each officer took in the excessive force incident. Obj. at 11. The Report and Recommendation found that "a plaintiff 'need not . . . positively identify which officers used the alleged excessive force against him to defeat a motion for summary judgment,'" as long as the plaintiff produces evidence that the defendants were present at the scene of the alleged assault, R. & R. at 52–53 (quoting *John v. City of New York*, 406 F. Supp. 3d 240, 245 (E.D.N.Y. 2017)). Defendants state, "the Magistrate Judge's application of this principle presupposes some evidentiary basis . . . that each named individual Defendant, rather than merely being present in the vicinity, personally used unreasonable force." Obj. at 11.

However, the personal involvement standard utilized by the Report and Recommendation is correct. *See Johnson v. Brown*, No. 20-CV-622, 2022 WL 7288498, at *23 (N.D.N.Y. May 12, 2022), *report and recommendation adopted*, No. 20-CV-622, 2022 WL 4395995 (N.D.N.Y. Sept. 23, 2022). Furthermore, Judge Lovric correctly applied the standard. The Report and Recommendation noted the undisputed presence in the record from Defendants' narratives and Plaintiff's testimony that each Defendant was involved in the attack. R. & R. at 53–54. Plaintiff being unable "to attribute which Defendant was responsible for individual blows" does not defeat his claim, in part because Plaintiff alleges it was Defendants' actions in pepper spraying him that resulted in his inability to identify Defendants. R. & R. at 54; Dkt. No. 95-4 at 138, 150; *see De Michele v. City of New York*, No. 09-CV-9334, 2012 WL 4354763, at *16–17 (S.D.N.Y. Sept. 24, 2012) (denying motion for summary judgment when officer defendants' presence was undisputed and plaintiff alleges it was defendants' actions that prevented him from knowing which officers took what actions). Thus, the evidence is sufficient to create a genuine issue of triable fact as to Defendants' involvement. *John*, 406 F. Supp. 3d at 245 (explaining that each of the defendants were present, and that the plaintiff testifying that more than one was involved in the attack was sufficient to defeat summary judgment).

Finally, Defendants object to the R&R's use of the personal involvement analysis in the penitentiary setting. Obj. at 12. Defendants argue that Judge Lovric relies too heavily on cases involving police officers dealing with civilians. *Id.* Defendants assert that unlike police officers, all correctional officers in the wing are required to respond when there is a security alert. *Id.* at 12–13. Thus, holding that a correctional officer used excessive force or failed to intervene simply because they were present at the scene would be unfair. *Id.* However, the same presence analysis has consistently been used in the penitentiary setting, and the Court sees no reason why it should

not apply here. *See, e.g.*, *Coleman v. Racette*, No. 18-CV-390, 2021 WL 4312392, at *7–8 (N.D.N.Y. May 27, 2021), *report and recommendation adopted*, No. 18-CV-390, 2021 WL 3508342 (N.D.N.Y. Aug. 10, 2021); *Johnson*, 2022 WL 7288498, *23.

After reviewing the Report and Recommendation and the corresponding relevant filings, the Court agrees with Judge Lovric that there exists a genuine dispute of material fact concerning whether Defendants' use of force was objectively reasonable. Thus, the Court denies the Motion as to the excessive force claims.

**D. Failure-to-Intervene Claim Against Grimmick**

The Report and Recommendation recommends that the Motion as to the Fourteenth Amendment failure-to-intervene claim against Grimmick be denied as there are facts sufficient to support a reasonable jury finding in favor of Plaintiff. R. & R. at 54–55 n.104. Defendants object that Plaintiff's "testimony, even fully credited, establishes at most that Grimmick anticipated a possible future event and [left] — it does not establish that Grimmick observed any actual use of force, had a realistic opportunity to intervene . . . or was even present during the incident." Obj. at 14.

Plaintiff states that before he entered the scanner room, Grimmick and other officers participated in a conversation subtly threatening Plaintiff while referencing Plaintiff's grievance. Am. Compl. at 11; Dkt. No. 95-4 at 140–42. Then, "[Grimmick] slid off because he knew what was about to happen." Dkt. No. 95-4 at 144. Plaintiff alleges he was taken to the scanner, and then to the male strip room where he was beaten immediately and without provocation. Am. Compl. at 11; Dkt. No. 95-4 at 144; Dkt. No. 95-3 at 58–59. Then, as Plaintiff was being taken to medical, Plaintiff saw and told Grimmick, "Yall gonna jump me, yall gonna pay for this," and Grimmick "smiled and said 'Dont start a war you cant finish." Am. Compl. at 11. After,

Defendants, excluding Grimmick, took Plaintiff to the medical shower area. *Id.* at 12. There, while in handcuffs, Defendants beat Plaintiff again. *Id.*; Dkt. No. 95-3 at 59.

Failure to intercede results in liability where an officer observes excessive force is being used or has "reason to know" that it will be used. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "Liability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008), *aff'd sub nom. Jean-Laurent v. Wilkerson*, 461 F. App'x 18 (2d Cir. 2012). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Branen*, 17 F.3d at 557.

Plaintiff does not allege that Defendants used excessive force against him in front of Grimmick, and as such, the question remains whether Grimmick had "reason to know" whether such excessive force would be taken. *See Curley*, 268 F.3d at 72. Defendants state that "[s]peculation that an officer anticipated a future event, without evidence that he actually observed the alleged constitutional violation, cannot satisfy that standard." Obj. at 14. However, "Defendants' argument suggests in conclusory fashion that because [Defendants] did not *see* [another] use force, they had no reason to *know* that force would be used." *Constant v. Prack*, No. 16-CV-3985, 2022 WL 917528, at *7 (S.D.N.Y. Mar. 29, 2022). "[S]eeing an event unfold and having reason to know it was going to unfold are separate concepts." *Id.* A reasonable juror

on these facts could find that Grimmick's alleged statements showed he knew that other Defendants were about to use excessive force, that Grimmick was in a position to intervene, and that Grimmick did nothing to stop the excessive force.

After reviewing the Report and Recommendation and the corresponding relevant filings, the Court agrees with Judge Lovric that there exists a genuine dispute of material fact concerning Plaintiff's failure-to-intervene claim. Thus, the Court denies the Motion as to the failure-to-intervene claim.

### E. Equal Protection Claim Against Lawson

The Report and Recommendation recommends that the Motion as to the Fourteenth Amendment equal protection claim against Lawson be denied. R. & R. at 48–49. Defendants object that if the excessive force claim against Lawson is dismissed, then the Fourteenth Amendment equal protection claim against him should be dismissed as derivative of the excessive force claim. Obj. at 14–15.

Because the Court denies the Motion as to the excessive force claim, *see supra* Part IV.C, Defendants' objection does not apply. After reviewing the Report and Recommendation and the corresponding relevant filings, the Court agrees with Judge Lovric that there exists a genuine dispute of material fact concerning Plaintiff's equal protection claim. Thus, the Court denies the Motion as to the equal protection claim.

### F. Qualified Immunity as to the Excessive Force Claims

The Report and Recommendation recommends that the Motion as to the qualified immunity defense be denied as material factual disputes remain as to the reasonableness of Defendants' actions on May 20, 2023. R. & R. at 56–57. Defendants object to the denial of qualified immunity for the excessive force claims and state that "the 'clearly established' inquiry

cannot meaningfully be conducted" as the "only evidence implicating certain individual Defendants in the alleged use of force is an inmate's own account formed without the ability to see who was doing what." Obj. at 15.

"Qualified immunity is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). When evaluating the doctrine of qualified immunity at summary judgment, the Court asks: "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up). To determine whether a right is clearly established, district courts consider "Supreme Court decisions, [Second Circuit] decisions, and decisions from other circuit courts." *Simon v. City of New York*, 893 F.3d 83, 92 (2d Cir. 2018). "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)

With respect to the second prong, Plaintiff's Fourteenth Amendment right for a pretrial detainee to be free from an unprovoked beating was clearly established. *See Frost*, 980 F.3d at 254 ("[C]aselaw makes clear that it is unconstitutional for officers to strike an individual who is compliant and does not pose an imminent risk of harm to others."); *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (explaining that plaintiff properly stated a claim for excessive force when he alleged defendants beat him while his arms were shackled).

The question under the first prong, then, is whether the evidence, viewed in a light most favorable to Plaintiff, makes out a violation of those rights. Defendants object, stating that "qualified immunity should [be granted] . . . for whom the record does not permit a jury to find" that they violated those rights. Obj. at 15. However, as previously discussed, *see supra* Part IV.C, the record does permit a jury to find Defendants' violated Plaintiff's rights. "In the qualified immunity context, pre-trial resolution of the defense of qualified immunity may be thwarted by a factual dispute." *Eaton v. Estabrook*, 144 F.4th 80, 89 (2d Cir. 2025) (cleaned up). "Any disputed questions of material fact—such as the acts of the defendant and their effects on the plaintiff—are to be determined by the factfinder." *Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022).

After reviewing the Report and Recommendation and the corresponding relevant filings, the Court agrees with Judge Lovric that there exists a genuine dispute of material fact concerning the reasonableness of Defendants' use of force, and whether Plaintiff's rights were violated by Defendants. Therefore, the Court denies the Motion as to qualified immunity for the excessive force claims.

The Court notes that Plaintiff did not file objections to the Report and Recommendation's recommendation to dismiss Plaintiff's (1) First Amendment retaliation claim against Torrisi, (2) First Amendment retaliation claim against Molesky, Lawson, and Spadinger relating to the events of March 18, 2023, (3) First Amendment retaliation claim against Lawson relating to the events of March 23, 2023, (4) Fourteenth Amendment conditions-of-confinement claims against Aragona and Lawson, or (5) Fourteenth Amendment disciplinary due process claim against Cavanaugh. *See* Dkt. Accordingly, the Court reviews the Report and Recommendation on these

issues for clear error. *See DiPilato*, 662 F. Supp. 2d at 339. Having found none, the Court adopts in part and rejects in part the Report and Recommendation.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Report and Recommendation, Dkt. No. 117, is **ADOPTED in part** and **REJECTED in part**; and it is further

**ORDERED**, that Defendants' motion for summary judgment, Dkt. No. 95, is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that Defendants' motion for summary judgment is **GRANTED** with respect to Plaintiff's (1) First Amendment retaliation claim against Defendant Torrisi, (2) First Amendment retaliation claim against Defendants Molesky, Lawson, and Spadinger relating to the events of March 18, 2023, (3) First Amendment retaliation claim against Defendant Lawson relating to the events of March 23, 2023, (4) Fourteenth Amendment conditions-of-confinement claims against Defendants Aragona and Lawson, (5) Fourteenth Amendment disciplinary due process claim against Defendant Cavanaugh, and (6) Fourth Amendment unlawful strip frisk claim against Defendants Aragona and Pleat; and it is further

**ORDERED**, that Defendants' motion for summary judgment is **DENIED** with respect to Plaintiff's (1) First Amendment retaliation claim against Defendants Stratta and Pleat, (2) Fourteenth Amendment excessive force claims against Defendants Stratta, Pleat, Bonnaci, Lacosse, Lawson, Spadinger, and Cohen, (3) Fourteenth Amendment failure-to-intervene claim against Defendant Grimmick, and (4) Fourteenth Amendment equal protection claim against Defendant Lawson; and it is further

**ORDERED**, that the Clerk shall **TERMINATE** Defendants Torrisi, Molesky, Aragona, and Cavanaugh from this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.[3]

**IT IS SO ORDERED.**

DATED: September 28, 2026
Albany, New York

LAWRENCE E. KAHN
United States District Judge

[3] The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein.

2021 WL 4312392
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Towaun COLEMAN, Plaintiff,
v.
Steven RACETTE, et al., Defendants.

No. 9:18-CV-0390 (MAD/CFH)
|
Signed 05/27/2021

**Attorneys and Law Firms**

TOWAUN COLEMAN, Plaintiff pro se, 07-A-2215, Southport Correctional Facility, P.O. Box 2000, Pine City, New York 14871.

OF COUNSEL: ERIK BOULE PINSONNAULT, ESQ., Assistant Attorney General, HON. LETITIA JAMES, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

***1** Plaintiff pro se Towaun Coleman ("Coleman" or "Plaintiff"), who was, at all relevant times, in the custody of Clinton Correctional Facility ("Clinton C.F."), brings this action pursuant to 42 U.S.C. § 1983 against Defendants, former Superintendent of Clinton C.F. Steven Racette ("Racette"), Lieutenant Durkin ("Durkin"), Sergeant Hutti ("Hutti"), Sergeant King ("King"), Correctional Officer John Reyell ("Reyell"), Correctional Officer Wyatt ("Wyatt"), Correctional Officer S. Dubrey ("Dubrey"), Correctional Officer Spinner ("Spinner"), Correctional Officer J. Tyler ("Tyler"), Correctional Officer Coryea ("Coryea"), and Correctional Officer Demers ("Demers"), for violations of his constitutional rights under the First and Eighth Amendments. See Dkt. No. 85 ("Sec. Am. Compl.").

Presently before the Court is Defendants' motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). See Dkt. No. 91. Coleman opposed Defendants' motion. [2] See Dkt. No. 98. For the following reasons, it is recommended that Defendants' motion for partial summary judgment be granted in part and denied in part.

**I. BACKGROUND**

In support of the motion, Defendants filed a Statement of Material Facts. [3] See Dkt. No. 91-6. The facts recited are for the relevant time period as referenced in the Second Amended Complaint and are related herein in the light most favorable to Coleman as the nonmoving party. See subsection II(A) infra.

**A. Facts** [4]

***2** On June 6, 2015, staff at Clinton C.F. discovered that two inmates, Richard Matt and David Sweat, had escaped from the facility. Dkt. No. 91-4 at ¶ 5. As a result, the entire facility was placed on lockdown immediately. Dkt. No. 91-3 at ¶ 4. At that time, Racette was the Superintendent at Clinton C.F. Dkt. No. 91-4 at ¶ 1.

On June 8, 2015, staff at Clinton C.F. conducted cell frisks throughout the facility, including Coleman's housing location, Upper H Block, 12 Company. [5] Dkt. No. 91-5 at 35-36. [6] At the relevant time, Coleman was housed in Cell 15. Dkt. No. 91-2 at ¶ 6. Between 8:00 A.M. and 9:00 A.M., Clinton C.F. staff began entering Upper H Block. Sec. Am. Compl. at ¶ 26. Durkin supervised the searches that were conducted in the Upper H Block on June 8, 2015. Dkt. No. 91-3 at ¶¶ 7, 10.

On June 25, 2015, Coleman filed a grievance (CL-67063-15) related to an assault that allegedly occurred on June 8, 2015, in the Upper H Block, 12 Company. Dkt. No. 91-3 at ¶ 8. In his grievance, Coleman identified Defendants Durkin, Hutti, King, Reyell, Dubrey, Spinner, Tyler, and Wyatt as "individuals that assaulted [him] or [ ] witnessed the assault." Dkt. No. 91-3 at 9. In March 2016, Coleman was transferred out of Clinton C.F., but returned in October 2018. [7] Dkt. No. 25; Dkt. No. 98-2 at 25.

The remaining record contains few undisputed facts. Coleman and Defendants disagree on many of the events that transpired on June 8, 2015 and provide conflicting accounts of the circumstances surrounding the incidents.

### 1. Plaintiff's Version of Events

Coleman claims that Coryea and Demers came to his cell and directed him to step out for a pat frisk. Dkt. No. 91-5 at 14-18; Sec. Am. Compl. at ¶¶ 27-28. After the pat frisk, Coryea and Demers directed Coleman to "turn around" so that he could observe the search of his cell. Id. Coleman witnessed Coryea reading his phone book while Demers read through Coleman's legal materials; including his "current Federal claim." [8] Dkt. No. 91-5 at 18-20. Coleman overheard Coryea and Demers whispering, and Demers asked Coleman if he was a "rat" or "snitch," meaning a confidential informant. Id. at 20.

Coryea and Demers began "throwing" Coleman's property onto the floor and out of his cell. Dkt. No. 91-5 at 22-23. At that time, Coleman saw Hutti and Durkin walking toward his cell. Id. at 24. Coleman "addressed" Hutti and "inquired" about the items that were being discarded from his cell. Id. at 24-25. While Coleman was speaking with Hutti about his personal property, Durkin asked Coryea and Demers "what's taking [you] so long." Id. at 26. One of the officers responded, "he has too much shit." Dkt. No. 91-5 at 27. Durkin then "yelled" at Coleman, "if you don't throw this shit away, I'm going to throw it away for you." Id.; Sec. Am. Compl. at ¶¶ 35-36. Coleman responded that he "had the amount of property I'm entitled to have by the State of New York. I have no more or no less." Dkt. No. 91-5 at 27. Durkin continued, "I don't care how much property you're entitled to have. If you don't get rid of this shit, we will." Id.

***3** At that time, Coryea stepped out of Coleman's cell and told Durkin, "he's been running his mouth all day" and approached Coleman. Sec. Am. Compl. at ¶ 37; Dkt. No. 91-5 at 27-28. Coleman alleges that Coryea "struck him" in the face, causing him to lose consciousness. Dkt. No. 91-5 at 28-31. When Coleman awoke, he was handcuffed and carried to the front of the housing block by "a number of Correctional Officers." Sec. Am. Compl. at ¶ 38. Coleman was "savagely beaten for what appeared to be a half an hour" by a number of individuals Id. at ¶ 39; Dkt. No. 91-5 at 30-36. Coleman heard someone say, "pick him up," and, as he was brought to his feet, Coryea "grabbed a handfull [sic] of Plaintiff's hair, lifted Plaintiff's head from off the floor," "spit in Plaintiff's face" and punched him "one last time with a gloved fist" while yelling racial slurs. Sec. Am. Compl. at ¶ 40.

### 2. Defendants' Version of Events

In support of the motion, Defendants proffer declarations from Racette, Durkin, and Demers. Racette and Durkin claim that Racette was not present during the frisk of Coleman's cell on June 8, 2015. Dkt. No. 91-4 at ¶ 13; Dkt. No. 91-3 at ¶ 5. Racette also asserts that he was not responsible for ordering cell frisks and/or searches throughout the facility. Dkt. No. 91-4 at ¶ 13.

Durkin, who supervised the search of Upper H Block, did not observe any officer using excessive force on Plaintiff. Dkt. No. 91-3 at ¶¶ 7, 10-11. Demers claims that he was assigned to frisk cell UH 12/35 ("Cell 35"), which was "20 cells away from Plaintiff's cell." Dkt. No. 91-2 at ¶¶ 7-8. Demers asserts that he did not frisk Coleman's cell, he did not read Plaintiff's legal papers or phone book, and did not use force on Plaintiff. Id. at ¶¶ 7, 10-11. Demers also states that he did not observe any other staff member use force on Plaintiff on June 8, 2015. Id. at ¶ 12.

### B. Procedural History

In April 2018, Coleman commenced the within action. Dkt. No. 1. In December 2018, Coleman filed an Amended Complaint. Dkt. No. 31. Upon review of the Amended Complaint, the Court found that the following claims survived review and required a response: (1) First Amendment retaliation claims against Defendants Durkin, John Doe #1 and Wood; (2) Eighth Amendment excessive force and failure-to-intervene claims against Defendants John Doe #1-4, Durkin, Hutti, King, Reyell, Wyatt, Dubrey, Tyler, Spinner, and Racette; and state law claims against Defendants John Doe #1-4, Durkin, Hutti, King, Reyell, Wyatt, Dubrey, Tyler, Spinner, and Racette. See Dkt. No. 33. Defendants filed Answers to the Amended Complaint (Dkt. Nos. 36, 68) and, in April 2019, Defendants filed a partial motion to dismiss. Dkt. No. 44. In a Memorandum-Decision and Order filed in February 2020, the Court dismissed several claims, including all claims against Wood. Dkt. No. 54.

On June 24, 2020, Coleman field a motion to amend the Amended Complaint. Dkt. No. 77. On August 11, 2020, Coleman appeared at a deposition. Dkt. No. 91-5 at 4. On August 28, 2020, the Court granted Coleman's motion, accepted the Second Amended Complaint (Dkt. No. 85) and ordered Defendants to respond to the

following: (1) First Amendment retaliation claims against newly-added defendants Coryea and Demers; (2) Eighth Amendment excessive force and failure to intervene claims against defendants Coryea, Demers, Durkin, Hutti, King, Reyell, Wyatt, Tyler, Dubrey, and Spinner; and (3) Eighth Amendment claims based on supervisory liability against Racette. Dkt. No. 84. On October 13, 2020, Defendants filed an Answer to the Second Amended Complaint. Dkt. No. 88

On October 27, 2020, Defendants filed the within motion pursuant to Fed. R. Civ. P. 56 seeking partial summary judgment: dismissal of all claims against Racette and Demers for lack of personal involvement and dismissal of First Amendment claims against Demers and Coryea. See generally Dkt. No. 91. Coleman opposed the motion.[9] Dkt. No. 98.

## II. DISCUSSION

### A. Legal Standard

***4** A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56 (c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 317, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing a genuine issue for trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law.

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Eighth Amendment Claims

"The Eighth Amendment requires prison officials to take 'reasonable measures to guarantee the safety of inmates' in their custody." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. 825, 832-33 (1994)). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted [is] sufficiently serious to warrant Eighth Amendment protection." Hudson v. McMillian, 503 U.S. 1, 8 (1992) (internal quotation marks and citation omitted); Blyden, 186 F.3d at 262.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000) (internal quotation marks and citations omitted). Thus, the key inquiry for an excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically [to] cause[ ] harm." Hudson, 503 U.S. at 7 (internal quotation marks and citations omitted); see also Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam) (observing that the Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—"not whether a certain quantum of injury was sustained.") (internal

quotation marks and citation omitted). In assessing whether defendants acted maliciously or wantonly, the Second Circuit has set forth five factors to consider:

> ***5** the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Similarly, "a state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983." Morales v. New York State Dep't of Corr., 842 F.2d 27, 30 (2d Cir. 1988). To state a claim for failure to protect under the Eighth Amendment, a plaintiff must demonstrate that (1) he or she was "incarcerated under conditions posing a substantial risk of serious harm," the objective prong; and (2) prison officials acted with deliberate indifference to that risk and the inmate's safety, the subjective prong. Farmer, 511 U.S. at 834.

As to the objective prong, the deprivation must be "sufficiently serious," Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotation marks omitted)), and "contemplate[ ] 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " Id. (quoting Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990)). "A substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker." Gilmore v. Rivera, No. 13-CV-6955, 2014 WL 1998227, at *3 (S.D.N.Y. May 14, 2014); see Rivers v. Spinnella, No. 9:09-CV-309 (FJS/RFT), 2010 WL 6428486, at *5 (N.D.N.Y. Nov. 4, 2010) (granting the defendants' motion for summary judgment where "there [were] no specific facts, nor even allegations, that indicate the [the d]efendant was aware that [the p]laintiff faced a substantial risk of serious harm until the altercation had already started."). [10]

As to the subjective prong, the plaintiff must demonstrate that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. See Farmer, 511 U.S. at 837. The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. The plaintiff must "show that the defendants actually inferred from that disclosure that a substantial risk of serious harm existed." Murray v. Goord, 668 F. Supp.2d 344, 359 (N.D.N.Y. 2009). A prison official's negligence does not amount to a constitutional violation. See Hathaway, 37 F.3d at 66.

### 1. Claims Against Racette

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. Polk Cnty. v. Dodson, 454 U.S. 312, 325 (1981); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003); Wright, 21 F.3d at 501. Thus, supervisory officials may not be held liable merely because they held a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). Before deciding Ashcroft v. Iqbal, 556 U.S. 62 (2009), the Second Circuit held that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

***6** In Tangreti v. Bachmann, 983 F.3d 609 (2d Cir. 2020), the Second Circuit addressed how the Supreme Court's decision in Iqbal affected the standards in Colon for establishing supervisory liability. Consistent with other circuits, the Court

concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " Id. at 618. Therefore, to avoid summary judgment, the plaintiff had to establish that the defendant violated the Eighth Amendment by her "own conduct, not by reason of [her] supervision of others who committed the violation" and could not "rely on a separate test of liability specific to supervisors." Id. at 619.

It is undisputed that Racette was not present during the search of Coleman's cell in the Upper H Block on June 8, 2015. Dkt. No. 91-3 at ¶ 5; Dkt. No. 91-4 at ¶ 13. Racette asserts, and Coleman does not dispute, that he did not see any staff use excessive force on any inmates between June 6, 2015, and June 28, 2015. Dkt. No. 91-4 at ¶ 12. As Coleman does not provide evidence that Racette was present at the time of the alleged assault, the Eighth Amendment excessive force claim against Racette must be dismissed. See Tangreti, 983 F.3d at 619; see also Celestin v. Angeletta, No. 19 CV 1887, 2021 WL 1062344, at *4 (S.D.N.Y. Mar. 19, 2021) (dismissing the plaintiff's excessive force claim against the captain because the plaintiff "does not connect Captain [ ] to the purported assault"); Forbes v. Doe, No. 6:18-CV-06700, 2021 WL 810020, at *3 (W.D.N.Y. Mar. 3, 2021) (dismissing claims against employee of Monroe County Sheriff's Department because the plaintiff failed to allege that employee was involved in searches or the use of excessive force against the plaintiff).

With respect to the failure-to-protect claim, Coleman alleges that Racette was personally involved in the constitutional violations because he was aware of Coleman's "many complaints of threats and harassment from the staff at Clinton." See Dkt. No. 98-1 at 9, 2, 12, 17. As support, Coleman relies upon a DOCCS' computer-generated list of grievances entitled "Closed Cases." Dkt. No. 98-2 at 3. The list includes four grievances: one he filed at Auburn Correctional Facility in December 2010 and three he filed at Clinton C.F. in April 2015, July 2015, and March 2016. Dkt. No. 98-2. The July 2015 grievance relates to the events that transpired on June 8, 2015, and the March 2016 grievance was relates to medical treatment. Id. The April 2015 grievance involves verbal harassment by an unidentified "C.O. at Clinton C.F. Id. The grievance was "reviewed by" Chris M. Vanbergen and "authorized" by Jeffrey A. Hale. Id. The named defendants, including Racette, are not referenced anywhere in the document. Id.

Coleman also contends that Racette was aware of his prior complaints related to harassment and threats at Clinton C.F. because Racette was a defendant in his "prior 1983 claim." Dkt. No. 98-1 at 12-13. Specifically, Coleman refers to a civil rights complaint he filed in this District in January 2015. See Coleman v. Racette, et al., No. 9:15-CV-0040 (TJM/ATB), Dkt. No. 1 (N.D.N.Y. filed on Jan. 14, 2015) ("Coleman I"). In Coleman I, Plaintiff asserted First and Eighth Amendment claims against Racette and Clinton Correctional Officer L. Nolan related to an alleged excessive force incident that he alleged occurred in December 2014. Id., Dkt. Nos. 19, 21. In lieu of an answer, the defendants filed a motion to dismiss. Id., Dkt. No. 28. On January 4, 2016, the Court dismissed all claims against Racette for failure to plead personal involvement. [11] Coleman I, Dkt. No. 38.

***7** Upon review of the record in the instant action, including the list of grievances, and, taking judicial notice of Coleman I, the Court addresses the objective and subjective standards of an Eighth Amendment failure-to-protect claim. As to the first prong – whether plaintiff established that he was incarcerated under conditions posing a substantial risk of serious harm – Coleman provides proof of general allegations of prior verbal harassment and accusations of excessive force against a Clinton C.F. officer not involved with the June 2015 incident. Coleman did not file any grievances or complaints against the officers purportedly involved in the June 2015 incident. Moreover, Coleman does not allege that he had prior altercations or any kind of history with the named defendants. In fact, Coleman testified that he never saw Coryea or Demers before June 8, 2015. Dkt. No. 91-5 at 14. As such, the evidence presented does not support the conclusion that Coleman faced a substantial risk of serious harm from the named defendants.

As to the second prong – whether plaintiff established that Racette acted with the necessary state of mind – the Court notes that Eighth Amendment failure to protect claims cannot be based on a defendant's knowledge of a "general risk" of harm to an inmate. See, e.g., Hogan v. Fischer, No. 09-CV-6225, 2012 WL 4845609, at *6 (W.D.N.Y. Oct. 10, 2012) (internal citation omitted) (holding that the failure to protect the plaintiff from a general threat of harm is insufficient to raise a failure-to-protect claim under the Eighth Amendment) vacated in part on other grounds 738 F.3d 509 (2d. Cir. 2013). Here, nothing in the record suggests that Racette acted with deliberate indifference. Even assuming that Racette was aware of Coleman's April 2015 grievance and Coleman I,

prior to June 8, 2015, [12] the complaints set forth therein did not involve the named defendants, physical assault, or threats of physical violence. Thus, Coleman has failed to show that Racette knew that Coleman was under the threat of harm and had the opportunity to prevent such harm. See Farmer, 511 U.S. at 829.

As Coleman has failed to show that he faced a "substantial risk of harm" from the named defendants, and that Racette failed to protect Coleman from future harm by the defendants, it is recommended that Defendants' partial motion for summary judgment and dismissal of the failure-to-protect claims against Racette be granted. See, e.g., Boyd v. Petralis, No. 6:16-CV-06286, 2021 WL 1100395, at *6 (W.D.N.Y. Mar. 23, 2021) (dismissing failure-to-protect claims based upon Tangreti and lack of evidence that the defendants were aware of the plaintiff's fear of an attack or any prior complaints against the deputies until after the incident); see also Brown v. Annucci, No. 19 CV 9048, 2021 WL 860189, at *5 (S.D.N.Y. Mar. 8, 2021) ("Aside from a general reference to records of misusing force, plaintiff pleads no facts suggesting [defendants] consciously or recklessly disregarded a serious risk of harm certain correction officers allegedly posed to plaintiff.") (internal quotation marks and citations omitted).

Accordingly, it is recommended that the Eighth Amendment claims against Racette be dismissed and that Defendants' motion for summary judgment be granted.

### 2. Claim Against Demers

Defendants argue that the Eighth Amendment claim against Demers must be dismissed for lack of personal involvement because Coleman cannot recollect who was involved in the alleged excessive force incident and did not identify Demers as one of the attackers. Dkt. No 91-1 at 17-18.

"A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." Munoz v. Martinez, No. 03 CIV. 0828, 2005 WL 1355094, at *4 (S.D.N.Y. June 8, 2005) (citation omitted); see Alexander v. Racette, 9:17-CV-309 (BKS/CFH), 2020 WL 5802273, at *11 (holding that, the fact that the plaintiff could not identify with certainty who was involved in the assault was not fatal where the plaintiff presented evidence that his assaulter was wearing a CIU jacket without a name tag but that he had a bag over his head for much of the assault, combined with evidence that a defendant may have worn his CIU jacket on the day in question "raise[d] a triable issue of fact as to whether [the defendant] was personally involved" was the individual involved in questioning the plaintiff and in the assault). "This is especially true where the acts complained of by the plaintiff, if true, (e.g., mace to the eyes, standing on back, 'mushing' face into the ground) are likely to have prevented plaintiff from identifying which of three defendant officers specifically engaged in the bad acts." Shankle v. Andreone, No. 06-CV-487, 2009 WL 3111761, at *5 (E.D.N.Y. Sept. 25, 2009).

***8** Here, Coleman testified that, at the time of the cell search, he was not able to identify the officers because they were not wearing name tags. See Dkt. No. 91-5 at 14, 20. With assistance, Coleman was later able to identify the officers as Coryea and Demers. Id. at 20-22; Dkt. No. 98-1 at 19-20. Coleman further testified that, although he saw Coryea hit him, he could not identify all of the officers involved in the assault because he was "stomped on" while he was "face down" on his stomach and "in and out of consciousness." Dkt. No. 91-5 at 33-35. Although Coleman cannot affirmatively state which officers participated in the physical assault, he testified that Demers was "present for the incident on June 8 th when 2015, when [he] was punched and kicked and stomped [on.]" Id. at 33, 38, 40-42.

Conversely, Demers avers that he was assigned to search Cell 35, twenty cells away from Coleman's cell and that he did not "strike Plaintiff or otherwise use force" on Coleman. Dkt. No. 91-2 at ¶¶ 8, 11. Demers provided a Cell Frisk Sheet which, he contends, supports his position that he searched Cell 35 and Coryea searched Cell 15. [13] Dkt. No. 91-2 at ¶ 4, pp. 5-6. Demers claims that if he had searched Coleman's cell on June 8, 2015, he would have put his name on the cell frisk sheet and signed the form. Id. at ¶ 9.

The competing evidence rests on the credibility of Coleman on one hand and Demers on the other. [14] In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party requires the Court to credit Coleman's version of the events for purposes of this motion. See In re Dana Corp., 574 F.3d 128, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

Thus, although Coleman acknowledges that he is unable to identify which of the defendants exerted what force upon him, he has proffered sufficient evidence to raise an issue of material fact as to Demers' personal involvement to require resolution by a trier of fact. Accordingly, it is recommended that Defendants' motion on this ground be denied.

### C. Retaliation Claims

In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: that "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and (3) ... there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). Accordingly, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." Colon, 58 F.3d at 872.

Here, Defendants do not dispute that Coleman allegedly suffered an adverse action to satisfy the second prong of the retaliation claim. Rather, Defendants argue that Coleman's retaliation claims against Demers and Coryea are subject to dismissal because Coleman "failed to explain the nature of his protected speech supporting his First Amendment claim" against Demers and Coryea. Dkt. No. 91-1 at 19. Moreover, Defendants contend that the record lacks evidence demonstrating a causal connection between the protected conduct and the alleged adverse action, the alleged excessive force incident. Dkt. No. 91-1 at 19-20.

***9** It is well settled that the filing of administrative grievances and lawsuits constitutes protected speech. See Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003) ("[T]he filing of prison grievances is a constitutionally protected activity"); Williams v. Ingraham, No. 04-CV-257 (GLS/DRH), 2005 WL 3746222, at *2 (N.D.N.Y. Feb. 3, 2005) ("The [inmate's] conduct at issue—complaints to judicial officials, filing a lawsuit, and grievances—are clearly constitutionally protected rights.") (citing Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002)).

As to the third element, the plaintiff bears the burden of establishing that causal connection "sufficient to support the inference 'that the speech played a substantial part' in the [ ] adverse [ ] action." Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000) (quoting Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 780-81 (2d Cir. 1991)). A plaintiff may establish a causal connection "with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)).

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

#### 1. Retaliation Claims Based upon "Many Grievances"

Coleman claims that Demers and Coryea were motivated to retaliate against him because they were aware of his "many grievances[.]" Dkt. No. 98-1 at 26. However, this conclusory claim, submitted for the first time in opposition to the motion for summary judgment, is not supported by competent, admissible evidence. As discussed supra, the record lacks facts establishing that Coleman filed grievances or complaints against Demers or Coryea prior to the June 2015 incident. Indeed, Coleman has not proffered any evidence establishing that Demers or Coryea were aware that Coleman filed any grievances prior to the June 2015 incident. Accordingly, Coleman has not established a viable retaliation claim based upon his generalized contention that Defendants were aware of his filing "many grievances." Id.

#### 2. Retaliation Claims Based upon Coleman I

Defendants concede that the filing of lawsuit is constitutionally protected activity.[15] Dkt. No. 91-1 at 19. Although Defendants' Memorandum of Law lacks any argument in support of dismissal of Coleman's retaliation claims based upon Coleman I, Coleman bears the burden of demonstrating that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. In this regard, Coleman relies upon the "close proximity in time" between his protected conduct and the adverse action. See Dkt. No. 98-1 at 26.

It is well-settled that "temporal proximity without more is insufficient to survive summary judgment." Flynn v. Ward, No. 15-CV-1028 (TJM/CFH), 2018 WL 3195095, at *11 (N.D.N.Y. June 7, 2018) (internal quotation marks and citation omitted). Instead, a plaintiff must come forward with additional "circumstantial evidence" establishing that the protected activity was "a substantial or motivating factor" in the defendant's conduct. See id. at *10. Retaliation is not "reasonably inferred" where a plaintiff's protected speech does not involve the defendant alleged to have retaliated against him. See Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009). "Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer." Jones v. Fischer, No. 9:10-CV-1331 (GLS/ATB), 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013) (citing Hare v. Hayden, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.")).

***10** Coleman testified that Demers and Coryea "grabbed" his legal work and began reading through his "claim against another correctional officer within that facility." Dkt. No. 91-5 at 18-19. Coleman overheard Defendants "whispering amongst themselves[,]" and although he admits that he "could not make out nor hear what they were whispering about," the assault occurred "shortly thereafter." Id. at 22; Dkt. No. 98-1 at 28.

As discussed, Coryea and Demers were not named defendants in Coleman I. Even assuming the truth of Coleman's claim that Demers read Coleman's legal materials, the record lacks evidence demonstrating that Demers or Coryea were motivated to retaliate against Coleman based on Coleman's filing of that lawsuit. Coleman has not proffered any explanation as to why Coryea or Demers would be motivated to retaliate against him in response to a lawsuit against Nolan. Coleman does not allege, and the record does not support, a conclusion that Demers or Coryea made any reference to the lawsuit, Nolan, or the December 2014 incident referenced in Coleman I prior to the alleged assault. Coleman's conclusory and speculative allegations are insufficient to support "an inference of a causal connection between" the protected conduct; i.e. filing Coleman I, and the alleged excessive force incident. See Baskerville, 224 F.Supp.2d at 732.

As there is an absence of factual support to demonstrate a causal connection, Coleman's retaliation claims against Demers and Coryea, based upon Coleman I, lack merit. Celotex Corp., 477 U.S. at 323.

### 3. Retaliation Claims Based Upon Oral Complaints

Construing Coleman's arguments in a light most favorable to him, Coleman asserts that Defendants were motivated to retaliate against him after overhearing his conversations with Hutti and Durkin. Dkt. No. 98-1 at 25. Defendants argue that the verbal exchanges between Coleman, Hutti, and Durkin were "brief and isolated" and cannot be construed as constitutionally-protected speech. Dkt. No. 91-1 at 20.

A prisoner does not have a First Amendment right to engage officers in a verbal dispute. See Torrez v. Mulligan, No. 3:17-CV-677, 2017 WL 2623165, at *3 (D. Conn. June 16, 2017) (dismissing retaliation claim against officer who allegedly assaulted the plaintiff immediately after the plaintiff told the defendant to "stop making inappropriate comments"). However, district courts in the Second Circuit have concluded that an inmate's oral complaints to a correctional officer, under some circumstances, may constitute speech or conduct protected under the First Amendment. See, e.g., Mazyck v. Keller, 6:20_CV-06055, 2021 WL 1201224, at *8 (W.D.N.Y. Mar. 31, 2021) (finding that the plaintiff "plausibly alleged that he engaged in protected activity for purposes of his First Amendment claim" where the plaintiff alleged to have verbally reported an assault by a correctional officer to a supervisor, and as a result, faced retaliation); Smith v. Woods, No. 03-CV-480 (DNH), 2006 WL 1133247, at *10 (N.D.N.Y. Apr. 24, 2006) (noting that "the First Amendment protects, not only the filing of written grievances and complaints, but under some circumstances, the making of oral complaints to correction officers."), aff'd, 219 F. App'x 110 (2d Cir. 2007) (summary order) (citation omitted); Sprau v. Coughlin, 997 F.Supp. 390, 393 (W.D.N.Y. 1998) (finding a prisoner's

threat to file a complaint against a prison guard sufficient to establish protected activity); but see Booker v. Griffin, No. 16-CV-00072, 2018 WL 1614346, at *17 (S.D.N.Y. Mar. 31, 2018) (dismissing First Amendment claims against correctional officers on the basis of qualified immunity "because the law is not well-settled regarding whether an inmate's verbal complaint constitutes protected speech, it would not necessarily be 'clear to a reasonable officer' that taking an adverse action in response to such a complaint would rise to the level of a constitutional violation.") (internal citation omitted).

***11** Although the Second Circuit has yet to articulate a bright line rule regarding constitutionally-protected oral speech by an inmate, several district courts in this Circuit have held that a verbal confrontation with a correction officer based on an inmate's dissatisfaction with that officer's directive is one example of speech that is not constitutionally-protected activity. See Williams v. Smith, No. 11-CV-0601 (LEK/TWD), 2015 WL 1179339, at *10 (N.D.N.Y. Mar. 13, 2015) (verbal complaint "about problems with [inmate's] braces" was not protected conduct); Carl v. Griffin, No. 08-CV-4981, 2011 WL 723553, at *5 (S.D.N.Y. Mar. 2, 2011) ("[The p]laintiff's brief and isolated verbal [encounter with the defendant] does not constitute protected First Amendment speech [because] [t]o construe it as such would elevate every verbal exchange between a prison employee and a prisoner to the level of protected speech under the First Amendment.") (internal quotation marks and citation omitted); see also Lugo v. Van Orden, No. 07-CV-879 (TJM/GJD), 2008 WL 2884925, at *3 n.4 (N.D.N.Y. July 23, 2008) ("A simple discussion with a corrections officer would not be protected speech unless that discussion was in the form of a complaint or concern about the officer or some policy involved.").

In his grievance, Coleman described his verbal exchange with Hutti as a "conversation" about his property. Dkt. No. 91-5 at 25. During his deposition, Coleman testified that while Demers and Coryea were "throwing stuff out of [his] cell," he "started addressing" Hutti and "started inquiring about the items that these two officers had discarded from [his] cell as rubbish." Dkt. No. 91-5 at 25-26. Coleman summarized his exchange with Hutti:

> A. Basically, there was a particular item that was discarded from my cell which was a property bag is, you know, a bag they sell on commissary that allows inmates to -- to store items in this property bag to create space in your cell.
>
> So Sergeant Coryea was the one who discarded this bag from out of my cell, so I asked -- asked -- asked Sergeant Hutti -- I didn't ask him. I stated to Sergeant Hutti that this officer was discarding property that I'm entitled to have. And I would like to know if I could retrieve it, because I'm entitled to have this.

Dkt. No. 91-5 at 26-27.

Coleman does not allege that he voiced any complaints to Hutti and does not describe the exchange with Hutti as argumentative. In his grievance, Coleman claimed that Durkin "yelled" at him, but Coleman described his tone to Durkin as "respectful." Dkt. No. 1-1 at 43. During his deposition, Coleman testified that while he was speaking with Hutti, Durkin interrupted and "started yelling in [his] face[.]" Dkt. No. 91-5 at 27. Durkin told Coleman, "if you don't throw this shit away, I'm going to throw it away for you." Id. Coleman testified that he responded:

> A. At that time, I interjected, and I stated to Lieutenant Derkin [sic] that I had a lot of amount [sic] of property that I'm entitled to have by the State of New York. I have no more or no less. At that time, he started yelling back in my face again, saying I don't care how much property you're entitled to have. If you don't get rid of this shit we will."

Dkt. No. 91-5 at 27.

Based upon Coleman's sworn testimony and the record before the Court, Coleman did not intend for his statements regarding the manner in which his property was handled to "reach anyone" other than Hutti and Durkin. See Carl, 2011 WL 723553, at *5. The record suggests that the verbal exchanges were, at best, "isolated" disagreements related to the cell search that day. There is no evidence that the parties engaged in any further conversations or arguments regarding these issues. Accordingly, the Court concludes that the oral exchanges between Coleman and Hutti and Coleman and Durkin were not verbal grievances or protected conduct. See Cosby v. McDonald, No. 3:20-CV-432, 2020 WL 5026550, at *6 (D. Conn. Aug. 25,

2020) (finding that there is a distinction between "verbal grievances and verbal confrontations or arguments between a prisoner and a correctional officer and [district courts] have concluded that the latter do not constitute protected speech") (collecting cases); see also Ford v. Martuscello, No. 9:14-CV-1566 (DNH/DEP), 2016 WL 5322166, at *4 (N.D.N.Y. June 23, 2016) (confronting a corrections officer based on a dissatisfaction with that officer's directive is one example of speech that is not constitutionally-protected activity), report and recommendation adopted, 2016 WL 5256901 (N.D.N.Y. Sept. 22, 2016) (citations omitted).

***12** Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of Coleman's First Amendment retaliation claims against Coryea and Demers be granted.

## III. CONCLUSION

**WHEREFORE**, for the reasons set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for partial summary judgment (Dkt. No. 91) be **GRANTED** as to Plaintiff's claims against Racette and Plaintiff's First Amendment retaliation claims against Demers and Coryea; and **DENIED** in all other respects; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.[16]

### All Citations

Not Reported in Fed. Supp., 2021 WL 4312392

## Footnotes

1 This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2 Defendants did not submit a reply.

3 At the filing date of Defendants' motion, Local Rule 7.1(a)(3) provided:

> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.
>
> The moving party shall also advise pro se litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set

forth a specific citation to the record where the factual issue arises. The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert. The non-movant's response may also set forth a short and concise statement of any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs, followed by a specific citation to the record where the fact is established.

Effective January 1, 2021, the rule number was changed to Local Rule 56.1.

Defendants filed a Statement of Material Facts. Dkt. No. 91-6. Coleman provided a Statement of Material Facts, but did not respond to Defendants' Statement of Material Facts. See Dkt. No. 98. The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute." Prestopnik v. Whelan, 253 F.Supp. 2d 369, 371 (N.D.N.Y. 2003). Although the Local Rules provide that the Court shall deem admitted any facts the nonmoving party fails to "specifically controvert," pro se plaintiffs are afforded special solicitude in this District and within the Second Circuit. N.D.N.Y. L.R. 7.1(a)(3); see subsection II.A. Supra.

4 The parties provided exhibits with their submissions, without objection or challenges to the authenticity of any documents. Therefore, to the extent that the "facts" asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits/documents in the context of the within motion. See Daniel v. Unum Provident Corp., 261 Fed. App'x 316, 319 (2d Cir. 2008) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party"). In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the non-moving party. See Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).

5 A cell frisk is a search of the inmate's cell. Dkt. No. 91-2 at ¶ 5.

6 Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

7 In March 2016, Coleman was transferred from Clinton C.F. to Green Haven C.F. See Coleman v. Racette, No. 9:15-CV-0040, Dkt. No. 44 (N.D.N.Y. filed Mar. 31, 2016).

8 The claim involved a different correctional officer at Clinton C.F. Sec. Am. Compl. at ¶ 30.

9 In response to the motion for summary judgment, Coleman submitted a Memorandum of Law. Dkt. No. 98-1. In the submission, Coleman introduces arguments related to the denial of medical attention. See id. at 16. The Second Amended Complaint does not include a claim related to deliberate medical indifference. See generally Dkt. No. 85. Thus, this issue is not properly before this Court and will not be considered.

10 Copies of the unpublished decisions cited within this Report-Recommendation & Order have been provided to plaintiff pro se.

11 On November 27, 2018, Coleman I was resolved with a Stipulation and Order of Discontinuance. See Coleman I, Dkt. No. 114.

12 Racette was not served with the summons and amended complaint in Coleman I until July 28, 2015, after the alleged use of force on June 8, 2015. Coleman I, Dkt. Nos. 23, 26

13 Demers stated that the Cell Frisk Sheet is dated June 18, 2015. Dkt. No. 91-2 at ¶ 4. Based upon a review of the document, which is dated June 8, 2015, it is clear that Demers' declaration contains a typographical error in relation to the date.

14 Although the record contains a declaration from Durkin, who admits he was present in Upper H Block on June 8, 2015, Durkin does not confirm, refute, or address Demers' claim that he was not personally involved in the alleged use of force.

15 In the December 2019 Report-Recommendation and Order, this Court concluded that Coleman engaged in protected conduct when he filed Coleman I. Dkt. No. 61 at 24.

16 If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 917528
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

William CONSTANT, Plaintiff,
v.
Albert PRACK, Director of Special Housing and Inmate Disciplinary Programs, DDOCS, et al., Defendants.

16-CV-03985 (PMH)
|
Signed 03/29/2022

**Attorneys and Law Firms**

Brian S. Sokoloff, Mark Anthony Radi, Vernee Ciara Pelage, Sokoloff Stern LLP, Carle Place, NY, for Plaintiff.

Deanna L. Collins, Silverman & Associates, White Plains, NY, James Brennan Cooney, Julie Ann Ortiz, Steven Neil Schulman, NYS Office of The Attorney General, New York, NY, for Defendants Correction Officer N. Dapcevic, Correction Officer A. Alban, Correction Officer B. Sturtevent.

## MEMORANDUM OPINION AND ORDER

PHILIP M. HALPERN, United States District Judge:

***1** William Constant ("Plaintiff") brings this action in connection with an incident that occurred in a recreation yard at Green Haven Correctional Facility, a maximum security prison, in Fishkill, New York ("Green Haven"), on May 27, 2013. (Doc. 40, "Am. Compl."). Following motion practice before Judge Román—to whom this matter was assigned before it was transferred to this Court on April 13, 2020—and a stipulation signed by counsel on March 20, 2021 and "so ordered" by this Court on March 22, 2021, Plaintiff proceeds against only three known Corrections Officers ("COs") employed by the New York State Department of Corrections and Community Supervision: (1) Nedzad Dapcevic ("Dapcevic"); (2) Antonio Alban ("Alban"); and (3) Brian Sturtevent ("Sturtevent," and collectively, "Defendants"). (Doc. 49 (dismissing claims for relief against William Lee, Frederick Bernstein, Robert Bentivegna, and Albert Prack); Doc. 103 (dismissing claims for relief against COs Jonathan Markwick ("Markwick"), Bryan Hess ("Hess"), Michael Vennero ("Vennero"), and Sergeant Ronald Cabral ("Cabral"))). [1] Only two claims for relief proceed against Defendants: (1) Eighth Amendment excessive force; and (2) Eighth Amendment failure to protect. (Am. Compl. ¶¶ 50-69). [2] Defendants assert eight affirmative defenses in their Answer, filed on June 20, 2018. (Doc. 43).

The Court held a pre-motion conference by telephone regarding Defendants' anticipated motion for summary judgment on February 2, 2021. (Feb. 2, 2021 Min. Entry). The parties, in accordance with the briefing schedule set by the Court, filed all their motion papers on May 14, 2021. (*See* Doc. 104; Doc. 105, "Def. Br."; Doc. 106; Doc. 107, "Collins Decl."; Doc. 108, "Alban Decl."; Doc. 109, "Cabral Decl."; Doc. 110, "Dapcevic Decl."; Doc. 111; Doc. 112, "Markwick Decl."; Doc. 113, "Sturtevent Decl."; Doc. 114; Doc. 115, "Reply Br."; Doc. 116; Doc. 117, "Pelage Decl."; Doc. 118, "Hurley Aff."; Doc. 119, "Opp. Br."; Doc. 120-1, "Rev. 56.1 Stmt."). [3]

***2** For the reasons set forth below, Defendants' motion is GRANTED IN PART.

## BACKGROUND

The Court draws the undisputed material facts from the pleadings, the Revised 56.1 Statement of Material Facts, the Declarations of Deanna L. Collins, Vernee C. Pelage, Antonio Alban, and Ron Cabral, together with exhibits, the Declarations submitted by Dapcevic, Hess, Markwick, Sturtevent, Vennero, and the Affidavit of Michael Hurley.

Plaintiff was an inmate incarcerated at Green Haven on May 27, 2013. (Rev. 56.1 Stmt. ¶ 1; *see also* Collins Decl., Ex. A; *id.*, Ex. B). Around 7:00 p.m. that evening—about an hour before sunset—Plaintiff sat at a table in the recreation yard playing cards with Michael Hurley, another inmate. (Rev. 56.1 Stmt. ¶ 2; *see also* Collins Decl., Ex. C at 34:16-35:5, 68:20-69:5). Anywhere from 300 to 600 inmates were present in the recreation yard, which measures approximately 100-110 square feet, as Plaintiff played cards. (Rev. 56.1 Stmt. ¶¶ 3, 10; *see also* Collins Decl., Ex. C at 102:4-9; Alban Decl. ¶ 6; Dapcevic Decl. ¶ 6; Sturtevent Decl. ¶ 6; Pelage Decl., Ex. 14 at 56:9-16). Defendants were assigned to supervise inmates in this recreation yard. (Rev. 56.1 Stmt. ¶ 5; *see also* Alban Decl. ¶ 4; Dapcevic Decl. ¶ 4; Sturtevent Decl. ¶ 4). [4] The total number of COs in the recreation yard at this time is unclear. (Rev. 56.1 Stmt. ¶ 5;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*see also* Collins Decl., Ex. C at 71:6-9; Alban Decl. ¶ 5; Dapcevic Decl. ¶ 5; Sturtevent Decl. ¶ 5; Pelage Decl., Ex. 1 at 44:12-45:5; *id.*, Ex. 2 at 32:7-21, 38:4-8; *id.*, Ex. 3 at 221:10-222:13).

As Plaintiff was playing cards, another inmate came up from behind and cut him on his forehead, cheek, and right ear with a sharp object. (Rev. 56.1 Stmt. ¶ 11; *see also* Collins Decl., Ex. C at 35:4-7, 61:24-62:6, 99:24-100:3; Opp. Br. at 4 n.5 (clarifying that Plaintiff disputed only the claim that he was cut in the head)). Plaintiff, in response, spun out of his attacker's grasp, and fell to the ground. (Rev. 56.1 Stmt. ¶ 11; *see also* Collins Decl., Ex. C at 35:7-8, 59:8-12). As Plaintiff stood, he picked up a rock measuring about three by four inches. (Rev. 56.1 Stmt. ¶¶ 11, 13; *see also* Collins Decl., Ex. C at 35:10-11, 59:24-60:3; Alban Decl. ¶ 14, Ex. A). The attack was instantaneous, lasting approximately one second. (Rev. 56.1 Stmt. ¶ 11; *see also* Collins Decl., Ex. C at 62:7-13). Defendants did not witness the attack and had no reason to anticipate it. (Rev. 56.1 Stmt. ¶ 12; *see also* Collins Decl., Ex. C at 69:24-70:3, 124:6-12; Alban Decl. ¶¶ 10, 15; Dapcevic Decl. ¶ 14; Sturtevent Decl. ¶¶ 10, 15).[5] As Plaintiff came to his feet, he saw another inmate, William Reyes ("Reyes"). (Rev. 56.1 Stmt. ¶ 14; *see also* Collins Decl., Ex. C at 35:8-10).

***3** Believing that Reyes was the assailant, Plaintiff followed Reyes—with rock in hand—as Reyes backpedaled away, retreating. (Rev. 56.1 Stmt. ¶ 14; *see also* Collins Decl., Ex. C at 35:13-16, 60:4-61:9, 69:6-11). Plaintiff and Reyes tried to strike each other as the men made their way around the recreation yard. (Rev. 56.1 Stmt. ¶ 14; *see also* Collins Decl., Ex. C at 35:13-17, 65:13-16). The pursuit ended near Defendants. (Rev. 56.1 Stmt. ¶ 14; *see also* Collins Decl., Ex. C at 35:17-20, 69:17-70:3). When Defendants saw Plaintiff approaching, they saw that he was bleeding and carrying something in his hand. (Rev. 56.1 Stmt. ¶ 15; *see also* Alban Decl. ¶ 10; Dapcevic Decl. ¶¶ 8-9; Sturtevent Decl. ¶ 10). Sturtevent, upon seeing Plaintiff, called for backup. (Rev. 56.1 Stmt. ¶ 16; *see also* Alban Decl. ¶ 14; Dapcevic Decl. ¶ 13; Sturtevent Decl. ¶ 10). Defendants insist that Plaintiff was given direct orders at this juncture to drop the object in his hand, but failed to do so. Plaintiff counters, however, that no such order was given. (Rev. 56.1 Stmt. ¶ 18; *see also* Collins Decl., Ex. C at 103:5-16; Alban Decl. ¶¶ 11-12; Sturtevent Decl. ¶¶ 11-12; Pelage Decl., Ex. 6 at 14:5-22; *id.*, Ex. 9 at 3; *id.*, Ex. 13 at 78:12-23).

As Plaintiff approached Defendants, they formed a semi-circle around him and Reyes grabbed Alban—placing Alban between himself and Plaintiff like a human shield. (Rev. 56.1 Stmt. ¶ 19; *see also* Collins Decl., Ex. C at 35:21-36:7, 76:3-77:10; Pelage Decl., Ex. 6 at 11:17-22, 20:25-21:5). Another CO grabbed Alban away from Reyes, clearing the way for Plaintiff and Reyes to fight. (Rev. 56.1 Stmt. ¶ 19; *see also* Collins Decl., Ex. C at 36:7-12, 79:19-80:8; Pelage Decl., Ex. 8 at 9:13-23, 21:17-22:5). As Plaintiff and Reyes fought, Plaintiff hit Reyes in the head with the rock. (Rev. 56.1 Stmt. ¶ 20; *see also* Collins Decl., Ex. C at 36:11-19, 82:22-25, 89:11-90:7; Alban Decl. ¶ 13; Dapcevic Decl. ¶¶ 11-12; Sturtevent Decl. ¶ 13).

The parties dispute precisely when and how, but they agree that at some point Dapcevic hit Plaintiff with a baton. (Rev. 56.1 Stmt. ¶ 22; *see also* Collins Decl., Ex. C at 29:7-11, 36:20-37:2, 90:14-92:17, 96:14-98:15, 101:2-12, 124:13-125:9 (Plaintiff testifying that Dapcevic used the baton to hit him in the head while he was on top of Reyes); Dapcevic Decl. ¶¶ 13-14 (stating that, after Plaintiff stood up and stopped hitting Reyes, Dapcevic hit Plaintiff with the baton in the shoulder because Plaintiff did not comply with orders to drop the rock); Pelage Decl., Ex. 11 (Cabral's report stating that "[w]hen [Plaintiff] started to advance towards Dapcevic in a[n] aggressive manner, CO Dapcevic struck [Plaintiff] twice ... [in] the upper right shoulder area with his baton"); *id.*, Ex. 13 at 92:24-93:22 (Dapcevic's testimony that he struck Plaintiff after Plaintiff stopped hitting Reyes and approached without dropping the rock); *id.*, Ex. 17; *id.*, Ex. 18 (inmate misbehavior report written by Dapcevic indicating that he struck Plaintiff "on the upper right side of his body" because Plaintiff failed to drop the rock); Hurley Aff. ¶¶ 7-8 (inmate statement that he did not see Plaintiff make an aggressive motion toward any Defendant and saw Defendant get struck in the "head and/or neck area")). Neither Alban nor Sturtevent saw Dapcevic hit Plaintiff. (Rev. 56.1 Stmt. ¶ 36; Alban Decl. ¶ 15; Sturtevent Decl. ¶ 15; Pelage Decl., Ex. 5 at 71:2-5; *id.*, Ex. 7 at 40:12-15).

After being struck with the baton, Plaintiff was handcuffed without incident. (Rev. 56.1 Stmt. ¶ 25; *see also* Collins Decl., Ex. C at 108:6-11; Dapcevic Decl. ¶ 13). Plaintiff was then escorted to the medical clinic and transported to a local hospital for treatment. (Rev. 56.1 Stmt. ¶ 26; *see also* Collins Decl., Ex. C at 118:19-119:5; Cabral Decl. ¶ 8; Dapcevic Decl. ¶ 13; Markwick Decl. ¶ 5). Plaintiff presented with: (1) a 10-centimeter vertical laceration to his right temple, which was deep, open, with an approximate ½-centimeter gap,

and bleeding profusely; (2) an approximately 3-centimeter superficial cut to his right cheek; (3) an approximately 1-centimeter laceration to the top of his head; and (4) an approximately 6-centimeter laceration to the right ear and back of head, which was very deep and bisected the ear. (Rev. 56.1 Stmt. ¶ 26; *see* Collins Decl., Ex. F; *id.*, Ex. G). Plaintiff received approximately 65 stitches to close the cuts. (Rev. 56.1 Stmt. ¶ 26; *see also* Collins Decl., Ex. C at 121:25-122:7).

***4** This litigation followed.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). " 'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial ...." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

"It is the movant's burden to show that no genuine factual dispute exists," *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)), and a court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 442 F. Supp. 3d at 722 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts ...." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must establish also its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when ... law supports the moving party"); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (explaining that summary judgment is appropriate when "the law so favors the moving party that entry of judgment in favor of the movant dismissing the complaint is proper").

## ANALYSIS

***5** Defendants seek summary judgment on all theories undergirding both of the remaining claims for relief. The Court addresses these claims *seriatim*.

### I. First Claim for Relief: Excessive Force

The first claim for relief, excessive force, complains that "Dapcevic and/or other defendant officers subjected plaintiff to potentially deadly physical force by brutally attacking him physically, including striking him on the head twice with a baton, without provocation from plaintiff and without any justification whatsoever." (Am. Compl. ¶ 51). The Court considers the claim for relief as stated against Dapcevic


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

before considering the theories of liability as to Alban and Sturtevent.

A. The Excessive Force Claim Against Dapcevic

"A prison official's use of force violates the Eighth Amendment when, objectively, 'the alleged punishment [was] ... sufficiently serious,' and, subjectively, 'the prison official ... [had] a sufficiently culpable state of mind.' " *Torres v. City of New York*, No. 17-CV-06604, 2019 WL 7602181, at *6 (S.D.N.Y. Aug. 14, 2019) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (alterations in original)), *adopted by* 2019 WL 4784756 (S.D.N.Y. Sept. 30, 2019).

"The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of contemporary standards of decency." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (internal quotation marks omitted). The Court, in assessing this component, must determine whether "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

As for the subjective element, that "component of the claim requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by wantonness' in light of the particular circumstances surrounding the challenged conduct." *Id.* (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). "When prison officials are accused of using excessive force, the 'wantonness' issue turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson*, 503 U.S. at 7). Factors considered at this step include "the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Castro v. City of New York*, No. 16-CV-08147, 2020 WL 6782000, at *10 (S.D.N.Y. Nov. 18, 2020) (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)). In short, "determining whether officers used *excessive* force necessarily turns on the need for the force used." *Harris v. Miller*, 818 F.3d 49, 64 (2d Cir. 2016) (emphasis in original). Given this naturally fact-intensive inquiry, while there are situations where summary judgment dismissing such a claim for relief is proper, *see, e.g.*, *Torres*, 2019 WL 4784756, at *4-5, *Lebron v. Mrzyglod*, No. 14-CV-10290, 2019 WL 3239850, at *14-15 (S.D.N.Y. July 18, 2019), determinations in this context are usually left for the jury to decide, *Thompson v. Booth*, No. 16-CV-03477, 2021 WL 918708, at *6 (S.D.N.Y. Mar. 10, 2021).

***6** The Court, in this case, is presented with a credibility dispute. The parties have put forth opposing evidence pertaining to (at least): (1) where Dapcevic struck Plaintiff; (2) why Dapcevic struck Plaintiff; and (3) the larger context in which force was applied. (*See* Rev. 56.1 Stmt. ¶¶ 3, 5, 10, 22; *see also* Collins Decl., Ex. C at 29:7-11, 36:20-37:2, 71:6-9, 90:14-92:17, 96:14-98:15, 101:2-12, 102:4-9, 124:13-125:9; Alban Decl. ¶¶ 5-6; Dapcevic Decl. ¶¶ 5-6, 13-14; Sturtevent Decl. ¶¶ 5-6; Pelage Decl., Ex. 1 at 44:12-45:5; *id.*, Ex. 2 at 32:7-21, 38:4-8; *id.*, Ex. 3 at 221:10-222:13; *id.*, Ex. 11; *id.*, Ex. 13 at 92:24-93:22; *id.*, Ex. 14 at 56:9-16; *id.* Ex. 17; *id.*, Ex. 18; Hurley Aff. ¶¶ 7-8). These facts go to the heart of determining the reasonableness of the force used, and making that determination requires that one version of events be selected over another—a task strictly within the province of the jury. *See generally* *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment." (internal quotation marks omitted)); *Smith v. DeGirolamo*, No. 17-CV-05532, 2020 WL 5752226, at *3 (E.D.N.Y. Sept. 25, 2020) ("In deciding a motion for summary judgment, the court is duty bound not to weigh evidence or assess the credibility of witnesses.").

In sum, the admissible evidence provides different accounts of what transpired on May 27, 2013, and resolving what happened is a question for the jury. Consequently, because Defendants cannot carry their burden of establishing both that there is no genuine issue of material fact *and* that they are entitled to judgment as a matter of law on this claim for relief, the motion for summary judgment on the Eighth Amendment excessive force claim against Dapcevic is denied.

B. The Excessive Force Claim Against Alban and Sturtevent

Alban and Sturtevent are implicated in the first claim for relief insofar as Plaintiff alleges that "other ... officers," apart from Dapcevic, used force against him. (Am. Compl. ¶ 51). The parties also interpret this claim for relief to encompass a claim against Alban and Sturtevent based on their failure to intervene in the use of excessive force. (*See* Def. Br. at 22-23;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Opp. Br. at 17-19). Only the latter theory of liability survives the extant motion.

Insofar as Plaintiff intended to press an excessive force claim against Alban and Sturtevent, Defendants have established, based on undisputed evidence, that neither officer used force of any kind against Plaintiff. (*See* Def. Br. at 12, 15). Moreover, even if this were not the case, Plaintiff conceded the argument because he failed to respond to it in his opposition brief. *See* *Concha v. Purchase Coll. State Univ. of New York*, No. 17-CV-08501, 2019 WL 3219386, at *5 (S.D.N.Y. July 17, 2019) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)). Consequently, any claim for relief against Alban or Sturtevent based on a theory that they themselves used excessive force against Plaintiff is dismissed.

To the extent Plaintiff proceeds on a failure to intervene theory, however, that claim demands a different result on this record.

In order for Plaintiff to prevail against Alban or Sturtevent based on their failure to intervene in the use of excessive force, Plaintiff must establish that: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Livingston v. Hoffnagle*, No. 19-CV-00353, 2021 WL 3888283, at *5 (N.D.N.Y. Aug. 3, 2021) (internal quotation marks omitted), *adopted by* 2021 WL 3885247 (N.D.N.Y. Aug. 31, 2021). "Importantly, liability will attach only if the official 'observes excessive force is being used or has reason to know that it will be.' " *Valverde v. Folks*, No. 19-CV-08080, 2020 WL 5849515, at *7 (S.D.N.Y. Sept. 30, 2020) (quoting *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)).

***7** Neither Alban nor Sturtevent saw Dapcevic strike Plaintiff. (Rev. 56.1 Stmt. ¶ 36; Alban Decl. ¶ 15; Sturtevent Decl. ¶ 15; Pelage Decl., Ex. 5 at 71:2-5; *id.*, Ex. 7 at 40:12-15). The question that remains open, however, is whether Alban or Sturtevent *had reason to know* that Dapcevic would strike Plaintiff. Defendants do not cite any evidence establishing Alban and Sturtevent's lack of knowledge about the use of force; instead, Defendants' argument suggests in conclusory fashion that because those men did not *see* Dapcevic use force, they had no reason to *know* that force would be used. (Def. Br. at 23; Reply Br. at 9).[6] Adopting Defendants' argument requires that the Court make factual determinations and disregard the reality that seeing an event unfold and having reason to know it was going to unfold are separate concepts. A reasonable juror could conclude on these disputed facts—whether Dapcevic hit Plaintiff as Plaintiff beat Reyes with the rock *or* Dapcevic hit Plaintiff because Plaintiff refused to drop the rock—that even if Alban and Sturtevent did not technically see Dapcevic use his baton, they still had reason to know Dapcevic would do so. *See* *Decayette v. Goord*, No. 06-CV-00783, 2009 WL 1606753, at *8 (N.D.N.Y. June 8, 2009) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.") (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

Consideration of the three elements of a failure to intervene claim underscores the necessity of this result: (1) Defendants have not established with admissible evidence on these disputed facts that they were unaware that Dapcevic was going to use his baton, and the facts suggest they might have had such knowledge; (2) as discussed above, there is a genuine issue of material fact as to how and why Dapcevic used force; and (3) given the logical inferences of the evidence presented to the Court, neither Alban nor Sturtevent took any steps to prevent Dapcevic's use of force. Defendants' motion for summary judgment on this theory must, accordingly, be denied because they have not established both the absence of genuine issues of material fact and their entitlement to judgment as a matter of law.

II. Second Claim for Relief: Failure to Protect

The second claim for relief is pressed against all Defendants and posits that Defendants, in violation of the Eighth Amendment, failed to protect Plaintiff: (1) from Reyes' initial attack; and (2) when they subsequently allowed Plaintiff and Reyes to fight. (*See* Am. Compl. ¶¶ 55-69).

In order for Plaintiff to establish a failure to protect claim under the Eighth Amendment, he must show that Defendants acted with "deliberate indifference." *Edwards v. Black*, 854 F. App'x 382, 383 (2d Cir. 2021). The first prong, the "objective prong," requires facts establishing that Plaintiff was "incarcerated under conditions posing a substantial risk

of serious harm ....” *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (internal quotation marks omitted). On this type of claim, “[a] plaintiff may show a substantial risk of harm from either a specific assailant or a more general risk of harm due to the conditions at the time of the attack, such as where a substantial risk of inmate attacks was longstanding, pervasive, [or] well-documented.” *Dietrich v. Cty. of Orange*, No. 19-CV-10485, 2020 WL 5209816, at *3 (S.D.N.Y. Sept. 1, 2020) (first alteration added, internal citations and quotation marks omitted). The second prong, the “subjective prong,” requires action with a” sufficiently culpable state of mind, which in prison-conditions cases, is one of deliberate indifference to inmate health or safety.” *Morgan*, 956 F.3d at 89 (internal quotation marks omitted). “[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.” *Rennalls v. Alfredo*, No. 12-CV-05300, 2015 WL 5730332, at *3 (S.D.N.Y. Sept. 30, 2015) (internal quotation marks omitted).

***8** With respect to the objective prong, the focus of the Court's inquiry concerns “not the extent of the physical injuries sustained in an attack, but rather the existence of a ‘substantial risk of serious harm.’ ” *Randle v. Alexander*, 960 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). A substantial risk of serious injury is defined as “a condition of urgency, one that may produce death, degeneration, or extreme pain.” *Gilmore v. Rivera*, No. 13-CV-06955, 2014 WL 1998227, at *3 (S.D.N.Y. May 14, 2014) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1996)). The inmate must show that the risk of “actual or imminent” future harm is “so grave that it violates contemporary standards of decency.” *Id.* (quoting *Benjamin v. Fraser*, 343 F.3d 35, 51 (2d Cir. 2003); *Braxton v. Nichols*, No. 08-CV-08568, 2010 WL 1010001, at *11 (S.D.N.Y. Mar. 18, 2010)).

A. The Initial Attack

Insofar as this claim is based on the initial attack, Defendants' motion for summary judgment must be granted for two separate reasons. First, while Plaintiff argued in passing that the facts support an Eighth Amendment claim as to both theories of liability (i.e., the initial attack and ensuing fight), he offers no substantive explanation as to how a claim based on the initial attack survives. (*See* Opp. Br. at 19-23). The argument is, therefore, conceded.[7] *See* *Concha*, 2019 WL 3219386, at *5. Second, even if Plaintiff had not conceded the issue, he was the victim of a *surprise* attack. It is well-established that prison officials cannot be deliberately indifferent to a surprise attack. *See, e.g.*, *Carrasco v. Annucci*, No. 17-CV-09643, 2020 WL 5038561, at *3 (S.D.N.Y. Aug. 26, 2020) (“Courts routinely deny deliberate indifference claims based upon surprise attacks.” (internal quotation marks omitted)); *Rennalls*, 2015 WL 5730332, at *4; *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013); *see also* *Charles v. Rockland Cty. Off. of the Sheriff*, No. 16-CV-00166, 2019 WL 1299804, at *3 (S.D.N.Y. Mar. 21, 2019) (granting summary judgment in the Fourteenth Amendment context because that less-stringent standard “is not satisfied when the surprise attack was a surprise to everyone involved, including plaintiff”), *appeal dismissed by* No. 19-1041, 2019 WL 5301898 (2d Cir. Sept. 5, 2019).

Insofar as Plaintiff seeks to proceed on a failure to protect claim based on the initial attack, Defendants' motion for summary judgment is granted and that claim for relief is dismissed.

B. The Second Attack

Summary judgment cannot be granted as to the second theory of liability, however, because there are genuine issues of material fact.

Plaintiff, in one version of events, was attacked, chased Reyes, and—agitated, ignoring direct orders, and intending to even the score—pummeled Reyes with a rock after catching up with him. (*See* Alban Decl. ¶¶ 10-13; Dapcevic Decl. ¶¶ 9-12; Sturtevent Decl. ¶¶ 10-13). In such a situation (i.e., where Plaintiff pursues Reyes seeking retribution) Plaintiff could hardly be heard to complain that Defendants failed to protect him from the fight he sought out. *See, e.g.*, *Louis-Charles v. Courtwright*, No. 11-CV-00147, 2014 WL 457951, at *6 (N.D.N.Y. Feb. 4, 2014) (“The undisputed evidence shows that he was the physical aggressor in each of his altercations with other inmates. Indeed, the gravamen of Plaintiff's complaint, to which he testified at length at his deposition, is that Defendants failed to protect him from his own violent tendencies..... [A]n inmate's own violent tendencies are not the type of ‘substantial risk of serious harm’ protected by the Constitution.”); *Parks v. City of New York*, No. 04-CV-02490, 2006 WL 944659, at *6 (S.D.N.Y. Apr. 11, 2006) (dismissing failure to protect claim where

it appeared that the plaintiff was involved in a plan to rob another inmate and was, therefore, "an instigator") (Chin, J.).

***9** However, in another version of the story, as Plaintiff approached, Defendants saw clearly that Plaintiff was injured and bleeding, and heard him shouting, "Look what he did to me!" (Rev. 56.1 Stmt. ¶¶ 15, 18; *see also* Collins Decl., Ex. C at 71:25-75:16; Alban Decl. ¶¶ 10-11; Dapcevic Decl. ¶¶ 8-9; Sturtevent Decl. ¶¶ 10-11; Pelage Decl., Ex. 7 at 23:5-20). While the extent of Plaintiff's injuries cannot support the objective element with respect to the initial attack—indeed, such a finding would ignore the direction that this Court's focus is "not the extent of the physical injuries sustained in an attack, but rather the existence of a substantial risk of serious harm," *Mazyck v. Keller*, 531 F. Supp. 3d 630, 642 (W.D.N.Y. 2021) (internal quotation marks omitted) —these injuries would certainly present "a condition of urgency, one that may produce death, degeneration, or extreme pain" leading up to the second attack. *See Gilmore*, 2014 WL 1998227, at *3 (internal quotation marks omitted); *see generally Coronado v. Goord*, No. 99-CV-01674, 2000 WL 1372834, at *3 (S.D.N.Y. Sept. 25, 2000) ("The documentation of several stab wounds serious enough to justify transporting Coronado to an off-site hospital is evidence that there was a risk of sufficiently serious harm to state a claim for the deprivation of Coronado's Eighth Amendment rights."); *King v. Dep't of Corr.*, No. 95-CV-03057, 1998 WL 67669, at *5 (S.D.N.Y. Feb. 18, 1998) ("[T]he injury sustained by the plaintiff, a cut to his face, neck, and shoulder requiring 12-13 stitches, and the manner in which he received the injury, are sufficient to satisfy the objective requirement of the Eighth Amendment claim."). Then, after Reyes lost his human shield, he attacked Plaintiff again, forcing Plaintiff to defend himself as Defendants watched. (Collins Decl., Ex. C at 78:13-80:11, 81:12-23; *see also* Pelage Decl., Ex. 6 at 12:3-12, 23:17-24:4, 30:9-15; *id.*, Ex. 8 at 9:21-10:5). Although Defendants disclaim subjective awareness that Plaintiff and Reyes were going to fight, this version of events presents: (1) Plaintiff clearly injured; (2) Plaintiff pursuing Reyes; (3) Plaintiff yelling, "Look what he did to me!"; and (4) Reyes hiding behind Alban. Notwithstanding Defendants' position as to their subjective awareness (or unawareness) of an impending fight, giving Plaintiff the benefit of every inference on these facts, a reasonable jury could find Defendants' claimed ignorance uncredible.

In light of the foregoing, the motion for summary judgment with respect to Plaintiff's claim that Defendants failed to protect him against Reyes' second attack, is denied.

III. <u>Qualified Immunity</u>

Defendants argue that they are entitled to qualified immunity because: (1) reasonable officers could disagree as to whether Dapcevic's use of force was necessary; and (2) Defendants did not know that Plaintiff and Reyes were going to fight and, in any event, reasonable officers could disagree about the proper course of action during the fight. (Def. Br. at 23-25).

When evaluating the existence of qualified immunity at summary judgment, the Court must ask: "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

Applying these considerations, Plaintiff's Eighth Amendment rights to both be free from excessive force and be protected against another inmate's attack were clearly established on May 27, 2013. *See Tatum v. City of New York*, No. 06-CV-04290, 2009 WL 124881, at *11 (S.D.N.Y. Jan. 20, 2009). The question, then, is whether the evidence, viewed in a light most favorable to Plaintiff, makes out a violation of those rights. The Court has held that there are genuine issues of material fact on that subject. (*See* discussion *supra*). Defendants' motion for summary judgment based on qualified immunity is, therefore, denied. *See Zwick v. Town of Cheektowaga*, No. 17-CV-00727, 2021 WL 4895106, at *6 n.7 (W.D.N.Y. Oct. 20, 2021) ("[G]iven the existence of a genuine issue of material fact, the Court will not address the viability of any qualified-immunity defense.") (citing *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)); *Betts v. Rodriquez*, No. 15-CV-03836, 2017 WL 2124443, at *5 (S.D.N.Y. May 15, 2017); *Tatum*, 2009 WL 124881, at *11 ("Dismissal on the basis of a qualified immunity defense is inappropriate where there are facts in dispute that are material to a determination of reasonableness.").

## <u>CONCLUSION</u>

In light of the foregoing, Defendants' motion for summary judgment is GRANTED IN PART. The first claim for relief is dismissed to the extent it alleges Alban and Sturtevent used excessive force against Plaintiff. The first claim for relief shall proceed to trial, however, insofar as it alleges that Dapcevic used excessive force against Plaintiff and

that Alban and Sturtevent failed to intervene in the use of that force. The second claim for relief is dismissed as to all Defendants to the extent that it alleges that Defendants failed to protect Plaintiff from Reyes' initial surprise attack. The second claim for relief shall proceed to trial, however, based on Defendants' purported failure to protect Plaintiff from Reyes' second attack. The claims against the John Doe Defendants are dismissed without prejudice, *sua sponte*.

***10** The Court shall hold a Case Management Conference at 12:30 p.m. on May 4, 2022. At the time of the conference, all parties shall call: (888) 398-2342; access code: 3456831. The parties shall file, by April 27, 2022, a Proposed Joint Pretrial Order, in accordance with Rule 6(A) of this Court's Individual Practices.

The Clerk of the Court is respectfully directed to terminate the motion sequence pending at Doc. 104 and terminate the John Doe Defendants as parties to this action.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 917528

## Footnotes

1 Judge Román's prior decisions in this case are available on commercial databases. *See Constant v. Prack*, No. 16-CV-03985, 2019 WL 3287818 (S.D.N.Y. July 19, 2019); *Constant v. Annucci*, No. 16-CV-03985, 2018 WL 1684411 (S.D.N.Y. Apr. 5, 2018).

2 Plaintiff also proceeds against "John and Jane Does 1-20." (*See generally* Am. Compl.). There is no indication that these individuals have been identified or served, but they remain parties to this action. Any claims against these unknown actors must, at this juncture, be—and are hereby—dismissed without prejudice for failure to prosecute. "Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice." *Delrosario v. City of New York*, No. 07-CV-02027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010); *see also Vanderwoude v. City of New York*, No. 12-CV-09046, 2014 WL 2592457, at *8 (S.D.N.Y. June 10, 2014) ("Discovery in this case has now closed, and the record does not reflect any attempts by Plaintiff to identify and/or serve this defendant. Indeed, neither party has mentioned this defendant in the summary judgment briefing. Based on this record, the Court *sua sponte* dismisses Plaintiff's claims against Defendant Police Officer Jane Doe Number 1 without prejudice for failure to prosecute.").

3 Defendants, alongside their motion for summary judgment, filed a document entitled "Defendants' Statement of Material Facts Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1 with Plaintiff's Amended Response, and Plaintiff's Additional Material Facts with Defendants' Response." (Doc. 106). Plaintiff served a revised copy of this document with his opposition papers. (Rev. 56.1 Stmt.). According to Plaintiff, "[t]he only changes ... are to Plaintiff's citations. The citations have been updated so that they correspond with exhibit designations" in Plaintiff's supporting declaration. (Doc. 120 at 1). This modification, Plaintiff explains, was done for the Court's convenience because his citations previously corresponded to Bates Numbers used during discovery. (*Id.*). Defendants, in a footnote in their reply brief, object and insist that Plaintiff's changes "alter[ ] evidence previously cited in the original 56.1." (Reply Br. at 1 n.1). As Defendants do not explain how Plaintiff's changes prejudiced them and their objection was voiced only in a footnote in a legal brief, the Court considers the revised submission in adjudicating the extant motion. *Youngs v. Comm'r of Soc. Sec.*, No. 18-CV-00119, 2019 WL 3083045, at *5 n.6 (W.D.N.Y. July 15, 2019) ("[I]t is well-established that the Court need not consider arguments made only in footnotes.").

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

4 Plaintiff disputes any suggestion that Defendants were actually "supervising" inmates at this time. (Rev. 56.1 Stmt. ¶ 5). Plaintiff does not challenge that Defendants were expected to supervise inmates in the recreation yard as part of their duties. (*Id.*).

5 Plaintiff disputes this fact, claiming that Defendants "knew or should have known Plaintiff and/or other inmates were at risk of being slashed or otherwise injured ... because it was not an uncommon occurrence" in the recreation yard. (Rev. 56.1 Stmt. ¶ 12). The basis for this objection is premised on a portion of Markwick's deposition where he testified that he could not recall this specific fight because "things like this happen[ed]" in the yard. (Pelage Decl., Ex. 34 at 18:6-19:5). As there is no dispute that Defendants did not see the initial attack, it appears Plaintiff intends to "demonstrate 'a substantial risk of inmate attacks [which were] longstanding, pervasive, well-documented, or expressly noted by prison officials ... and that the officials being sued were exposed to information concerning the risk and thus, must have known about it.' " *Fisher v. Miller*, No. 16-CV-01175, 2018 WL 4610679, at *5 (N.D.N.Y. Apr. 30, 2018) (quoting *Sullivan v. Graham*, No. 09-CV-01211, 2011 WL 4424355, at *6 (N.D.N.Y. Aug. 6, 2011) (alterations in original)), *adopted by* 2018 WL 3854000 (N.D.N.Y. Aug. 14, 2018); *see also* *Stephens v. Venettozzi*, No. 13-CV-05779, 2016 WL 929268, at *21 (S.D.N.Y. Feb. 24, 2016), *adopted sub nom.* *Stephens v. Venetozzi*, 2016 WL 4272376 (S.D.N.Y. Aug. 5, 2016). Generalized testimony about how frequently inmate fights break out, without specific information about those events or linking Defendants to those events, cannot create a genuine issue of material fact as to Defendants' knowledge about the surprise attack.

6 Indeed, the evidence cited in the Revised 56.1 Statement speaks only to the fact that Alban and Sturtevent did not see Dapcevic use the baton; it is silent as to what they knew about Dapcevic's use of force. (Rev. 56.1 Stmt. ¶ 22; *see also* Alban Decl. ¶ 15; Sturtevent Decl. ¶ 15).

7 That portion of the opposition brief addressing failure to protect is entitled "Defendant Officers Are Not Entitled to Summary Judgment for Their Failure to Protect Plaintiff from *Further* Assault by Inmate Reyes." (Opp. Br. at 19 (emphasis added)). That title only serves to further support the Court's conclusion that Plaintiff abandoned this theory of liability.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1514836
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John COSBY, Plaintiff,
v.
Colleen RUSSELL; Roberts J. Lennox; Darrell D. Pilon; Scott J. Bishop; Douglas J. Wilson; Kyle J. Mulverhill; Mayo; J. Hayes; E. Pritchard; E. Rich; and W. Kline, Defendants.

Civil Action No. 9:10–CV–0595 (TJM/DEP).
|
Feb. 8, 2012.

**Attorneys and Law Firms**

John Cosby, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Adrienne J. Kerwin, Esq. Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

***1** *Pro se* plaintiff John Cosby, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 against several New York State Department of Corrections and Community Supervision ("DOCCS") employees stationed at the correctional facility in which he was confined at the relevant times, alleging deprivation of his civil rights. In his complaint plaintiff claims to have been assaulted by several corrections officers, purportedly in retaliation for having filed a grievance against a corrections employee who was not involved in the assault, and that following the incident he received inadequate medical treatment for the injuries he sustained. Plaintiff's complaint asserts claims of excessive force, unlawful retaliation, failure to intervene, and deliberate medical indifference.

Currently pending before the court is a motion filed by the defendants requesting dismissal of various claims contained within plaintiff's complaint, which has already been amended once in response to a court determination that the claims set forth in his initial complaint were legally deficient. For the reasons set forth below, I recommend that defendants' motion be granted in part, but otherwise denied.

I. *BACKGROUND* [1]

Plaintiff is a prison inmate entrusted to the custody and care of DOCCS; while currently incarcerated elsewhere, at the times relevant to his claims Cosby was designated to the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. *See generally* Amended Complaint (Dkt. No. 7).

On May 14, 2007, while serving time in a long-term keeplock cell at Great Meadow, plaintiff filed a grievance accusing Corrections Officer Stormer, who is not named as a defendant in this action, of having threatened him. [2] Amended Complaint (Dkt. No. 7) ¶ 22. In response to his grievance plaintiff was transferred away from the area in which Corrections Officer Stormer works and into a general population cell. *Id.* at ¶ 23.

Shortly after his transfer, plaintiff was approached by Corrections Officers Colleen Russell and Scott Bishop and instructed to dress himself so that he could be escorted to the prison commissary. Amended Complaint (Dkt. No. 7) ¶ 24. Once outside his cell plaintiff requested permission to take his hands out of his pockets while being transported so that he could utilize a handrail to assist him in negotiating a set of stairs. *Id.* at ¶¶ 25–26. After the request was denied, and following a brief verbal exchange regarding the issue, plaintiff was ordered by Corrections Officers Russell and Bishop to return to his cell. *Id.* at ¶ 26. Plaintiff complied and walked back to his cell, where he then proceeded to sit down on the floor and demand that he be allowed to see a sergeant. *Id.* at ¶ 27. After efforts on the part of Corrections Officers Bishop and Russell to forcibly pull the plaintiff to his feet failed, he was forced to lay down on his stomach, and his feet and legs were temporarily secured until assistance could arrive in response to an alarm sounded by the officers. *Id.*

***2** Once help arrived plaintiff was handcuffed, lifted to his feet, and taken to a stairwell where he was told to face the control room. Amended Complaint (Dkt. No. 1) ¶ 28. There his head was smashed into the control room window by either Corrections Officer Robert J. Lenox or Corrections Officer Darrell D. Pilon. *Id.* Thereafter, Officers Pilon, Lennox, and Bishop began stepping on plaintiff's feet and striking him with blows to his ankles and legs. *Id.* Plaintiff was then placed in leg restraints and taken to the hospital infirmary for treatment

of a laceration above his right eyebrow, requiring five stitches to close the wound. *Id.; see also* Plaintiff's Opposition (Dkt. No. 31) Exhs. B, C.

Following the treatment received at the prison infirmary, plaintiff was transported by wheelchair to the facility's special housing unit ("SHU"),[3] where he was frisked by Corrections Officer Mayo. Amended Complaint (Dkt. No. 7) ¶ 29. Corrections Officer Mayo then placed the plaintiff in handcuffs and, with the assistance of two other officers, carried him by his arms toward an SHU cell. *Id.* at ¶ 30. When plaintiff cried out in pain, Corrections Officer Mayo instructed the other two officers to lay him on the floor on his stomach, at which time defendant Mayo "stomped down on and jumped up and down on plaintiff's left ankle and leg[,]" causing an injury later determined to be a broken leg. *Id.* at ¶¶ 30–31. Plaintiff was then dragged into an SHU cell, but was later returned to the infirmary after experiencing a seizure. Amended Complaint (Dkt. No. 7) ¶¶ 31–32.

Plaintiff did not receive medical treatment for his leg injury until May 15, 2007, the day following the alleged incident, when he was examined by a physician's assistant and underwent x-rays revealing a fracture of his left leg/ankle. *Id.* at ¶¶ 33–35. Plaintiff was then seen by Dr. Thomas, a prison physician, who attempted to stabilize the injury by twisting his ankle back into position pending treatment at a local hospital. *Id.* at ¶ 46. Subsequent x-rays taken at a hospital confirmed that plaintiff's ankle was broken in three places and dislocated. *Id.* at ¶ 37.

II. *PROCEDURAL HISTORY*

On May 20, 2010, plaintiff commenced this action and sought leave to proceed *in forma pauperis ("IFP"* ). Dkt. Nos. 1–3. Plaintiff's initial complaint named Colleen Russell, Robert J. Lennox, Darrell D. Pilon, Scott Bishop, Douglas Wilson, Kyle J. Mulverhill, [f/n/u] Mayo, J. Hayes, [f/n/u] Griffin, E. Pritchard, E. Rich, and W. Kline as defendants. Dkt. No. 1. Following an initial review of plaintiff's complaint and IFP application, Senior District Judge Thomas J. McAvoy issued a decision on July 29, 2010 granting him leave to proceed *in forma pauperis* and approving the filing of the complaint, but directing dismissal of plaintiff's claims against defendants Wilson, Mulverhill, Hayes, Griffin, Pritchard, Rich, and Kline, without prejudice and with leave to replead within thirty days.

***3** On September 30, 2010, plaintiff submitted an amended complaint in accordance with Senior District Judge McAvoy's order. Dkt. No. 7. That amended complaint names all of the defendants listed in his earlier complaint with the exception of defendant Griffin, and alleges claims of excessive force, failure to intervene, and deliberate medical indifference in violation of the Eighth Amendment to the United States Constitution, as well as unlawful retaliation in violation of the First Amendment; the complaint also purports to assert claims under federal and state criminal statutes as well as a conspiracy cause of action under 42 U.S.C. § 1985(3). *Id.* Plaintiff's complaint seeks declaratory relief as well as compensatory and punitive damages.

Upon its receipt, plaintiff's amended complaint was again reviewed by the court for facial sufficiency. That review resulted in the issuance of a decision and order by Senior District Judge McAvoy on February 23, 2011 in which the court 1) ordered dismissal of all claims against defendants Griffin, Wilson, and Mulverhill, without prejudice; 2) dismissed plaintiff's due process and equal protection causes of action against defendants Russell and Bishop, without prejudice; and 3) ordered the addition of Dr. Thomas, a physician at Great Meadow Correctional Facility, as a defendant based upon allegations against him set forth in the body of plaintiff's complaint. Dkt. No. 9.

Following service of the summons and amended complaint, defendants moved, on May 17, 2011, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss various of plaintiff's claims for failure to state a cause of action upon which relief may be granted. Dkt. No. 26. In their motion, defendants assert that 1) defendants Hayes, Pritchard, Rich, and Kline were not sufficiently involved in the conduct giving rise to plaintiff's claims to be held liable for damages under section 1983; 2) the claims against defendants Russell, Bishop, and Lennox involve only a *de minimis* use of force and cannot support a plausible excessive force claim under the Eighth Amendment; 3) plaintiff's complaint fails to state a plausible deliberate medical indifference cause of action against Dr. Thomas; 4) plaintiff's retaliation claim is subject to dismissal based upon his failure to allege facts demonstrating that the defendants were aware of his grievance against Corrections Officer Stormer when taking the actions forming the basis for his claims; and, 5) plaintiff's claims arising out of state and federal criminal provisions as well as under 42 U.S.C. § 1985(3) lack merit. *Id.* Plaintiff has since responded in opposition to defendants' motion; included within his

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

opposing papers are both an affidavit and supporting exhibits providing greater detail concerning his claims.[4] Dkt. No. 31.

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Dismissal Motion Standard*

***4** A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper,* 378 U.S. at 546, 84 S.Ct. at 1734; *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal,* 129 S.Ct. at 1949. In the wake of *Twombly* and *Iqbal,* the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

B. *Personal Involvement*

From the outset, as is demonstrated by the court's initial order following review of Cosby's original complaint and accompanying IFP application, the sufficiency of his allegations to establish the requisite personal involvement of the named defendants in the conduct giving rise to his claims has been in question. The court's initial order reflects, moreover, that plaintiff has been apprised of the need to demonstrate the involvement of each named defendant in the civil rights deprivations alleged in order to establish liability. Despite this admonition, defendants argue, plaintiff's amended complaint perpetuates this deficiency and fails to set forth facts demonstrating a plausible showing of personal involvement in any unconstitutional conduct on the part of defendants Hayes, Pritchard, Rich, and Kline.

***5** It is well-established that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). As the Supreme Court has noted, a defendant may only be held accountable for his or her actions under section 1983. *Iqbal,* 129 S.Ct. at 1952. In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

The sole allegations in plaintiff's amended complaint regarding the involvement of defendants Hayes, Pritchard, and Rich in the relevant events are as follows:

> 46. The actions of Defendants, E. Hayes, E. Pritchard and E. Rich, violated the plaintiff's rights under Due Process and the Equal Protection of the Law under the Fourteenth Amendment to the United States Constitution and the Eighth Amendment's Deliberate Indifference standard, when they neglected and failed to intervene in the malicious, sadistic beating of plaintiff on the part of their fellow coworkers NYS Corrections Officers excessive use of force!

Amended Complaint (Dkt. No. 7) ¶ 46. Defendants argue that this mere conclusory allegation, without any supporting facts, fails to demonstrate the existence of a plausible claim for failure to intervene.

The plaintiff appears to allege that while they did not actively participate in beating him, defendants Hayes, Pritchard, and Rich are nonetheless legally responsible for their failure to intervene and protect him from harm at the hands of other officers. It is well-established that a corrections worker who, while not participating in an assault upon an inmate, is present while it occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). A law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02–CV–6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).[5] In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual, and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

***6** As defendants argue, plaintiff's complaint states claims against defendants Hayes, Pritchard, and Rich in a purely conclusory fashion and without the inclusion of factual allegations sufficient to permit the court to gauge whether a plausible cause of action for failure to intervene has been asserted. I have therefore turned to plaintiff's submission in opposition to the pending motion to determine whether this shortcoming is cured and a plausible claim exists against those defendants.

In his opposing papers plaintiff asserts that defendants Hayes, Pritchard, and Rich, as well as defendants Kline and Thomas, were present when he was physically beaten and severely injured. Cosby Aff. (Dkt. No. 31) ¶ 3. This claim is corroborated by a written Use of Force/Unusual Incident Report authored by Sergeant W. Kline on May 14, 2007, which confirms the presence of defendants Hayes, Pritchard, and Rich in plaintiff's B–1 SHU cell at or about the time of the alleged assault by defendant Mayo. *See id.* at Exh. B. It therefore appears that, as supplemented by his motion opposition, plaintiff's complaint reveals the existence of a plausible cause of action against those three defendants for failure to intervene. Accordingly, I recommend that the portion of defendants' motion seeking dismissal of plaintiff's claims against defendants Hayes, Pritchard, and Rich be denied.

Defendants also seek dismissal of plaintiff's claims against Corrections Sergeant W. Kline, on the basis of lack of personal involvement. Once again, from a review solely of plaintiff's amended complaint it would appear that defendants' arguments regarding Sergeant Kline are well-taken. The allegations set forth in the body of plaintiff's complaint regarding Sergeant Kline suggest that he is named as a defendant solely by virtue of his supervisory position. In his amended complaint plaintiff identifies Sergeant Kline as a supervisory employee and alleges that Sergeant Kline acted "with a callous disregard to the rights, life, health and safety of the plaintiff", and further that he was "deliberately indifferent to his suborindate(s) [sic] (corrections officers)

use of excessive force in a malicious, sadistic manner upon plaintiff ...". Amended Complaint (Dkt. No. 7) ¶ 44. To the extent that plaintiff is alleging that Sergeant Kline can be held vicariously liable for the acts of his subordinates, such a claim is not cognizable; a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; as there is no *respondeat superior* liability under section 1983.[6] *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501.

From plaintiff's submissions in opposition to the pending motion, however, it is clear that his allegations against Sergeant Kline are not limited to a *respondeat superior* claim, and that instead he asserts, and provides convincing supporting documentation showing, that Sergeant Kline was present during all or some of the incident but, according to the plaintiff, failed to intervene and protect him from the assault. *See* Cosby Aff. (Dkt. No. 31) ¶ 4 and Exh. B. In deference to his *pro se* status, I therefore recommend that the court find that plaintiff has stated a plausible claim of failure to intervene on the part of Sergeant Kline and that the portion of defendants' motion seeking dismissal of plaintiff's claims against that defendant also be denied. *See Phillips v. Roy,* No. 9:08–CV–878, 2011 WL 3847265, at *7 (N.D.N.Y. Aug.29, 2011) (Scullin, S.J.).

C. *Legal Sufficiency of Plaintiff's Excessive Force Claims Against Defendants Russell, Bishop, and Lennox*

***7** In their motion defendants argue that the only participation by Corrections Officers Russell and Bishop in the relevant events was that they tried lifting the plaintiff to his feet after he sat down and refused to move until the arrival of a sergeant, and, failing in that endeavor, forced him to lie down on his stomach in order to await the arrival of additional officers to assist. Defendants also contend that the actions of defendant Lennox, as alleged in plaintiff's complaint, appear to be limited to the claim that he smashed the plaintiff's head on the control room on an isolated occasion. Defendants maintain that these allegations are insufficient to establish a plausible claim of use of excessive force against those officers.

Plaintiff's claims of excessive force are brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. —— U.S. ——, ——, 130 S.Ct. 1175, 1179, 175 L.Ed.2d 995 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> ***8** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

Plaintiff's amended complaint makes only exceedingly modest allegations regarding the roles of defendants Bishop and Russell in any use of excessive force against him. Crosby alleges that after attempting to forcibly pull him to his feet, without success, the two officers required him to lay on his stomach at which time Officer Russell sat on his feet and legs until help could arrive. Amended Complaint (Dkt. No. 7) ¶ 27. He further alleges that after reinforcements arrived he was taken to a stairwell and that defendant Bishop "started stepping on [his] feet and striking him with deadly blows and force, to his ankles and legs." *Id.* at ¶ 28.

The allegation that defendant Russell sat on plaintiff's legs after he complained of pain is insufficient to state a plausible deliberate indifference claim. "Not every push or shove, even if it later may seem unnecessary in the peace of the judges chambers, judge's violates a prisoner's constitutional rights." *Johnson,* 481 F.2d at 1033. By plaintiff's own admission, he was non-compliant with orders from defendants Bishop and Russell, requiring that some modicum of force be applied. Because the court is unable to conclude that plaintiff has stated a plausible claim, demonstrating that the force applied was not a good faith effort to maintain or restore discipline, I recommend dismissal of plaintiff's claims against defendant Russell. *See Cicio v. Graham,* No. 9:08–CV–534, 2010 WL 980272, at *5 (N.D.N.Y. Mar. 15, 2010) (Mordue, C.J.); *Headley v. Fisher,* No. 06 CV 6331, 2008 WL 1990771, at *4 (S.D.N.Y. May 8, 2008).

The claims against defendants Bishop and Lennox stand on different footing. Plaintiff alleges that defendant Bishop struck him with blows to his ankles and legs, and that defendant Lennox smashed his head into a control room window, causing a laceration requiring five stitches. The defendants' contention that these allegations are not sufficient at this early juncture to establish a plausible excessive force claim against those defendants is patently untenable. *See Phelan v. Hersh,* No. 9:10–CV–0011 2011 WL 6031940, at *12 (N.D.N.Y. Sep. 13, 2011) (Treece, M.J.), *report and recommendation adopted,* 2011 WL 6031071 (N.D.N.Y. Dec 05, 2011) (Sharpe, J.); *Phillips v. Roy,* No. 9:08–CV–878, 2011 WL 3847265, at *6–7 (N.D.N.Y.2011) (Scullin, S.J.). I therefore recommend that the court deny the motion to dismiss as it relates to plaintiff's claims against defendants Bishop and Lennox.

D. *Deliberate Medical Indifference*

***9** In his complaint, as amended, plaintiff alleges that while being treated for the broken ankle suffered as a result of the May 14, 2007 incident, Dr. Thomas, who apparently is a prison physician at Great Meadow, twisted his ankle when, consistent with proper medical judgment and the prevailing standard of medical care, he should not have. Defendants seek dismissal of this claim as failing to rise to a level of constitutional significance.

Like plaintiff's excessive force claim, his assertion that prison officials intentionally disregarded his medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment and are informed by the same principles. *Estelle,* 429 U.S. at 102, 104, 97 S.Ct. at 290, 291. With regard to the objective element of an Eighth Amendment medical indifference claim, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279–81 (2d Cir.2006).

Plaintiff's allegations against Dr. Thomas fail to support the finding of a plausible deliberate medical indifference claim. Instead, even when his complaint is liberally construed, the plaintiff's own words implicate nothing more the medical judgment exercised by Dr. Thomas in treating his ankle. It is well-established that claims of medical malpractice or simple disagreement by a prison inmate with a course of treatment followed or prescribed by a prison medical employee do not rise to a level sufficient to support a deliberate indifference claim. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703; *see also Arroyo v. City* of New York, No. 99 Civ. 1458, 2003 WL 22211500, at * 2 (S.D.N.Y.2003) ("Charges that amount only to allegations of malpractice, and mere disagreements with respect to quality of medical care

do not state an Eighth Amendment claim ...” ') (citing Estelle, 429 U.S. at 105–06, 97 S.Ct. at 292). Based upon a review of plaintiff's complaint and accepting the truth of plaintiff's allegations, I find no basis to conclude that Cosby was either denied adequate treatment for his ankle condition, or that Dr. Thomas acted with a sufficiently culpable state of mind to establish deliberate indifference on his part. Accordingly, I recommend dismissal of plaintiff's claims against that defendant.

E. *Retaliation*

In their motion defendants next seek dismissal of any First Amendment retaliation claim deemed to be contained within plaintiff's complaint. In this regard, defendants assert that the complaint lacks any factual allegations that the defendants who participated in his beating had any awareness of a grievance filed earlier by Cosby against a fellow corrections officer, who is not named as a defendant and was not involved in the assault.

***10** When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable claim of retaliation lies under 42 U.S .C. § 1983. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims “with skepticism and particular care.” *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a “substantial or motivating factor” in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); Dawes, 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff “even in the absence of the protected conduct.” *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

The protected conduct alleged by plaintiff in support of his retaliation claim is the filing of a grievance against a corrections officer employed at Great Meadow. *See* Amended Complaint (Dkt. No. 7) ¶ 22. That act plainly qualifies as protected activity for purposes of the First Amendment. *Franco,* 854 F.2d at 590. As one court has noted, *“Franco* recognized that prisoners must be permitted the “free and uninhibited access' “ to both administrative and judicial forums for the purpose of seeking redress of grievances.' “ *Alnutt v. Cleary,* 913 F.Supp. 160, 169 (W.D.N.Y.1996) (quoting *Franco* ). It is undeniable that were prison officials permitted to retaliate against inmates for filing grievances, those individuals' First Amendment rights would suffer a severe chilling effect resulting from fear of reprisal. *See Bordas v. Payant,* No. 9:08–CV–0458, 2009 WL 35292, at *3 (N.D.N.Y. Jan.5, 2009) (McAvoy, S.J.), *aff'd,* 374 Fed. App'x 192 (2d Cir.2010).

***11** As an adverse action linked to and allegedly stemming from that protected conduct, plaintiff asserts that he was beaten by several other corrections officers. This factual allegation, which at this juncture must be accepted as true, is similarly sufficient to plausibly support a finding of adverse action for purposes of plaintiff's retaliation cause of action. *See Cannon v. Wood,* No. 9:10–CV–1332, 2011 WL 7071100, at * 5 (N.D.N.Y. Aug.12, 2011) (Treece, M.J.) (finding allegation of harassment in retaliation for grievance sufficient to support a plausible claim for retaliation), *report and recommendation adopted,* 2012 WL 177972 (N.D.N.Y. Jan 23, 2012) (Suddaby, J.).

The focus of defendants' challenge to Crosby's retaliation claim is upon the required showing of a nexus between the protected conduct and adverse action. As is true in most instances, plaintiff cannot point to direct evidence showing that plaintiff's beating was motivated by his filing of a grievance. Plaintiff argues, however, that the required link between the two is evidenced in this case by the fact that on the same day that he filed a grievance concerning corrections officer Stormer, causing him to be transferred to a new cell

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

block, he was assaulted by other corrections officers. The fact that an adverse action occurs shortly after an inmate has engaged in protected conduct is one that can support a finding of the required connection linking the two for purposes of a retaliation claim. *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002). Given that at this juncture all inferences must be drawn in plaintiff's favor, I conclude that one such permissible inference to be drawn from the timing involved here is that the officers engaged in the assault were aware of plaintiff's grievance against one of their coworkers. For this reason, I conclude that plaintiff's complaint, as amended, sets forth sufficient allegations of fact to support a finding of a plausible retaliation claim, and I therefore recommend against dismissal of that cause of action.

F. *Plaintiff's Remaining Claims*

In the final point of their motion defendants seek dismissal of plaintiff's remaining claims. Among the additional causes of action summarily set forth in plaintiff's amended complaint are those arising out of state and federal penal laws governing such matters as conspiracy, assault, the filing of false written statements, and harassment under New York Penal Law Articles 105, 120, 175, and § 240.26(1)(2) as well as 18 U.S.C. §§ 241 and 242. Plaintiff's complaint also asserts a conspiracy claim under 42 U.S.C. § 1985(3).

The portion of plaintiff's claims predicated upon penal statutes is easily disposed of. None of those statutes give rise to a private civil right of action, but instead may be enforced only by authorized law enforcement agencies. *Brown v. Seniuk,* No. 01 CV 1248, 2002 WL 32096576, at *1 (E.D.N.Y. Mar. 25, 2002) (citing *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) ("a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.")).

***12** Turning to plaintiff's section 1985(3) claim, I note that to sustain a cause of action for conspiracy to violate civil rights under that section, a plaintiff must allege and demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his or her equal protection of the laws or equal privileges and immunities secured by law. *United Brotherhood of Carpenters & Joiners, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 834–39, 103 S.Ct. 3352, 3359–61, 77 L.Ed.2d 1049 (1983); *Gagliardi v. Village of Paing,* 18 F.3d 188, 194 (2d Cir.1994); *Gleason v. McBride,* 869 F.2d 688, 694 (2d Cir.1989); *Patterson v. County of Oneida,* No. 00–CV–1940, 2002 31677033, at *4 (N.D.N.Y.2002) (Hurd, J.), *aff'd in relevant part,* 375 F.3d 206 (2d Cir.2004); *Benson v. United States,* 969 F.Supp. 1129, 1135–36 (N.D.Ill.1997) (citing, *inter alia, United Brotherhood,* 463 U.S. at 434–37); *see also LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1995). A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can, in the alternative, be evidenced circumstantially by a showing that the parties had a " 'tacit understanding to carry out the prohibited conduct.' " *LeBlanc–Sternberry,* 67 F.3d at 427 (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)). This notwithstanding, in order to properly plead such a claim, a plaintiff must make more than "conclusory, vague, or general allegations of conspiracy." *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) (per curiam); *Williams v. Reilly,* 743 F.Supp. 168, 173 (S.D.N.Y.1990) ("[u]nsubstantiated, conclusory, vague or general allegations of a conspiracy to deprive constitutional rights are not enough to survive [even] a motion to dismiss"). "[D]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) (quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)).

Moreover, it is well settled that a plaintiff attempting to establish a claim under 42 U.S.C. § 1985(3) must demonstrate that the defendant under consideration acted with class-based invidiously discriminatory animus. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 266–68, 113 S.Ct. 753, 758–59, 122 L.Ed.2d 34 (1993). "When a plaintiff fails to establish membership in a protected group, a civil rights conspiracy complaint under 42 U.S.C. § 1985 may be dismissed." *Estes–El v. Town of Indian Lake,* 954 F.Supp. 527, 532 (N.D.N.Y.1997) (citation and internal quotations omitted).

Plaintiff's complaint contains no factual allegations that would support a finding of racial or class-based animus. In his complaint plaintiff does not even identify his race, or that of the offending officers, nor does he set forth any factual allegations, as distinct from conclusory statements, that could give rise to a finding of race-based animus. I therefore also recommend dismissal of plaintiff's conspiracy claim under section 1985(3).

G. *Whether to Permit Amendment*

***13** The next issue to be addressed is whether plaintiff, having already filed one amended complaint, should be granted further leave to replead in order to cure the deficiencies noted in this report.

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). Generally, when a *pro se* action is dismissed *sua sponte,* the plaintiff should be allowed to amend his or her complaint. *See Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999).

Notwithstanding this rule, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (finding that repleading would be futile) (citation omitted); *see also Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ( "Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *cf. Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 796 (2d Cir.1999) (granting leave to amend is appropriate "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim."). The court must next determine whether plaintiff is entitled to the benefit of the general rule favoring amendment given the procedural history of the case.

Certain of the claims that I am recommending be dismissed appear on their face to be hopelessly defective, such that any opportunity to amend would prove futile. For example, plaintiff's endeavor to assert civil claims based upon state and federal penal statutes is plainly misguided, and no amount of revision will cure this deficiency. Other claims for which I have recommended dismissal, however, could ostensibly be revived. For this reason, I recommend that plaintiff be denied the opportunity to amend with regard to his effort to bring claims under state and federal penal laws since those claims are plainly precluded. I further recommend, however, that he be given the opportunity to amend with regard to his excessive force claim against defendant Russell, any deliberate medical indifference cause of action against Dr. Thomas, and his section 1985 cause of action for conspiracy.

Should plaintiff choose to take advantage of any opportunity afforded to amend in his second amended complaint he must clearly set forth the facts, including the wrongful acts that give rise to the claim, the dates, times and places of the alleged acts, and the identity of each individual who committed or participated in each alleged wrongful act. Such an amended complaint must replace the existing second amended complaint, must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court, *see Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); Fed.R.Civ.P. 10(a), and should specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged in sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass,* 790 F.2d at 263.

IV. *SUMMARY AND RECOMMENDATION*

***14** Certain portions of plaintiff's complaint in this action, including his allegations of the use of excessive force and failure of certain of the defendants to intervene to protect him from harm, set forth cognizable claims. Others causes of action alleged by plaintiff, however, are not supported by factual allegations sufficient to demonstrate the existence of plausible claims. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' dismissal motion (Dkt. No. 26) be GRANTED, in part, and that plaintiff's claims against defendants Russell and Thomas, as well as plaintiff's causes of action arising out of state and federal penal law, and under 42 U.S.C. § 1985(3), be DISMISSED, with leave to replead only with regard to his claims against defendants Russell and Thomas, and under 42 U.S.C. § 1985(3), and that such amended pleading, if any, be filed within thirty days of any decision and order adopting this report and recommendation in full, and that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1514836

## Footnotes

1 In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See* *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also* *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). Also considered were the materials submitted by the plaintiff in opposition to the defendants' motion, Dkt. No. 31, to the extent they are consistent with the allegations set forth in his complaint. *See* *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

2 Keeplock is a form of confinement through which an inmate is restricted to a cell, separated from others, and deprived of participation in certain regular prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens); Tinsley v. Greene,* No. 95–CV1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)).

3 SHU is a more restrictive form of confinement than keeplock. Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N .Y.C.R.R. pt. 304. They are allowed two showers per week and one of hour of outdoor exercise per day. *Id.* They are entitled to unlimited legal visits and one non-legal visit per week. *Id.* SHU inmates have access to counselors and sick call. *Id.* Additionally, they can participate in cell study programs and can receive books from the library. *Id.*

4 While those materials have not been formally excluded, I have opted not to recommend conversion of defendants' motion to an application for summary judgment pursuant to Federal Rules of Civil Procedure 12(d), although in deference to plaintiff's *pro se* status I have considered his additional submissions to the extent they are consistent with the allegations in his complaint. *Hale v. Rao,* No. 9:08–CV–1612, 2009 WL 3698420, at *3 n. 8 (N.D.N.Y. Nov.3, 2009) (Hurd, D.J. and Lowe, M.J.) ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint.)

5 Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

6 Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also* *Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Caravalho v. City of New York, S.D.N.Y., March 31, 2016

2012 WL 4354763
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Frank DE MICHELE, Plaintiff,
v.
CITY OF NEW YORK, County of Westchester, Timothy Bugge, Deodat Urprasad, Adam Mellusi, Roger Dicarlo, Andrew Myberg, William T. Mcguinness, Brian P. Tierney, George O. Ruiz, Christian M Gutierrez, Mitchell B. Serlin, Christopher M. Lieberman, Michael N. Brady, Richard E. Pucillo, and Does 1–20, Defendants.

No. 09 Civ. 9334(PGG).
|
Sept. 24, 2012.

***MEMORANDUM OPINION & ORDER***

PAUL G. GARDEPHE, District Judge.

***1** Plaintiff Frank DeMichele brings this action pursuant to 42 U.S.C. § 1983 and state law against Defendants City of New York (the "City"), New York City Police Department ("NYPD") Deputy Inspector Timothy Bugge, NYPD Captain Deodate Urprasad, NYPD Sergeant Adam Mellusi, NYPD Officers Roger DiCarlo and Andrew Nyberg [1] ("the City Defendants"), the County of Westchester (the "County"), Westchester County Sergeant William McGuinness, and Westchester County Police Officers Brian Tierney, George Ruiz, Christian Gutierrez, Mitchell Serlin, Christopher Lieberman, Michael Brady, and Richard Pucillo (together, "County Defendants"), asserting claims related to his January 18, 2009 arrest. The Amended Complaint includes (1) causes of action for excessive force, false arrest, malicious prosecution, and deprivation of access to the courts under Section 1983; (2) *Monell* claims against the County and the City; and (3) state law causes of action for false arrest, malicious prosecution, battery, and assault. (Am.Cmplt.)

Plaintiff has moved for summary judgment on his claims against (1) Defendants Urprasad, Mellusi, and DiCarlo for false arrest and malicious prosecution under Section 1983 and state law; and (2) Defendant Ruiz for excessive force under Section 1983. (Dkt. No. 77)

The City Defendants have moved for summary judgment on Plaintiff's (1) false arrest claims, because his arrest was supported by probable cause; (2) malicious prosecution claims, because the prosecution was instituted with probable cause; (3) claims against the individual City defendants, on qualified immunity grounds; (4) claims against defendants Bugge and Mellusi, because of a lack of evidence that they were personally involved; and (5) claims against the City, arguing that he has not established a basis for *Monell* liability. (Dkt. No. 72)

The County Defendants have moved for summary judgment on Plaintiff's excessive force, false arrest, assault, and battery claims, and claim for punitive damages. (Dkt. No. 80)

For the reasons stated below, the City Defendants' and County Defendants' motions will be granted in part and denied in part, and Plaintiff's motion will be denied. [2]

***BACKGROUND***

Plaintiff's claims arise out of his arrest in the early morning hours of Sunday, January 18, 2009. County police arrested Plaintiff for drag racing on the Hutchinson River Parkway, while NYPD officers arrested him for armed robbery. (County R. 56.1 Stmt. ¶¶ 64–69) [3]

**I. *COUNTY POLICE CAR CHASE***

At about 12:35 a.m on January 18, 2009, County Officer Christian Gutierrez observed a white Mercedes Benz C63 racing with a gray Audi on the lower Hutchinson River Parkway. (County R. 56.1 Stmt. ¶¶ 63–64) Officer Gutierrez attempted to stop the two cars, but they accelerated and began to recklessly weave in and out of traffic at high speed. (County R. 56.1 Stmt. ¶ 65; Pltf. R. 56.1 Stmt. ¶ A)

Gutierrez contacted a County helicopter unit, which then began tracking the two vehicles on the Parkway. (County R. 56.1 Stmt. ¶ 66; Jones Decl., Ex. H (Lieberman Dep.) at 29–30; Pltf. R. 56.1 Stmt. ¶ B) The helicopter was staffed by County Officer Christopher Lieberman, the pilot, by County Officer Richard Pucillo, a tactical flight officer; and by County Officer Michael Brady, a tactical flight officer in

training. (County R. 56.1 Stmt. ¶ 66) Officer Lieberman observed the white Mercedes traveling at a high rate of speed southbound on the Parkway, and followed it to a point where it stopped in traffic on the highway shoulder. (County R. 56.1 Stmt. ¶ 67)

***2** Officer Lieberman observed a County police car—driven by County Officer Brian Tierney—attempt to intercept the vehicle. (County R. 56.1 Stmt. ¶ 68) Tierney drove his patrol car onto the shoulder and positioned it immediately in front of the white Mercedes; the front bumpers of the two vehicles were facing each other, approximately three feet apart. (County R.56.1 Stmt. ¶ 79; PX 13 (Tierney Dep.) at 17) Tierney had his vehicle's headlights and police lights on, and was able to observe that the white Mercedes's sole occupant was a white man with short brown hair, between the ages of 18 and 22, wearing a Yankees baseball cap. (County R.56.1 Stmt. ¶ 80; Jones Decl., Ex. E (Tierney Dep.) at 20–22) The driver of the white Mercedes put the car into reverse, and then smashed into the front passenger side of Tierney's car. (County R.56.1 Stmt. ¶ 81; Jones Decl., Ex. E (Tierney Dep.) at 23) The bumper of Tierney's car was damaged (*id.*), and he lost sight of the white Mercedes. (County R.56.1 Stmt. ¶ 82)

Officer Lieberman observed the white Mercedes drive at a high rate of speed to 1164 Edison Avenue in the Bronx, where the car's single occupant fled into that building. (County R. 56.1 Stmt. ¶ 69; Pltf. R. 56.1 Stmt. ¶ I) Lieberman transmitted the location of the white Mercedes over the radio, and Officer Tierney and other County police officers responded to that location. (County R. 56.1 Stmt. ¶¶ 70, 82) At 1164 Edison Avenue, Tierney observed NYPD officers and other County officers (County R.56.1 Stmt. ¶ 83), including County Officers Serlin, Gutierrez, and Ruiz. (County R.56.1 Stmt. ¶ 84) The County helicopter was positioned above the house, with its spotlight trained on the ground. (County R.56.1 Stmt. ¶ 84)

Officer Tierney observed three NYPD officers, including a captain, at the entrance to the basement apartment of the building. (County R.56.1 Stmt. ¶ 85) County Officer Serlin brought a police dog to the scene and had the dog sniff inside the white Mercedes. Officer Serlin then directed the dog to track the scent. (County R.56.1 Stmt. ¶ 56; PX 16 (Serlin Dep.) at 12–15) The dog tracked the scent to the steps leading down to Plaintiff's basement apartment. (*Id.*) NYPD officers then knocked on the door to that apartment. (PX 16 (Serlin Dep.) at 16)

Tierney was subsequently asked to view a suspect. From about 10 to 15 feet away, Tierney identified DeMichele as the individual who had been driving the white Mercedes. (County R.56.1 Stmt. ¶¶ 86–87; PX 13 (Tierney Dep.) at 61–63)

### II. *NYPD ARMED ROBBERY ARREST*

At some point before January 17, 2009, Robert Guerrerio, Jr. arranged to sell Mercedes car parts to an individual over the Internet. (City R.56.1 Stmt. ¶ 104) Late in the evening on January 17, 2009, Guerrerio went to a golf course on Shore Road in the Bronx, where he had agreed to sell the car parts. (City R.56.1 Stmt. ¶ 105) At that location, Guerrerio observed two men emerge from a customized, white Mercedes C63 automobile with a black roof. (City R. 56.1 Stmt. ¶ 106; Nyugen Decl., Ex. B (Guerrerio Aff.) ¶ 5) One man threatened to shoot Guerrerio, and both robbed him of his car parts and cellular telephone. (City R. 56.1 Stmt. ¶ 106; Nyugen Decl., Ex. B (Guerrerio Aff.) ¶ 5) Guerrerio attempted to report the robbery to New Rochelle police, but was instructed to report the crime to officers at the 45th Precinct in the Bronx. (City R. 56.1 Stmt. ¶ 109; Nyugen Decl., Ex. B (Guerrerio Aff.) ¶¶ 7–8) Guerrerio arrived at the 45th Precinct about one hour after the robbery. (City R. 56.1 Stmt. ¶ 110; Nyugen Decl., Ex. B (Guerrerio Aff.) ¶ 9; Pltf. R. 56.1 Stmt. ¶ FFF)

***3** While at the 45th Precinct, Guerrerio overheard a report about a high speed car chase involving a white Mercedes C63 with a black roof. (City R. 56.1 Stmt. ¶ 111) An NYPD officer brought Guerrerio to 1164 Edison Avenue in the Bronx, where the car had stopped. Plaintiff resides in a basement apartment at this location. (City R. 56.1 Stmt. ¶ 111; Pltf. R. 56.1 Stmt. ¶¶ III, KKK; *see also* PX 26 (Ferrer Dep) at 16–17; County R. 56.1. Stmt. ¶ 1)

Guerrerio arrived at 1164 Edison Avenue two to three hours after the robbery. (City R. 56.1 Stmt. ¶ 112) At that location, Guerrerio observed a white Mercedes C63 and Plaintiff sitting in the back of a County police car. Guerrerio told police that the car appeared identical to the one used by the men who had robbed him, and noted that the car was unique, because it had been customized. (City R. 56.1. Stmt. ¶¶ 112–13) Guerrerio also told police that Plaintiff "look[ed] like" one of them men who had robbed him. (City R. 56.1 Stmt. ¶ 114) When Guerrerio made his identification, Plaintiff had blood on his face, and was wearing only underwear and a tank top. (Pltf. R. 56.1 Stmt. ¶ PPP) NYPD Defendants Urprasad and McGuinness were present at the showup identification. (Pltf. R. 56.1. Stmt. ¶ VVV; PX 32 (McGuinness Dep.) at 112)

**III. *PLAINTIFF'S BACKGROUND AND ACTIVITIES ON JANUARY 17–18, 2009***

The building at 1164 Edison Avenue is owned by Marcy Manfredonia (County R. 56.1. Stmt. ¶ 2) and contains four apartments. (*Id.* ¶ 12) Manfredonia and her family, including her son—Frank Desideri—live in a basement apartment in the building. (*Id.* ¶ 4) Plaintiff and his mother, Margaret Bonura, reside in another basement apartment in the building. (*Id.* ¶ 1) Plaintiff's apartment has two entrances: a front door on Edison Avenue, and a rear door that opens onto B Street. (*Id.* ¶ 14) Only Plaintiff's apartment is accessible through the rear of the building. (*Id.* ¶ 16)

Plaintiff was 19 years old at the time of his arrest, and was "good friends" with Desideri (*id.* ¶ 6; PX 7 (DeMichele Dep.) at 55; Pltf. Resp. to County R. 56.1 Stmt. ¶ 6), seeing him two to three times per week. (*Id.;* PX 7 (DeMichele Dep.) at 56) Plaintiff's girlfriend, Diana Brescia, and Desideri's girlfriend, Christina Ruocco, were also friends. (*Id.* ¶ 11)

Plaintiff drove a 2008 white BMW. (*Id.* at ¶ 8) Desideri drove a white Mercedes that was registered to Nationwide Maintenance General Contracting, a company owned by his mother. (*Id.* ¶ 9) Plaintiff did not drive the white Mercedes on January 17–18, 2009. (*Id.* ¶ 10; Jones Decl., Ex. A (DeMichele Dep.) at 57–58)

During the afternoon of Saturday, January 17, 2009, Plaintiff and his girlfriend, and Desideri and his girlfriend, visited with Tristano Reveccio, at Reveccio's home. (*Id.* ¶ 25) In the evening, the group left Reveccio's house in separate cars, and drove to the Crosstown Diner. (*Id.* ¶¶ 28–30) [4] Plaintiff and Brescia drove in Plaintiff's white BMW from the diner to Plaintiff's residence, where Plaintiff parked his car on B Street. (*Id.* ¶ 34) Plaintiff and Brescia then went to Plaintiff's bedroom to watch television. (*Id.* ¶ 36)

***4** Shortly thereafter, Desideri entered Plaintiff's apartment through the B Street rear entrance. (*Id.* ¶ 38) Plaintiff was aware that Desideri had entered the apartment. (*Id.* ¶ 47)

**IV. *PLAINTIFF'S ARREST***

Minutes after Desideri entered the apartment, Plaintiff heard a loud knock on the rear door. (*Id.* ¶¶ 41–42; Pltf. R. 56.1 Stmt. ¶ X) Plaintiff's mother answered the door and spoke with police officers. (*Id.* ¶ 42) County Officer Tierney identified Plaintiff as the man he had encountered earlier that evening driving the white Mercedes. (*Id.* ¶¶ 46, 87; Jones Decl., Ex. E (Tierney Dep.) at 61–63; PX 7 (DeMichele Dep.) at 98) NYPD Captain Urprasad, along with County Officers Gutierrez and Ruiz, removed Plaintiff from his home. (Pltf. R. 56.1 Stmt. ¶¶ BB–DD)

Outside, in Plaintiff's backyard, County and NYPD officers attempted to handcuff him. (County R. 56.1 Stmt. ¶¶ 51, 90; Pltf. R. 56.1 Stmt. ¶ HH) While against a brick wall, Plaintiff turned his head from side to side. (*Id.* ¶¶ 52, 90; Jones Decl., Ex E (Tierney Dep.) at 73) The parties dispute to what extent Plaintiff resisted arrest: Officer Ruiz testified that Plaintiff was flailing his arms and attempting to kick him and Gutierrez (PX 11 (Ruiz Dep.) at 84–89), but Plaintiff denies that he used force to resist. (PX 7 (DeMichele Dep.) at 143–44) The parties likewise dispute what, if any, force was used against Plaintiff. Officers Tierney and Ruiz testified that they used "soft hand" techniques to force Plaintiff's hands behind his back. (County R.56.1 Stmt. ¶¶ 90, 91) Ruiz also stated that he used "cuff control"—which involves twisting handcuffs at a pressure point on the wrists—in response to Plaintiff's resistance. (Pltf. R. 56.1 Stmt. ¶ OO; PX 11 (Ruiz Dep.) at 84–89) Plaintiff sustained bruises on his wrist, a scrape on his knee, a scrape and bruises on the back of his neck, and a cut above his left eyebrow. [5] (County R.56.1 Stmt. ¶ 92) There were about 20 to 25 officers at the Plaintiff's residence at the time of his arrest. (Pltf. R. 56.1 Stmt. ¶ FF)

**V. *POST–ARREST EVENTS***

DeMichele was charged in a criminal complaint with robbery in the first, second and third degree, with grand and petit larceny, with resisting arrest, and with criminal possession of stolen property. (PX 36 (Criminal Complaint)) He was held in NYPD custody from January 18, 2009 until January 20, 2009, when he was arraigned and released on his own recognizance. (Pltf. R. 56.1 Stmt. ¶¶ TTTT, VVVV) He was ordered to return to Bronx County Supreme Court on March 26, 2009. (Pltf. R. 56.1 Stmt. ¶ WWWW)

Plaintiff's mother filed a civilian complaint with the County. Her complaint was investigated by County Detective Steven Fumuso. (County R.56.1 Stmt. ¶ 93; Jones Decl., Ex. M (Fumuso Aff. ¶ 4)) Fumuso's investigation revealed that 1164 Edison Avenue was owned by Marcy Manfredonia, Desideri's mother (*id.* ¶ 95), and that the white Mercedes observed at the rear of the building on January 18, 2009, and impounded by County police, was also owned by Manfredonia. (*Id.* ¶ 94) Fumuso's investigation also revealed that Christina Ruocco, Desideri's girlfriend, had falsely reported to the New Rochelle

Police Department on January 18, 2009, that the Mercedes had been stolen. (*Id.* ¶ 103; Jones Decl., Ex. M (Fumuso Aff.) ¶ 6)

***5** On January 20, 2008, Det. Fumuso interviewed Guerrerio, who reported that "he was 'not 100% sure' about the identification of DeMichele." Guerrerio, however, "had seen the suspect vehicle at the scene on Edison Avenue, and was positive that it was the sa[me] one that 'Frankie Dez' arrived in earlier at 870 Shore Road." (Pltf. R. 56.1. Stmt. ¶ QQQ; PX 1 (Fumuso Report) at 12)

Based on his investigation, Det. Fumuso determined that it was Desideri, and not DeMichele, who had been driving the white Mercedes on January 18, and the County did not bring any charges against Plaintiff. (County R.56.1 Stmt. ¶ 97; Jones Decl., Ex. M (Fumuso Aff.) ¶¶ 6, 9))

In late January 2009, Det. Fumuso told NYPD Detective John Fennell that Plaintiff may have been misidentified on January 18, 2009. (City R. 56.1 Stmt. ¶ 116) In order to confirm the misidentification, Det. Fennell arranged for Guerrerio to view a photo array on February 2, 2009. (City R. 56.1 Stmt. ¶ 117) At that time, Det. Fennell confirmed that Guerrerio had misidentified Plaintiff as one of the robbers on January 18, 2009. (City R. 56.1 Stmt. ¶ 117)

When Plaintiff returned to Bronx County Supreme Court on March 26, 2009, the People dismissed the charges against him. (Pltf. R. 56.1 Stmt. ¶ CCCCC; PX 39) In dismissing the charges, the assistant district attorney noted that "there had been a mis-identification. The first individual who was identified, Mr. DeMichele, had not actually been present during the incident." (Pltf. R. 56.1 Stmt. ¶¶ EEEEE, FFFFF; PX 39)

## *DISCUSSION*

A number of Plaintiff's claims are brought under Section 1983, which provides " 'a method for vindicating federal rights elsewhere conferred,' including under the Constitution." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). In order to state a claim for relief under Section 1983, "[t]he conduct at issue 'must have been committed by a person acting under color of state law' and 'must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.' " *Id.* (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994)).

### I. *SUMMARY JUDGMENT STANDARD*

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cnty. of Nassau,* 524 F.3d 160, 163 (2d Cir.2008). " '[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.' " *Lesavoy v. Lane,* No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D .N.Y. July 10, 2008) (quoting *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991)).

***6** In deciding a summary judgment motion, the Court " 'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment .' " *Spinelli v. City of New York,* 579 F.3d 160, 166 (2d Cir.2009) (quoting *Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir.2001)). However, a " 'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.... [M]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist.' " *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (alterations in original) (quoting *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995)).

### II. *FALSE ARREST*

Plaintiff has moved for summary judgment on his false arrest claims against Urprasad, Mellusi, and DiCarlo, while the City and County Defendants have moved for summary judgment on all of Plaintiff's false arrest claims.

"To establish a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must show that 'the defendant intentionally confined him without his consent and without justification.' " *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004) (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996)); *see also Golphin v. City of New York,* 09 Civ. 1015(BSJ), 2011 WL 4375679, at *1 (S.D.N .Y. Sept. 19, 2011) ("In order to state a claim for false arrest [under New York law], a plaintiff must prove four elements: (1) the defendant intended to confine the

plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.") (citing *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003)). [6] "The Fourth Amendment protects against unreasonable searches and seizures, including false arrests, by requiring probable cause to support the execution of any search or seizure." *Golphin,* 2011 WL 4374679, at *1 (citing *Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir.2006)).

### A. *Probable Cause*

#### 1. *Applicable Standard*

"Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff." *Escalera,* 361 F.3d at 743 (citing Weyant, *101 F.3d at 852* ). *See also* *Drummond v. Castro,* 522 F.Supp.2d 667, 677 (S.D.N.Y.2007) ( "Regardless of whether the first three prongs are satisfied, the claim for false arrest will fail where defendants establish that probable cause existed, as the existence of probable cause is a complete defense to an action for false arrest."). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant,* 101 F.3d at 852. "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Id.* at 852.

***7** " '[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness.' " *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (quoting *Miloslavsky v. AES Eng'g Soc'y,* 808 F.Supp. 351, 355 (S.D.N.Y.1992) *aff'd,* 993 F.2d 1534 (2d Cir.1993)). Police officers, when making a probable cause determination, are entitled to rely on the victim's allegations that a crime has been committed, *Martinez,* 202 F.3d at 634 (citing *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir.1995)), unless the circumstances raise doubt as to the person's veracity. *Singer,* 63 F.3d at 119. They are also entitled to rely on the allegations of fellow police officers. *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006) (citing *Bernard v. United States,* 25 F.3d 98, 102–03 (2d Cir.1994)). Under what is known as the "collective knowledge doctrine," all information known to one officer is imputed to all other officers involved in the same investigation. *Golphin,* 2011 WL 4375679, at *2 (citing *United States v. Colon,* 250 F.3d 130, 135 (2d Cir.2001)). "[T]he determination of probable cause does not turn on whether [the fellow officer's] observations were accurate, but on whether [the arresting officer] was reasonable in relying on those observations." *Bernard,* 25 F.3d at 103.

In order to determine whether an arrest was supported by probable cause, courts must consider the "totality of the circumstances" in light of the facts known to the arresting officer at the time of the arrest. *See* *Jenkins v. City of New York,* 478 F.3d 76, 90 (2d Cir.2007) ("[p]robable cause is, of course, evaluated on the totality of the circumstances"); *Zellner v. Summerlin,* 494 F.3d 344, 369 (2d Cir.2007) (citing *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.") It is, therefore, axiomatic that subsequently discovered evidence cannot be used to cure an arrest that was made without probable cause. *Mejia v. City of New York,* 119 F.Supp.2d 232, 253 (E.D.N.Y.2000). The eventual disposition of a criminal charge is irrelevant to the probable cause determination for false arrest. *Allen v. City of New York,* 480 F.Supp.2d 689, 711 (S.D.N.Y.2007); *see also* *Pierson v. Ray,* 386 U.S. 547, 555 (1967).

A witness identification that later proves mistaken may nonetheless provide a basis to find probable cause. *Sanchez v. Port Authority of New York and New Jersey,* No. 08–CV–1028 (RRM) (CLP), 2012 WL 1068078, at *5 (E.D.N.Y. Mar. 29, 2012) (citing *Hill v. California,* 401 U.S. 797, 802–03 (1971) (holding that police officers had probable cause to arrest an individual whose appearance was similar to description in warrant). "If officers arrest an individual based on a mistaken identification, that arrest is still constitutionally valid if: (1) the police have probable cause to arrest the person sought; and (2) the arresting officer reasonably believed that the arrestee was that person." *Id.;* *Seitz v. DeQuarto,* 777 F.Supp.2d 492, 504 (S.D.N.Y.2011).

#### 2. *Analysis*

##### (a) *County Defendants*

***8** County police saw a white Mercedes drag racing on the Hutchinson River Parkway. (County R. 56.1 Stmt. ¶ 64) The driver of the car refused to stop for a marked police car, intentionally rammed that police car, fled the scene, was tracked by helicopter to 1164 Edison Avenue, and was

observed running from his car into the only back entrance to 1164 Edison Avenue. (*Id.* ¶¶ 65–69) County officers had ample cause to believe that a crime had been committed by the driver of the white Mercedes. *Manganiello v. City of New York,* 612 F.3d 149, 161–62 (2d Cir.2010) (quoting *Zellner,* 494 F.3d at 368) ("probable cause to arrest exists when the officers have knowledge of ... facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested").

County police also had probable cause to believe that Plaintiff was the driver of the white Mercedes. Officer Tierney saw the driver through a car window at a distance of less than twenty feet. (County R. 56.1 Stmt. ¶ 80) Indeed, at that time, the front bumper of his patrol car was only three feet from the front bumper of the white Mercedes. (*Id.* ¶ 79) The headlights and emergency lights of Tierney's vehicle illuminated the scene. (*Id.* ¶ 80) Tierney described the driver as a white male with short brown hair between the ages of 18 and 22, a description that matches Plaintiff. (*Id.;* Jones Decl., Ex. E (Tierney Dep.) at 20–22)

As noted above, County police tracked the white Mercedes from the air, following it from the Parkway to a parking spot behind Plaintiff's apartment. (*Id.* ¶ 69) Officer Lieberman then saw a figure run into the only back entrance to the building, which led to Plaintiff's apartment. (*Id.* ¶¶ 16, 38, 70) A police dog, after sniffing the interior of the white Mercedes, tracked the scent to Plaintiff's apartment. (*Id.* ¶ 56; PX 16 (Serlin Dep.) at 12–15) When Officer Tierney saw DeMichele outside the apartment, he immediately identified him as the man who had been driving the Mercedes. (*Id.* ¶ 46; PX 13 (Tierney Dep.) at 63)

While Tierney was mistaken, it is undisputed that Plaintiff closely resembles Desideri. Plaintiff testified that he and Desideri look very much alike: "He basically looks like me just with a different hair style, I guess. If we both had Yankee hats on and wearing the same clothes, you wouldn't know the difference that night, to be honest. Because my girlfriend literally seen him places and used to think it was me...." (Jones Decl., Ex. A (DeMichele Dep.) at 127–28); *see also* Ex. B (DeMichele 50–H Hearing Tr.) at 47–48 ("He looks exactly like me, just about two inches taller."). Given the admittedly close resemblance, and the surrounding circumstances, there is no reason to question the *bona fides* of Officer Tierney's identification. *Sanchez,* 2012 WL 1068078 at *5.

***9** Furthermore, it is undisputed that Desideri was inside Plaintiff's apartment when the police knocked on the door, and that his uniquely customized white Mercedes with the black roof—the car involved in the high speed chase—was parked outside that apartment. (County R. 56.1 Stmt. ¶ 47; Jones Decl., Ex A (DeMichele Dep.) at 163, 485–87; City R. 56.1 Stmt. ¶¶ 113–14) In sum, it is undisputed that County police followed the right vehicle to the right location, and knocked on the door to the apartment into which the suspect had fled.

Based on Officer Tierney's eyewitness identification, the helicopter's observation of the path of the white Mercedes and its driver's flight into the back entrance of 1164 Edison Ave, and the presence of the customized Mercedes in back of Plaintiff's apartment, the County Defendants had probable cause to arrest Plaintiff. Accordingly, the County Defendants' motion for summary judgment concerning Plaintiff's false arrest claims will be granted.

**(b) *City Defendants***

Guerrerio told NYPD officers at the 45th Precinct that he had met two men at a golf course in the Bronx for the purpose of selling them car parts. When he arrived at the appointed time, the two men—one of whom claimed to have a gun—robbed him of the car parts and a cell phone. Guerrerio told police that the two men drove away in a customized white Mercedes C63 with a black top. (Nyugen Decl., Ex. B (Guerrerio Aff.) ¶ 5; PX 24 (Complaint Report)) In sum, the NYPD had probable cause to believe that a crime had been committed. *Martinez,* 202 F.3d at 634.

While Guerrerio was at the 45th Precinct reporting the robbery, officers heard about a high speed chase involving a white Mercedes C63 with a black roof—the same car Guerrerio had described. (Nyugen Decl., Ex. B (Guerrerio Aff.) ¶ 10; PX 26 (Ferrer Dep.) at 14) Police brought Guerrerio to 1164 Edison Avenue, where the white Mercedes had been tracked by helicopter. (PX 26 (Ferrer Dep.) at 16) At that location, Guerrerio identified Plaintiff as one of the robbers, and the white customized Mercedes parked outside Plaintiff's apartment as the car that they had driven. (Nyugen Decl ., Ex. B (Guerrerio Aff.) ¶¶ 12–13) Accordingly, the victim—who had been robbed only two-to-three hours earlier in a face-to-face transaction—identified Plaintiff as the perpetrator. (Nyugen Decl., Ex. B (Guerrerio Aff.) ¶¶ 4–6, 11–13)

While Guerrerio's identification, like Tierney's, was wrong, that mistake is attributable to the close resemblance between

Plaintiff and Desideri. (Jones Decl., Ex. A (DeMichele Dep.) at 127–28) Moreover, Guerrerio was undoubtedly influenced by the presence of the unique customized white Mercedes he had observed during the robbery outside Plaintiff's apartment. (City R. 56.1 Stmt. ¶¶ 106, 113)

Where, as here, police arrest a suspect based on eyewitness identification, there is probable cause for the arrest. *See, e.g., Wahhab v. City of New York,* 386 F.Supp.2d 277, 287 (S.D.N.Y.2005) (finding that police had probable cause to arrest a suspect in response to a 911 call from an eyewitness); *Russell v. Eighty Fourth Precinct,* No. 03–CV–6179, 2004 WL 2504646, at *3 (E.D.N.Y. Nov. 8, 2004) (finding that police had probable cause to arrest a suspect based on eyewitness identification).

***10** Guerrerio's identification was also corroborated. The unique vehicle he described the robbers having used was found outside Plaintiff's apartment. Moreover, County Officer Tierney—in the presence of one or more NYPD officers—identified Plaintiff as the driver of that vehicle. (County R. 56.1 Stmt. ¶ 46; PX 13 (Tierney Dep.) at 62–63; Nyugen Decl., Ex. B (Guerrerio Aff.) ¶ 5) In light of Guerrerio's identification of Plaintiff as his assailant, the presence of the customized car outside Plaintiff's apartment, and Tierney's identification of Plaintiff as the driver of that car, no rational fact-finder could conclude that, under the totality of the circumstances, the NYPD lacked probable cause to arrest Plaintiff. [7]

While Plaintiff argues that Sergeant Mellusi improperly ignored his parents' claims that he was innocent, "once an officer has probable cause to arrest a suspect, the officer need not investigate ... claims of innocence prior to making the arrest." *LaFontaine v. City of New York,* No. 08 Civ. 1555(SHS), 2009 WL 3335362, at *5 (S.D.N.Y. Oct. 14, 2009) (citing *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997) ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."); *Krause v. Bennett,* 887 F.2d 362, 372 (2d Cir.1989) (noting that law enforcement officers are tasked with "apprehend[ing] those suspected of wrongdoing," not engaging in "a weighing of the evidence")). Here, the officers had probable cause to arrest DeMichele on the basis of Guerrerio's complaint and the identifications at the time of arrest. [8] Indeed, the police had no reason to doubt that Plaintiff had committed the robbery. [9]

Plaintiff argues, however, that the showup identifications prevent a finding of probable cause. Plaintiff argues too much time had passed between the crime and the identifications; that the distance from the scene of the robbery was too great; that Guerrerio's identification was unreliable because Plaintiff was in the back of a police car, in handcuffs, in his underwear, with blood on his face; and that officers urged Guerrerio to identify Plaintiff as the robber.

Showup identification procedures are generally disfavored by the courts, *Stovall v. Denno,* 388 U.S. 293, 301 (1967), but may be justified by extenuating circumstances. *United States v. Concepcion,* 983 F.2d 369, 377–78 (2d Cir.1992); *United States v.. Bautista,* 23 F.3d 726, 730 (2d Cir.1994) (The Second Circuit "has instructed law enforcement officials that where an officer has or should have doubts whether a detained suspect is in fact the person sought, the officer must make immediate reasonable efforts to confirm the suspect's identity.") (internal quotation marks omitted)). The Second Circuit has noted that " 'it is now settled law that prompt on-the-scene confrontation is 'consistent with good police work' and does not offend the principles established in *United States v. Wade." James v. Marshall,* No. CV–05–1982 (BMC), 2007 WL 3232513, at *10 (E.D.N.Y. Oct. 31, 2007) (quoting *United States ex rel. Cummings v. Zelker,* 455 F.2d 714 (1972)). Promptly conducted, on-the-scene showups make it possible for the police to have "reasonable assurances that they have arrested or detained the right person." *People v. Duuvon,* 77 N.Y.2d 541, 545 (1991); *see also United States v. Brown,* No. (S1) 94 Cr. 631(AGS), 1995 WL 464956, at *4 (S.D.N.Y. Aug. 7, 1995); *Styles v. Van Zandt,* No. 94 Civ. 1863(MGC), 1995 WL 326445, at *4 (S.D.N.Y. May 31, 1995)). Appropriate factors to consider in determining if a particular showup is unduly suggestive include proximity in time and location to the point of arrest, as well as the "uncertain, emergent realities and varieties of these street situations." *Duuvon,* 77 N.Y.2d at 545; *see also People v. Hicks,* 68 N.Y.2d 234 (1986); *People v. Brnja,* 50 N.Y.2d 366 (1980). An unduly suggestive showup has not, in itself, been held to be a constitutional violation. *Wray v. City of New York,* 490 F.3d 189, 193 (2d Cir.2007).

***11** In the context of a Section 1983 case, "the relevant inquiry for purposes of probable cause is whether the flaws in the [identification] procedures increased the risk of a misidentification to an extent that the resulting identification no longer supports the requisite probability that the suspect has perpetrated a crime." *See Williams v. City of New York,* No. 10–CV–2676 (JG)(LB), 2012 WL 511533, at

*7 (E.D.N.Y. Feb. 15, 2012) (factors used to determine admissibility of identification at trial need not be applied where the issue is probable cause). Since the probable cause standard requires much less certainty than that necessary for a conviction, the evidence required need not be as reliable. *Williams,* 2012 WL 511533 at *7. "Concerns about reliance on tainted evidence to convict a defendant at trial do not apply with nearly the same force when such evidence is used to establish probable cause." *Id.*

Here, the procedures used did not " 'render [the identifications] so defective that probable cause could not reasonably be based upon [them].' " *Id.* (quoting *Jenkins v. City of New York,* 478 F.3d 76, 93 (2d Cir.2007)). Guerrerio identified Plaintiff two to three hours after the robbery, at a location approximately four miles away. The identification was thus not distant either in time or place. (Nguyen Decl., Ex. D; Ex. B (Guerrerio Aff.) ¶ 11) In the habeas context, courts have upheld showup identifications that took place two hours after the incident. *See, e.g., Dixon v. Miller,* No. 03–cv–1611, 2005 WL 3240482, at *8 (E.D.N.Y. Nov. 30, 2005) (admission of showup identification that took place one to two hours after the crime, when a witness was brought to the scene of petitioner's arrest, was not "unreasonable in light of precedent"); *McBride v. Senkowski,* No. 98 CIV. 8663(MBM), 2002 WL 523275, at *5–6 (S.D.N.Y. Apr. 8, 2002) (showup identification two hours after crime, where the victim was brought to a location two blocks from the crime scene to identify suspects, found not unduly suggestive).

The fact that Plaintiff was shown to Guerrerio in handcuffs, and in the back of a police car, does not mean that the circumstances surrounding the showup identification were unduly suggestive. *See Charlemagne v. Goord,* No. 05 Civ. 9890(DAB)(HBP), 2008 WL 2971768, at * 12 (S.D.N.Y. June 30, 2008) (citing cases holding that showup procedures, in which suspects were shown in handcuffs and surrounded by police officers, were not unduly suggestive); *see also Jamison v. Grier,* No. 01 CIV 6678(AGS)(AJP), 2002 WL 100642, at *20–21 (S.D.N.Y. Jan. 25, 2002) (showup procedures found not unduly suggestive where defendant was shown to eyewitness in handcuffs) (citing *United States v. Ortiz,* 99 Cr. 532, 2000 WL 37998 at *1 (S.D.N.Y. Jan. 18, 2000) (showup identification procedures not unduly suggestive where "defendants [were] in handcuffs, standing beside a marked police car, and accompanied by uniformed police officers")); *Jones v. Strack,* No. 99 Civ. 1270(AJP)(LA), 1999 WL 983871, at *11 (S.D.N.Y.1999) (showup identification after street crime not unduly suggestive where defendant was "surrounded by police, with lights flashing, within a few blocks of the incident"); *United States v. Butler,* 970 F.2d 1017, 1021 (2d Cir.1992) (identification found proper where suspects were brought to robbery victim who was sitting in a police car); *United States v. Nelson,* 931 F.Supp. 194, 197, 199–200 (W .D.N.Y.1996) (showup identification in which single suspect was taken in handcuffs to eyewitnesses after hot pursuit not unnecessarily suggestive)). These cases reason that handcuffs are often "necessary incidents of an on-the-scene identification" and do not "render the pre-trial identification procedure unnecessarily suggestive." *Ortiz,* 2000 WL 37998 at *1.

***12** Plaintiff also complains that officers suggested to Guerrerio that Plaintiff was the robber, by saying, in sum or substance, "this is him," "this is the person," and "we have his car over there." (Pltf. R. 56.1 Stmt. ¶ SSS; PX 7 (DeMichele Dep.) at 175–76)

Assuming that these statements were made, the Court finds —under the totality of circumstances—that they did not "increase[ ] the risk of a misidentification to [such] an extent that the resulting identification no longer supports the requisite probability that the suspect has perpetrated a crime." *Williams,* 2012 WL 511533, at *7. Even absent these statements, it would have been obvious to Guerrerio that the police believed that Plaintiff was the perpetrator; this is an inherent factor in most showup identifications. Guerrerio's identification was based on much more than police suspicion, however. He had had a face-to-face encounter two to three hours earlier with a man who had robbed him of car parts and his cell phone. (Jones Decl., Ex. D (Guerrerio Aff.) ¶ 5) It is obvious that he not only had every motive to be paying attention, but that he did pay attention: he accurately described the uniquely customized vehicle that the perpetrator was driving. And the probable cause determination here did not rest exclusively on Guerrerio's identification of Plaintiff. It was bolstered by, *inter alia,* (1) Guerrerio's statement to the police that the car parked outside Plaintiff's apartment "was identical to the car that was involved in [the] robbery" (Jones Decl., Ex. D (Guerrerio Aff.) ¶ 12); (2) the fact that police had tracked the robber's uniquely customized vehicle to a location immediately outside Plaintiff's home; (3) the fact that a police dog had then tracked the scent inside the vehicle directly to Plaintiff's apartment; and (4) Officer Tierney's identification of Plaintiff as the driver of that vehicle.

Probable cause requires only a probability, and not "hard certainties" or even a *prima facie* showing of criminal activity.

*Walczyk v. Rio,* 496 F.3d 139, 156–57 (2d Cir.2007); *see also Illinois v. Gates,* 462 U.S. 213, 231–32, 235 (1983). That standard was met here. Because NYPD officers had probable cause to arrest Plaintiff, the City Defendants' motion for summary judgment on Plaintiff's false arrest claims will be granted, and Plaintiff's motion for summary judgment on his false arrest claims will be denied.

### III. *EXCESSIVE FORCE* [10]

Plaintiff has moved for summary judgment on his excessive force claims against Officer Ruiz, while the County and County Defendants Tierney, Ruiz, and Gutierrez, and City Defendant Bugge, seek summary judgment dismissing Plaintiff's excessive force claims against them. Plaintiff argues that Ruiz's liability has been established as a matter of law, while the County argues that (1) "any force used by the County Defendants while placing Plaintiff under arrest was *de minimis,* conformed to standardized techniques provided by New York State and [was] not violative of Plaintiff's Constitutional rights"; and (2) Plaintiff has not demonstrated that Tierney, Ruiz, and Gutierrez were personally involved in the use of excessive force. (County Sum. J. Br. 6) City Defendant Bugge likewise argues that Plaintiff has not demonstrated that he was personally involved in the use of excessive force. (City Sum. J. Br. 17–18) The County also contends that its officers are entitled to summary judgment on qualified immunity grounds. (County Sum. J. Br. 7) The Court concludes that material issues of fact concerning Plaintiff's excessive force claims preclude a ruling as a matter of law.

#### A. *Legal Standard*

***13** An excessive force claim that arises in the context of an arrest invokes the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their person ... against unreasonable ... seizures." *Graham v. Connor,* 490 U.S. 386, 394 (1989). In order to establish that an officer used excessive force, the plaintiff must demonstrate, "in light of the totality of the circumstances faced by the arresting officer, [that] the amount of force used was objectively [un]reasonable at the time." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 123 (2d Cir.2004) (citing *Graham,* 490 U.S. at 397). *See also Batson–Kirk v. City of New York,* No. 07–CV–1950, 2009 WL 1505707(KAM) (JMA), at *11 (E.D.N.Y. May 28, 2009); *Mickle v. Morin,* 297 F.3d 114, 120 (2d Cir.2002).

Because "[t]he Fourth Amendment test of reasonableness 'is one of objective reasonableness,' " *Bryant v. City of New York,* 404 F.3d 128, 136 (2d Cir.2005) (quoting *Graham,* 490 U.S. at 399), the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake. *Amnesty Am.,* 361 F.3d at 123. In balancing these interests, a court must consider, *inter alia,* "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham,* 490 U.S. at 396); *see also Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006). A court must consider the evidence " 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Tracey v. Freshwater,* 623 F.3d 90, 96 (2d Cir.2010) (quoting *Jones,* 465 F.3d at 61). Moreover, courts must "make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " *Id.* (quoting *Graham,* 490 U.S. at 397). Nonetheless, the Second Circuit has cautioned that, "[g]iven the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am.,* 361 F.3d at 123 (citing *O'Bert v. Vargo,* 331 F.3d 29, 37 (2d Cir.2003)).

" 'Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out.' " *Castro v. Cnty. of Nassau,* 739 F.Supp.2d 153, 176 (E.D.N.Y.2010) (quoting *Esmont v. City of New York,* 371 F.Supp.2d 202, 214 (E.D.N.Y.2005)). Placing handcuffs on an arrestee tight enough to cause nerve damage may, however, constitute excessive force in violation of the Fourth Amendment. *Warren v. Williams,* No. Civ.A. 304CV537 (JCH) 2006 WL 860998, at *36 (D.Conn. Mar. 31, 2006) (citing *Kopec v. Tate,* 361 F.3d 772, 777 (3d Cir.2004); *Lucky v. City of New York,* 03 Civ.1983, 2004 WL 2088557, at *7 (S.D.N.Y. Sept. 20, 2004)). To determine whether the handcuffing of an arrestee was reasonable, the handcuffing must be viewed "in light of the minimal amount of force necessary to maintain custody of [the arrestee]." *Esmont,* 371 F.Supp.2d at 215. "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: (1) the handcuffs were unreasonably tight; (2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and (3) the degree of injury to the

wrists." *Id.* (citing *Burchett v. Kiefer,* 310 F.3d 937, 944–45 (6th Cir.2002) (additional citation omitted)).

***14** Applying these standards here, the Court cannot find as a matter of law either that the use of force was justified or that it was excessive. There is conflicting evidence as to, *inter alia,* the nature of the force that was used, who employed that use of force, and the degree to which Plaintiff was resisting arrest.

### B. *Resistance Offered and Force Used*

Beginning with the three factors cited in *Amnesty America,* 361 F.3d at 123—"the severity of the crime ..., whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"—the crime at issue—armed robbery—was extremely serious. Given that the victim reported that the suspect had threatened to shoot him (Jones Decl., Ex. D (Guerrerio Aff.) ¶ 5), the officers had good cause to fear for their safety. The suspect had also fled from police; indeed, the suspect had led the police on a high-speed car chase from the Hutchinson River Parkway in Westchester County to a location in the Bronx, smashing his car into a police cruiser along the way in order to evade capture.

It is undisputed that Gutierrez—with the help of other officers—placed handcuffs on Plaintiff, and that he was then led out of the back yard of 1164 Edison Avenue. (County R. 56.1 Stmt. ¶ 54; Pltf. R. 56.1 Stmt. ¶¶ II–LL; PX 7 (DeMichele Dep.) at 148) It is likewise undisputed that Ruiz used "cuff control" [11] "to gain [Plaintiff's] compliance." (PX 11 (Ruiz Dep.) at 84) The remaining facts about this incident are very much in dispute.

Plaintiff admits that while up against the brick wall, he turned his head from side to side (County R.56.1 Stmt. ¶¶ 52, 90; *see also* Jones Decl., Ex. E (Tierney Dep.) at 81), but denies that he resisted arrest in any other way. (PX 7 (DeMichele Dep.) at 143–44) Brescia also testified that Plaintiff was not resisting arrest, and would not have been able to resist arrest, because the officers "had him." (Jones Decl., Ex. C (Brescia Dep.) at 166)

According to Plaintiff, however, he was pushed into a wall, the police repeatedly "stomped" on his bare feet, his head was repeatedly driven into the brick wall, he was repeatedly punched in the ribs, he was "thrown down onto the floor in the backyard" "face forward," and then picked up by the handcuffs attached to his wrists. [12] (PX 7 (DeMichele Dep.) 144–48, 153, 155–58) Plaintiff claims that the blows were severe enough to cause bleeding on his feet, from his head, and in his mouth, and Plaintiff "felt like [he] was going to pass out." (*Id.* at 146, 148) As Plaintiff was led out through the backyard of 1164 Edison, a police officer told him to "say good-bye to [his] pretty Mercedes." (*Id.* at 161) After Plaintiff replied, "that's not my car," the officer punched him in the face, and he fell to the ground. (*Id.* at 161, 166)

Plaintiff asserts that the handcuffs were tight enough to cause bruising to his wrists (*id.* at 143), and there is evidence that he sustained bruising on his wrists, neck and the back of his head, a gash to his knee, and a cut above his left eye. (PX 20, 21; Jones Decl., Ex. J (Ruiz Dep.) at 93–94) Officer Serlin testified that he observed "blood near the bridge of [DeMichele's] nose." (Pltf. R. 56.1 Stmt. ¶ VV; PX 16 (Serlin Dep.) at 31) DeMichele testified that he sought medical treatment after his release on bail, because he was feeling pain throughout his body, including his head, neck, back, arms, wrists, knees, and feet. (PX 7 (DeMichele Dep.) at 251; *see also* Pltf. Resp. to County R. 56.1. Stmt., Ex. 5 (letter from treating physician))

***15** The police officers tell a very different story. Officer Serlin testified that the Plaintiff began "to flail his arms and struggle with the NYPD Officers" before starting to walk up the stairs from his basement apartment. (PX 16 (Serlin Dep.) at 18–19) Serlin stated that the NYPD officers "had their hands on him. They were trying to subdue him but he was not allowing them to." (*Id.*) "[Plaintiff] continued to fight and kick, throw his arms around, disregard, I guess, their commands. I could hear them yelling at him at that point, 'Stop resisting,' which he didn't." (*Id.* at 20)

Officer Tierney also testified that Plaintiff resisted arrest by failing to comply with police orders to put his hands behind his back, flailing his arms, and not cooperating with the officers. (Jones Decl., Ex E (Tierney Dep) at 73) Tierney testified that DeMichele kept pulling his arms away, and turning his head from side to side, but eventually he was pushed up against a brick wall and placed in handcuffs. (*Id.* at 81–82).

Officer Ruiz likewise testified that Plaintiff resisted arrest, flailed his arms, attempted to kick him and Officer Gutierrez, and at one point broke free from their grasp while in the rear yard. (PX 11 (Ruiz Dep.) at 44, 47, 84) Officer Gutierrez also testified that Plaintiff refused to walk while the officers

were escorting him to the police car. (PX 10 (Gutierrez Dep.) at 175–79) Urprasad denies having punched DeMichele or seeing any other officer striking him. (PX 30 (Urprasad Dep.) at 65–66, 70). Officer Gutierrez also testified that no police officer struck Plaintiff. (PX 10 (Gutierrez Dep.) at 175–79)

In sum, there are material issues of fact concerning both the extent to which Plaintiff resisted arrest and the degree of force that was used in effecting Plaintiff's arrest. "Plaintiff['s] allegations are sufficient to create issues of fact as to the objective reasonableness of the degree of force used by the police officers. Plaintiff[ ] aver[s] that [his] resistance to arrest was purely passive, and that the police used more force than was necessary to [effect the arrest]. [The Second Circuit has] previously held that allegations involving comparable amounts of force used during the arrest of a nonviolent suspect are sufficient to allow a reasonable factfinder to conclude that the force used was excessive." *Amnesty Am.,* 361 F.3d at 123–24 (plaintiffs thrown to ground, dragged on the ground face down, and had head slammed into a wall) (citing *Robison v. Via,* 821 F.2d 913, 923–24 (2d Cir.1987) (evidence that police yanked arrestee out of a car, threw her against it, and pinned her arm behind her back were sufficient to withstand summary judgment in excessive force case). [13]

Plaintiff's motion for summary judgment on his excessive force claim against Officer Ruiz will be denied. The County Defendants' summary judgment motion concerning Plaintiff's excessive force claim will likewise be denied to the extent that it is premised on the argument that "any force used by the County Defendants while placing Plaintiff under arrest was *de minimis,* conformed to standardized techniques provided by New York State and [was] not violative of Plaintiff's Constitutional rights." (County Sum. J. Br. 6)

### C. *Personal Involvement*

***16** County Defendants Tierney, Gutierrez, and Ruiz, and City Defendant Bugge, contend that DeMichele's excessive force claim against them must be dismissed because he has not demonstrated their personal involvement.

" 'In this Circuit, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Smith v. New York City Police Dept,* No. 06 Cov. 15436(JSR)(KNF), 2010 WL 423039, at *4 (S.D.N.Y. Feb. 4, 2010) (quoting *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "To survive a motion for summary judgment, there must be some evidence of the personal involvement of each defendant in the alleged constitutional deprivation." *Ricks v. O'Hanlon,* No. 07 Civ. 9849(WHP), 2010 WL 245550, at *4 (S.D.N.Y. Jan. 19, 2010) (citing *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986); *Universal Calvary Church v. City of New York,* No. 96 Civ. 4606(RPP), 2000 WL 1538019, at *16 (S.D.N.Y. Oct. 17, 2000). " 'Personal involvement' is a question of fact, governed by the general rule that summary judgment may be granted only if no issues of material fact exist." *Shankle v. Andreone,* No. 06–CV–487 (NG)(LB), 2009 WL 3111761, at *5 (E.D.N.Y. Sept. 25, 2009) (citing *Williams,* 781 F.2d at 323). "A police officer is personally involved in the use of excessive force if the officer either: (1) directly participates in an assault; or (2) is present during the assault, and fails to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Vesterhalt v. City of New York,* No. 07 Civ. 2142(MGC), 2009 WL 3424122, at *3 (S.D.N.Y. Oct. 26, 2009) (citing *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997)); *see also Shankle,* 2009 WL 3111761, at *5 ("personal involvement may ... be proved by, among other things, a defendant's failure to remedy an alleged constitutional violation after learning of it or a defendant's gross negligence in managing subordinates" (citing *Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 229 (2d Cir.2004); *Lehman v. Kornblau,* 134 F.Supp.2d 281, 288 (E.D.N.Y.2001)).

"[A]n arrestee's 'inability to positively identify those who allegedly violated his rights is not *per se* fatal to his claims.' " *Shankle,* 2009 WL 3111761, at *5 (quoting *Davis v. Callaway,* No. 3:05CV00127, 2007 WL 1079988, at *8 (D. Conn. April 9, 2007) and citing *Munoz v. Martinez,* No. 03 CV 0828(LAK), 2005 WL 1355094 (S.D.N.Y. June 8, 2005) ("A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene.")) "This is especially true where the acts complained of ... if true ... are likely to have prevented plaintiff from identifying which [officers] specifically engaged in the bad acts." *Shankle,* 2009 WL 3111761, at *5 (citing *Davis,* 2007 WL 1079988, at *9); *see Shankle,* 2009 WL 3111761, at *5–6 (summary judgment denied even though plaintiff was "unable to identify the particular officers who subjected him to excessive force"); *Munoz v. Martinez,* No. 03 Civ. 0828(LAK), 2005 WL 1355094, at *5 (S.D.N.Y. June 8, 2005) (arrestee "must submit some sort of evidence that [officer] was present at the scene of the alleged assault" to survive summary judgment on personal involvement).

***17** Here, it is undisputed that all four officers—Tierney, Gutierrez, Ruiz, and Bugge—were present at DeMichele's arrest at the time of the alleged use of excessive force (PX 2 (SUI Report) at P226–P230; County Resp. to Pltf. R. 56.1 Stmt. ¶¶ HH–OO; PX 29 (Bugge Dep.) at 28–31, 36–41), and that Ruiz, Gutierrez, and Tierney were all involved in handcuffing Plaintiff. (PX 13 (Tierney Dep.) at 76; PX 10 (Gutierrez Dep.) at 35; PX 11 (Ruiz Dep.) at 83–85) Moreover, DeMichele testified that there were multiple officers around him when he suffered the blows described above, and that, for part of the time he was beaten, his face was up against a brick wall (PX 7 (DeMichele Dep.) at 141), preventing him for seeing which officers were taking what actions. Although DeMichele cannot say for certain which officers allegedly assaulted him and in what way, Plaintiff "need not establish who, among a group of officers, directly participated in the attack and who failed to intervene," *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (citing *Skorupslki v. Cnty of Suffolk,* 652 F.Supp. 690, 694 (E.D.N.Y.1987)), as long as "there [was] a realistic opportunity to intervene to prevent the harm from occurring." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) (citing *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988)); *Husbands ex rel. Forde v. City of New York,* No. 05 Civ. 9252(NRB), 2007 WL 2454106, at *11 (S.D.N.Y. Aug. 16, 2007). Given that Tierney, Gutierrez, Ruiz, and Bugge were concededly all present when the alleged, repeated acts of abuse took place, they had an opportunity to intervene. Accordingly, the County Defendants' motion for summary judgment on Plaintiff's excessive force claim willo-as to Officers Tierney, Gutierrez, Ruiz—be denied. Defendant Bugge's motion for summary judgment on the excessive force claim will likewise be denied. *See Ricks,* 2010 WL 245550, at *5 (citing *Younger v. City of N.Y.,* 480 F.Supp.2d 723, 731–33 (S.D.N.Y.2007) (summary judgment denied on personal involvement grounds where arrestee alleged officers' presence and a police report listed them as present at the scene).

### D. *Qualified Immunity*

The County argues that Plaintiff's excessive force claim against the County officers must be dismissed on qualified immunity grounds. [14] (County Sum. J. Br. 7) As a general matter, police officers who violate a plaintiff's constitutional rights are nevertheless entitled to qualified immunity if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003). It is well established that "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier v. Katz,* 533 U.S. 194, 201–02 (2001), overruled in part on other grounds by *Pearson v. Callahan,* 555 U.S. 223 (2001) (citing *Graham v. Connor,* 490 U.S. 386 (1989)). However, identifying the generalized constitutional protection is not enough; the law must be "clearly established in a more particularized sense," *Kerman v. City of New York,* 261 F.3d 229, 236 (2d Cir.2001) (citing *Anderson v. Creighton,* 488 U.S. 635, 640 (1986)), that is, "in ... the specific context of the case." *Saucier,* 533 U.S. at 201. The Supreme Court has made clear that officers who have used excessive force may be entitled—under the qualified immunity doctrine—to an extra layer of protection "from the sometimes hazy border between excessive and acceptable force." *Id.* at 206. The relevant inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202; *see Loria v. Gorman,* 306 F.3d 1271, 1286 (2d Cir.2002) ("Said differently, ... we analyze the objective reasonableness of the officer's belief in the lawfulness of his actions.").

***18** As to the County officers named as defendants in Plaintiff's excessive force claim, there are material issues of fact that preclude summary judgment on their qualified immunity defense. If, as Plaintiff and other witnesses have testified, Plaintiff was not resisting arrest but was nonetheless beaten, the officers could not have reasonably believed that their actions were lawful. Resolution of Plaintiff's excessive force claim and Defendants' qualified immunity defense requires credibility determinations that are the province of a jury. *See Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994).

To the extent that the County Defendants' motion for summary judgment on Plaintiff's excessive force claim is predicated on qualified immunity, it will be denied.

## IV. *MALICIOUS PROSECUTION*

Plaintiff and the City Defendants have cross-moved for summary judgment on Plaintiff's Section 1983 and state law claims for malicious prosecution against the City and NYPD officers Urprasad, Mellusi, and DiCarlo.

### A. *Legal Standard*

"To state a claim for malicious prosecution [under New York law], a plaintiff must show (1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) termination

of the proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Drummond v. Castro,* 522 F.Supp.2d 667, 677 (S.D.N.Y.2007) (citing *Russel v. Smith,* 68 F.3d 33, 36 (2d Cir.1995). To prevail on a Section 1983 malicious prosecution claim, a plaintiff must establish these four elements and also show that "his Fourth Amendment rights were violated after legal proceedings were initiated." *Douglas v. City of New York,* 595 F.Supp.2d 333, 341 (S.D.N.Y.2009) (citing *Fulton v. Robinson,* 289 F.3d 188, 195 (2d Cir.2002) (citations omitted). To satisfy the constitutional element, plaintiff must show a seizure or other "perversion of proper legal procedures" implicating plaintiff's personal liberty and privacy interests under the Fourth Amendment. *Washington v. Cnty. of Rockland,* 373 F.3d 310, 316 (2d Cir.2004).

Courts considering a malicious prosecution claim must determine whether, at the time a prosecution was commenced, "there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced." *Coakley v. 42nd Pct. Case 458,* No. 08 Civ. 6206(JSR), 2009 WL 3095529, at *6 (S.D.N.Y. Sept. 28, 2009) (quoting *Mejia v. City of New York,* 119 F.Supp.2d at 254). "As with a false arrest claim, the presence of probable cause is a complete defense to an action for malicious prosecution." Drummond, 522 F.Supp.2d at 677 (citing *Graebe v. Falcetta,* 726 F.Supp. 36, 38 (E.D.N.Y.1989), *aff'd,* 946 F.2d 883 (2d Cir.1991)). For purposes of a malicious prosecution claim, "the determination of probable cause is assessed in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest." *Id.* at 678–79. " '[E]ven when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause.' In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996) (quoting *Cox v. Cnty. of Suffolk,* 780 F.Supp. 103, 108 (E . D.N.Y.1991)).

**B. *Analysis***

***19** Given the Court's finding that Plaintiff's arrest was supported by probable cause, Plaintiff must demonstrate that evidence uncovered after his arrest, but before the Criminal Complaint was filed, vitiated probable cause. *Drummond,* 522 F.Supp.2d at 678.

There is no such evidence. A criminal complaint—signed by Officer DiCarlo—was filed against DeMichele on January 18, 2009. (PX 36) He was arraigned on January 20, 2009, and released on his own recognizance. (Pltf. R. 56.1 Stmt. ¶¶ TTTT, VVVV) He was ordered to return to Bronx County Supreme Court on March 26, 2009. (Pltf. R. 56.1 Stmt. ¶ WWWW)

The record shows that County Detective Fumuso thereafter commenced an investigation that led him to believe that Plaintiff had been wrongly accused. (Ptlf. R. 56.1 Stmt. ¶ XXXX; Jones Decl., Ex. M (Fumuso Aff.)) In late January 2009, Fumuso shared his concerns with NYPD Detective Fennel. (City R.56.1. Stmt. ¶ 116) On February 2, 2009, Det. Fennel arranged for Guerrerio to look at a photo array, and Guerrerio identified Desideri as the man who had robbed him. (PX 28 (Fennel Dep.) at 57–58) Fennel notified the Bronx County District Attorney's Office of this development that same day. (Pltf. R. 56.1 Stmt. ¶ AAAAA) When Plaintiff returned to Bronx County Supreme Court on March 26, 2009, the People dismissed the charges against him. (Pltf. R. 56.1 Stmt. ¶ CCCCC; PX 39)

Plaintiff has made no showing that Officer DiCarlo, or Sergeant Mellusi and Captain Urprasad—who allegedly had supervisory responsibility for the filing of the complaint (Pltf. Opp. City Br. 11–14)—had any reason to doubt that there was probable cause to begin a prosecution. The Court has already found that the City Defendants had probable cause to arrest Plaintiff. Plaintiff has made no showing that that probable cause dissipated between the arrest and the filing of the criminal complaint. *See Lowth,* 82 F.3d at 571.

The City Defendants' motion for summary judgment on Plaintiff's malicious prosecution claims will be granted, and Plaintiff's motion for summary judgment on these claims will be denied.

**V. *MONELL CLAIMS***

The City and County argue that they are entitled to summary judgment on all of Plaintiff's claims because he has not demonstrated a basis for *Monell* liability. *See Monell v. Dep't. of Social Servs. of City of New York,* 436 U.S. 658, 694 (1978). Plaintiff names the City as a defendant in his excessive force, false arrest, malicious prosecution, and assault and battery claims; the County is named as a defendant in Plaintiff's excessive force, false arrest, and assault and battery claims. (Am.Cmplt.)

As an initial matter, based on the rulings made earlier in this opinion, the City and County are entitled to summary

judgment on Plaintiff's *Monell* claims to the extent that they are predicated on false arrest and malicious prosecution causes of action, because those claims have been dismissed.

A prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor. *"Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006). Municipal liability under Section 1983 thus requires proof that a particular constitutional or statutory violation was the result of an official policy; "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983." *Monell,* 436 U.S. at 694. The Second Circuit has explained that a plaintiff "must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer. Second, the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and the deprivation of his constitutional rights." *Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985). To establish liability under *Monell,* a plaintiff must show that the municipality bore some responsibility for violations of his constitutional rights. *See, e.g., City of Canton v. Harris,* 489 U.S. 378, 385 (1989).

***20** A plaintiff may demonstrate the existence of a policy or practice in a variety of ways. First, he may provide evidence of a formal policy officially adopted by the municipality. *Monell,* 436 U.S. at 690. Second, a single unconstitutional act or decision, when taken by an authorized decision-maker, may be considered policy and thus subject a municipality to liability. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 405–06 (1997). Third, a policy may be established by showing that the acts of the municipal agent were part of a widespread practice that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988); *Monell,* 436 U.S. at 690–91. " 'The policy or custom used to anchor liability need not be contained in any explicitly adopted rule or regulation,' " but must be " 'persistent and widespread.' " *Morpurgo v. Inc. Vill. of Sag Harbor,* 697 F.Supp.2d 309, 325 (E.D.N.Y.2010) (quoting *Sorlucco v. New York Police Dep't,* 971 F.2d 864, 870–71 (2d Cir.1992). Fourth, where a municipality's failure to provide adequate training or supervision of its agents rises to the level of deliberate indifference, Section 1983 liability may lie against the municipality. *See, e.g., Brown,* 520 U.S. at 407–08; *see generally City of Canton,* 489 U.S. at 388–89.

"[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.1998) (quoting *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)). *Monell* liability may spring from a single violation only where the conduct causing the violation was undertaken pursuant to a municipality-wide custom, practice, or procedure. *Sforza v. City of New York,* No. 07 Civ. 6122(DLC), 2009 WL 857496, at *11 (S.D.N.Y. Mar. 31, 2009) (citing *DiSorbo v. Hoy,* 343 F.3d 172, 180–81 (2d Cir.2003)).

In order to prove that a municipality's inaction amounts to deliberate indifference to the rights of its citizens, a plaintiff must show that: (1) a policymaker knows "to a moral certainty" that employees will confront a given situation; (2) the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult, or that there is a history of employees mishandling the situation; (3) the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. *City of Canton,* 489 U.S. at 390. *City of Canton* requires a plaintiff to establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that a specific deficiency in the city's training program is "closely related to the ultimate injury," such that it "actually caused" the constitutional deprivation. *Ambrose v. City of New York,* 623 F.Supp.2d 454, 465 (S.D.N.Y.2009) (citing *City of Canton,* 489 U.S. at 391). Where a plaintiff has shown only misbehaving officers, but has not offered proof of an official policy that led to the constitutional or statutory violation, his *Monell* claim under Section 1983 must fail. *See, e.g., Turpin v. Mailet,* 619 F.2d 196, 203 (1980) (reversing jury verdict against municipality in Section 1983 action where plaintiff failed to show that unlawful arrest "was made pursuant to any official policy of the City of West Haven").

### A. *City of New York*

***21** In opposing the City's motion for summary judgment concerning his *Monell* claim, Plaintiff argues that "either a lack of training and/or an institutional culture led to the beating, and arrest and criminal charges, without probable

cause." (Pltf. Opp. City Br. at 21) As noted above, because the City Defendants are entitled to summary judgment on Plaintiff's false arrest and malicious prosecution claims, *Monell* liability cannot be predicated on these claims. *Claudio v. Sawyer,* 675 F.Supp.2d 403, 409–10 (S.D.N.Y.2009) (Once a "district court properly [finds] no underlying constitutional violation, its decision not to address the municipal defendant's liability under Monell [i]s entirely correct.") (quoting *Segal,* 459 F.3d at 219); *see also Costello v. City of Burlington,* 632 F.3d 41, 49 (2d Cir.2011) (to prevail on a *Monell* claim, plaintiff must show that there was a constitutional violation and that a specific policy or custom of the municipality caused the violation); *Khan v. Ryan,* 145 F.Supp.2d 280, 285 (E.D.N.Y.2001) ("If there is no underlying constitutional violation by a municipal official, the municipality is not liable.")

As to Plaintiff's excessive force claim, he has not pointed to any formal policy, officially promulgated or adopted by the City, that led to the alleged constitutional deprivation. *Monell,* 436 U.S. at 691. To the contrary, Plaintiff argues that a number of NYPD policies were violated during his arrest.[15] (Pltf. Opp. City Br. at 21–22) Plaintiff has likewise not offered any evidence that the excessive force allegedly exercised here was "part of a widespread practice" constituting "a custom or usage of which the supervisor must have been aware." *City of St. Louis,* 485 U.S. at 130. Similarly, Plaintiff has not offered evidence that any of the named defendants were authorized to set policy for the City or the NYPD. *Cf. Brown,* 520 U.S. 397.

Indeed, Plaintiff's sole statement concerning *Monell* liability premised on excessive force is that "either a lack of training and/or an institutional culture led to ... [p]articipation by high-ranking NYPD officers in improper police practices, and observation of subordinate officers acting improperly, and failing to take action to stop it." (Pltf. Opp. City Br. at 21–22) This assertion is not sufficient to defeat summary judgment.

Plaintiff has offered no evidence regarding the training—or lack thereof—given to NYPD officers, nor has he offered any proof demonstrating that the City is deliberately indifferent to the use of excessive force. *Chiaro v. Cnty. of Nassau State of New York,* No. CV 09–3702(SJF)(AKT), 2011 WL 3701804, at *6 (E.D.N.Y. July 11, 2011) (granting summary judgment to County where the record contained no evidence of the County's failure to train its police officers, or any failure that amounted to "deliberate indifference") (citing *City of Canton,* 489 U.S. at 388)). Plaintiff cites to a report prepared by his expert, Walter Signorelli (Carlino Aff., Ex.D (Signorelli Report)), asserting that a number of violations of police procedures and practices took place in connection with Plaintiff's arrest. This report does not address the training actually provided to NYPD officers, however, and accordingly does not support Plaintiff's *Monell* claim. *Hickey v. City of New York,* No. 01 Civ. 6506(GEL), 2004 WL 2724079, at *20 (S.D.N.Y. Nov. 29, 2004). "[I]t is impossible to prevail on a claim that the [municipality's] training program was inadequate without any evidence as to ... how the training was conducted, how better or different training could have prevented the challenged conduct, or how a hypothetically well-trained officer would have acted under the circumstances." *Amnesty Am.,* 361 F.3d at 130 (quotation omitted).

***22** At best, Plaintiff has shown only misbehaving officers. Because he has not offered evidence of an official policy that led to the alleged excessive force, the City of New York is entitled to summary judgment on his *Monell* claim.

### B. *Westchester County*

In support of his *Monell* claim against the County, Plaintiff relies exclusively on (1) testimony from Officer Ruiz and Sergeant McGuinness indicating that they believe that "cuff control" is an "authorized police practice"; and (2) Westchester County Department of Public Safety General Orders stating that handcuffs should not be used to cause pain or injury, and that any force used by police must be reasonable under the circumstances. (Pltf. Opp. County Br. at 22 (citing Carlino Decl., Ex. D (Signorelli Report) at 14; PX 14 (Westchester General Order § 41.01); PX 15 (Westchester General Order § 1.02)). Plaintiff argues that the County officers' alleged use of excessive force was the product of the County's "failure to train and/or supervise" and "the organizational culture." (*Id.* at 23)

Plaintiff's *Monell* claim against the County based on excessive force fails for the same reasons that his *Monell* claim against the City fails. Plaintiff has not pointed to any formal policy, officially promulgated or adopted by the County that led to the alleged constitutional deprivation. *Monell,* 436 U.S. at 691. To the contrary, Plaintiff argues that Officer Ruiz violated Westchester Department of Public Safety general orders.[16] (Pltf. Opp. County Br. at 22) Plaintiff has likewise not offered any evidence that the excessive force allegedly exercised by the County Defendants was "part of a widespread practice" constituting "a custom or usage of which a supervisor must have been aware." *City of St. Louis,* 485 U.S. at 130. Similarly,

Plaintiff has not offered evidence that any of the named defendants were authorized to set policy for the County. *Cf. Brown,* 520 U.S. 397.

As with the City, Plaintiff has offered no evidence regarding the training—or lack thereof—given to County police officers, nor has he offered any proof demonstrating that the County is deliberately indifferent to the use of excessive force. As discussed in connection with Plaintiff's *Monell* claim against the City, these and the other evidentiary deficiencies cited above are fatal to Plaintiff's *Monell* claim. *See Jenkins,* 478 F.3d at 95; *Amnesty Am.,* 361 F.3d at 130; *Chiaro,* 2011 WL 3701804, at *6.

The County's motion for summary judgment on Plaintiff's *Monell* claim will be granted. [17]

## VI. *PUNITIVE DAMAGES*

The County Defendants have moved for summary judgment on Plaintiff's claim for punitive damages under Section 1983 and state law. (County Sum. J. Br. 15–17)

Although a municipality is immune from a claim for punitive damages, *see City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 258–68 (1981), that immunity does not extend to a municipal official sued in his individual capacity. *See, e.g., Smith v. Wade,* 461 U.S. 30, 55–56 (1983). Punitive damages may be awarded in a Section 1983 action where a plaintiff demonstrates that " 'the defendant's conduct is ... motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others,' or, in other words, when a plaintiff has produced evidence of 'a positive element of conscious wrongdoing' or 'malice.' " *Cameron v. City of New York,* 598 F.3d 50, 69 (2d Cir.2010) (quoting *New Windsor Volunteer Ambulance Corps., Inc. v. Meyers,* 442 F.3d 101, 121–22 (2d Cir.2006). The Second Circuit has sustained punitive damage awards in Section 1983 excessive force cases involving conduct and injuries comparable to those alleged here. *Compare* Pltf. Resp. to County R. 56.1. Stmt. ¶ 168 and Appx., Ex. 5 *with Ismail v. Cohen,* 899 F.2d. 183, 185 (2d Cir.1990) (upholding $150,000 punitive damage award in Section 1983 action where arrestee suffered two displaced vertebrae, a cracked rib, and serious head trauma); *O'Neill v. Krzeminski,* 839 F.2d 9, 13 (2d Cir.1988) (upholding $185,000 punitive damage award where plaintiff suffered fractured nose and lacerations to head and face). The County Defendants' motion for summary judgment as to Plaintiff's Section 1983 punitive damages claim will be granted as to the County Defendants in their official capacities, but will otherwise be denied.

***23** Plaintiff also seeks punitive damages on his state law claims of assault and battery. As an initial matter, any claim against the County, or against the County Defendants in their official capacities, for punitive damages based on assault and battery is barred. *See, e.g., Karoon v. New York City Transit Authority,* 241 A.D.2d 323, 324 (1st Dept.1997) ("The [New York] Court of Appeals has clearly held that the State and its political subdivisions ... are not subject to punitive damages." (citing *Sharapata v. Town of Islip,* 56 N.Y.2d 332, 334 (1982)); *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 386 (1987) (citing *Sharapata,* 56 N.Y.2d at 338).

As to the County Defendants in their individual capacities, a plaintiff seeking punitive damages under New York law must show evidence of wrongdoing that is " ' " 'intentional and deliberate, and has the character of outrage frequently associated with crime.' " ' " *Freeman v. The Port Authority of New York and New Jersey,* 243 A.D.2d 409, 410 (1st Dept.1997) (quoting *Liberman v.. Riverside Mem. Chapel,* 225 A.D.2d 283, 291 (1st Dept.1996) (quoting *Prozeralik v. Capital Cities Commc'ns.,* 82 N.Y.2d 466, 479 (1993) (quoting Prosser and Keeton, Torts § 2 at 9 (5th ed.1984)))). New York courts have permitted punitive damages claims to proceed based on conduct not dissimilar to that alleged here. *See, e.g., Freeman,* 243 A.D.2d at 411. The County Defendants' summary judgment motion on punitive damages will be denied to the extent that it addresses Plaintiff's state law assault and battery claims against the County Defendants in their individual capacities.

## *CONCLUSION*

Plaintiff's motion for summary judgment (Dkt. No. 77) is denied in its entirety.

The City Defendants' motion for summary judgment (Dkt. No. 72) is granted as to (1) all Section 1983 claims against the City of New York; (2) Plaintiff's claims against NYPD Officer Nyberg; (3) Plaintiff's Section 1983 and state law claims for false arrest; (4) Plaintiff's Section 1983 and state law claims based on malicious prosecution; and is otherwise denied.

The County Defendants' motion for summary judgment (Dkt. No. 80) is granted as to (1) all Section 1983 claims

against the County of Westchester; (2) Plaintiff's Section 1983 claim against County Officers Lieberman, Brady, and Pucillo for denial of access to the courts; (3) Plaintiff's state law assault and battery claims against County Officer Serlin; (4) Plaintiff's Section 1983 and state law claims for false arrest; (5) Plaintiff's Section 1983 punitive damages claims against the County and the individual County defendants in their official capacities; and (6) Plaintiff's punitive damages claim based on assault and battery, to the extent that claim is made against the County and the individual County defendants in their official capacities; and is otherwise denied.

The Clerk of the Court is directed to terminate the motions (Dkt.Nos.72, 77, 80).

***24** The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order. The joint pre-trial order will be filed on October 19,2012. Motions *in limine, voir dire* requests, and requests to charge are due on October 19, 2012. Responsive papers, if any, are due on October 26, 2012.

Trial will commence on November 13, 2012, at 9:00 a.m.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4354763

## Footnotes

1 Nyberg is incorrectly named in the caption as Myberg.

2 Plaintiff consents to the dismissal of (1) his claims against Officer Nyberg (Pltf. Opp. City Br. at 24); his Section 1983 claim for denial of access to the courts as against Officers Lieberman, Brady, and Pucillo (Pltf. Opp. County Br. at 24–25); and his state law assault and battery claims against Officer Serlin. (*Id.*) Accordingly, these claims will be dismissed.

3 To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. *See Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003) ("If the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

4 Brescia testified that, while at the diner, Desideri told the group about how, earlier that evening, he and Reveccio had robbed a person named Rob, taking a car part from him. (*Id.* at ¶ 32; Jones Decl., Ex. C (Brescia Dep.) at 28, 128–29) Plaintiff does not recall this conversation. (PX 7 (DeMichele Dep) at 75)

5 Plaintiff claims that he suffered "serious and permanent injuries" to his shoulder, wrist and spine. (Pltf. Resp. to County R. 56.1 Stmt. ¶ 168) He underwent surgery in July 2010 to repair damage to his left shoulder. Plaintiff's physician has opined that his shoulder injury, and other injuries to his neck, back, and wrist, resulted from the January 18, 2009 incident, and that the defendant will continue to suffer a "permanent loss of movement, permanent weakness, and permanent recurrent pain." (*Id.,* Appx., Ex. 5)

6 "[L]iability for false arrest [under New York law] also gives rise to liability under 42 U.S.C. § 1983." *Savino,* 331 F.3d at 75.

7 In arguing that the City Defendants did not have probable cause to arrest him, Plaintiff relies on Guerrerio's statements in the days after the arrest. (*See, e.g.,* Ptlf. R. 56.1 Stmt. ¶ QQQ) These statements are not relevant to whether there was probable cause at the time of the arrest, however. *See Mejia,* 119 F.Supp.2d

at 253 (probable cause determination is based on the information possessed or reasonably available to an officer at the time of the arrest).

8 Plaintiff mistakenly argues that DiCarlo and Urprasad did not have probable cause to arrest him, because they relied on information provided by other officers. (Pltf. Sum. J. Br. at 17) Police officers are entitled to rely on information provided by other officers, however, and each individual officer need not have probable cause to arrest. *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006) (police officers are entitled to rely on information provided by fellow officers)

9 Plaintiff did not tell police that Desideri had run into his apartment and was hiding inside, even though he suspected that the police were looking for Desideri. (Jones Decl., Ex. A (DeMichele Dep.) at 487).

10 Plaintiff's Section 1983 excessive force claim is brought against the City, the County, NYPD Deputy Inspector Bugge, NYPD Captain Urprasad, and County Officers Tierney, Ruiz, and Gutierrez. (Am. Cmplt., First Cause of Action)

11 Ruiz explains that “cuff control” is “when handcuffs are placed on the suspect, you twist the hands at a pressure point on the wrists ... basically using pressure points to gain compliance.” (PX 11 (Ruiz Dep.) at 85–86) “It is not tightening the handcuffs. Maneuvering either back or forth.” (*Id.* at 91)

12 DeMichele testified that it was Defendant Urprasad who punched him in the ribs, “stomped” onto his bare feet, and lifted him from the ground by his handcuffs. ((Pltf. R. 56.1 Stmt. ¶¶ RR, SS, TT; PX 8 (DeMichele Dep.) at 435–36)

13 While a plaintiff who suffers only *de minimis* injuries may not be able to survive summary judgment on an excessive force claim, the injuries here are sufficient to trigger potential liability for excessive force. *See, e.g., Robison,* 821 F.2d at 923–24 (summary judgment denied where officer twisted plaintiff's arm and she suffered a bruise of unspecified extent and degree; no evidence that bruise persisted or required medical treatment); *Mickle v. Morin,* 297 F.3d 114, 120–21 (2d Cir.2002) (citing cases) (reversing judgment as a matter of law where plaintiff alleged injury from the use of handcuffs that were allegedly too tight); *Davis v. City of New York,* No. 04–CV–3299 (JFB)(RLM), 2007 WL 755190, at *12–13 (E.D.N.Y. Feb. 15, 2007) (denying summary judgment where plaintiff alleged redness and soreness in shoulder after officer kicked her); *see also Blair v. City of New York,* No. 03 CV 1485(SLT)(CLP), 2009 WL 959547, at *10–11 (E.D.N.Y. Mar. 31, 2009) (rejecting need to show continuing or long-term injury or medical treatment); *Sforza v. City of N.Y.,* No. 07 Civ. 6122(DLC), 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009) (“[P]laintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient.”).

14 To the extent that the City Defendants and the County Defendants argue that they are entitled to summary judgment on Plaintiff's false arrest claims on qualified immunity grounds (City Sum. J. Br. 16; County Sum. J. Br. 7), their motions are denied as moot.

15 In the event that a defendant NYPD officer violated the NYPD Patrol Guide, that may be evidence of excessive force, but such proof does not demonstrate that the City was indifferent to the use of excessive force. *Flemming v. City of New York,* No. 02 Civ. 4113(PKC), 2008 WL 80746, at *3 (S.D.N.Y. Jan. 2, 2008) (“While plaintiff's own testimony is evidence that the Patrol Guide—a City policy—was not followed, that evidence does not equate to evidence that the City was deliberately indifferent to whether its police officers followed the policy or used excessive force.”).

16 In the event that Officer Ruiz violated the general orders, that may be evidence of excessive force, but does not demonstrate that the County was indifferent to the use of excessive force. *See Flemming,* 2008 WL 80746, at *3.

17 Because the Court has granted summary judgment to the County as to all of Plaintiff's claims, it does not address Plaintiff's claim for punitive damages against the County under Section 1983. The Court notes, however, that punitive damages are not available as against municipalities in Section 1983 actions. *Nimkoff v. Dollhausen,* 751 F.Supp.2d 455, 468 (E.D.N.Y.2010) (citing *City of Newport v. Fact Concerts,* 453 U.S. 247, 267 (1981)).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Faulk v. Fisher, 545 Fed.Appx. 56 (2013)

545 Fed.Appx. 56
This case was not selected for publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE(WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals,
Second Circuit.

Alfonzo FAULK, Plaintiff–Appellee,
v.
Brian FISHER, Commissioner, Richard Roy, I.G., Gregory Kadien, Supt., Hessle, D.S.S., McNamara, D.S.P., Allen, CC, Samick, CC, Cotton, CC, Kelleher, CC, Howard, PA, Kull, Officer, Regan, PA, Dzierba, SCC, Gian, Officer, Wiley, I.G. Agent, Mirtello, Sargent, Janish, IGP Supervisor, LaGraves, IGP Supervisor, Lukaszek, Officer, Turinsky, Officer, Zacagnino, Defendants–Appellants, David Patterson, Governor, Defendant.

No. 12–3406.
|
Nov. 21, 2013.

**Synopsis**
**Background:** State prisoner brought § 1983 action against corrections employees and officials. The United States District Court for the Western District of New York, Telesca, J., 2012 WL 2953229, granted summary judgment to defendants. Prisoner appealed.

**Holding:** The Court of Appeals held that prisoner failed to show that his successful inmate grievance resulted in the disciplinary charges brought against him.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (1)

**[1]** **Civil Rights** Discipline and classification; grievances

State prisoner failed to show that his successful inmate grievance was a substantial or motivating factor in the disciplinary charges brought against him by corrections officers, as required to establish § 1983 retaliation claim; although prisoner pointed to his "excellent" disciplinary history prior to his successful grievance and fact that officers issued two misbehavior reports the day after prisoner succeeded on his grievance, he pointed to no evidence suggesting that the officers were motivated by, or even aware of, his successful grievance, neither officer was named in the successful grievance, and they introduced evidence that the misbehavior reports were substantiated. 42 U.S.C.A. § 1983.

63 Cases that cite this headnote

***57** Appeal from the judgment of the United States District Court for the Western District of New York (Telesca, J.).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED.**

**Attorneys and Law Firms**

Alfonzo Faulk, pro se, Bronx, NY, for plaintiff-appellee.

Victor Gerard Paladino, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Denise A. Hartman, Assistant Solicitor General, on the brief), for Eric T. Schneiderman, Attorney General of the State of New York, Albany, NY, for defendants-appellants.

Present: ROBERT D. SACK, PETER W. HALL, and DEBRA ANN LIVINGSTON, Circuit Judges.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***SUMMARY ORDER***

Plaintiff–Appellant Alfonzo Faulk, *pro se,* appeals from the district court's judgment granting the Appellees' motion for summary judgment and dismissing his action brought pursuant to 42 U.S.C. § 1983. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

We review orders granting summary judgment *de novo. See Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013). "Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* In determining whether there are genuine disputes of material fact, this Court is " 'required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.' " ***58** *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003) (quoting *Stern v. Trs. of Columbia Univ. in City of New York,* 131 F.3d 305, 312 (2d Cir.1997)). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

On appeal, Faulk primarily challenges the district court's dismissal of his retaliation claim, which alleged that, the day after he succeeded on an inmate grievance, several of the Appellees retaliated against him by filing misbehavior reports. To prevail on such a claim, Faulk must show "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). The Appellees concede that filing an inmate grievance constitutes protected conduct, so the only issue is whether Faulk has produced sufficient evidence to raise a question of material fact about whether his successful grievance was a "substantial or motivating factor" in the disciplinary charges. *See id.* at 137–38. This he has not done.

"[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Id.* at 137 (internal quotation marks omitted). Accordingly, while we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, *see id.* at 138, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim. For example, in *Bennett,* we permitted the prisoner to proceed to trial where disciplinary charges were filed as he was in the process of successfully settling a lawsuit against prison officials and the disciplinary charges "were subsequently found to have been unjustified." *Id.; see also Gayle v. Gonyea,* 313 F.3d 677, 683–84 (2d Cir.2002) (prisoner permitted to proceed to trial where there was temporal proximity between a grievance and a misbehavior report and the "testimony at the disciplinary hearing also shed[ ] doubt on the accuracy of the accusations stated in the misbehavior report"). Similarly, in *Espinal v. Goord,* we held that a trial was required where only six months separated the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by two officers, one of whom was a defendant in the lawsuit, and there was evidence that the other was aware of the lawsuit. *See* 558 F.3d 119, 129–30 (2d Cir.2009).

Finally, in *Colon v. Coughlin,* upon which Faulk relies, Colon introduced evidence that he was brought up on drug- and weapon-related disciplinary charges immediately after winning a lawsuit against prison officials; he had never before been found in possession of either drugs or weapons while in prison; and the prison official who had authorized the contraband search told Colon that he had been "framed" because of his lawsuit. *See* 58 F.3d 865, 868, 872–73 (2d Cir.1995). In that case, we opined that if the circumstantial evidence of retaliation—Colon's prior good behavior and the temporal proximity between the lawsuit and the disciplinary charges—"represented the sum total of Colon's proof, we might be inclined to affirm the grant of summary judgment" given the weakness of his case and the ease with which prisoner retaliation claims could be fabricated. *Id.* at 873 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). We nonetheless permitted Colon to proceed to trial because he had presented direct evidence of retaliation: ***59** the prison official's statement that he had been framed. *See id.*

Here, Faulk has introduced circumstantial evidence of retaliation: his "excellent" disciplinary history prior to his successful grievance, and the two misbehavior reports issued by corrections officers Michael Gian and Jacob Lukaszek the day after Faulk succeeded on his grievance. But he can point to no more. Faulk alleged that corrections counselor Patrick Kelleher commented on his successful grievance and warned him against filing more; but Kelleher neither initiated nor

authorized the two challenged misbehavior reports. *Cf. Colon,* 58 F.3d at 868, 873. Gian and Lukaszek did, and Faulk points to no evidence suggesting that they were motivated by, or even aware of, his successful grievance. First, neither of those officers were named in the successful grievance. *Cf. Espinal,* 558 F.3d at 129. Second, while Faulk alleged that Gian was present during a meeting when Kelleher reprimanded him, he made no allegation that the successful grievance was discussed during that meeting. *Cf. Espinal,* 558 F.3d at 129. To the extent Faulk alleged that Kelleher "used" Gian to file the misbehavior report, such conclusory allegations are insufficient to withstand summary judgment. *See Bennett,* 343 F.3d at 137 (noting that this Court is "careful to require non-conclusory allegations" in support of prisoner retaliation claims). Similarly, while Faulk alleged that prior to issuing his misbehavior report, Lukaszek had asked whether Faulk had a "problem" with Kelleher and "reminded" him that "the counselors and corrections officers run Gowanda," there is no indication that Lukaszek mentioned the successful grievance. Finally, the defendants introduced evidence that the misbehavior reports were substantiated. *Cf. Bennett,* 343 F.3d at 137; *Gayle,* 313 F.3d at 683–84.

Given the absence of any further evidence of retaliatory intent on the part of Gian and Lukaszek, we affirm the district court's summary judgment decision on the retaliation claim. *See Colon,* 58 F.3d at 873.

We have considered all of Faulk's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

545 Fed.Appx. 56

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

603 Fed.Appx. 61
This case was not selected for publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals,
Second Circuit.

Denise Ann GARCIA, as administrator of the estate of James J. Healy, Jr., deceased, Plaintiff–Appellee,
v.
Deputy Benjamin SISTARENIK, Defendant–Appellant. *

No. 14–3306.
|
May 13, 2015.

Appeal from an order of the United States District Court for the Southern District of New York (Stein, J.).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the order of the ***62** district court be **AFFIRMED** in part, and that the appeal be **DISMISSED** in part.

**Attorneys and Law Firms**

David L. Posner (with Kimberly Hunt Lee, on the brief), McCabe & Mack LLP, Poughkeepsie, N.Y., for Appellant.

Michael Zilberg (with Gary Todd Certain, on the brief), Law Office of Certain & Zilberg, PLLC, New York, N.Y., for Appellee.

PRESENT: DENNIS JACOBS, PETER W. HALL and GERARD E. LYNCH, Circuit Judges.

***SUMMARY ORDER***

Dutchess County Sheriff's Deputy Benjamin Sistarenik appeals from an interlocutory order of the United States District Court for the Southern District of New York (Stein, *J.*) denying his motion for summary judgment on the basis of qualified immunity. We assume the parties' familiarity with the underlying facts, the procedural history, and the issues presented for review.

Typically, "[t]he denial of a motion for summary judgment is ... not immediately appealable because such a decision is not a final judgment." *Jones v. Parmley,* 465 F.3d 46, 54 (2d Cir.2006) (internal quotation marks omitted). The collateral-order doctrine, however, provides a limited exception, under which "the denial of a qualified-immunity-based motion for summary judgment is immediately appealable to the extent that the district court has denied the motion as a matter of law, although not to the extent that the defense turns solely on the resolution of questions of fact." *Id.* (internal quotation marks omitted). In other words, this Court has appellate jurisdiction "to determine whether a [a disputed factual] issue is *material,* but not whether it is *genuine.*" *Bolmer v. Oliveira,* 594 F.3d 134, 141 (2d Cir.2010).

**1.** As to the excessive force claim, we dismiss for lack of appellate jurisdiction.

Relying on conflicting witness testimony, the district court held that "a reasonable jury could conclude that Healy was no longer resisting the officers when he was tased," Dist. Ct. Op. at 15; that "Healy did not pose an immediate threat to the safety of the officer[s] or others at the time Sistarenik tased Healy," Dist. Ct. Op. at 17; and that "Sistarenik ... administer[ed] two taser shocks against Healy in short succession without advance warning and while Healy was restrained on the floor by four other officers," Dist. Ct. Op. at 21.

It cannot be disputed that the fact issue of whether (and to what extent) Healy presented a threat at the time Sistarenik used the taser is material. *See, e.g., Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 124 (2d Cir.2004) ("Because a reasonable jury could ... find that the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances, ... the determination as to the objective reasonableness of the force used must be made by a jury

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

following a trial.”). On appeal, Sistarenik refuses to accept plaintiff's version of the facts, and argues—just as he did in the district court—that “[f]rom Sistarenik's perspective[, Healy] presented a live and continuing threat,” Appellant's Br. at 21, at the time of the tasing. Perhaps he did; perhaps he did not. But we lack appellate jurisdiction to review the genuineness of these factual disputes. *Bolmer,* 594 F.3d at 141.

**2.** As to the due process claim for denial of medical care, we affirm the denial of summary judgment. Sistarenik's only argument on appeal is that, although the four state troopers on the scene had a duty to provide medical care to Healy, Sistarenik had no such duty because he was a “non-custodial officer.” Appellant's Br. at ***63** 29. Sistarenik cites no authority for this proposition.

In any event, the argument is forfeited, because Sistarenik raised it for the first time in his reply brief in support of his motion for summary judgment. Presumably, that is why the district court did not address the argument (in what is otherwise a thorough written opinion). Accordingly, we decline to consider it for the first time on appeal. *See, e.g., Dalberth v. Xerox Corp.,* 766 F.3d 172, 184 (2d Cir.2014).

* * *

For the foregoing reasons, and finding no merit in Sistarenik's other arguments, we hereby **AFFIRM** the order of the district court, in part; and **DISMISS** for lack of appellate jurisdiction, in part.

**All Citations**

603 Fed.Appx. 61

## Footnotes

* The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 706598
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Deborah GOFFREDO, Plaintiff,
v.
WAL-MART STORES EAST, L.P., Defendant.

No. 3:15-cv-00704 (MPS)
|
Signed 02/22/2017

**Attorneys and Law Firms**

Thomas G. Parisot, Connor McNamara, Secor, Cassidy & McPartland, P.C., Waterbury, CT, for Plaintiff.

Michael P. Kenney, Ryan Ryan DeLuca LLP, Hartford, CT, for Defendant.

**Ruling on Summary Judgment**

Michael P. Shea, U.S.D.J.

## I. Introduction

***1** Plaintiff Deborah Goffredo ("Goffredo") is suing Wal-Mart Stores East, L.P. ("Wal-Mart") for negligence in connection with a slip-and-fall incident on November 10, 2013, at Wal-Mart's store located at 1100 New Haven Road, Naugatuck, Connecticut (the "Store"). Wal-Mart has moved for summary judgment. I DENY Wal-Mart's motion because Goffredo's testimony about the presence of tracks made by a shopping cart in several aisles of the Wal-Mart, including aisles perpendicular to the one she fell in, together with a Wal-Mart employee's statement that he witnessed "a trail of liquid all around the department," when construed in the light most favorable to her, would allow a reasonable jury to infer that Wal-Mart had constructive notice of the condition that caused her fall.

## II. Facts

On November 10, 2013, Goffredo was shopping at the Store. After Goffredo had completing her shopping, Goffredo "was getting ready to leave" and "[o]n the way to the checkout" when she slipped on "a blue liquid" that "looked like Dawn or something of that nature." (ECF No. 26-1 at 13-14.) She had been pushing her cart "walking, and [slipped].... within a split second." (*Id.* at 16.) Her "foot locked and slid, and [she] was holding onto the cart to keep [herself] from falling." (*Id.*) But she fell to her knees. After her fall, she noticed "tracks from some type of liquid." (*Id.* at 45.) According to Goffredo, these "tracks [were] going up and down several aisles." (*Id.* at 43.) The tracks in the other aisles ran perpendicular to the aisle Goffredo slipped on. To Goffredo, "it appeared that carts went through the puddle up and down a few of the aisles." (*Id.*) Goffredo did not see the substance (or any substance) prior to her fall. She estimated that the pool of blue liquid measured about six inches in diameter. She noticed the substance only after her fall and did not see any dirt or tracks in the pool in which she slipped.

At the time of her fall, Goffredo was walking down a main aisle toward the front of the Store. This aisle, known as an "action alley", is "the main walkway through the store" (ECF No. 34-1 at 10), and runs from the back of the Store to the front of the Store where the cash registers are located. Along the aisle where Goffredo fell, there were other aisles that ran perpendicular to it. Her fall occurred near a food display, but there were no displays of any soaps or detergents in the area where the incident occurred. The aisle where Goffredo fell was approximately six aisles away from the household chemicals aisle.

Goffredo's fall was reported to Willem Hoving, a co-manager of the Store. Hoving went to the scene of the incident, and he recorded his observations in a witness statement dated November 10, 2013. Upon arriving at the scene, Hoving's statement indicated that he "witnessed a trail of liquid around the dep[artment]." (ECF No. 34-1 at 43.) According to Hoving, Goffredo "appeared upset", and she conveyed to him that "she was stiff and uncomfortable." (*Id.*) Hoving directed another Store employee to take Goffredo's statement while he and another Store employee "guarded the spill" until "Joe from maintenance cleaned [it] up." (*Id.*) Before the spill had been cleared, Hoving photographed the incident scene, and Store personnel later confirmed that the blue liquid substance resembled laundry detergent.

***2** Karen O'Connell ("O'Connell") was only several feet away from Goffredo when she fell. She did not see Goffredo fall, but heard her yell, looked toward the noise, and saw Goffredo on her knees on the floor holding the handle of her cart. O'Connell went to assist Goffredo. As O'Connell approached the incident scene, she observed a line of little, light blue dots that resembled drips on the floor behind and in front of where Goffredo fell. After she inquired into Goffredo's welfare, she went to inform a Store manager

about the incident. O'Connell conveyed to the Store manager Goffredo's medical needs, but he appeared to be dismissive of what she was saying. O'Connell then left Goffredo with the Store manager. But before leaving, O'Connell offered that she would be willing to make a statement on Goffredo's behalf in connection with the incident and provided Gofrredo with her contact information.

At some time later, Goffredo asked O'Connell to write a letter documenting her observations of the incident. In O'Connell's letter dated February 7, 2014, O'Connell indicated she observed "a blue substance" on "the floor where [Goffredo] had slipped", and as she "looked around on the floor, the blue substance could be seen as a path of spots." (*Id.* at 55.) The letter further indicates she informed the Store manager about the "trail of liquid substance spots" and that he should have Store employees clean up the trail. (*Id.*) O'Connell did not recall any dirt, discoloration or other tracks in the substance other than where Goffredo had slipped in it. O'Connell concluded that the substance had leaked from a container being transported through the aisle by another customer based on the substance's appearance and location.

On the date of the incident, Wal-Mart had "Slip, Trip and Fall Guidelines" in effect for its employees "to prevent slips, trips and falls within a facility." (ECF No. 34-1 at 50.) As part of these guidelines, "[a]ll associates ha[d] a responsibility to conduct periodic safety sweeps." (*Id.* at 51.) A "safety sweep" consisted of "periodically walking a department or area, checking the conditions for safety and cleanliness, and providing a quick clean." (*Id.* at 46.) The guidelines instructed Store employees to:

> [p]erform a visual sweep of the area looking for potential hazards, such as falling merchandise, empty pallets, spills, unattended pallet jacks, debris, and empty boxes.
>
> [d]ust mop or broom sweep high traffic areas including but not limited to: action alley, frontend, personal care, household chemicals, backroom, fresh areas ... sidewalks, and the vestibule.
>
> [w]atch for and correct potential hazards...

(*Id.* at 51.) According to Hoving, Store employees had a responsibility to conduct "safety sweeps" every hour. (*Id.* at 9.) Under Wal-Mart's corporate policy at that time, the completion of "safety sweeps" by maintenance employees was recorded in a handwritten log that was checked daily. (*Id.* at 27.) The logs detailing the "safety sweeps" from the date of the incident have been shredded in accordance with Wal-Mart's document retention policy. (*Id.* at 28.) Furthermore, the guidelines provided that Store employees were to set cones near spills.

Goffredo claimed that the fall caused her intense pain, including severe burning and numbing sensations in her right leg. (ECF No. 26-1 at 14.) She testified that the pain is recurring, with the severity of the pain depending on her level of activity. (*Id.* at 14.) As a result of her injury, Goffredo testified that she struggles to navigate the stairs and has difficulty doing yard work. (*Id.* at 21-22.)

## III. Legal Standards

### A. Summary Judgment

"Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.' " *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting Fed. R. Civ. Pro. 56(a)). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Id.* (quotation marks omitted). On summary judgment a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

***3** An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006)(internal quotation marks and citation omitted). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted).

**B. Premises Liability**

Under Connecticut law, "[a] business owner owes its invitees a duty to keep its premises in a reasonably safe condition." *DiPietro v. Farmington Sports Arena, LLC*, 49 A.3d 951, 957 (Conn. 2012)(quotation marks omitted). "Nevertheless, for a plaintiff to recover for the breach of a duty owed to him as a business invitee, it is incumbent upon him to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused his injury or constructive notice of it." *Id.* (quotation marks and alteration marks omitted). "[T]he notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it." *Id.*

"To defeat a motion for summary judgment in a case based on allegedly defective conditions, the plaintiff has the burden of offering evidence from which a jury reasonably could conclude that the defendant had notice of the condition and failed to take reasonable steps to remedy the condition after such notice." *Id.* "[T]o charge a defendant with constructive notice it is incumbent on the plaintiff to establish that the defect had been there a sufficient length of time and was of such a dangerous character that the defendant by the exercise of reasonable care could and should have discovered and remedied it." *Lombardi v. Town of E. Haven*, 12 A.3d 1032, 1040 (Conn. App. 2011). However, "[w]hat constitutes a reasonable length of time is largely a question of fact to be determined in the light of the particular circumstances of a case." *Considine v. Waterbury*, 279 Conn. 830, 870 (2006)(internal quotation marks and citation omitted). "[U]nless the period of time is such that but one conclusion could be found, its determination should be left to the trier." *Baker v. Ives*, 162 Conn. 295, 307 (1972). [1]

**IV. Discussion**

**A. Actual Notice**

***4** Goffredo apparently concedes that there is no evidence of actual notice here because she does not raise the argument in her memorandum. Even if Goffredo were to contest that issue, there is nothing in the record to support the assertion that Wal-Mart actually knew of the alleged defect or that the Store employees created the alleged defect.

**B. Constructive Notice**

The only issue, then, is whether there is a genuine issue of material fact as to whether Wal-Mart had constructive notice of the defect that Goffredo claims caused her injury. Wal-Mart argues that Goffredo has presented no evidence of the length of time the alleged defect—the blue, soapy liquid—was on the floor and therefore cannot establish constructive notice.

Contrary to Wal-Mart's assertion, there is evidence from which a reasonable juror could conclude that the alleged defect was on the floor for enough time that Wal-Mart, in the exercise of reasonable care, should have known of it. Goffredo testified that, immediately after her fall, she saw "tracks from some type of liquid." (ECF No. 34-1 at 4.) She further testified that "[t]here were tracks [of the blue substance] going up and down *several* aisles" and that it "appeared that carts went through the puddle and up and down a few of the aisles." (ECF No. 26-1 at 43)(emphasis added.) Recounting his observation of the incident scene, Hoving wrote in his witness statement that he saw a "trail of liquid around the dep[artment]." (ECF No. 34-1 at 43.) Hoving's witness statement about the "trail of liquid" is consistent with his testimony when he was asked at his deposition about the placement of pairs of cones next to aisles adjacent to the spill as shown to him in a photograph dated November 10, 2013. (ECF No. 34-1 at 19). At his deposition, Hoving testified that placement of the cones could indicate the trail of liquid throughout the department that he had referenced in his witness statement. (*Id.* at 13-14.) In her letter, O'Connell observed that she saw "a path of spots" and a "trail of liquid" around the department and had informed a Store manager that the Store employees should clean up the area. [2] (*Id.* at 55.) Moreover, there was evidence that Goffredo's fall occurred in the food department, which was six aisles away from the household chemicals department. A reasonable juror could conclude from the evidence of a "trail of liquid" in multiple aisles that enough time had passed since the container began leaking from a cart being pushed through the aisles that a Wal-Mart employee should have noticed it prior to Goffredo's fall. *See e.g.*, *Schwarz v. Waterbury Pub. Mkt., Inc.*, 6 Conn. App. 429, 432–33 (1986)(finding there was legally sufficient evidence of constructive notice to sustain a jury verdict in plaintiff's favor where there was evidence, among other things, that there was a trail of spilled milk covering six aisles in a supermarket at the time of plaintiff's fall). Further, as noted, under Wal-Mart policy, "[a]ll [Store employees] ha[d] a responsibility to conduct periodic safety sweeps" and Store employees had to [w]atch for and correct potential hazards" such as spills. (ECF No. 34-1 at 51.)

***5** Wal-Mart argues that there is not constructive notice because there is no evidence of the very defect which occasioned the injury. (ECF No. 27 at 16.) Specifically, Wal-Mart focuses on Goffredo's testimony that she observed tracks of "some type of liquid" in other aisles, which it argues is insufficient to create a genuine issue of material fact as to notice. (*Id.*) At her deposition, however, Goffredo testified that she observed the blue liquid in which she slipped in other areas of the Store, noting that "[t]here were tracks going up several aisles." (ECF No. 26-1 at 43.) She also testified that "it appeared that carts went through the puddle up and down a few of the aisles." (*Id.*) Unlike the plaintiff in *Gomes v. U.S.*, No. 11-cv-1825, 2012 WL 5869801 (D. Conn. Nov. 19, 2012) – relied on by Wal-Mart to support this argument—Goffredo certainly has presented more than a "scintilla of evidence that the [substance] on which [s]he claims to have slipped.... [was] the same [substance]" in the other aisles. *See* *Gomes v. U.S.*, No. 11-cv-1825, 2012 WL 5869801, at * 7 (D. Conn. Nov. 19, 2012).

Wal-Mart also argues that based on the video footage of the incident, the Court should draw the inference that the blue liquid was on the floor, at most, for four minutes prior to Goffredo's fall. (ECF No. 27 at 15.) The Court notes that in its exhibits to its motion for summary judgment, Wal-Mart labeled Exhibit F as the "Store Video." Wal-Mart, however, did not upload the video to the docket, provide Chambers a copy of the video, or manually file the video with the Clerk's office. Therefore, the "Store Video" is not part of the summary judgment record, and the Court may not consider it in ruling on Wal-Mart's motion for summary judgment. In any event, especially because the video was described in a deposition as "grainy" and not clear enough for at least one witness to discern locations depicted in the video, (ECF No. 34-1 at 23-24) even if the video is as Wal-Mart describes it, Goffredo's testimony about seeing the blue liquid in several aisles would be sufficient to raise a triable issue of fact

### V. Conclusion

Because there is a genuine issue of material fact as to whether Wal-Mart had constructive notice of the alleged defect that caused Goffredo's fall, I DENY Wal-Mart's motion for summary judgment.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2017 WL 706598

## Footnotes

1 I note that neither side has suggested that a "mode of operation" theory applies in this case. Such a theory "allows a customer injured due to a condition inherent in the way [a] store is operated to recover without establishing that the proprietor had actual or constructive knowledge of the dangerous condition" and applies to "premises liability claims brought by business invitees seeking compensation arising out of a business owner's self-service method of operation." *Kelly v. Stop and Shop, Inc.* 281 Conn. 768, 777, 786 (Conn. 2007). In *Fisher v. Big Y Foods, Inc.*, 298 Conn. 414, 424, 437 (Conn. 2010), the Connecticut Supreme Court held that the "mode of operation rule, as adopted in Connecticut, does not apply generally to all accidents caused by transitory hazards in self-service establishments, but rather, only to those accidents that result from particular hazards that occur regularly, or are inherently foreseeable, due to some specific method of operation employed on the premises," and that this rule is "meant to be a narrow one." *Fisher v. Big Y Foods, Inc.*, 298 Conn. 414, 424, 437 (Conn. 2010).

2 It is also true that at her deposition, O'Connell testified to seeing the blue substance only in Goffredo's immediate vicinity. But to the extent her testimony contradicts that of Goffredo's, I must accept Goffredo's testimony for purposes of this motion. *See* *Caronia*, 715 F.3d at 427.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 6700087
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Eric JENKINS, Plaintiff,
v.
The CITY OF NEW YORK; Captain Deochan; Correction Officer O'Garra; Correction Officer Congilio, Defendant.

18-CV-7024 (LDH)(LB)
|
Signed 11/12/2020

**Attorneys and Law Firms**

Eric Jenkins, Attica, NY, pro se.

Corey Stephen Shoock, Genevieve Nelson, Corporation Counsel of the City of New York, New York, NY, for Defendant City of New York.

Corey Stephen Shoock, Corporation Counsel City of New York, New York, NY, for Defendants Captain Deochan, Correction Officer O'Garra, Correction Officer Coniglio.

## MEMORANDUM AND ORDER

LASHANN DEARCY HALL, United States District Judge:

***1** Plaintiff Eric Jenkins, proceeding pro se, asserts claims against Defendants City of New York, Captain Deochan, Correction Officer O'Garra, and Correction Officer Coniglio pursuant to 42 U.S.C. § 1983 for violations of his Fourth and Eighth Amendment rights guaranteed under the United States Constitution. [1] Defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint in its entirety. In the alternative, Defendants move pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings.

## BACKGROUND [2]

Plaintiff was arrested on July 17, 2017, and arraigned on July 18, 2017. (Compl. at 4, 17, ECF No. 1.) From the time he was arrested until July 23, 2017, Plaintiff remained in the intake receiving room, and did not receive hot food (alternatively referred to by Plaintiff as a "proper meal"), a shower, or a bed. (*Id.* at 4, 17.)

On September 10, 2017, while detained at Otis Bantum Correctional Center, [3] Plaintiff and multiple other inmates were strip searched inside of a bathroom by the Officer-Defendants. (Compl. at 3, 4.) Plaintiff's search was conducted: (1) in the absence of an immediate threat to the housing area; (2) in front of other inmates; (3) in view of correction officers of the opposite sex; (4) with demeaning comments made about his body; (5) without mats to stand on or any coverings for private body parts; and (6) in violation of the Department of Corrections' ("DOC") search policy. (*Id.*) The strip search caused him a "loss of dignity and self-respect ... [and] emotional stress." (*Id.*)

## STANDARD OF REVIEW

***2** To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of defendants' liability for the alleged misconduct. *Id.* While this standard requires more than a "sheer possibility" of defendants' liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id.* (citations omitted).

Moreover, where, as here, a plaintiff is proceeding pro se, his pleadings "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). A pro se complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008) (quoting *Erickson v. Pardus*, 55 U.S. 89, 94 (2007) (per curiam)). This rule is "particularly so when the pro se plaintiff alleges that [his] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200

(2d Cir. 2004)). Still, "even pro se plaintiffs asserting civil right[s] claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.' " *Jackson v. NYS Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (quoting *Twombly*, 550 U.S. at 555).

**DISCUSSION**

**I. Prison Litigation Reform Act**

Pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), "[n]o Federal civil action may be brought by a prisoner ... for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e); *see also Liner v. Goord*, 196 F.3d 132, 134 (2d Cir. 1999) ("[T]he PLRA restricts an inmate's right to file suit in federal court prior to exhausting administrative remedies and, with respect to emotional distress claims, without a prior showing of physical injury."). Plaintiff alleges that his injuries consisted of "loss of dignity and self respect [sic] as well as emotional stress due to comments made during [the] search." (Compl. at 4, 18.) As Plaintiff has alleged exclusively emotional injuries, Plaintiff's complaint is barred by the PLRA. However, even if his complaint were not barred, each of his claims fails on the merits.

**II. Strip Search**

**A. Fourth Amendment**

There can be no question that "inmates [ ] retain a limited right to bodily privacy." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). Courts assessing an inmate's claim that officers infringed upon his right to bodily privacy must undertake a two-part inquiry. *First*, the court must determine whether the inmate has exhibited an actual, subjective expectation of bodily privacy. *Id. Second*, the court must determine whether the prison officials had sufficient justification to intrude on the inmate's fourth amendment rights. *Id.* In considering the second question, where, as here, a plaintiff challenges an isolated strip search,[4] courts apply the standard set forth in *Bell v. Wolfish,* 441 U.S. 520 (1979), to determine whether the search was reasonable under the Fourth Amendment. In *Bell*, the Supreme Court held that "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." 441 U.S. at 559. Rather, the Court must consider (1) "the scope of the particular intrusion," (2) "the manner in which it is conducted," (3) "the justification for initiating it," and (4) "the place in which it is conducted." *Id.* To survive a motion to dismiss, a plaintiff alleging an unconstitutional search must "plead facts sufficient to give rise to a plausible inference that the search was not reasonably related to legitimate penological interests." *Rebenstorf v. City of New York*, No. 15 CIV. 5784 (BMC), 2015 WL 6438765, at *4 (E.D.N.Y. Oct. 21, 2015) (citing *Simmons v. Cripps,* No. 12 Civ. 1061, 2013 WL 1290268, at *21 (E.D.N.Y. Feb. 15, 2013)). Defendants argue that Plaintiff's allegations regarding the search are insufficient to state a cognizable claim under the Fourth Amendment. (Defs.' Mem. L. Supp. Mot. Dismiss ("Defs.' Mem.") 5-12, ECF No. 54.) The Court agrees.

***3** *First,* strip searches conducted in view of other inmates or officers are not, in and of themselves, unreasonable. *See Rebenstorf*, 2015 WL 6438765, at *2, *4 (dismissing plaintiff's claim for unconstitutional strip search where the Corrections Officers yelled "obscenities and remarks" during the visual body cavity search, which took place in view of other inmates and officers); *Lopez v. Phipps*, No. 18-CV-3605 (MKB), 2019 WL 2504097, at *4-*5 (E.D.N.Y. June 17, 2019) (finding that a search that was conducted in view of three other inmates did not state a viable Fourth Amendment claim); *Miller v. Bailey*, No. 05-CV-5493 (CBA)(LB), 2008 WL 1787692, at *9 (E.D.N.Y. Apr. 17, 2008) (collecting cases for the proposition that "strip searches of prisoners in the presence of other inmates and staff is not constitutionally defective, especially in light of legitimate security concerns"). That female officers were present does not change the Court's conclusion. Where an officer of the opposite sex is involved in a strip search, district courts in this circuit have recognized that these cases involve a "heightened invasion of privacy." *Holland v. City of New York*, 197 F. Supp. 3d 529, 543 (S.D.N.Y. 2016) (collecting cases). However, those courts have distinguished between "regular and close viewing" and "incidental and brief viewing of a naked" inmate, with the latter being found constitutional. *Id.* (internal quotations omitted). Here, there are no allegations that the strip search involved anything more than an incidental or brief viewing of Plaintiff by officers of the opposite sex.

*Second,* allegations that officers made demeaning comment about Plaintiff's body during the search does not render the search unreasonable under law. *See Rebenstorf*, 2015 WL 6438765 at *4 (dismissing plaintiff's claim for unconstitutional strip search where the Corrections Officers yelled "obscenities and remarks" during the visual body cavity search, which took place in view of other inmates and officers). While "indefensible and unprofessional,"

allegations of verbal threats and verbal abuse are not sufficient to transform an otherwise lawful strip search into one proscribed by the Constitution. *Id.* at *4 (quoting *Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y. 1995)); *see also Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed.").

*Third,* Plaintiff's allegation that he lacked a mat to stand on during the search is likewise insufficient to state a claim. In this regard, Plaintiff's complaint is akin to *Mercedes v. City of New York,* 19-CV-04094(KAM)(LB), 2020 WL 2219186, at *1 (E.D.N.Y. May 6, 2020). In *Mercedes*, the district court found that the plaintiff had not sufficiently pleaded an unreasonable search where the plaintiff alleged, among other things, that he had to stand barefoot in urine and saliva during a strip search.[5] *Id.*

*Fourth,* the allegation that the strip search violated "search policy" does not rise to the level of a Fourth Amendment violation. (Compl. at 4.) To start, Plaintiff does not specify what policy was alleged violated. However, assuming Plaintiff is referring to a violation of a DOC policy or regulation, such a violation does not, in and of itself, constitute a cognizable constitutional claim. *See Rebenstorf,* 2015 WL 6438765, at *4 (finding no Fourth Amendment violation where violation of DOC regulation alleged); *Simmons v. Cripps,* No. 12-CIV-1061, 2013 WL 1290268, at *21 (S.D.N.Y. Feb. 15, 2013) ("As a general matter, violations of state or local prison regulations, do not, in themselves, constitute violations of federal rights."), *report and recommendation adopted*, No. 12-CIV.-1061, 2013 WL 1285417 (S.D.N.Y. Mar. 28, 2013).

*Fifth,* that there was no particularized suspicion of Plaintiff does not render the search unconstitutional. Indeed, "routine and random" searches divorced from any particularized suspicion have long been deemed constitutional. *See Covino v. Patrissi*, 967 F.2d 73, 75, 80 (2d Cir. 1992) (affirming district court's denial of a preliminary injunction seeking to enjoin prison officials from conducting "random visual body-cavity searches," as such searches "are reasonably related to its legitimate penological interests"); *Rebenstorf*, 2015 WL 6438765, at *3 (dismissing plaintiff's visual body cavity search claim for failing to state a claim under the Fourth Amendment because plaintiff failed to make any allegations that the search, which took place in front of other inmates and officers, was any different from "a routine, random strip search of inmates"); *Walker v. Ponte*, No. 14 CIV. 8507 (ER), 2016 WL 4411415, at *4 (S.D.N.Y. Aug. 18, 2016) (collecting cases for the proposition that "random strip searches may be conducted [ ] in detainees' housing units").

***4** Against this backdrop, the Court has considered each of the allegations related to the search and considered the scope, manner, justification, and place of the strip search at issue, as required by *Bell*. The scope of the search was a strip search, rather than a visual or manual body cavity search. While the search was conducted in view of other inmates and female correction officers, it was conducted in the bathroom rather than some place more public. Furthermore, there is a legitimate penological interests in conducting a random and routine strip search of a housing unit.[6] Accordingly, Plaintiff's Fourth Amendment claim is dismissed.

### B. Eighth Amendment [7]

"The unnecessary and wanton infliction of pain on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (internal quotations omitted). Prison officials violate the Eighth Amendment when: (1) the alleged punishment is "objectively, sufficiently serious," and (2) the alleged perpetrator possesses a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (internal quotations omitted). The Court construes Plaintiff's Eighth Amendment claim as a complaint that the strip search constituted sexual abuse. Certainly, "a single incident of sexual abuse, if sufficiently severe or serious, may violate an inmate's Eighth Amendment rights." *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015). Nonetheless, Defendants argue that, as alleged, Plaintiff has not stated a cognizable Eighth Amendment claim. (Def.'s Mem. 10.) The Court agrees.

Generally, a single strip search, without more, "reflect[s] a legitimate penological purpose, rather than the wanton infliction of an objectively serious deprivation." *Vaughn v. Strickland*, No. 12 CIV. 2696 (JPO), 2013 WL 3481413, at *3 (S.D.N.Y. July 11, 2013) (collecting cases). For example, in *Cole v. Suffolk Cty. Corr. Facility*, the inmate alleged that a prison official groped his penis and scrotum while frisking him. 2020 WL 2113205, at *4. There, the court found that this contact was "too similar to the type of incidental contact accompanying a run-of-the-mill pat down to reasonably infer any inappropriate touching or malicious intention." *Id.* A similar analysis is applicable here. Plaintiff has not alleged any inappropriate touching or malicious intention that would rise to the level of an Eighth Amendment violation.

Accordingly, Plaintiff's Eighth Amendment claim related to his strip search is dismissed. [8]

**III. Lack Of Hot Food, Shower, And Bed From July 17, 2017 To July 23, 2017**

***5** "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010). In Plaintiff's complaint, filed on December 3, 2018, he failed to identify any officer allegedly responsible for his denial of hot food, a shower, and a bed while he was in the intake room between July 17, 2017 and July 23, 2017 (the "July 17 to July 23 allegations"). (Compl. 4, 17) This need not be fatal. In *Valentin v. Dinkins*, the Second Circuit ruled that a pro se litigant is entitled to assistance from the district court in identifying a defendant. 121 F.3d at 76. However, the Second Circuit made clear that its ruling in *Valentin* was "not intended to preclude a finding by the district court, after further inquiry, that the information available is insufficient to identify the defendant with enough specificity to permit service of process, so that dismissal of the complaint is warranted." *Id.*

Here, Magistrate Judge Bloom issued a Valentin order against Defendant City of New York (the "City") in an effort to assist Plaintiff in identifying any DOC personnel who might be responsible for the July 17 to July 23 allegations. [9] (ECF No. 10.) The order required the City to locate Plaintiff's movement records during this time period. (*Id.*) After reviewing Plaintiff's movement records, the City determined that Plaintiff was only in intake for a period of approximately 28 hours—from 1:10 a.m. on July 19, 2017 through 5:35 a.m. on July 20, 2017—rather than the five days alleged in his complaint. (ECF No. 15.) In that 28-hour time period, the City determined that nearly 60 people had contact with Plaintiff. (ECF No. 26.) Plaintiff never provided counsel for the City with any identifying details which could assist in narrowing the individual(s) allegedly responsible for his deprivations. (ECF No. 26.) Counsel from the City met with three captains that were scheduled to supervise intake at OBCC during the time period Plaintiff was in intake, but none of these individuals recalled Plaintiff or the allegations. (*Id.*) Ultimately, Magistrate Judge Bloom determined that a 60-person list of potential Defendants was insufficient to identify the potential tortfeasor with enough specificity to permit service, as it would be unreasonable to name and serve 60 people as defendants in this matter. (ECF No. 27.) To-date, Plaintiff has not otherwise identified the alleged wrongdoers. On this basis alone, Plaintiff's claims related to the lack of food, shower and a bed are ripe for dismissal. [10]

**IV. Municipal Liability**

***6** Plaintiff failed to state a claim for violations of his constitutional rights with respect to the strip search, and accordingly, he cannot sustain a claim against the City pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978). *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (observing that *Monell* liability does not lie where a municipality's officer does not inflict constitutional harm); *Johnson v. City of New York*, 551 F. App'x 14, 15 (2d Cir. 2014) (summary order) (affirming district court's dismissal of *Monell* claim where plaintiff did not allege a valid underlying constitutional deprivation against the City). As to the July 17 to July 23 allegations, he has failed to allege that any deprivations he experienced were the result of a policy, custom, or practice by the City, as required by *Monell. See Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) (recounting that to state a *Monell* claim against a municipality, a plaintiff must plead "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right").

* * *

Having dismissed all of Plaintiff's federal claims, and as the parties here are not diverse of citizenship, the Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3) over Plaintiff's other claims to the extent they arise under the state constitution or common law. *See Brzak v. United Nations*, 597 F.3d 107, 113–14 (2d Cir. 2010) ("[W]e have said that if a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as well." (internal quotations omitted)); *see also First Capital Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) ("The exercise of supplemental jurisdiction is left to the discretion of the district court[.]"). These claims are therefore dismissed without prejudice for lack of subject-matter jurisdiction.

**CONCLUSION**

For the foregoing reasons, Defendants' 12(b)(6) motion is GRANTED, and the complaint is dismissed in its entirety.

Accordingly, the Court need not reach Defendants' 12(c) motion.

In light of his pro se status, Plaintiff is granted leave to file an amended complaint within 30 days from the entry of this memorandum and order. *Cruz v. Gomez*, 202 F.3d 593 (2d Cir. 2000). The amended complaint must be captioned "Amended Complaint" and bear the same docket number as this memorandum and order. Failure to file an amended complaint within 30 days, as directed by this memorandum and order, will result in dismissal of Plaintiff's case for failure to prosecute.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 6700087

## Footnotes

1 Neither the City of New York, nor the three officers named as Defendants were initially named in Plaintiff's complaint. (*See* Compl. at 1, ECF No. 1.) On December 17, 2018, Magistrate Judge Bloom ordered that the City replace the Department of Corrections as a substitute defendant, and issued an order pursuant to *Valentin v. Dinkins*, 121 F. 3d 72 (2d Cir. 1997) ("*Valentin* order"), for the City to assist Plaintiff in identifying the individual officers involved in his September 10, 2019 strip search. (ECF No. 5.) On June 17, 2019, the City identified the three officers present during the strip search; and, on June 20, 2019, amended summonses were issued identifying the Defendant-officers by name. (ECF Nos. 26, 28.) Lastly, as discussed in greater depth below, on June 18, 2019, Magistrate Judge Bloom granted the City's request to be relieved of any further obligation pursuant to the *Valentin* order to identify the officers who were responsible for the denial of food, a shower, and a bed from July 17, 2017 to July 23, 2017 as alleged by Plaintiff. (ECF No. 27.)

2 The following facts are taken from the complaint and the documents attached to the complaint, which are deemed incorporated into the complaint by reference, and are assumed to be true for the purpose of evaluating this instant motion. *See* *Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015) ("It is well established that documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." (internal quotations and modification omitted)).

3 Plaintiff refers to the location of this incident as OBCC, which is an acronym for Otis Bantum Correctional Center. (*See* Compl. at 8.); *see also* The New York City Department of Correction, Facilities Overview, *available at* https://www1.nyc.gov/site/doc/about/facilities.page (last visited Nov. 2, 2020).

4 A strip search is an "inspection of a naked individual, without any scrutiny of the subject body's cavities." *Harris*, 818 F.3d at 58. A strip search is distinguishable from a "visual body cavity search," which extends to visual inspection of the anal and genital areas, or a "manual body cavity search," which includes some degree of touching or probing of body cavities. *Id.*

5 *Mercedes* was analogous in several other respects. There, female officers watched while the search was conducted, multiple officers were laughing during the search, and there was no probable cause to search plaintiff as all inmates in an entire housing unit were subjected to strip searches. 2020 WL 2219186, at *1.

6 Were the Court to construe Plaintiff's complaint as alleging an unlawful strip search policy, the Court would find that Plaintiff has not alleged facts to even plausibly allege that the search policy was unrelated legitimate penological interests. *See* *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

(2012) ("[A] regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.' " (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987))).

7 From Plaintiff's filings, it appears that the strip search occurred after an arrest, and not after a conviction. (*See* Pl.'s Opp. Defs.' Mot. Dismiss ("Pl.'s Opp.") 1, ECF No. 55. ("A person rights are not taken away for merely being arrested[.]"); *see also* Compl. at 4, 17 (alleging that Plaintiff was arrested on July 17, 2017 and arraigned July 18, 2017).) Generally, Eighth Amendment protection against cruel and unusual punishment applies only after conviction. *See* *Whitley v. Albers*, 475 U.S. 312, 318 (1986) ("The Clause applies only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." (internal quotations omitted)). However, courts in the Second Circuit " 'apply the established Eighth Amendment framework for claims of sexual abuse by prison officials' to pretrial detainees." *Cole v. Suffolk Cty. Corr. Facility*, No. 20-CV-1883, 2020 WL 2113205, at *3 (E.D.N.Y. May 4, 2020) (quoting *Harry v. Suarez*, No. 10-cv-6756, 2012 WL 2053533, at *2 n.3 (S.D.N.Y. June 4, 2012) (collecting cases)).

8 In his opposition, Plaintiff states—for the first time—the same strip search is also violative of the First Amendment as it violates his religion. (Pl.'s Opp 1) Plaintiff does not specify what religion he follows or allege any additional facts with respect to any First Amendment claim. In any event, his First Amendment claim fails. "Reasonable strip searches of prisoners, regardless of their religion, are generally acceptable under the First Amendment because they further the compelling governmental interest of penological safety." *Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 324 (S.D.N.Y. 2006), *aff'd*, 461 F. App'x 18 (2d Cir. 2012). The Court has already found that the search, as pleaded, constituted a routine and random search and was thus justified by legitimate penological interests. And courts in this circuit that have examined whether "standard strip searches" of Muslim inmates—"whose religion might forbid them from being seen naked by other individuals"—violate the First Amendment have found that such searches are not unconstitutional. *Cook v. City of New York*, No. 1:19-CV-3858 (PKC) (JO), 2019 WL 3388909, at *2 (E.D.N.Y. July 26, 2019) (quoting *Pizarro v. Bd. of Corr.*, No. 16-CV-2418 (RJS), 2018 WL 3462512, at *5 (S.D.N.Y. July 17, 2018) (collecting cases)). Accordingly, any First Amendment claim is also dismissed.

9 In opposition to the motion to dismiss, Plaintiff requests a court order to assist him in gaining access to video footage from July which will show that he was held for 5 days without shower or a hot meal, and may presumably show who was interacting with Plaintiff during this time. (Pl's Opp. 4.) Defendants have already represented to Plaintiff and the Court that no such surveillance video exists and accordingly, this request is denied. (ECF No. 26.)

10 Even if Plaintiff were to identify these individuals, his claims would still fail on the merits. The denial of hot food for 28 hours does not constitute a constitutional violation. *See* *Brooks v. NYC DOC Comm'r,* No. 14-CV-6283 (RRM) (CLP), 2016 WL 4530456, at *4 (E.D.N.Y. Aug. 29, 2016) (collecting cases for the proposition that pretrial detainees' lack of access to hot food for up to two weeks is insufficient to state claim). Nor does a claim regarding unconstitutional conditions of confinement lie based on lack of showers for 28 hours. *See id.* at *5 (collecting cases for the proposition that lack of access to showers for up to thirteen days is insufficient to state claim for deprivation of rights). Lastly, the lack of a bed or mattress for 28 hours is not sufficient to state a cognizable constitutional claim. *See, e.g.,* *Myers v. City of New York,* No. 11 CIV. 8525 (PAE), 2012 WL 3776707, at *6-7 (S.D.N.Y. Aug. 29, 2012) (collecting cases for the proposition that courts have found that a detainee who has been forced to sleep on the floor or on a "filthy" surface for "multiple days" does not have a cognizable claim for a constitutional violation).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 7288498
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Angelo D. JOHNSON, Plaintiff,
v.
BROWN, et al., Defendants.

9:20-CV-622 (LEK/ATB)
|
Signed May 12, 2022

**Attorneys and Law Firms**

ANGELO D. JOHNSON, Plaintiff, pro se.

JONATHAN REINER, Asst. Attorney General, for Defendant.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

***1** This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior U.S. District Judge. Presently before the court is a motion for summary judgment pursuant to Fed. R. Civ. P. 56, filed by defendants at Great Meadow Correctional Facility ("Great Meadow")–Superintendent Christopher Miller, First Deputy Superintendent Donita McIntosh, Deputy Superintendent Gerard Caron, Assistant Deputy Superintendent Melissa Collins, Lieutenant George Murphy, Sergeant Nathaniel Gilles, Correction Officer ("CO") Preston Boule, CO Eric Rich, and CO Daniel Papa–as well as by these other named defendants associated with the New York State Department of Corrections and Community Supervision ("DOCCS")–Dr. Eric Goe, Dr. David Karandy, Physician Assistant ("PA") Ted Nesmith, Nurse Marcia Rocque, Nurse Christy Watkins, Dr. John Morley, and DOCCS Regional Health Administrator Mary Tandy-Walters. (Dkt. No. 63). Plaintiff has failed to respond to the defendants' motion, despite being given an extension of time to do so. (Dkt. Nos. 65, 66).

**DISCUSSION**

**I. Procedural Background**

Plaintiff originally filed this action in the Southern District of New York ("S.D.N.Y."). (Complaint ("Compl.") (Dkt. No. 2). On May 14, 2020, District Judge Colleen McMahon, S.D.N.Y., granted plaintiff's application to proceed in forma pauperis ("IFP"). (Dkt. No. 4). On June 3, 2020, S.D.N.Y. District Judge Kenneth M. Karas severed and transferred plaintiff's claims arising out of his incarceration at Great Meadow and Five Points Correctional Facility to the Northern District of New York. (Dkt. No. 6).

On June 29, 2020, after conducting an initial review of the transferred claims, Judge Kahn issued an order, dismissing some of the plaintiff's claims, transferring his claims arising at Five Points Correctional Facility to the Western District of New York, and directing service upon, and a response from, the remaining defendants. (Dkt. No. 8 at 30-32). Judge Kahn directed plaintiff to take reasonable steps to identify the "John" or "Jane Doe" defendants named in the complaint and seek to amend the complaint to add their names. [1] (Dkt. No. 8 at 32).

There are sixteen remaining defendants, and the claims against them are as follows:

1. Defendant Marcia Rocque was deliberately indifferent to plaintiff's medical care on October 29, 2018 by taking away Plaintiff's migraine medication. (Compl. ¶¶ 45–46).

2. Deliberate indifference to plaintiff's medical care by:

   a. Defendant Eric Goe on November 1, 2018. (Compl. ¶¶ 47–50).

   b. Defendant Ted Nesmith on November 16 and 21, 2018. (Compl. ¶¶ 51, 53).

   c. Defendants Goe and David Karandy on December 5, 2018 through February 19, 2019. (Compl. ¶¶ 54–56).

   d. Defendant Goe on May 17, 2019. (Compl. ¶ 72).

   e. Defendants Goe and Karandy in July 2019. (Compl. ¶ 138).

***2** 3. Deliberate indifference to plaintiff's medical care by failing to rectify other defendants' deficient care:

   a. Mary Tandy-Walters on December 14, 2018. (Compl. ¶¶ 68, 65[2]–66[2]). [2]

b. John Morley on February 5, 2019. (Compl. ¶¶ 67[2]–68[2]).

4. On June 17, 2019, defendants Preston Boule, Nathaniel Gilles, Daniel Papa, and Eric Rich, along with three John/Jane Doe defendants, threw plaintiff on a table, removed his clothes, sexually abused him by sliding a hand between his buttocks, and took mocking pictures of plaintiff's buttocks. (Compl. ¶¶ 85–113).

a. The claims against all of these defendants include: denial of adequate medical care, excessive force, failure to intervene (with respect to excessive force), sexual abuse, and unlawful search under the Fourth Amendment.

b. Defendant Gilles is claimed to be the "ringleader," and plaintiff asserts an Equal Protection claim against him.

c. Plaintiff asserts a claim of denial of medical care against defendant Nesmith (PA) relative to this incident.

5. Between June 23 and July 9, 2019, defendant George Murphy allegedly violated plaintiff's Due Process rights under the Fourteenth Amendment by failing to provide a fair disciplinary hearing. (Compl. ¶¶ 111–17).

6. On July 10, 2019, Defendants Gilles, Nesmith, and Christy Watkins were deliberately indifferent to plaintiff's medical needs, used excessive force, and failed to intervene by putting a harmful concoction on plaintiff's mouth. (Compl. ¶¶ 118–26).

7. From July 11-15, 2019, defendants Gerard Caron, Melissa Collins, Donita McIntosh, and Christopher Miller were deliberately indifferent to plaintiff's medical needs and the conditions of his confinement by ignoring his complaints regarding such conditions. (Compl. ¶¶ 129–34).

8. At some point prior to January 27, 2020, defendant Collins violated plaintiff's Due Process rights under the Fourteenth Amendment by presiding over a "secret" disciplinary hearing. (Compl. ¶¶ 149–52).

(Def.s' Mem. at 1-3). Most of plaintiff's claims allege constitutionally-inadequate medical care. Some allege excessive force, and one claim involves an alleged incident of sexual assault in conjunction with excessive force. Plaintiff also claims denial of procedural due process with respect to disciplinary hearings. Rather than include a lengthy statement of facts at the outset, I will discuss the relevant facts and evidence of record in connection with my analysis of the plaintiff's particular claims.

## II. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

***3** The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

"When the opposing party fails to respond to the moving party's Rule 56.1 Statement, the material facts contained in the moving party's statement are deemed admitted as a matter of law." *Antwi v. Health & Human Sys. (Ctrs.) F.E.G.S.*, No. 13-CV-0835, 2014 WL 4548619, at *4 (S.D.N.Y. Sept. 15, 2014); *see also Genova v. County of Nassau*, 851 F. App'x 241, 244 (2d Cir. 2021). Generally, failure to respond to a motion for summary judgment results in summary judgment for the moving party, "once the court assures itself that Rule 56's other requirements have been met." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009). However, "a district court must ensure that there is support in the record for facts contained in unopposed Rule 56.1 statements before accepting those facts as true." *United States v. Abady*, No.

03-CV-1683, 2004 WL 444081, at *3 (S.D.N.Y. Mar. 11, 2004) (citing *Giannullo v. City of New York*, 322 F.3d 139, 140–43 (2d Cir. 2003)). Moreover, a pro se plaintiff must be notified of the consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). In this case, plaintiff was sent a specific warning by the court of the consequences of a failure to respond. [3] (Dkt. No. 64 at 2).

**III. Exhaustion of Administrative Remedies**

**A. Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), abrogated on other grounds by *Ross v. Blake*, 578 U.S. 632 (2016). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford*, 548 U.S. at 90-103.

***4** The grievance procedure in New York is a three-tiered process, known as the Incarcerated Grievance Program ("IGP"). [4] The inmate must first file a grievance with the Incarcerated Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the IGP encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (I), 701.5.

There is also a relaxed exhaustion requirement for bringing claims of sexual assault in the administrative process. If an inmate wishes to bring a claim of "sexual abuse" or "sexual harassment," as defined in DOCCS Directive # 4027A and Directive # 4027B, he need only report the incident. *See* 7 NYCRR § 701.3(i); Prison Rape Elimination Act ("PREA") [5] Standards, 28 C.F.R. § 115.06; *Sheffer v. Fleury*, No. 18-CV-1180 (LEK/ DJS), 2019 WL 3891143, at *3 (N.D.N.Y. Aug. 19, 2019). Section 701.3(i) states:

> [A]ny allegation concerning an incident of sexual abuse or sexual harassment shall be deemed exhausted if official documentation confirms that: an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office Staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards; or to the Department's Office of the Inspector General.

*Id.* (citations omitted). If an inmate does file a grievance regarding a complaint of sexual abuse or sexual harassment, "[t]he complaint shall be deemed exhausted upon filing." *Id.* Finally, "[a] sexual abuse or sexual harassment complaint may be submitted at any time." *Id.*

Prior to *Ross v. Blake, supra*, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

In *Ross*, the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 578 U.S. 632, 640 (2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 639). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at 642. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 2016 WL 4572321 at *2.

**B. Analysis**

***5** Defendant concedes that plaintiff has exhausted his administrative remedies as to two of his claims: (1) upon his admission to Great Meadow on October 29, 2018, during plaintiff's initial medical evaluation, defendant Rocque deprived him of his needed migraine medication, knowing that it would cause plaintiff severe pain.[6] (Compl. ¶¶ 45-47), and (2) plaintiff's claim against Dr. Goe, involving a November 1, 2018 medical appointment, after which Dr. Goe allegedly "maliciously" failed to order refills of plaintiff's migraine medications, even though he promised plaintiff he would do so.[7] (Compl. ¶¶ 48-50).

Defendants argue that plaintiff has failed to exhaust every other remaining claim herein. In support of their argument, defendants have filed the declaration of Rachel Seguin, the Assistant Director of the IGP and the declaration of Sidney Frierson, an Investigator assigned to the DOCCS Sex Crimes Division of the Office of Special Investigations ("OSI"). (Seguin Decl.) (Dkt. No. 63-3); (Frierson Decl.) (Dkt. No. 63-5).

In her capacity as Assistant Director of the IGP, Seguin is the custodian of the records maintained by the CORC. (Seguin Decl. ¶ 11). At defendants' request, Assistant Director Seguin searched the CORC records for appeals received from grievances filed by plaintiff. (Seguin Decl. ¶ 13). Assistant Director Seguin cites three grievances brought by plaintiff at Great Meadow: Grievance Nos. GM-64599-19, GM-63809-18, and 63852-18.

Plaintiff filed Grievance No. 63809-18 on November 8, 2018. (Seguin Decl. Ex. A & Ex. C). The grievance was entitled "Wants to Be Seen." (*Id.*) In the grievance, plaintiff claimed that upon his admission to Great Meadow, he explained his medical conditions to staff, and stated that he had "self-carry" medications, but he was deprived of these medications upon arrival. When he attempted to explain this to the "nurse," on the 7:00 a.m. to 3:00 p.m. shift, plaintiff was ignored. (Seguin Decl. Ex. C at p. 42). Plaintiff appealed the denial of this grievance to the CORC. (*Id.*) Thus, plaintiff exhausted his claim alleging that defendant Rocque took away his pain medication upon arrival to the facility. (Claim # 1 Compl. ¶¶ 45-46).

Plaintiff filed Grievance No. GM-63852-18 on November 26, 2018, entitled "Discrimination/Medical Treatment." (Seguin Decl. Ex. D). Plaintiff complained that Dr. Goe ignored plaintiff's complaints of migraine headaches on November 1, 2018. (Seguin Decl. Ex. E at 52). Plaintiff claimed that the improper medical care was related to racial discrimination by Dr. Goe. (*Id.*) Plaintiff appealed the denial of this grievance to the CORC. (*Id.*) Thus, plaintiff has exhausted his claim that Dr. Goe denied him proper medical treatment on November 1, 2018. (Claim # 2(a) Compl. ¶¶ 47-50).

Plaintiff filed his next Grievance No. GM-64599-19 almost one year later, on September 27, **2019**. (Seguin Decl. Ex. A). The grievance is entitled "Medicine for Chronic Right Knee Pain." (Seguin Decl. Ex. A, B at CM/ECF p. 15). The summary of the grievance states that Dr. Karandy, Dr. Gore,[8] and Nurse Administrator Barry deprived plaintiff of adequate pain medication for his knee. (Seguin Decl. Ex. B at p. 16). Plaintiff alleged that these individuals ignored his complaints, and that he had not received proper care since he arrived at Great Meadow, despite the doctors' knowledge that plaintiff had a chronic problem prior to arriving at the facility. (*Id.*) Plaintiff requested adequate pain medication, care for his right knee, and a cane. (*Id.*) Plaintiff also alleged problems with his eyesight and his need for contact lenses. (Seguin Decl. Ex. B at 20). Plaintiff appealed this grievance to the CORC.[9]

**1. Defendants Goe and Karandy (Compl. ¶¶ 54-56, 72, 138) (Claims ## 2(c)-2(e))**.

***6** Defendants argue that the grievance GM-64599-19, filed in September of 2019, did not include the conduct which plaintiff alleges in the instant complaint against Dr. Goe and Dr. Karandy between December 5, 2018 and February 19, 2019 (Dr. Goe and Dr. Karandy); on May 17, 2019 (Dr. Goe); and on July 19, 2019 (Dr. Goe and Dr. Karandy). "In order to exhaust ... inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) (finding the PLRA exhaustion requirement was "not dissimilar to the rules of notice pleading").

The grievances that were appealed to the CORC as discussed above all involve plaintiff's medical care. The September 2019 grievance claimed that the actions of defendants Goe and Karandy had been going on since the time that plaintiff arrived at Great Meadow. (Seguin Decl. Ex. B at 16-21) (plaintiff complained about his knee, back, neck, and contact lenses). The court understands that plaintiff did not assert every action in his grievance by these two defendants that he now alleges in his complaint. However, with respect to these two defendants, the court finds that plaintiff gave the authorities sufficient information about the alleged conduct for officials to take appropriate responsive measures. In fact, a review of the investigation related to the September 2019 grievance shows that prison officials reviewed plaintiff's previous medical records to establish that he had been given proper care by these defendants. (Seguin Decl. Ex. B). Thus, this court will not recommend dismissing the remainder [10] of plaintiff's medical care claims against defendants Goe and the claims against defendant Karandy for failure to exhaust. [11] (Compl. ¶¶ 54-56, 72, 138).

**2. PA Nesmith (Compl. ¶¶ 51, 53, 87, 89, 92) (Claims ## 2(b), 4(c))**

The court does not find that grievance GM-64599-19 exhausted plaintiff's claims against defendant PA Nesmith. Plaintiff alleges in his complaint that PA Nesmith saw plaintiff on November 16 and November 21, 2018, and each time refused to address plaintiff's complaints of severe pain. (Compl. ¶¶ 51, 53). Plaintiff also claims that defendant Nesmith tried to suffocate plaintiff with a "harmful concoction" on his hands prior to the June 17, 2019 incident discussed below. [12] (Compl. ¶ 87, 89, 92). Plaintiff never mentions defendant Nesmith in any of his exhausted grievances. This is not akin to a situation in which plaintiff has failed to name, in a grievance, certain individuals in connection with an incident involving several defendants. *See Espinal v. Goord*, 558 F.3d 119, 127-28 (plaintiff exhausted claims with respect to all people and claims related to the same incident even if he did not name each of the individuals in the grievance).

***7** In this case, plaintiff's claims against defendant Nesmith occurred on different days than those against defendants Goe and Karandy, and the June 17, 2019 incident is completely unrelated to plaintiff's other medical care claims. Assistant Director Seguin states that her investigation showed no grievances by plaintiff filed against defendant Nesmith for any of his alleged conduct. (Seguin Decl. ¶¶ 16, 17 & Ex. A). Officials would not have necessarily investigated claims against defendant Nesmith in conjunction with the grievances that plaintiff did exhaust, and officials would not have been alerted to conduct that occurred at a different time against a different defendant. This is distinguishable from ongoing conduct that was alleged in the exhausted grievances above as against defendants Goe and Karandy. However, if a reviewing court should find that the some of the claims against defendant Nesmith were related to those against Goe and Karandy, and therefore, exhausted, the claims against defendant Nesmith also fail on the merits as discussed below.

**3. Mary Tandy-Walters and John Morley (Compl. ¶¶ 68, 65[2]-66[2], 67[2]-68[2]) (Claims ## 3(a), 3(b))**

Defendant Mary Tandy-Walters is a DOCCS Regional Health Services Administrator in Albany, New York. (Tandy-Walters Decl. ¶ 1). Defendant John Morley was the Acting Deputy Commissioner/Chief Medical Officer of the DOCCS Division of Health Services. (*See* Tandy-Walters Decl. Ex. A). Plaintiff claims that he wrote to these two defendants in an effort to address his medical needs, but neither of them rectified the violations committed by others. (Compl. ¶¶ 68, 65[2]-66[2], 67[2]-68[2]).

Assistant Director Seguin states that plaintiff has never filed or appealed a grievance related to the alleged actions of either of these two defendants. (Seguin Decl. ¶¶ 20-21 & Ex. A). Although plaintiff's claims against these two defendants are

related to his medical care, none of the claims brought in plaintiff's exhausted grievances would have alerted officials to any improper conduct by these supervisory individuals. Thus, plaintiff has failed to exhaust his administrative remedies as against defendants Tandy-Walters and Morley, and the complaint may be dismissed against them for failure to exhaust. [13]

**4. Defendants Gilles, Boule, Papa, Rich, and three John/ Jane Does (Compl. ¶¶ 85-113) (Claims ## 4(a), 4(b))**

In the complaint, plaintiff claims that on June 17, 2019, defendants Gilles, assisted by defendants Boule, Papa, Rich, and three unidentified officers, beat plaintiff, threw him on a table, removed his clothes, and sexually abused him by sliding a hand between his buttocks and taking "mocking" pictures of his buttocks. Plaintiff alleges excessive force, sexual abuse, failure to intervene, and unlawful search, with an Equal Protection claim against defendant Gilles, who plaintiff believes was the "ringleader" of the incident.

Plaintiff claims that, on July 17, 2019, during morning recreation in the yard, he became dizzy and subsequently lost consciousness. (Compl. ¶ 83). He states that he woke up as he was being escorted to the medical department. (Compl. ¶ 84). Plaintiff states that he was "maliciously" thrown onto the infirmary table, surrounded by defendants Gilles, Boule, Rich, Papa, John Doe #1, John Doe #2, and Jane Doe #3. (Compl. ¶ 85). Plaintiff was then "aggressively" interrogated by defendant Gilles about whether plaintiff was high on "K-2." (*Id.*)

***8** Although plaintiff states that he tried to explain his medical problems to defendant Gilles, he continued to ask plaintiff whether he had taken K-2. (Compl. ¶ 87). While plaintiff was trying to persuade defendant Gilles that plaintiff was not on drugs, defendant Nesmith put a "harmful concoction" on his gloved hand and placed it over plaintiff's nose and mouth, suffocating the plaintiff as the other defendants held him down. (*Id.*) The "concoction" on PA Nesmith hands burned plaintiff's lips, making it difficult for plaintiff to bite defendant Nesmith. (Compl. ¶ 89). Defendant Nesmith finally stopped, and allegedly stated that plaintiff "looks conscious now." (Compl. ¶ 90).

Plaintiff then claims that defendant Gilles told the others to get plaintiff up and bring him to the second floor of the medical department. [14] Plaintiff claims that, as he was being taken to the second floor, [15] his handcuffs were cutting off his circulation, and his arms were extended backward, causing "excruciating" pain. (Compl. ¶ 95). Plaintiff states that, when they got to the second floor of the medical department, defendant Gilles ordered the other defendants to take plaintiff's restraints off. (Compl. ¶ 97). Plaintiff states that defendant Gilles ordered plaintiff to take all of his clothes off, and when plaintiff hesitated to remove his boxer shorts until the other defendants had left the room, defendant Gilles ordered the others to "fuck [plaintiff] up." (Compl. ¶ 98).

Plaintiff claims that defendants Boule, Rich, Papa, and the three Doe defendants punched and kicked plaintiff with blows to his body, arms, back, legs, and back of plaintiff's head. (Compl. ¶ 99). Defendant Gilles ordered the other defendants to pick plaintiff up off the ground and slam him against the wall, extending his arms backward, and "popping" his shoulder. (*Id.*) Defendant Gilles then ordered the other defendants to place the restraints back on plaintiff and place plaintiff face-down on the mattress. (Compl. ¶ 100).

At that time, one of the defendants pulled plaintiff's boxer shorts off. One defendant held one side of plaintiff's buttocks, while another defendant held the other side of plaintiff's buttocks while defendant Gilles slid his hands up and down between plaintiff's buttocks, telling the other defendants " 'this is how it's done.' " (*Id.*) Plaintiff states that defendant Gilles then walked toward the cell door while the other defendants continued to abuse the plaintiff by opening and closing his "butt cheeks," placing their faces near his anus and asking if anyone was home." (Compl. ¶ 102). Defendant Gilles then ordered the other defendants to make sure that the handcuffs were "super tight." They left plaintiff naked in the cell. (Compl. ¶ 103).

Plaintiff claims that he went to the cell door to yell for a "grievance" and for medical assistance for his left shoulder. (Compl. ¶ 104). Plaintiff claims that defendant Gilles just laughed and left him in the cell. (Compl. ¶ 105). Plaintiff claims that he was left naked and in pain for hours before the restraints were removed and he was given boxer shorts to wear. (Compl. ¶¶ 105-106). Plaintiff claims that defendant Gilles came back later with some other officers and "staged false pictures" of plaintiff's injuries to "cover up" their alleged actions. [16] (Compl. ¶ 107).

***9** Plaintiff alleges that, sometime during the evening of June 17, he spoke with an unidentified nurse, who came to his cell, accompanied by unidentified officers. Plaintiff alleges

that he told the nurse about all of his injuries. (Compl. ¶ 108). The nurse did not "examine" plaintiff, but told him that she would "note" his complaints. (*Id.*) Plaintiff also alleges that he reported the sexual assault to the nurse, and asked for OMH, [17] but when the officers heard that plaintiff was making allegations against other officers, they terminated the nurse's interview. (Compl. ¶ 108).

Plaintiff states that he was held for observation because of his "seizure" in the yard. (Compl. ¶ 109). Plaintiff claims that, on June 18, 2019, a nurse from OMH came to speak with him, but that she was rude, "unethical," and only gave him "30 seconds" to tell his story. (*Id.*) She did not allow him to explain his "serious crisis." (*Id.*) She just walked away, without giving plaintiff her name. (*Id.*) Plaintiff was "cleared" later that day, but was taken to "punitive Ad Seg keeplock." (Compl. ¶ 110). Plaintiff was charged with misbehavior as a result of the incident. (Compl. ¶¶ 111-13).

Defendants argue that plaintiff failed to exhaust his administrative remedies with respect to the sexual abuse claim and any related claim of excessive force. Because plaintiff's claim deals with an allegation of sexual abuse, the more relaxed exhaustion standard applies. As stated above, in a case of alleged sexual abuse, plaintiff has only to alert one of several agencies or corrections officials of the sexual abuse. [18] *Sheffer v. Fleury*, 2019 WL 3891143, at *3 (quoting Section 701.3(i)). In this case, defendants concede that, in March of **2020**, plaintiff informed the Office of Special Investigations ("OSI") for DOCCS, that defendant Gilles and "six unknown corrections officers," sexually abused him on "June 11, 2019." (Def.s' Mem. at 11) (Dkt. No. 63-1). Defendants argue that plaintiff never reported an incident occurring on June 17, 2019, and therefore, failed to exhaust his administrative remedies with respect to any incident on that date. Defendants also argue that any excessive force claim asserted by plaintiff as occurring on the same date is not sufficiently "intertwined" with the sexual abuse claim to justify exhausting both claims through the relaxed procedure.

Defendants cite the declaration of Sidney Frierson, an OSI Sex Crimes Division investigator. (Frierson Decl.) (Dkt. No. 63-5). Investigator Frierson states that plaintiff filed a complaint on March 2, 2020, in which he alleged that, after being in the hospital, he was taken back to the cell block, where he was put in a cell and strip frisked. (Frierson Decl. ¶ 4). Plaintiff further claimed that the staff was " 'playing in his ass,' " " 'going in his ass,' " and "swiping their hands between his buttocks." (*Id.*) When interviewed on March 9, 2020, plaintiff told the OSI investigator that the perpetrators were defendant Gilles and "six unknown corrections officers." (Frierson Decl. ¶ 5). In addition, plaintiff never mentioned a physical assault, which allegedly occurred prior to the sexual assault. (Frierson Decl. ¶ 6). Inspector Frierson stated that plaintiff never made allegations against defendants Boule, Rich, or Papa and did not mention any conduct occurring after June 11, 2019. (Frierson Decl. ¶ 8).

It seems clear that the plaintiff has made an error in reporting the date of the incident to OSI, [19] because the facts are too similar to be a coincidence, and it is questionable that such an incident happened twice. Plaintiff's description of the incident is almost identical to the OSI claim, [20] and it afforded officials the opportunity to investigate the claim. Thus, the court will not recommend dismissal for failure to exhaust the sexual abuse claim.

***10** Aside from the error in the date, defendants argue that the physical assault claim is not exhausted because it was not mentioned in the OSI claim and it was never separately exhausted through the grievance procedure. However, plaintiff claims that the physical assault happened immediately before the sexual assault, and was part of the same incident even though it was not raised specifically with OSI. (*See* Compl. ¶¶ 95-102). While investigating the alleged sexual assault, the investigator would necessarily examine the facts surrounding the incident. For purposes of exhaustion, this court finds that plaintiff gave defendants the opportunity to investigate the allegations. The court will not separate the physical from the sexual assault because plaintiff alleges that both were part of the same incident. As stated above, the plaintiff did not need to name every individual involved in the incident to exhaust his administrative remedies. *Espinal v. Goord, supra.*

### 5. Defendants Gilles, Nesmith, and Watkins [21] (Compl. ¶¶ 118-19, 125-26) (Claim # 6)

Plaintiff also complains of an incident which occurred on July 9 and 10, 2019 against defendants Gilles, Nesmith, and Watkins. On July 9, plaintiff claims that defendant Gilles took plaintiff from his cell to the special housing unit ("SHU") without allowing him to bring his medications. (Compl. ¶¶ 118-19). On July 10, plaintiff had a seizure and was brought to the medical unit, where he claims that he was again

"suffocated" with the "harmful concoction" by defendant Nesmith, in the presence of defendant Gilles, and assisted by defendant Watkins. (Compl. ¶¶ 125-26).

Plaintiff has never filed any grievance relating to these claims, and he has therefore, failed to exhaust his administrative remedies. (Seguin Decl. ¶ 17 & Ex. A). In any event, as discussed below, plaintiff's allegations regarding this incident have no merit.

**6. Defendant Murphy (Compl. ¶¶ 111-17) (Claim # 5)**

Plaintiff claims that between June 23, 2019 and July 9, 2019, defendant Disciplinary Hearing Officer George Murphy violated plaintiff's due process rights by failing to provide a fair disciplinary hearing. Plaintiff was issued a misbehavior report after the June 17, 2019 incident. [22] (Murphy Decl. Ex. B at 13) (Dkt. No. 63-12). The misbehavior report, written by defendant Boule, charged plaintiff with violent conduct, disobeying a direct order, interference with an employee, and refusal of search/frisk. (*Id.*)

In the complaint, plaintiff alleges that defendant Murphy attempted to coerce him into pleading guilty prior to beginning the hearing by telling plaintiff that, since he had filed claims against Murphy's "comrades," he would give him 60 days keeplock and loss of privileges, and "call it a day," if he pled guilty instead of proceeding with the hearing. (Compl. ¶ 111). However, if plaintiff fought the charges, Murphy would still find him guilty, but would sentence him to more than 60 days confinement. (*Id.*) Plaintiff did not plead guilty, and the hearing was held.

Plaintiff alleges that, after two extensions of the hearing date, defendant Murphy failed to call all of plaintiff's witnesses, ordered plaintiff to be taken back to his cell, and conducted the hearing in absentia, without telling plaintiff that his witnesses would be called. (Compl. ¶ 116). Plaintiff claims that he was denied the right to "cross-examine" his own witnesses, and denies that he left the hearing voluntarily. (Compl. ¶ 117). Finally, plaintiff claims that on July 9, 2019, officers came to his cell to escort him to SHU without giving him defendant Murphy's disposition.

***11** Defendants note that plaintiff never filed a grievance with respect to defendant Murphy's conduct before or during the disciplinary hearing. (Seguin Decl. ¶ 23). DOCCS has a separate review process for the appeal of disciplinary determinations. *Waters v. Jacobsen*, No. 9:18-CV-196 (MAD/ML), 2020 WL 1527054, at *4 (N.D.N.Y. Mar. 31, 2020) (citing See Davis v. Barrett, 576 F.3d 129, 132 (2d Cir. 2009)). Generally, "[a] disciplinary appeal is sufficient to exhaust a claim that an inmate was deprived of due process at a disciplinary hearing." *Id.* (citing *Thomas v. Delaney*, No. 9:17-CV-1023, 2019 WL 4247807, *10 (N.D.N.Y. Aug. 13, 2019) (collecting cases)). However, it has been held that " 'allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved.' " *Id.* (quoting *Barker v. Smith*, No. 16-CV-76, 2017 WL 3701495, *3 (S.D.N.Y. Aug. 25, 2017)) (quoting *Scott v. Gardner*, 287 F. Supp. 2d 477, 489 (S.D.N.Y. 2003)) (internal quotations omitted).

In this case, the only allegation that could qualify as the type of "staff misconduct" that needed to be separately grieved would be plaintiff's claim that defendant Murphy tried to coerce him into pleading guilty. All the other claims are alleged due process violations that would be sufficiently exhausted by the appeal of defendant Murphy's disciplinary determination. Plaintiff appealed the determination through the disciplinary process and, in fact, obtained a reversal of the violent conduct charge based on lack of evidence. [23] (Murphy Decl. Ex. B at 2). Plaintiff did not plead guilty, and the court does not find that plaintiff's initial claim regarding defendant Murphy's behavior would have to be separately exhausted. [24] Plaintiff's claim that defendant Murphy attempted to coerce plaintiff into pleading guilty will be considered with the merits of plaintiff's due process claim. Thus, the court will not recommend dismissal of any of the due process claims against defendant Murphy for failure to exhaust.

**7. Defendants Gerard Caron, Melissa Collins, Donita McIntosh, and Christopher Miller (Compl. ¶¶ 129-34) (Claim # 7)**

Plaintiff alleges that the conditions of SHU were unconstitutionally severe, and that he complained "directly" to defendants Caron, [25] Collins, McIntosh, [26] and Miller [27] each time that these individuals made their "regular weekly tours" through the SHU. (Compl. ¶ 132). Plaintiff claims that he also complained about the pain he was suffering due to the June 17, 2019 assault and the pain he was suffering due to the inadequate medical treatment he was receiving. (Compl. ¶ 133). Plaintiff claims that these defendants "failed to remedy the daily constitutional violations." (Compl. ¶ 134).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Assistant Director Seguin states that plaintiff has never filed or appealed any grievances to the CORC regarding such unconstitutional conditions, nor has he complained about any of the above defendants in relation to the conditions of the Great Meadow SHU. (Seguin Decl. ¶ 24). Plaintiff has not responded to the summary judgment motion and has not alleged otherwise. There is no indication in the record that plaintiff ever filed such a grievance. Thus, these claims against defendants Caron, Collins, McIntosh, and Miller may be dismissed for failure to exhaust.

**8. Defendant Collins (Compl. ¶¶ 149-52) (Claim # 8)**

***12** On December 23, 2019, defendant Collins presided over a Tier III disciplinary hearing held after plaintiff received a misbehavior report charging him with refusing a direct order and refusal to provide a urine specimen. (Collins Decl. ¶ 4 & Ex. A) (Dkt. No. 63-11). Defendant Collins states that plaintiff refused to attend the hearing, she held the hearing in absentia, and she ultimately found plaintiff guilty of both charges, sentencing him to 54 [28] days of keeplock confinement, together with a loss of privileges. (Collins Decl. ¶¶ 5-7).

Plaintiff was transferred to Five Points Correctional Facility ("Five Points") some time in mid January of 2020. [29] (*See* Seguin Decl. Ex. A) (Plaintiff filed an unrelated grievance at Five Points on January 30, 2020). Plaintiff never appealed the disciplinary determination by himself, nor did he file a grievance against defendant Collins for any misconduct relative to the hearing. In his complaint, plaintiff states that he was surprised at Five Points when he was placed in SHU upon arrival, rather than in general population because he believed that his previous SHU confinement [30] expired on January 16, 2020, when he left Great Meadow. (Compl. ¶ 149). The Five Point staff told plaintiff that his confinement in SHU was due to a "Great Meadow[ ] disposition." (Compl. ¶ 150).

Plaintiff claims that he did not find out that his SHU confinement was due to defendant Collins's disposition until he received an "incomplete" disposition on January 27, 2020. (Compl. ¶ 151). Plaintiff claims that he had no appeal available for the disposition, and alleges that defendant Collins unlawfully conducted "hearings" [31] in absentia, depriving plaintiff of due process. (Compl. ¶ 152-54). Plaintiff alleges that defendant Collins failed to note for the record whether plaintiff's refusal to attend the hearing was knowing and voluntary, resulting in the violation of all his other due process rights, including the ability to call witnesses and to introduce "relevant" evidence. (Compl. ¶ 154).

Read in its most liberal interpretation, and notwithstanding plaintiff's failure to respond to the defendants' summary judgment motion, plaintiff seems to be claiming that he did not find out about the hearing and disposition until after he had transferred to Five Points, and by that time, he had no appeal mechanism for the disciplinary determination, nor could he file a grievance against Collins because his time to file a grievance had passed. Such an argument relates to whether the administrative remedy was "available" to plaintiff.

A review of the documents submitted by defendants with their summary judgment motion shows that plaintiff refused to accept service of the misbehavior report, refused to attend his hearing, and refused to accept service of the hearing disposition, which informed him of his right to appeal. [32] (Collins Decl. Ex. A at CM/ECF pp. 13, 14, 17, 18, 20). The plaintiff's December 23, 2019 disciplinary hearing determination was automatically reviewed by the Superintendent because the "confinement sanction [was] more than 30 days." [33] (Collins Decl. Ex. A at CM/ECF p.). The form indicates that the Superintendent reviewed the penalty and made no changes. (*Id.*)

***13** Plaintiff's conclusory allegation that his appeal remedies were not "available" to him because he was transferred and allegedly did not receive defendant Collins's disposition until it was too late to appeal are belied by the many records showing that plaintiff refused to attend hearing or to participate in the process in any way. He has not responded to the summary judgment motion to challenge the veracity of these documents, which show that he was served with the disposition of the hearing in plenty of time for him to appeal to the Superintendent if he wished, even if he refused to acknowledge receipt.

The fact that the hearing disposition was automatically reviewed does not save the plaintiff from failure to exhaust because the Superintendent would have been unaware of any of the claims that plaintiff would have made if he had opted to participate. In addition, plaintiff failed to bring any grievance against defendant Collins to claim any misconduct separate from the hearing itself. Thus, this court finds that plaintiff failed to exhaust any claims against defendant Collins relative to the December 23, 2019 disciplinary hearing. In any event,

as discussed below, the claims against defendant Collins fail on the merits.

## IV. Medical Care

### A. Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (*citing* inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### A. Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (*citing Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (*citing Farmer*, 511 U.S. at 844–47).

The second part of the objective test asks whether the inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (*citing Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (*citing Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)). However, where the alleged inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (*citing Smith*, 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### B. Subjective Element

***14** The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Salahuddin* 467 F.3d at 280. (*citing Wilson v. Seiter*, 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (*citing Farmer*, 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (*citing Farmer*, 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (*citing Chance*, 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (*quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. Thus, the court stated in *Salahuddin*, that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." 467 F.3d at 28.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention

he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (*citing Estelle*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

### B. Analysis

#### 1. Defendant Rocque (Compl. ¶¶ 45-46) (Claim # 1)

Plaintiff claims that on October 29, 2018, defendant Rocque was deliberately indifferent to his medical needs when she took away his migraine medication upon his admission to Great Meadow. (*Id.*) Defendant Rocque has filed a declaration in support of the defendants' motion for summary judgment. (Rocque Decl.) (Dkt. No. 63-6). Defendant is a registered nurse, whose responsibilities include assessing patients, assisting doctors at the facility, and following doctors' orders regarding patient care. (Rocque Decl. ¶¶ 1-2). Defendant states that she would have assessed the plaintiff upon his arrival at the facility. (Rocque Decl. ¶ 4).

***15** Defendant Rocque states that, upon any new inmate's arrival, the inmate is advised that his medications must reviewed by a physician at the facility, who will write new orders for medications and relay those orders to the nursing staff. (Rocque Decl. ¶ 5). Any medications that the inmate brings with him into the facility would be given to a doctor or a physicians' assistant for review. (*Id.*) As a nurse, defendant Rocque had no authority to change plaintiff's medications, nor did she have authority to change the protocol for review of those medications by the appropriate health care professional. (Rocque Decl. ¶¶ 5, 6). Plaintiff's Ambulatory Health Record ("AHR") shows that he was seen by defendant Rocque on November 8, 2018, at which time he was "yelling" about his medications. (Goe Decl. Ex. A at 194). Plaintiff "demanded" that his medications be returned to him immediately and that his eye drops be made "self-carry." (*Id.*) Defendant Rocque's notes indicate that the encounter was terminated "by security." (*Id.*) Defendant Rocque noted that the chart was given to the doctor for review. (*Id.*)

Based on the defendant Rocque's declaration and the medical records accompanying the defendants' summary judgment motion, there is no indication that defendant Rocque had any authority to change the medical protocol, and she was required to give plaintiff's "carry-on" medications to other medical providers for approval. As such, plaintiff cannot establish that defendant Rocque had a sufficiently culpable state of mind when she took his medications upon his arrival or when she failed to change the protocol for administering those medications on November 8, 2018, and plaintiff's claims may be dismissed as against Nurse Rocque. *See Spencer v. Armor Correctional Health*, No. 18-CV-4638 (JMA/ARL), 2022 WL 992566, at *4 (E.D.N.Y. Mar. 31, 2022) (no culpable state of mind where there is no evidence that the nurse had the authority to prescribe pain medication or override the physician's orders); *Barnes v. Uzu*, No. 20-CV-5885, 2022 WL 784036, at *16-17 (S.D.N.Y. Mar. 15, 2022) (same).

#### 2. Defendants Doctors Goe (Compl. ¶¶ 47-50, 54-56, 72, 138), Karandy (Compl. ¶¶ 54-56, 138), and PA Nesmith (Compl. ¶¶ 51, 53) (Claims ## 2(a)-2(e))

Plaintiff claims that on November 1, 2018, he was seen by defendant Goe, who allegedly told plaintiff that he had "to[o] many issues." (Compl. ¶ 48). Plaintiff claims that defendant Goe lied to him on November 1, 2018 when he promised that he would "at least" order plaintiff's migraine medications "immediately." (Compl. ¶ 49). Plaintiff states that, on November 5, 2018, plaintiff received only Claritin and a nasal spray, but that Dr. Goe failed to order the migraine medications and failed to reinstate the "carry-on" orders. (Compl. ¶ 50).

Plaintiff essentially claims that none of his medical care at Great Meadow was constitutionally adequate. Dr. Goe has filed an affidavit together with plaintiff's relevant medical records to show that plaintiff received more than constitutionally adequate medical care while he was housed at Great Meadow. (Goe Decl. & Ex. A). Plaintiff was seen at various times by both Dr. Goe and Dr. Karandy, who each addressed various concerns.

Dr. Goe states that he treated plaintiff beginning November 1, 2018. (Goe Decl. ¶ 4). Plaintiff's concerns included

"osteoarthritis of the right knee and left shoulder, migraine headaches, stomach pain, chronic sinus congestion, and cervical neuralgia (i.e., pinched nerves of the neck)." (*Id.* & Ex. A at 195). Dr. Goe states that he addressed all of plaintiff's medical problems. However, Dr. Goe states that plaintiff was not due for a refill of his Imitrex (Migraine medication), and all of plaintiff other medications were administered by the nurse due to plaintiff's previous suicide attempts. (Goe Decl. ¶ 6 & Ex. A at 196). Dr. Goe subsequently changed several of plaintiff's medications to self-carry due to their low risk of harm to plaintiff. (*Id.* & Ex. A at 195). At various times, and for various reasons, plaintiff's medications were switched from self-carry to 1:1 administration. (Goe Decl. Ex. A at 10, 20, 123). After plaintiff's initial arrival and evaluation at Great Meadow, this was done because plaintiff had a seizure or other episode, occasionally resulting from missing doses of his medications. (*Id.* at 123) (post seizure).

***16** At plaintiff's November 1, 2018 appointment, Dr. Goe made several referrals to specialists in order to address the plaintiff's many medical impairments. (Goe Decl. ¶ 7 & Ex. A at 114, 195). These referrals included "additional primary care, physical therapy, upper endoscopy, and x-rays of the left shoulder and c-spine." (*Id.*) Plaintiff saw an orthopedic consultant on December 8, 2018, who, inter alia, prescribed physical therapy. (Goe Decl. Ex. A at 114-15). However, plaintiff refused physical therapy on multiple occasions for both his shoulder and his knee. (Goe Decl. ¶ 8 & Ex. A at 2, 5, 7, 13-16, 18-19, 23, 28). Some of the "no shows" for physical therapy may have been due to the plaintiff's SHU status, but it is clear that he only attended physical therapy sporadically, and occasionally refused to attend. [34] (*See e.g.* Goe Decl. Ex. A at 23). Thus, plaintiff's allegation that Dr. Goe and Dr. Karandy failed to follow up on the specialist's prescription for physical therapy is not supported by the medical records. [35]

Plaintiff had an upper GI endoscopy on November 29, 2018 at the Albany Medical Center, resulting in the discovery of a small hiatal hernia, normal stomach, and normal duodenum. (Goe Decl. Ex. A at 116-22). He was observed post-endoscopy and discharged to his cell by Dr. Goe on November 30, 2018 at 1:30 p.m. (Goe Decl. Ex. A at 132-33).

In January, March, and April of 2019, Dr. Karandy referred plaintiff for ophthalmology consultations. (Goe Decl. Ex. A at 145-65). Plaintiff's visual impairments are treated with medications and contact lenses. There are multiple visits to eye consultants in plaintiff's medical record. [36] (*Id.*) On July 1, 2019, Dr. Karandy wrote a detailed report regarding plaintiff's multiple health issues. (Goe Decl. Ex. A at 25). Dr. Karandy stated that plaintiff was given "unlimited time to have each and every issue addressed." (*Id.*) "The encounter was not terminated until the patient had no more questions or concerns that he wanted to raise." (*Id.*)

Dr. Karandy noted that, notwithstanding plaintiff's visual impairments, he was seen ambulating through the unit and looking at medical records without difficulty, which did not support his claims of a severe visual impairment. In any event, his contact lenses were ordered and would be provided to him. Plaintiff also requested an increase in the dosage for his Excedrin - Migraine, and "a new prescription [was] provided to the pharmacy. (*Id.*) Plaintiff had also changed his mind about having surgery for the torn meniscus on his right knee, and Dr. Karandy "re-referred" plaintiff to another specialist to address the issue. [37] (*Id.*) Plaintiff also requested a referral for an epidural to address his cervical impairment. Dr. Karandy noted that, once the knee issue had been addressed, plaintiff could be referred to "pain management services" to address the spine issues." Dr. Karandy stated that simultaneous referrals were likely to conflict with each other, and plaintiff was "comfortable" and ambulated easily without impairment. (*Id.*) Plaintiff was also being treated for sinus congestion and Hepatitis C. Dr. Karandy noted that plaintiff was halfway through his Hepatitis treatment, and he was doing well with no side effects or issues. (*Id.*)

***17** In his complaint, plaintiff alleges that Dr. Karandy would send plaintiff to specialists, but would not obey the specialist's orders. Plaintiff has not responded to the summary judgment motion, and he has failed to specify what orders or prescriptions Dr. Karandy failed to follow. There is no indication in the medical records that the specialists' orders were not followed by the staff at Great Meadow or by Dr. Karandy specifically. There are over two hundred pages of plaintiff's relevant medical records. Occasionally, plaintiff's appointments were terminated due to his hostility toward staff, not because of deliberate indifference to his serious medical needs. (*See* Goe Decl. Ex. A at 194).

Plaintiff's disputes regarding his medications were more the desire to control his own medications and dictate his care than the defendants depriving him of needed medications. While it is true that plaintiff's medications were taken away from him initially [38] and periodically thereafter, as stated above, the medications were administered by the nurse "1:1." Dr. Goe articulated the reasons why plaintiff's medications were administered by the staff at various times during his

incarceration at Great Meadow. These instances occurred for evaluation purposes and for purposes of stabilizing plaintiff after a seizure incident to make sure that he was receiving the proper dosage of his medication at the proper time.

On April 19, 2019, plaintiff saw Dr. Goe, and was "demanding Neurontin," in addition to "treatment" for his "pinched nerves." (Goe Decl. Ex. A at 178). Dr. Goe states that no inmate at Great Meadow is allowed to take Flexeril or Neurontin.[39] (Goe Decl. ¶ 12). Dr. Goe states that the plaintiff's request for Neurontin was sent to, and denied by, the "facility medical director," as indicated by Dr. Goe's April 19, 2019 AHR entry. (Goe Decl. ¶ 12 & Ex. A. at 178). Although plaintiff claims that Dr. Goe did not renew his "pain medication" on May 17, 2019, the medical records show that Dr. Goe specifically renewed plaintiff's Imitrex. (Goe Decl. ¶ 9 & Ex. A at 32).

On June 17, 2019,[40] there is a note in plaintiff's medical record that he had a "near syncope" in the yard, "security thinks K2," and he "responded well to ammonia inhalant," but was "agitated" in the clinic. (Goe Decl. Ex. A at 125). At 11:00 a.m., plaintiff ambulated into the unit with security. (Goe Decl. Ex. A at 126). His gait was steady, but he became abusive and "verbal" with security. A "use of force" examination was completed, "no injuries noted," "no injuries claimed."[41] (*Id.*) He appeared lethargic, but followed commands. (*Id.*)

Defendant Nesmith states that he administered the ammonia inhalant on June 17, 2019, in "a successful attempt to have plaintiff regain consciousness. (Nesmith Decl. ¶ 4 & Ex. A). Defendant Nesmith states that he was not attempting to "suffocate" the plaintiff, and that the ammonia inhalant may have caused the "painful sensations" that plaintiff describes in his complaint. (Nesmith Decl. ¶¶ 5, 8) (citing Compl. ¶¶ 87, 125-26). Plaintiff was extraordinarily agitated when he "came to," but defendant Nesmith states that he never observed any staff member attempt to suffocate plaintiff or use more force than necessary to prevent plaintiff from hurting himself or others. (Nesmith Decl. ¶¶ 7, 8).

***18** Plaintiff was admitted to the medical unit for monitoring, and by 4:00 p.m. on June 17, 2019, he was alert, and oriented, with no complaints. (Nesmith Decl. Ex. A at 3; Goe Decl. Ex. A at 126). He told staff[42] that he had a seizure and that he did not "take his meds this morning." (Goe Decl. Ex. A at 126). Plaintiff was up and walking with a steady gait, his respiration was even, and he was in no acute distress. By 7:00 p.m., no seizure activity was noted, fluids were encouraged, and he ate his dinner. (*Id.*) He was monitored through the night. (Goe Decl. Ex. A at 126-27). At 7:00 a.m. on July 18, 2019, plaintiff was alert and oriented, with no seizure activity. (Goe Decl. Ex. A at 127). However, at 9:00 a.m., he was pounding on the cell door, demanding to speak with OMH. A mental health referral was made, and by noon, he was sitting on the bed speaking with a mental health provider. (*Id.*) The notes state that plaintiff would not specify his mental health complaints. (*Id.*) Plaintiff was discharged at 12:40 p.m. (*Id.*)

On July 10, 2019, plaintiff was found lying face-down outside his cell. (Nesmith Decl. ¶ 6 & Ex. A). He was given nasal Narcan twice by a nurse at the cell, but then brought to the clinic where defendant Nesmith again administered the ammonia inhalant, to which plaintiff responded.[43] (*Id.*) He was very agitated upon regaining consciousness and was again admitted for observation. (*Id.*) Plaintiff told Dr. Goe that he missed two doses of one of his medications that morning. (Goe Decl. Ex. A at 123-24). Plaintiff's medications were changed from "self-carry" to "1:1" so that the dosages could be regulated and plaintiff's condition stabilized. (Goe Decl. Ex. A at 123). Plaintiff was discharged on July 12, 2019, when he no longer had neurologic symptoms and was "medically stable." (Goe Decl. Ex. A at 123).

Defendants have established that there is no question of fact regarding plaintiff's medical care. Plaintiff has failed to oppose any of the facts set forth in the medial records or in any of the defendants' declarations. It is clear from the plaintiff's records that he did not believe that the defendants were caring for him properly, but often refused the care that was offered to him. To the extent that he wished to have a different medication prescribed, defendant Goe states that plaintiff was not allowed by the facility medical director to have the medications that he wanted. (Goe Decl. ¶ 12 & Ex. A at 178). On two occasions, defendant Nesmith administered an ammonia inhalant to bring plaintiff back to consciousness, and concedes that the substance could cause burning or discomfort as the plaintiff suggests, but there is no indication that defendant Nesmith was attempting to suffocate the plaintiff during either incident. Thus, plaintiff's medical care claims may be dismissed as against all the defendants.

## V. Due Process

### A. Legal Standards

To begin a due process analysis relating to prison disciplinary proceedings, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

***19** The due process protections afforded inmates facing disciplinary hearings that are found to affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing inter alia*, Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing inter alia*, Superintendent v. Hill*, 472 U.S. 445, 455 (1985)). If the court determines that the plaintiff received due process, it need not reach the issue of whether plaintiff had a liberty interest under *Sandin*. *Bedoya v. Coughlin*, 91 F.3d 349, 352 (2d Cir. 1996).

**B. Analysis**

**1. Defendant Murphy (Compl. ¶¶ 111-17) (Claim # 5)**

Plaintiff alleges that on June 23, 2019, he was brought to a disciplinary hearing, conducted by defendant Murphy. (Compl. ¶ 111). Plaintiff makes various allegations against defendant Murphy, including the attempt to "coerce" plaintiff to plead guilty prior to the start of the hearing, the failure to call witness and allow plaintiff to "cross-examine" them, and failure to note for the record that the time for completing the hearing had been extended. (Compl. ¶¶ 111-17).

Defendant Murphy has submitted a declaration, together with the disciplinary records, including a copy of the misbehavior report, a transcript of the disciplinary hearing, a copy of the Commissioner's review of the Superintendent's Hearing, and other relevant disciplinary records from the hearing. (Murphy Decl. & Exs. A, B). The misbehavior report was written by defendant Boule regarding the June 17, 2019 incident. (Murphy Decl. Ex. B at 13). The report states that defendant Boule was conducting a probable cause frisk for apparent drug use. Plaintiff was directed to remove his white boxer shorts and pass them "back." At that time, plaintiff reached for his buttocks, and force became necessary to gain compliance. (*Id.*)

Although the documents indicate that plaintiff was served with the misbehavior report on June 18, 2019, when the hearing began on June 22, plaintiff maintained that he never received a copy of the report, even though the other officer present in the hearing room recalled serving plaintiff with the report.[44] Plaintiff also completed an employee assistance form. (*Id.*) Defendant Murphy adjourned the hearing so that plaintiff could have an opportunity to read the report and obtain any evidence that he wished for the hearing. (Murphy Decl. Ex. A, Hearing Transcript ("HT") at 1-2).

The hearing was reconvened on July 1, 2019. (HT at 3). Plaintiff was unhappy with the assistance that he received, even though he obtained both of the documents that were requested on his form. (HT at 3). Plaintiff told defendant Murphy that he had also requested medical information, video evidence, and witnesses, including the officers present and a mental health representative. (HT at 3-5). Defendant Murphy explained that the video evidence would not be available due to a malfunctioning of the equipment. (HT at 5). Defendant Murphy agreed that obtaining mental health evidence would be appropriate, and adjourned the hearing in order to obtain MHU testimony. (HT at 5-6).

The hearing was later reconvened. However, defendant Murphy stated for the record that plaintiff had demanded to be removed from the hearing room and taken back to his cell. (HT at 6). Defendant Murphy also stated that plaintiff was informed that the hearing would continue in his absence. Defendant Murphy then read the misbehavior report into the record and began taking testimony. (HT at 6). Defendant Murphy heard testimony from defendant Gilles, who stated that he was present during the incident and confirmed the accuracy of the misbehavior report. (HT at 6-7). Defendant Murphy specifically asked whether defendant Gilles believed that plaintiff reaching for his buttocks was intentional or whether it was related to his drug use. (HT at 7). Defendant

Gilles testified that he believed that it could have been "both." (*Id.*)

***20** Defendant Murphy then heard testimony from defendant Boule, who stated that he did not believe that plaintiff's conduct in reaching for his buttocks was a "spasm" caused by a medical condition. (HT at 8). Defendant Murphy adjourned the hearing after defendant Boule's testimony and reconvened the hearing on July 2, 2019. [45] (HT at 8). At that time, Corrections Officer Freson testified that he had gone to plaintiff's cell in order to bring him to the hearing, but the plaintiff refused to attend. (*Id.*) Officer Freson testified that he explained to plaintiff that the hearing would continue even if he did not attend. (*Id.*)

Defendant Murphy then heard the testimony of Dr. Karandy. (HT at 8-10). Defendant Murphy read the misbehavior report to Dr. Karandy, who testified that plaintiff did have a history of seizures. (HT at 9). Dr. Karandy also testified that plaintiff's behavior on June 17[th] was consistent an inmate who ingested drugs or with an inmate who was having a seizure. (*Id.*) However, Dr. Karandy testified that the act of reaching for his buttocks, such as described in the misbehavior report, would not have been consistent with an individual having a seizure. (HT at 10).

The hearing transcript indicates that defendant Murphy adjourned the hearing to obtain "confidential MHU testimony." (HT at 10). The actual testimony is not part of the hearing transcript. After the MHU testimony, defendant Murphy issued his determination, finding plaintiff guilty of all charges except interference with an employee. (HT at 10). Defendant Murphy sentenced plaintiff to 15 days prehearing confinement with 99 more days of SHU and 120 days of loss of packages, commissary, and telephone. (*Id.*) Defendant Murphy stated his bases for the determination, including the testimony of the officers described above and the confidential MHU testimony. Defendant Murphy found that plaintiff's intellectual competence was not an issue. He also found as an "aggravating factor" that this was plaintiff's second failure to obey a direct order violation since April 29, 2019. (*Id.*) Defendant Murphy also put the appeal information on the record, but noted that the plaintiff was not present to sign the documents, having chosen to forgo the hearing. (HT at 10-11).

Plaintiff appealed the decision, and on September 19, 2019, D. Venetozzi, the Director of Special Housing/Inmate Disciplinary program dismissed the violent conduct charge (104.11), finding that the misbehavior report did not support the charge. (Murphy Decl. Ex. B at 1-2). Plaintiff's records were adjusted accordingly. [46] (*Id.*)

Plaintiff's first claim that defendant Murphy tried to coerce him to plead guilty prior to the hearing is not supported by the record. In any event, plaintiff did not plead guilty, and he was given ample opportunity to review the misbehavior report and ask to have witnesses and evidence produced. The hearing was adjourned immediately when plaintiff claimed that he had not received the misbehavior report, even over the officer's statement that he had served it on the plaintiff. Defendant Murphy obtained plaintiff's witnesses even after he chose to leave the hearing and failed to return for its completion. The fact that the video was unavailable does not change this court's finding. In any event, the unavailability of the video due to mechanical malfunction of the camera is not the hearing officer's responsibility. Defendant Murphy obtained medical and mental health testimony in an effort to investigate plaintiff's defense that his medical or mental state influenced his actions on June 17, 2019.

***21** Plaintiff claims that he was unable to cross-examine witnesses. First, the due process rights afforded by *Wolff* do not include the right to "cross"-examination. *Wiley v. Kirkpatrick*, 801 F.3d 51, 64 (2d Cir. 2015) (citing *Wolff*, 418 U.S. at 567). *See also Fava v. Bryant*, 9:20-CV-156 (TJM/TWD), 2022 WL 356739, at *8 (N.D.N.Y. Feb. 7, 2022) (no right under *Wolff* to confrontation or cross-examination at prison disciplinary hearings). Plaintiff's voluntary absence from the hearing prevented him from even questioning the witnesses. [47] However, that is not a due process violation by defendant Murphy. In his complaint, plaintiff claims that he never refused to attend the hearing. (Compl. ¶ 117). While plaintiff also refused to sign the forms indicating that he refused to attend the hearing, the rest of the evidence does not support his allegations. As stated above, the officer who went to get plaintiff from his cell, and who is not a defendant in this action, specifically stated on the record that plaintiff refused to attend.

There was "some" evidence to find plaintiff guilty of the violations. This is true even if one of the charges was ultimately reversed because the constitutional standard for sufficiency of evidence is "some," or "a modicum" of evidence, while the standard under state law is "substantial evidence." *Heyliger v. Iffert*, No. No. 9:18-CV-1113 (LEK/CFH), 2020 WL 8254418, at *10 (N.D.N.Y. Dec. 14, 2020), *report-recommendation adopted sub nom. Heyliger v. Peacock*, 2021 WL 212821 (N.D.N.Y. Jan. 21, 2021). Thus,

any due process claims may be dismissed as against defendant Murphy.

#### 2. Defendant Collins (Compl. ¶¶ 149-52)

Plaintiff claims that defendant Collins violated his due process right by presiding over a "secret" hearing. (Compl. ¶¶ 149-52). As stated above, plaintiff was charged on with refusing a direct order and a urinalysis violation. Plaintiff alleges that he only found out about the hearing after he was transferred to Five Points, and therefore, he was found guilty of misbehavior that he did not know he committed, and he was denied all the due process protections. However, the hearing packet submitted as an exhibit to the Collins declaration shows that on December 18, 2019, Officer Laduke served the misbehavior report on plaintiff at 8:52 a.m. (Collins Decl. Ex. A at 3, 11, 13, 19). The misbehavior report charges plaintiff with refusing to submit a urine sample. (Collins Decl. Ex. A at 12) (106.10 - direct order; 180.14 - urinalysis testing). According to the misbehavior report, plaintiff refused to provide a sample because he "just did this last month." (*Id.*)

The hearing was scheduled to take place on December 23, 2019. However, plaintiff refused to attend. (Collins Decl. ¶¶ 5, 6). His refusal was witnessed by two officers. (Collins Decl. Ex. A at 15). Defendant Collins found plaintiff guilty of the charges, and sentenced him to 6 days of prehearing confinement and 54 days of keeplock, together with a loss of 54 days of packages and commissary. (Collins Decl. Ex. A at 3). Plaintiff refused to sign for a copy of the disposition and refused to sign any documents that were associated with the disciplinary hearing. (Collins Decl. Ex. A at 10, 11, 14 (assistant form), 15 (refusal to attend hearing)). The Superintendent reviewed the disposition and affirmed the result. (Collins Decl. Ex. A at 1).

***22** While the Second Circuit has avoided a bright line rule that a certain period of SHU confinement automatically fails to create a liberty interest, it has established certain "guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed." *Chavez v. Gutwein*, No. 20-CV-342 (KMK), 2021 WL 4248917, at *7 (S.D.N.Y. Sept. 17, 2021) (citations omitted). For periods of restricted confinement of under 100 days, generally no liberty interest will be implicated unless the conditions of confinement are atypical and significant. *Id.* For periods of confinement of 101 to 305 days, a detailed record must be developed comparing the inmate's condition to ordinary prison conditions. *Id.*

In this case, plaintiff was sentenced by defendant Collins to a total of 60 days in "keeplock" confinement, which is confinement to an inmate's own cell. Plaintiff has not shown that his conditions of confinement for that time were sufficiently atypical and significant to establish a liberty interest.[48] The plaintiff's due process claims against defendant Collins may be dismissed on that basis alone.

However, even if the court were to assume that plaintiff had a liberty interest, there are no facts that would support any due process violation by defendant Collins. Plaintiff's refusal to attend his hearing waives any challenges to the conduct of that hearing. *Hinton v. Prack, supra.* Defendant Collins had no choice but to rely upon the misbehavior report that was written on December 17, 2019, stating that plaintiff refused to provide a urine sample. Plaintiff's claim that defendant Collins presided over a "secret" hearing is meritless, and the due process claims against her may be dismissed.

## VI. Excessive Force/Sexual Assault (Compl. ¶¶ 85-113) (Defendants Gilles, Boule, Rich, Papa, John & Jane Does (Claim # 4)

### A. Legal Standards

To establish an excessive force claim, the plaintiff must satisfy both an objective test and a subjective test. *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992). Objectively, a the plaintiff must establish that the force applied was "sufficiently serious" or harmful to establish a constitutional violation. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)) (additional citations omitted); *see also Romano v. Howarth*, 998 F.2d 101, 104 (2d Cir. 1993). The objective component is "contextual and responsive to 'contemporary standards of decency.' " *Hudson*, 503 U.S. at 9. In addition, a plaintiff "need not prove 'significant injury to make out an excessive force claim,' " *Griffin v. Crippen*, 193 F.3d 89, 92 (2d Cir. 1999), but "a de minimis use of force will rarely suffice to state a constitutional claim." *Romano*, 998 F.2d at 105.

Sexual abuse "by a corrections officer can give rise to an Eighth Amendment claim," *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015) (citing *Boddie v. Schnieder*, 105 F.3d 857, 859 (2d Cir. 1997)) ("*Crawford I*"), and violates the Constitution when the alleged conduct "serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate," *id.* (emphasis added.) Even a "single incident of sexual abuse, if

sufficiently severe or serious, may violate" an inmate's rights. *Id.* The critical inquiry "is whether the contact is incidental to legitimate official duties, such as a justifiable pat-frisk or strip search, or by contrast whether it was taken to arouse or gratify the officer or humiliate the inmate," *Crawford*, 796 F.3d at 257 (citing *Whitley v. Albers*, 475 U.S. 312 (1986)).

**B. Analysis**

***23** Defendants argue that plaintiff has failed to establish either a physical or sexual assault which violated plaintiff's eighth amendment rights. Defendants argue, inter alia, that plaintiff was unable to identify which, among multiple defendants, violated his constitutional rights, and they are therefore, entitled to summary judgment. (Def.s' Mem. of Law at 18-20) (Dkt. No. 63-1) (citing *Piper v. City of Elmira*, 12 F. Supp. 3d 577, 591 (W.D.N.Y. 2014)). Plaintiff's complaint to OSI in March 2020–almost one year after the incident–stated that a sexual assault was committed by defendant Gilles and six unknown officers, and when he signed his federal complaint, on April 14, 2020, he named defendants Gilles, Boule, Rich, Papa, and three unknown officers, who allegedly assaulted him physically first and then sexually during the same incident. (Compl. ¶¶ 85-113). However, by the time that plaintiff was deposed on August 24, 2021, he named defendant Gilles and Boule as his assailants together with other officers, of whose names he had to be reminded. (Pl.'s Dep. at 21-26, 28-30, 87-93).[49] Plaintiff only definitely identified defendant Gilles and testified that he did not know the identities of the other officers "until [he] read the report." (*Id.*)

In *Piper*, the court held that "[a] plaintiff may establish an officer's personal involvement through facts suggesting that the officer was either personally involved in the use of force or was present during the use of force and failed to intervene." 12 F. Supp. 3d at 596 (citation omitted). Further, "[i]n adducing such facts, the ' "plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." ' " *Id.* (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), *aff'd*, 426 F.3d 549 (2d Cir. 2005)). " '[T]he mere fact that [an] [o]fficer was present for the entire incident does not, on its own, establish that he had either awareness of excessive force being used or an opportunity to prevent it.' " *Id.* (quoting *Rodriguez v. City of New York*, No. 10 Civ. 9570 (PKC/KNF), 2012 WL 1658303, *5 (S.D.N.Y. 2012)).

In this case, plaintiff has named four officers, and has alleged that defendant Gilles ordered the others to "fuck him up" prior to the physical assault taking place. (Compl. ¶ 98). Plaintiff has also claimed that Gilles was the officer who ran his hand up and down his buttocks. (Compl. ¶ 100). Thus, the cases cited by defendants do not support their argument in this case because plaintiff has identified individuals who were present during the incident and who may have participated in the alleged assault or may have failed to intervene in an assault that was taking place.[50]

While plaintiff was unable at his deposition to state exactly what the other officers did or did not do in failing to intervene, it is undisputed even from the defendants' own records that a use of force took place when plaintiff allegedly reached for his buttocks. Plaintiff claims that the defendants took "mocking photographs" of his buttocks and anus in addition to other humiliating conduct. However, plaintiff claims that they failed to take pictures of the injuries that they inflicted as a result of the excessive force. The details of how the defendants brought plaintiff "into compliance" are not stated in any of the documents, and the records indicate that a "use of force" examination was conducted after the incident, but the details of that examination are also not stated. While plaintiff has not responded to the summary judgment motion, and this court makes absolutely no finding on the merits of this claim, I find that there is at least a question of fact regarding the alleged physical/sexual assault which precludes granting summary judgment in favor of defendants Gilles, Boule, Rich, and Papa as to the June 17, 2019 incident.[51]

***24 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 63) be **DENIED** as to defendants Gilles, Boule, Rich, and Papa **only as to the June 17, 2019 incident alleging physical/sexual assault (Compl. ¶¶ 94-113)**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 63) be **GRANTED AND THE COMPLAINT BE DISMISSED IN ALL OTHER RESPECTS AS TO ALL OTHER DEFENDANTS**, either for failure to exhaust or on the merits as discussed above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT**

**TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 7288498

## Footnotes

1 Plaintiff has failed to identify any of the John or Jane Doe defendants, notwithstanding the opportunity for discovery. (*See* Dkt. Nos. 51 (unrelated motion to compel); 58 (order granting motion in part)).

2 As noted by defense counsel, after paragraph 68 of plaintiff's complaint, he returned to paragraph 65. (Def.s' Mem. at 2 n.3). The bracketed numbers indicate the second appearance of the paragraph number.

3 Plaintiff was aware of this responsibility. He asked for, and was granted an extension of time to file his response to January 24, 2022. (Dkt. Nos. 65-66). At the same time, plaintiff filed a change-of-address notification, indicating that he had been released from incarceration. (Dkt. No. 65). He failed to submit a response to the summary judgment motion or to ask for an extension of the deadline within the time set by the court.

4 The IGP was formerly known as the Inmate Grievance Program.

5 34 U.S.C. § 30301, et seq.

6 Claim # 1 above. The court has numbered the claims as indicated at the beginning of this Report-Recommendation on pp. 3-4.

7 Claim # 2(a) above.

8 Plaintiff's actual grievance refers to Dr. Goe. (Seguin Decl. Ex. B at 17-18).

9 Plaintiff's appeal to the superintendent also made a passing reference to "pinched nerves." (Seguin Decl. Ex. B at 23). During the investigation, the nurses discussed plaintiff's neck and back pain. (*Id.* at 25) (noting that there were three "complaints" from September 13, 2019 - knee, contact lenses, and neck/back pain).

10 As stated above, defendants concede that plaintiff has exhausted his claim that defendant Goe failed to give plaintiff constitutionally adequate medical care on November 1, 2018, shortly after plaintiff was transferred to Great Meadow.

11 Defendants have also argued that plaintiff's claims against these defendants fail on the merits, and the court will discuss such arguments below.

12 It appears that defendant Nesmith was not present either for the alleged physical and sexual assault that plaintiff alleges occurred after he was taken to another room by defendants Gilles and the other officers on June 17, 2019. Thus, defendant Nesmith's actions on June 17, 2019 are limited to the application of the alleged "harmful concoction" that he used to revive plaintiff, an incident as to which plaintiff has not exhausted his administrative remedies.

13 The court notes that, notwithstanding the failure to exhaust, it is unlikely that plaintiff would be able to meet the new standard for a defendant's personal involvement with respect to these two supervisory defendants.

*See Tangreti v. Bachmann*, 983 F.3d 609, 615-18 (2d Cir. 2020) (requiring that the defendant have violated plaintiff's rights him or herself, not merely by reason of the supervision of other individuals). This is particularly true for defendant Morley, because defendant Tandy-Walters responded to plaintiff's letter on defendant Morley's behalf. (Tandy-Walters Decl. Ex. A). It does not appear that defendant Morley had any contact with plaintiff either in person or in a supervisory capacity.

14 In this paragraph of the complaint, plaintiff incorrectly states that the date was June 17, 2020. (Compl. ¶ 94). This appears to be a typographical error.

15 Plaintiff does not allege that defendant Nesmith accompanied the other defendants to the second floor of the medical department. In fact, it is clear from plaintiff's deposition that any physical and/or sexual assault occurred after plaintiff was taken out of the infirmary and brought to the observation cell, and defendant Nesmith was not present. (Reiner Decl. Ex. A, Pl.'s Dep. at 28-38) (Dkt. No. 63-4). Plaintiff testified that defendant Gilles and the other officers began their assault in the hallway after he was taken out of the infirmary. (Pl.'s Dep. at 28-29).

16 Plaintiff claims that defendant Gilles did this because plaintiff was asking for grievance forms. (Compl. ¶ 107).

17 Office of Mental Health.

18 As stated above, the inmate has several options, all of which result in immediate exhaustion of the claim.

19 The court notes that plaintiff signed his federal complaint on April 14, 2020, using the correct date of the incident, and he filed his OSI claim on March 2, 2020, reporting the wrong date. While it is perhaps questionable that plaintiff confused the dates in two documents created only a month apart, the mistake in his OSI claim could plausibly reflect a scrivener's error or a mental lapse, which plaintiff caught and corrected when preparing his complaint.

20 A review of the medical records attached to defendants' motion corroborates defendant Gilles's declaration that an incident did occur on June 17, 2019, during which plaintiff was brought to the infirmary, ammonia applied to restore him to consciousness, and after which a strip search was performed. (Gilles Decl. ¶ 4; Nesmith Decl. ¶ 4 & Ex. A). It is also clear from the disciplinary records attached to the declaration of defendant George Murphy, who conducted the subsequent disciplinary hearing, that a use of force occurred during the strip search. (Murphy Decl. & Ex. A) (Dkt. No. 63-12). The incident reportedly involved plaintiff reaching for his buttocks during the strip search and the officers having to use force to gain control of him. (*Id.*) The facts seem too similar to plaintiff's 2020 report to be describing a different incident.

21 The complaint refers to this defendant as RN Christy. (Compl. ¶¶ 125-26). However, this nurse's name is Christine Watkins, and the court will refer to RN Watkins using her proper name.

22 This is more support for the court's finding that plaintiff made an error in the date when reporting the incident to OSI for exhaustion purposes. However, even a brief review or investigation into plaintiff's records would have revealed that plaintiff had an "identical" incident which resulted in a misbehavior report and subsequent confinement only one week later than he asserted in his report to OSI.

23 Defendant Murphy found plaintiff "not guilty" of the interference charge after the disciplinary hearing. (Murphy Decl. Ex. B at 3).

24 Such a claim is similar to alleging bias on the part of the hearing officer which could be raised on the disciplinary appeal. The claims for which separate exhaustion has been required include filing a misbehavior report in retaliation for plaintiff's exercise of a constitutional right (which would involve the investigation of other conduct by both plaintiff and defendant(s) separate from the disciplinary charges). *See Waters, supra.*

25 Gerard Caron was Deputy Superintendent of Security at Great Meadow. (Def.s' Statement of Material Facts ("SOF") ¶ 2(d)) (Dkt. No. 63-2).

26 Donita McIntosh was the First Deputy Superintendent of Great Meadow. (SOF ¶ 2(b)).

27 Christopher Miller was the Superintendent of Great Meadow. (Def.s' SOF ¶ 2(a)).

28 The sentence was 60 days, but plaintiff was credited with 6 days prehearing confinement. (Collins Decl. Ex. A at CM/ECF p. 6).

29 In other paragraphs of the complaint, plaintiff states that he was transferred out of Great Meadow on January 16, 2020. (Compl. ¶¶ 139, 142). He states that he was taken to Auburn Correctional Facility, where he stayed for five days, arriving at Five Points on January 21, 2020. (Compl. ¶¶ 143, 144). It is not disputed that plaintiff was at Five Points at the end of January when he filed his grievance there.

30 Plaintiff is referring to the SHU confinement which he received after the June 17th incident.

31 Plaintiff believes that defendant Collins held two hearings, one on "1/10/20" and "2/9/20," neither of which is the date that defendant Collins held her one hearing (12/23/19). (Compl. ¶ 153).

32 Plaintiff's refusal to attend his hearing was witnessed by two corrections officers. (Collins Decl. Ex. A at CM/ECF p. 18). The refusal form informed plaintiff that the hearing would proceed without him if he refused to attend. (*Id.*) Plaintiff was afforded the opportunity to select an assistant, but waived that right and refused to sign the form. (Collins Decl. Ex. A at CM/ECF p. 17).

33 This document is a "check-box" form, entitled "Superintendent's Review of Disciplinary Disposition Form." (Collins Decl. Ex. A at 1).

34 The records indicate that a PT session was completed on June 11, 2019, June 13, 2019 and June 25, 2019. (Goe Decl. Ex. A at 27; Nesmith Decl. Ex. A at 2). However, on 6/27/19, two days later, Dr. Karandy specifically noted that plaintiff "did not come for PTH." (Goe Decl. Ex. A at 25, 27). On 7/9/19, plaintiff "Refused PT session," and a refusal form was completed. (Goe Decl. Ex. A at 23). On 7/16/19, the notes indicate that "PT session not completed No Show SHU inmate - Chart to MD." (Goe Decl. Ex. A at 19). On 7/18/19 AHR note states that "PT session not completed - unable to see due to security issues". (Goe Decl. Ex. A at 19).

35 In any event, if plaintiff was unable to attend physical therapy due to "security" reasons or due to SHU confinement, that was not the fault of either Dr. Goe or Dr. Karandy, and they cannot be held liable for plaintiff's disciplinary issues.

36 There are also records discussing plaintiff's eye impairments from a previous facility. (Goe Decl. Ex. A at 166-67).

37 Plaintiff was seen in February of 2019, but had declined surgery at that time. (Goe Decl. Ex. A at 25, 181) (plaintiff offered surgery on 2/25/19, but declined).

38 When plaintiff was transferred to Great Meadow from Downstate, plaintiff's medical records indicate that he had a history of anxiety, depression, and suicide attempts. (Goe Decl. Ex. A at 144, 196). An AHR entry dated October 30, 2018 states that plaintiff was "in draft" and that there were "6 meds 1:1." (Goe Decl. Ex. A at 196). These medications were changed to self-carry by defendant Goe on November 16, 2018. (*Id.* at 194).

39 The court notes that the rule may be facility-specific because plaintiff's medical records indicate that he was receiving both of those medications at Downstate, which may have contributed to his anger at not receiving them while he was incarcerated at Great Meadow. (Goe Decl. Ex. A at 201-204).

40 This is the same day that plaintiff states that he was assaulted.

41 As stated above, the use of force was related to plaintiff's attempt to reach for his buttocks during the strip search and defendants' use of force to gain control over him. (Murphy Decl. & Ex. A) (disciplinary records).

42 The signature on the document is illegible. However, the same signature appears on the mental health referral form, and it appears to be the signature of an RN, who is not a defendant herein. (Goe Decl. Ex. A at 128).

43 Defendant Nesmith states that he did not try to suffocate plaintiff "at any time." (Nesmith Decl. ¶ 8).

44 For some reason, plaintiff also objected to the officer's presence in the room. (Murphy Decl. HT at 1-2).

45 The hearing was adjourned due to the lateness of the hour. (HT at 8).

46 Although Director Venetozzi's form states that the penalty was not changed, even though one of the charges was dismissed, it is unclear whether that is the case. The total confinement portion of defendant Murphy's sentence, including prehearing confinement is 114 days, while the total confinement portion on Director Venetozzi's form is 90 days. This discrepancy does not affect this court's decision because it is questionable with either confinement that plaintiff had a liberty interest, and because this court finds that, even assuming a liberty interest was created, plaintiff was afforded all the process that he was due.

47 Although there is no right to full cross-examination or confrontation, inmates do have the limited right to question witnesses. *Lebron v. Mrzyglod*, No. 14-CV-10290 (KMK), 2019 WL 3239850, at *17 (S.D.N.Y. July 18, 2019) (citations omitted). Plaintiff waived his right to do so by his voluntary absence from the hearing. *Woodward v. Ali*, No. 9:13-CV-1304 (LEK/DJS), 2018 WL 4190139, at *13 (N.D.N.Y. Aug. 10, 2018) (citing inter alia *Boddie v. Connecticut*, 401 U.S. 371, 377-78 (1971)), *report-recommendation adopted*, 2018 WL 4188430 (N.D.N.Y. Aug. 31, 2018). " '[I]t is well established federal precedent that an inmate's refusal to attend a disciplinary hearing waives his due process objections where it occurs through no fault of prison authorities.' " *Id.* (quoting *Hinton v. Prack*, 9:12-CV-1844 (LEK/RFT), 2014 WL 4627120, at *15 (N.D.N.Y. Sept. 11, 2014) (citations omitted)).

48 Defendant Collins states that through July of 2019, she walked through many parts of Great Meadow, including the SHU. (Collins Decl. ¶ 8). Defendant Collins states that, when she visited the SHU during this time, she did not notice that it was smokier or hotter than any other part of the facility. (*Id.*)

49 Defendants have filed only excerpts of plaintiff's deposition, and the court has cited to the pages of the deposition as they are numbered at the top of the page, not to the CM/ECF pagination.

50 The plaintiff makes it clear in the complaint and in his deposition that defendant Nesmith, although involved in placing the ammonia inhalant near his mouth and nose, was not present either for the alleged physical or sexual assault because the uses of force occurred after plaintiff was taken out of the infirmary and was taken to the observation cell. (Pl.'s Dep. at 34-35).

51 As part of their argument that plaintiff cannot identify the defendants involved in the assaults, they argue that, at plaintiff's deposition, he stated that defendants Morley and Caron were also "involved" in the assault. Defendant Morley, who as stated above is the Acting Deputy Commissioner/Chief Medical Officer of the DOCCS Division of Health Services, and it is highly unlikely that he was involved in any incident involving plaintiff, particularly in the June 17th alleged assault. Plaintiff's passing reference to him at his deposition

is not sufficient to add him to the complaint as a defendant in this incident, and it is clear that plaintiff was having a difficult time making specific identifications. Defendant Caron is the Deputy Superintendent of Great Meadow, and plaintiff never alleged that he was involved in the assault. Thus, the court does not consider these stray comments by plaintiff at his deposition to be an amendment of his claims. In any event, if the case should go to trial on this issue, his deposition testimony may be used on cross-examination.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1723773
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Carvaughn JOHNSON, Plaintiff,
v.
Syed Johar NAQVI and Captain Ogando, Defendants.

Civil Action No. 3:18-cv-694 (CSH)
|
Signed 04/29/2021

**Attorneys and Law Firms**

Carvaughn Johnson, Suffield, CT, pro se.

James Michael Belforti, Office of the Attorney , General, Hartford, CT, for Defendants.

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

CHARLES S. HAIGHT, JR., Senior United States District Judge

***1** Plaintiff Carvaughn Johnson ("Plaintiff") currently is incarcerated at MacDougall-Walker Correctional Institution ("MWCI") and filed a *pro se* Complaint pursuant to 42 U.S.C. § 1983 against twelve of the facility's employees. Doc. 1 ("Compl."). Plaintiff thereafter filed an Amended Complaint. Doc. 6 ("Am. Compl.").

The Court then filed an Initial Review Order, in which it permitted four claims to proceed against two individuals in their personal capacities: (1) a claim of First Amendment retaliation against Captain Ogando ("Ogando") for a strip search that Ogando allegedly ordered without a penological purpose; (2) a Fourth Amendment violation against Ogando for the same strip search; (3) a claim of deliberate indifference to serious medical needs, in violation of the Eighth Amendment, against Dr. Syed Johar Naqvi ("Dr. Naqvi," and collectively with Ogando, "Defendants") regarding his failure to treat Plaintiff's injuries stemming from a falling cabinet door; and (4) a claim of recklessness under state law against Dr. Naqvi based on his failure to treat Plaintiff. *See Johnson v. Maurer*, No. 18 Civ. 694 (CSH), 2018 WL 6421059 (D. Conn. Dec. 6, 2018).

Defendants filed a motion for summary judgment, seeking to dismiss all of Plaintiff's claims. Doc. 21 ("Mot."); Doc. 21-1 ("Defs.' Mem."). Plaintiff opposes Defendants' motion in all respects. Doc. 26, at 12–15 ("Pl.'s Mem."). This Ruling resolves Defendants' motion.

## I. BACKGROUND

The following facts are derived from the Parties' submissions. Doc. 21-7 ("Defs.' 56(a)"); Doc. 26, at 1–11 ("Pl.'s 56(a)"). Unless otherwise noted, they are undisputed.

### A. Medical Treatment

On May 21, 2017, Plaintiff saw Dr. Naqvi, complaining of foot pain. Defs.' 56(a) ¶ 1. Dr. Naqvi prescribed Plaintiff Motrin, otherwise known as ibuprofen, a nonsteroidal anti-inflammatory drug (NSAID) that relieves pain and reduces inflammation. *Id.* ¶ 2.[1] Dr. Naqvi wrote the Motrin prescription for three months—from May 21, 2017 until August 21, 2017—and instructed Plaintiff to take one eight-hundred milligram pill of Motrin twice a day. *Id.* ¶ 4.

The Motrin prescription was a "keep on person" ("KOP") prescription, meaning that Plaintiff would be provided with a certain number of pills in a bottle to keep with him in his cell to take at regular intervals. *Id.* ¶ 5. According to Defendants, Plaintiff received regular supplies of Motrin on May 23, May 27, June 3, June 10, June 17, June 24, June 27, July 1, July 7, July 15, July 22, July 29, August 5, and August 12, 2017. *Id.* ¶ 6.[2]

***2** Dr. Naqvi next saw Plaintiff on June 25, 2017, for complaints of shoulder pain and foot fungus. *Id.* ¶ 7. Dr. Naqvi did not order any additional pain medication for Plaintiff because he already was receiving Motrin regularly from the previous prescription. *Id.* ¶ 8. However, Dr. Naqvi did prescribe Plaintiff antifungal medication for his foot. *Id.* ¶ 9.

Dr. Naqvi then saw Plaintiff on July 24, 2017 and treated Plaintiff's foot fungus and his complaints of shoulder and neck pain. *Id.* ¶ 10. Plaintiff's fungus had cleared up, but he reported that he had reduced range of motion in his neck. *Id.* ¶ 11. Dr. Naqvi therefore ordered c-spine x-rays, which were completed on July 25, 2017. *Id.* ¶ 12. The x-rays revealed no injuries to Plaintiff. *Id.* ¶ 13.

Plaintiff received a new Motrin prescription from a nurse practitioner on August 14, 2017. *Id.* ¶ 14. This prescription was for an additional three months—to expire in November 2017—and again Plaintiff was to take an eight-hundred milligram tablet of Motrin twice a day. *Id.* ¶ 15. The prescription also was KOP. *Id.* ¶ 16. [3] Plaintiff received supplies of Motrin on August 17, August 26, September 2, September 9, September 16, September 23, September 30, October 7, October 14, October 21, October 28, November 4, and daily from November 11 to November 30, 2017. *Id.* ¶ 17.

Dr. Naqvi next saw Plaintiff on August 27, 2017 and treated his complaints of neck and chest pain. *Id.* ¶ 18. Dr. Naqvi explained to Plaintiff that his previous x-rays were normal and revealed no injuries. *Id.* ¶ 19. According to Plaintiff, at the August 27 appointment, Plaintiff also complained to Dr. Naqvi about his shoulder pain. Pl.'s 56(a), at 4 ¶¶ 18–20. [4]

On that same day, Dr. Naqvi prescribed Plaintiff Elavil—otherwise known as amitriptyline—which is an antidepressant and can be used to treat anxiety, depression, tension, and can help patients sleep better. Defs.' 56(a) ¶ 21. Elavil can also be used to treat neuropathic pain, which is pain coming from damaged nerves, and Dr. Naqvi prescribed this medication to attempt to further address Plaintiff's complaints of pain. *Id.* ¶ 22. According to Plaintiff, however, Plaintiff repeatedly informed Dr. Naqvi that the Elavil did not reduce Plaintiff's pain—it only made Plaintiff sleepy. Pl.'s 56(a), at 5 ¶ 22. Dr. Naqvi wrote the Elavil prescription for three months and instructed Plaintiff to take one twenty-five milligram pill before bedtime. Defs.' 56(a) ¶ 23. According to Defendants, Plaintiff received Elavil daily from August 27, 2017 until April 17, 2018, *id.* ¶ 24, though according to Plaintiff, he stopped taking the medication because it "was not working," Pl.'s 56(a), at 5 ¶ 24.

***3** Dr. Naqvi next saw Plaintiff on November 19, 2017 and treated his complaints of pain on the left side of his chest, in his neck, and right shoulder. Defs.' 56(a) ¶ 25. [5] Dr. Naqvi knew that Plaintiff had a prescription for Motrin at the time, but he renewed Plaintiff's prescription for Elavil in order to attempt to relieve Plaintiff's complaints of pain. *Id.* ¶ 26. Dr. Naqvi again wrote the Elavil prescription for three months and instructed Plaintiff to take one twenty-five milligram pill of Elavil before bedtime. *Id.* ¶ 27. Prior this prescription's expiration, a nurse practitioner increased the dosage to fifty milligrams and extended it until May 2018. *Id.* ¶ 28.

Plaintiff disputes Defendants' assertions regarding his Elavil prescription. According to Plaintiff, at some point he stopped showing up to pick up his medication—and stopped taking the medication altogether—because it did not reduce his pain. Pl.'s 56(a), at 5 ¶¶ 24, 26, 30. Plaintiff also claims that he repeatedly requested to stop being prescribed Elavil, and that on multiple occasions he complained to Dr. Naqvi about this pain and the ineffectiveness of Elavil. *Id.* at 5 ¶ 25. Lastly, Plaintiff claims that he continues to have pain and spasms to this day. *Id.* at 5 ¶ 30.

Dr. Naqvi recommended that Plaintiff have a consultation with an orthopedic specialist for his shoulder. Defs.' 56(a) ¶ 29. Plaintiff saw the specialist on February 16, 2018, who concluded that:

> [Plaintiff] is a 35-year-old male with right shoulder pain. He has no concerning findings on x-ray examination today. It is possible that his right shoulder pain is secondary to some residual myofascial inflammation from his previously reported history of minor trauma. As such, we have recommended that he take over-the-counter NSAIDs including Motrin and naproxen as needed for pain. We also demonstrated different stretching and strengthening exercises for the right shoulder that the patient could do and recommended that he utilize ice or heat as needed for pain as well. Otherwise, he has no restrictions and he does not require further orthopedic followup.

*Id.* ¶ 30.

On March 11, 2018, Dr. Naqvi prescribed Plaintiff naproxen to help address his complaints of pain. *Id.* ¶ 31. Plaintiff was to take one five-hundred milligram pill of naproxen twice a day for three months. *Id.* ¶ 32.

On March 29, 2018, Dr. Naqvi saw Plaintiff for his complaints of shoulder pain and his request for bigger sneakers. *Id.* ¶ 33. Dr. Naqvi discontinued Plaintiff's previous naproxen

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

prescription and prescribed him Motrin. *Id.* ¶ 34. Plaintiff was to take one eight-hundred milligram pill of Motrin twice a day for three months. *Id.* ¶ 35.

Dr. Naqvi continued to treat Plaintiff for a variety of medical complaints, including shoulder pain, beyond March 2018. *Id.* ¶ 36. According to Plaintiff, he continued to report to Dr. Naqvi that he still was experiencing pain. Pl.'s 56(a), at 5 ¶ 36. Dr. Naqvi also recommended that Plaintiff receive a steroid injection to reduce inflammation in his shoulder in order to alleviate his pain. Defs.' 56(a) ¶ 37. Plaintiff received this shot in November 2018. *Id.* ¶ 38.

The Parties dispute whether Dr. Naqvi received any medical correspondence from Plaintiff from May 2017 to April 2018. According to Defendants, Dr. Naqvi did not receive or read any medical requests, complaints, or other correspondence from Plaintiff during that period because DOC doctors do not typically receive such requests. *Id.* at 39. Inmate medical requests and complaints, according to Defendants, are processed by nursing staff, and the inmate is then placed on a sick call list to see a medical doctor or nurse practitioner. *Id.* ¶ 40.

***4** Plaintiff claims, in contrast, that Plaintiff wrote numerous medical requests that were addressed to Dr. Naqvi. Pl.'s 56(a), at 6 ¶ 39. Plaintiff also claims that Defendants' description of the inmate request procedure—that the nursing staff handle all requests and place inmates on a doctor's sick call list—is not completely accurate; Plaintiff claims that Dr. Naqvi also can instruct the medical staff to place patients on a list to see him. *Id.* at 6 ¶ 40.

**B. Settlement Agreement and Release of Claims**

On February 8, 2018, Plaintiff signed a settlement agreement in connection with a different lawsuit in this Court. Defs.' 56(a) ¶ 41. That lawsuit was captioned *Johnson v. Trestman*, No. 14 Civ. 856 (SRU).[6] *Id.* Among other terms in the agreement, Plaintiff agreed to the following:

> [R]elease and forever discharge ... all other present and former officers, officials, representatives and employees of the State of Connecticut, their heirs, successors and assigns, from all actions, causes of action, suits, claims, or controversies, whether in law or equity, whether foreseen or unforeseen, whether known or unknown, whether accrued or not accrued, and of and from all direct or indirect claims, debts, damages and demands of every nature and kind, including attorneys' fees and costs, monetary and equitable relief, which the Plaintiff, his heirs, successors and assigns ever had or now have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world up to the date of this Agreement only ... including such actions as may have been or may in the future be brought in the federal courts.

*Id.* ¶ 42.

**C. Strip Search**

On July 29, 2018, Ogando was on duty at MCWI. *Id.* ¶ 43. At approximately 11:20 a.m., inmate kitchen workers were returning to their assigned units for the 11:45 a.m. Facility Formal count. *Id.* ¶ 44. At approximately 11:20 a.m., Ogando directed custody staff to report to the kitchen block (L-Pod vestibule) to conduct random strip searches of the inmate kitchen workers. *Id.* ¶ 45. The L-pod vestibule was chosen because it would serve as a checkpoint for the inmates before returning from work and entering their housing units. *Id.* ¶ 46.

Ogando ordered the strip searches because there were consistent and frequent reports of items missing from the kitchen. *Id.* ¶ 47.[7] Ogando knew from his years of training and experience that the removal of items from the kitchen can cause security problems because it can lead to inmates selling or trading food, or even lead to the introduction into the housing units of weapons such as knives. *Id.* ¶ 48. According to Defendants, Ogando therefore ordered the strip searches of all inmates returning from work for the purpose of finding any weapons or other concealed contraband. *Id.* ¶ 49.

Plaintiff was one of the inmates who was strip searched, but disputes that Ogando ordered the strip search of *all* inmates. Specifically, at approximately 11:20 a.m., Plaintiff was returning from his work assignment as a hospital janitor at MCWI's hospital unit along with the inmate kitchen workers. *Id.* ¶ 50. Plaintiff was given the same directions

as the inmate kitchen workers. *Id.* ¶ 51. Plaintiff indicated that he was not a kitchen worker, but he complied with staff directions. *Id.* ¶ 58.

***5** Ogando ordered that Plaintiff be searched as well because he knew that Plaintiff was returning from work at MCWI's hospital unit, from which potentially dangerous items could be smuggled that could pose a safety risk to the prison community. *Id.* ¶¶ 52–54. But Plaintiff claims that he was the *only* inmate who worked at the hospital who was strip searched, out of the four inmates who were returning from hospital jobs that day—that is, Plaintiff disputes that Ogando ordered the strip search of all inmates returning from jobs. Pl.'s 56(a), at 6 ¶¶ 49–51.

The Parties dispute Ogando's underlying motivation behind ordering the strip search of Plaintiff. According to Defendants, Ogando was concerned that Plaintiff was leaving a work area from which he could hide or smuggle contraband, and he therefore directed that Plaintiff also be searched along with the kitchen workers. Defs.' 56(a) ¶¶ 55–56. Plaintiff disputes this, arguing that Ogando could not have been genuinely worried that Plaintiff was leaving a work area from which he could hide or smuggle contraband because he only ordered a strip search of Plaintiff and not the other hospital workers. Pl.'s 56(a), at 7 ¶ 55. Instead, according to Plaintiff, Ogando that day remarked to Plaintiff that he was being strip searched "*since you like to file lawsuits*." *Id.* at 7 ¶ 56 (emphasis added).

The Parties further dispute the location of the search and, specifically, whether Plaintiff was searched in a private room. According to Defendants, Plaintiff was directed to go to a private area for a search. Defs.' 56(a) ¶ 57. Defendants claim that along with twelve to fifteen other inmates who were strip searched before they reentered their housing units on July 29, 2018, Plaintiff's strip search was conducted in the L-pod vestibule. *Id.* at ¶¶ 58–60. The searches took place in the L-pod vestibule, according to Defendants, because it contains multiple private offices and ensures the privacy of the inmates being searched. *Id.* ¶ 61. Plaintiff disputes these claims regarding the privacy of the room where he was searched. According to Plaintiff, he was strip searched in a room "that wasn't private at all." Pl.'s 56(a), at 7 ¶ 57. Rather, the search took place "in the second room to your left when you walk into" the L-pod vestibule, which is a "room used for [l]egal [c]alls" and has "no privacy whatsoever" because it has two big windows and an additional smaller window in the door. *Id.*

The Parties also dispute the extent to which Ogando oversaw Plaintiff's strip search. According to Defendants, Ogando did not personally observe every strip search conducted that day, nor did he personally search or observe the search of Plaintiff. Defs.' 56(a) ¶ 62. Plaintiff claims, in contrast, that Ogando looked into the room while Plaintiff was being strip search several times to see if Plaintiff was complying. Pl.'s 56(a), at 8 ¶ 62.

Additionally, the Parties dispute whether Ogando was violating DOC protocol in connection with Plaintiff's strip search. According to Defendants, Ogando had no reason to believe that the search of Plaintiff violated established protocol in any way. Defs.' 56(a) ¶ 63. They claim that Plaintiff was strip searched in the same manner as the other inmate workers: per protocol and in keeping with DOC's Administrative Directive 6.7. *Id.* ¶ 64. Plaintiff asserts, in contrast, that Ogando's actions violated prison policy because they were motivated by retaliation, and that Ogando intentionally singled out Plaintiff for a strip search out of all of the inmates returning from the hospital unit that day. Pl.'s 56(a), at 8 ¶ 63–64.

***6** Lastly, the Parties dispute whether Plaintiff complained about the search when it was underway. Defendants claim that at the time of the search, Plaintiff did not report any issues or objections to Ogando regarding the manner in which the strip search was conducted. Defs.' 56(a) ¶ 65. On the other hand, Plaintiff asserts that he did object and asked Ogando why he was being strip searched because he had nothing to do with the kitchen workers, to which Ogando responded—as mentioned *supra*—that Plaintiff was being searched "since you like filing lawsuits." Pl.'s 56(a), at 8 ¶ 65.

## II. STANDARD OF REVIEW

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Redd v. New York Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.*

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). If the initial burden is satisfied, the burden then shifts to the nonmoving party to present "specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks and citation omitted). While the Court must view the record in the light most favorable to the nonmoving party, and resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, *see Anderson*, 477 U.S. at 255, the nonmoving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must support each assertion disputing the veracity of a fact or existence of an alleged dispute with specific citation to the evidentiary record. *See* Fed. R. Civ. P. 56(c)(1).

Because Plaintiff is proceeding *pro se*, the Court must read his submissions "liberally" and interpret them "to raise the strongest arguments" that they suggest. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). Nonetheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (internal quotation marks omitted).

## III. DISCUSSION

As the Court explained in its Initial Review Order, Plaintiff's remaining claims in this lawsuit are: (1) retaliation against Ogando for a strip search without a penological purpose; (2) a Fourth Amendment violation against Ogando for the same strip search; (3) deliberate indifference to serious medical needs against Dr. Naqvi regarding his failure to treat Plaintiff's injuries stemming from a falling cabinet door; and (4) recklessness under state law against Dr. Naqvi based on his failure to treat Plaintiff. The Court will address these claims in order.

### A. Strip Search

#### 1. Retaliation

Plaintiff brings a claim for retaliation against Ogando on the basis that Ogando ordered a strip search of Plaintiff in retribution for Plaintiff's filing of lawsuits against DOC officials. *See* Am. Compl. ¶ 72.

***7** It is well settled that inmates "have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). "[T]o sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citation and internal quotation marks omitted). Even where a plaintiff has adduced sufficient evidence to satisfy each element of a retaliation claim, a defendant can still defeat the retaliation claim:

> If the plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff even in the absence of the protected conduct. Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.

*Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citation and internal quotation marks omitted).

"Because retaliation claims are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts. Conclusory allegations of retaliatory conduct are not sufficient." *Green v. Tavernier*, No. 18 Civ. 1781 (CSH), 2019 WL 2015849, at *3 (D. Conn. May 7, 2019) (citing *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015)).

There is no dispute that Plaintiff's filing of a lawsuit constitutes protected activity. *See Shand v. Parsons*, No. 20 Civ. 28 (CSH), 2020 WL 1989151, at *6 (D. Conn. Apr. 27, 2020) ("Protected speech or activity includes, for example,

filing a lawsuit, an administrative complaint, or a prison grievance." (citing *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019)). However, the Parties dispute the second and third prongs of Plaintiff's retaliation claim.

The Court will now turn to the second prong: whether Ogando's conduct constituted an adverse action.

An adverse action, as used in the second prong of a retaliation claim, refers to "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation and internal quotation marks omitted). This is an "objective test" that "applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill*, 389 F.3d at 381 (citing *Davis*, 320 F.3d at 353).

Defendants' only argument in support of their claim that Ogando's conduct did not constitute an adverse action is that the "search was conducted in a reasonable and lawful manner." Defs.' Mem. at 25. According to Defendants, "such a routine and normal incident could not possibly deter a similarly situated individual of ordinary firmness from exercising his constitutional rights." *Id.* (internal quotation marks and citation omitted). Plaintiff does not overtly address the issue in his brief.

Whether a strip search constitutes an adverse action for purposes of a retaliation claim has not been addressed by many courts in this circuit. Courts have more frequently addressed other types of searches, such as inmates' cell searches, which generally do not rise to the level of an adverse action. *See, e.g.*, *Joseph v. Annucci*, No. 18 Civ. 7197 (NSR), 2020 WL 409744, at *5 (S.D.N.Y. Jan. 23, 2020) ("Plaintiff has failed to state a claim for relief because cell searches and pat frisks, even if conducted for retaliatory reasons, cannot constitute an adverse action as required to support a First Amendment retaliation claim." (collecting cases; citation and internal quotation marks omitted)). Similarly, courts have ruled that pat frisks do not constitute adverse actions. *See, e.g.*, *Henry v. Annetts*, No. 08 Civ. 286 (LAP), 2010 WL 3220332, at *2 (S.D.N.Y. July 22, 2010) ("[P]at frisks are an ordinary part of prison life and would not (and do not) deter the average inmate from continuing to exercise his First Amendment rights.").

***8** Strip searches in the retaliation context were briefly addressed in *Lipton v. Cty. of Orange, NY*, 315 F. Supp. 2d 434, 444 (S.D.N.Y. 2004). In that case, the plaintiff—who previously had been an outspoken critic of the police department in the media—was temporarily transferred from a county jail to the jail on Riker's Island. *See id.* at 443–44. When the plaintiff was being transported back to the county jail because he was being released on bail, a county police officer ordered that the plaintiff undergo a strip search. *See id*. The plaintiff asked the officer why he was being searched, given that he had been in the custody of other officers during the transport. *See id.* at 444. The officer responded, "I hear you tape record cops. You give cops a hard time," which the plaintiff claimed was evidence of retaliation. *Id.* (internal quotation marks omitted). Although the court ultimately granted the defendants' motion for summary judgment on other grounds—specifically, the plaintiff had not proffered any evidence that the search resulted from a county custom or policy (for purposes of municipal liability) or that any named defendant had personal involvement in the search—the court still opined on the inappropriateness of the search:

> We treat plaintiff's claims with respect to the alleged pre-release strip search separately because, viewed in the light most favorable to plaintiff, those allegations present an appalling abuse of the power afforded to corrections officers that is too serious an affront to a decent society to dismiss solely on the basis of a briefing failure, without a review of their merit.

*Id.* at 446.

More recently, retaliatory strip searches were addressed in *Pizarro v. Bd. of Correction*, No. 16 Civ. 2418 (RJS), 2018 WL 3462512 (S.D.N.Y. July 17, 2018), a case that Defendants cite. In that case, District Judge Richard Sullivan (as he then was) concluded that an officer's strip search of an inmate did not qualify as an adverse action. *See id.* at *6. Judge Sullivan cited the United States Supreme Court's holding in *Hudson v. Palmer*, 468 U.S. 517 (1984), in which the court held that "wholly random searches are essential to the effective security of penal institutions" and therefore do not violate prison inmates' Fourth Amendment rights. *Id.* at 529. Judge Sullivan also relied upon the principle,

articulated in *Florence*, 566 U.S. 318, that courts must defer to prison officials in the formulation of search procedures. *See Pizarro*, 2018 WL 3462512, at *6. With that guidance in mind, Judge Sullivan reasoned that the plaintiff presented no evidence demonstrating "why a routine and ordinarily lawful strip search would deter a typical prisoner from exercising his or her First Amendment rights." *Id.* The court added that "Plaintiff plead[ed] no facts indicating that the ... officer singled out Plaintiff for strip searching; in fact, Plaintiff admit[ed] that his whole housing unit underwent strip searches." *Id.* [8]

Turning to the case at bar, the Court concludes that the strip search at issue could deter a typical prisoner from exercising his or her First Amendment rights. A strip search is significantly more invasive than a cell search or a pat frisk. *See Harris*, 818 F.3d at 58. That is particularly the case when windows permit other officers and inmates to view the inmate's exposed body, as Plaintiff alleges occurred in the case are bar. *See id.* at 62. Although this might not be determinative in the Fourth Amendment context where the reasonableness of the search is in question, *see Green v. Martin*, 224 F. Supp. 3d 154, 164 (D. Conn. 2016) ("Numerous district courts in this Circuit have held that accusations of humiliation and embarrassment caused by strip searches, on their own, do not state a claim under the Fourth Amendment." (collecting cases)), the Court undertakes a different inquiry when it evaluates, as it must in this case, whether an inmate subjected to a strip search may be objectively deterred from affirmatively exercising his or her rights.

***9** Additionally, the underpinnings of Judge Sullivan's analysis in *Pizarro* are not present in this case. The court there found that the strip search was routine and ordinary, and the plaintiff was not singled out. *See Pizarro*, 2018 WL 3462512, at *6. In contrast, Plaintiff here has provided evidence that this search was neither routine nor ordinary; rather, according to Ogando's alleged admission, Ogando selected Plaintiff for a strip search because Plaintiff had previously filed a lawsuit against DOC officials. It is one thing for an inmate to know that he or she might be subject to regular searches as an incident to daily life in prison, but it is quite different if an inmate suspects that his or her mere filing of a lawsuit could subject the individual to a public strip search, for no reason whatsoever aside from a prison official's vindictive animus. Such retaliatory behavior exemplifies the type of "appalling abuse of the power afforded to corrections officers that is too serious an affront to a decent society," and an individual might be deterred from exercising his or her constitutional rights under those circumstances. *Lipton*, 315 F. Supp. 2d at 444. Accordingly, Plaintiff has satisfied the adverse action prong of his retaliation claim for purposes of this motion. [9]

The Court now turns to the third prong of the retaliation analysis: whether there was a causal connection between Plaintiff's filing of a lawsuit and the subsequent strip search.

In support of their motion for summary judgment, Defendants assert that Ogando's actions could not be causally related to Plaintiff's filing of a lawsuit because Ogando was unaware that Plaintiff had previously filed the *Johnson v. Trestman*, No. 14 Civ. 856 (SRU) action in this Court. Defs.' Mem. at 25. According to Defendants, Ogando "was not aware of [the lawsuit's] existence or the nature of the complaints contained therein." *Id.*

On the other hand, Plaintiff disputes that Ogando was unaware of Plaintiff's previous lawsuit. In particular, Plaintiff claims that Ogando remarked to Plaintiff that he was being strip searched "since you like to file lawsuits." *See Johnson*, 2018 WL 6421059, at *13. Additionally, Plaintiff claims that Ogando was aware of the previous lawsuit because he singled Plaintiff out for a strip search, out of the four inmates who were returning from the health unit. *See id.* [10]

To satisfy the causation prong of a retaliation claim, "allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." *Davis*, 320 F.3d at 354 (citation and internal quotation marks omitted). "Some of the facts often used to determine retaliatory motive may include (1) temporal proximity between the protected conduct and the alleged retaliatory act, (2) the prisoner's prior good disciplinary record, (3) a finding of not guilty at the disciplinary hearing, and (4) statements by the officials showing motivation." *Ramos v. Semple*, No. 18 Civ. 1459 (VAB), 2019 WL 2422875, at *2 (D. Conn. June 10, 2019) (citation omitted).

The Parties do not address the first three factors, but Plaintiff argues that the alleged statement made by Ogando reflects Ogando's true motive for the search: to retaliate against Plaintiff because he had previously filed a lawsuit against prison officials. The Court agrees. Particularly because of the apparent nexus between the content of the alleged comment and the strip search itself—"since you like to file lawsuits you [are] getting strip searched to[o]"—a rational juror could conclude that Ogando's actual reason for the search order

was to retaliate against Plaintiff. Pl.'s 56(a), at 7 ¶ 56; *see also* *Shepherd v. Fisher*, No. 08 Civ. 9297 (RA), 2017 WL 666213, at *19 (S.D.N.Y. Feb. 16, 2017) (denying summary judgment on the plaintiff's retaliation claim and concluding that a reasonable factfinder could infer a causal relationship between the plaintiff's prior complaints about the defendant and the adverse action because the defendant "expressly linked" the two in statements made to the plaintiff); *Cole v. New York State Dep't of Corr. & Cmty. Supervision*, No. 14 Civ. 539 (BKS) (DEP), 2016 WL 5394752, at *26 (N.D.N.Y. Aug. 25, 2016), *report and recommendation adopted*, 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016) (an inmate raised genuine issues of material fact concerning the causation element of a retaliation claim in a case involving an alleged assault, because during the assault the defendant allegedly referenced prior assaults and a lawsuit that resulted from those assaults, as well as commented that the assault was "payback" for the plaintiff's grievances); *Bilal v. New York State Dep't of Corr.*, No. 09 Civ. 8433 (JSR) (AJP), 2010 WL 2506988, at *15 (S.D.N.Y. June 21, 2010) (although granting the defendants' motion for summary judgment, concluding nonetheless that the plaintiff had satisfied the causation prong of a retaliation claim because during three alleged incidents, "an officer specifically commented about [the plaintiff's] filing of grievances"), *aff'd sub nom. Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012). [11]

***10** Defendants nonetheless make a number of arguments in support of their contention that Ogando did not retaliate against Plaintiff. For example, Defendants claim that Ogando could not have retaliated against Plaintiff because Ogando was not named in Plaintiff's prior lawsuit. Defs.' Mem. at 25. According to Defendants, "the mere fact that Plaintiff filed a complaint against third parties is simply too thin and speculative to satisfy the causal element of a retaliation claim." *Id.* [12]

This argument is not persuasive. As Defendants contend, generally it is "difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, No. 09 Civ. 3135 (RWS), 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011). But "there is no *per se* rule of law standing for the proposition that a retaliation claim may only be sustained against individual defendants against whom grievances were filed." *Alston v. Bellerose*, No. 12 Civ. 147 (CSH), 2015 WL 4487973, at *9 (D. Conn. July 23, 2015) (citation omitted).

Further, the Second Circuit rejected a similar argument in *Espinal v. Goord*, 558 F.3d 119 (2d Cir. 2009). In *Espinal*, prison officials allegedly used excessive force against the plaintiff and denied him medical treatment in violation of the Eighth Amendment in retaliation for the plaintiff's prior lawsuits. *See id.* at 120–21. One of the defendants had not been named in the plaintiff's previous lawsuits—the defendant had allegedly only heard of the lawsuit from his colleagues—and retaliated against the plaintiff thereafter. *See id.* at 129–30. The court of appeals did not find this distinction conclusive, however, and held that it could nonetheless *infer* that the defendant who was unnamed in the previous lawsuit had knowledge of the lawsuit, under the circumstances. *See id*. In ruling that summary judgment should not have been awarded to the defendants on the plaintiff's retaliation claim, the Second Circuit explained:

> [W]e cannot conclude that there is no evidence that [the defendant who was not named in the prior lawsuit] was aware of [the plaintiff's] prior lawsuit. Viewing the evidence in the light most favorable to [the plaintiff], as we must, it is a legitimate inference that [the defendant], as a member of [the prison's] emergency response team with Surber ... learned of the prior lawsuit from Surber, who was a defendant in the earlier lawsuit, or from other officers aware of the lawsuit, and took action in response to [the plaintiff's] protected activity.

***11** *Id.*; *see also* *Barrington v. New York*, 806 F. Supp. 2d 730, 749–50 (S.D.N.Y. 2011) (inferring that correctional officers had knowledge of the plaintiff's prior grievance—even though they had not been named in the prior grievance—because both the named and unnamed officers were present together at the alleged retaliation for the grievance (citing *Espinal*, 558 F.3d at 130)); *cf. Alston*, 2015 WL 4487973, at *9 (concluding that a plaintiff stated a claim for retaliation because his "allegations support[ed] the inference that the named Defendants ... were generally aware of Plaintiff's participation in a protected activity," even though they were not named in the plaintiff's prior lawsuit, because other officers allegedly made statements to them regarding the plaintiff's "litigiousness").

Guided by these precedents, the Court reverts to the causation inquiry in the case at bar. Similar to *Espinal*, the Court cannot conclude that there is no evidence that Ogando was aware of Plaintiff's prior lawsuit. Viewing the evidence in a light most favorable to Plaintiff, a reasonable juror could infer on the basis of Ogando's alleged comment to Plaintiff that Ogando learned of Plaintiff's previous lawsuit from other officers who were aware of the lawsuit, and took action—ordering Plaintiff's strip search—in response to Plaintiff's protected activity. The fact that Ogando ordered a strip search of Plaintiff, who was the only inmate returning from the health unit who was singled out, is additional, circumstantial evidence from which a juror could conclude that a causal connection existed sufficient for a claim of retaliation.

Defendants cite to a number of cases in support of their argument that Ogando could not have retaliated against Plaintiff because he was not named in the previous lawsuit, but they are distinguishable. For example, in *Jones v. Fischer*, No. 10 Civ. 1331 (GLS) (ATB), 2013 WL 5441353 (N.D.N.Y. Sept. 27, 2013), the court concluded that the plaintiff had not established a nexus between his protected activity of filing a grievance against a prison official and the alleged retaliation of filing a misbehavior report against the plaintiff. *See id.* at 20. In that case, the plaintiff submitted a grievance against one official, but alleged that a separate official (who was not named in the grievance) retaliated against plaintiff. *See id.* The official who allegedly retaliated against the plaintiff had been serving as acting captain, and he was assigned to review the mail of the captain who was on leave. *See id.* at 21. The plaintiff alleged that the acting captain read the grievance that the plaintiff had submitted, in connection with his mail-reviewing duties. *See id.* The court rejected this argument as speculation, concluding that it was "unclear how ... [the defendant] would have become aware of plaintiff's grievance against" a different officer. *Id.*

*Jones* is distinguishable because it was not clear that the defendant was actually aware of the plaintiff's grievance regarding another officer. The court did not state, as a matter of law, that the defendant could not have retaliated against the plaintiff because the defendant was not named in the plaintiff's lawsuit. In contrast, in the case at bar, there is evidence of Ogando's awareness of Plaintiff's lawsuit. [13]

***12** Defendants ague, in the alternative, that Ogando did not retaliate against Plaintiff because Ogando did not become aware of the *instant* lawsuit until several months after the strip search. *See* Defs.' Mem. at 26. According to Defendants, Plaintiff filed an Amended Complaint in this action on October 9, 2018, the Court issued its IRO on December 6, 2018, and Ogando was only sent a waiver of service alerting him to the existence of this case on March 21, 2019, about eight months after the adverse action. *Id.* (citations omitted); *see also* Defs.' Reply at 8.

The Court agrees that there is no basis to find a causal connection between Plaintiff's filing of this lawsuit and Ogando's act of retaliation. It is undisputed that Ogando was not served with the Complaint in the case at bar until 2019—after the strip search took place. Defs.' 56(a) ¶ 68. *See, e.g.*, *Bernheim v. Litt*, 79 F.3d 318, 325 (2d Cir. 1996) ("Clearly, [a plaintiff] may not base her claim of retaliation upon complained-of acts that predated her [protected activity]."). However, that does not alter the Court's conclusion that there is a disputed fact regarding Ogando's knowledge of Plaintiff's prior lawsuit, and that a rational juror could conclude that a causal connection existed between Ogando's alleged adverse action and Plaintiff's filing of lawsuits.

The question remains whether Defendants have shown by a preponderance of the evidence that they would have disciplined Plaintiff even in the absence of the protected conduct. *See Graham*, 89 F.3d at 79. As discussed *supra*, if Plaintiff was strip searched "for both proper and improper reasons," the conduct "may be upheld if the action would have been taken based on the proper reasons alone." *Id.* The Parties do not address this question in their briefs, but it is possible to infer potential arguments.

For example, Defendants contend that Ogando ordered the search due to concerns over the smuggling of contraband. *See* Defs.' Mem. at 25. According to Defendants, Plaintiff was returning from work at the hospital unit where he had access to a number of items that could harm members of the prison community, and Ogando's "years of experience ha[d] taught him" that Plaintiff could have smuggled such items into the housing unit. *See id.* at 25–26. Following this argument to its logical end, Defendants could maintain that Ogando would have ordered the search *regardless* of Plaintiff's prior participation in protected activity.

Plaintiff, in turn, could make similar arguments that the Court addressed *supra.* That is, he could argue that Ogando was not actually concerned that Plaintiff had smuggled weapons and other potentially-harmful medical devices out of the health unit; if Ogando had been concerned, then he would have not singled Plaintiff out—he would have ordered a search of all

four inmates who returned from the health unit. Additionally, Plaintiff could once again cite to Ogando's comment that Plaintiff was being strip searched because he liked filing lawsuits.

The Court concludes that Plaintiff has raised a triable issue with respect to Ogando's motivations. Defendants ultimately bear the burden of showing by a preponderance of the evidence that Ogando ordered the search of Plaintiff for a proper purpose. *See Graham*, 89 F.3d at 79. Plaintiff has put forward enough evidence to raise a genuine dispute regarding the validity of that stated purpose.

Defendants lastly argue, in their reply brief, that Plaintiff's opposition runs afoul of this District's local rules, which require that:

> ***13** Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial.

D. Conn. Local Civ. R. 56(a)(3). According to Defendants, Plaintiff has failed to include in his Rule 56(a) statement the proper citations to admissible evidence. Defs.' Reply at 8. [14]

It is true that, "*[p]ro se* parties and represented parties alike must comply with this District's requirements for motions for summary judgment; if they do not, the district court may, in its discretion, deny their motion or impose other sanctions." *Dwarven Forge, LLC v. Whitaker*, No. 17 Civ. 2053 (VAB), 2020 WL 3489407, at *9 (D. Conn. June 26, 2020). However, a number of factors counsel against sanctioning Plaintiff, including his *pro se* status and the fact that he has limited access to the prison law library. *See, e.g.*, *Langer v. 121 Inflight Catering, LLC*, No. 14 Civ. 861 (MPS), 2016 WL 868156, at *1 n.1 (D. Conn. Mar. 7, 2016) ("Given [the plaintiff's] *pro se* status ... I choose not to impose such sanctions and consider the evidence in the record in light of [the plaintiff's] arguments."); *cf. Claude v. Wells Fargo Bank, N.A.*, No. 13 Civ. 535 (VLB), 2015 WL 5797007, at *3 (D. Conn. Sept. 30, 2015) ("Plaintiff has failed to clearly respond to the Defendant's assertions proffered in its 56(a)1 statement, and he has also failed to provide a proper 56(a)2 statement in connection with his summary judgment opposition. Because Plaintiff is proceeding *pro se*, the Court will liberally construe his submissions." (citing *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006)).

Additionally, the Court was easily able to compare Plaintiff's Rule 56(a) statement to his other submissions, including his affidavit and Amended Complaint. *See Ricci v. Destefano*, No. 04 Civ 1109 (JBA), 2006 WL 2666081, at *3 (D. Conn. Sept. 15, 2006) (noting in connection with a motion to strike that, "Local Rule 56(a)1 specifically provides that a court will consider only statements 'supported by the evidence.' Parties should assume that courts will undertake this obligation faithfully and fully review the proffered evidence of record and draw appropriate conclusions." (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 142 (2d Cir. 2003)); *Colon*, 58 F.3d at 872 (rejecting the defendants' argument regarding the plaintiff's lack of compliance with Rule 56 because they failed to take note that he had filed a verified complaint, which is "to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)"). Therefore, the Court declines at this time to sanction Plaintiff for his noncompliance with the local rules.

### 2. Fourth Amendment Violation

The Court now turns to Plaintiff's claim that the strip search that Ogando ordered violated the Fourth Amendment, which "protects individual privacy against certain kinds of governmental intrusion." *Katz v. United States*, 389 U.S. 347, 350 (1967). In the prison context, the amendment proscribes unreasonable searches. *See Bell v. Wolfish*, 441 U.S. 520, 558 (1979).

***14** "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application" and each case "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559. Courts must consider: (1) the scope of the particular intrusion; (2) the manner in which the search is conducted; (3) the justification for initiating it; and (4) the place in which it is conducted. *Id.*; *see also Harris v. Miller*, 818 F.3d 49, 58 (2d Cir. 2016).

With respect to strip searches, in particular, the Second Circuit has recognized that inmates retain a "limited right to bodily privacy," and " '[a] strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body is a serious invasion of privacy.' " *Harris*, 818 F.3d at 57–58 (quoting *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 344–45 (2012) (Breyer, J., dissenting)). However, courts have upheld strip searches as reasonable security measures even when probable cause for the searches was absent as long as the searches were related to legitimate penological or security interests. *See, e.g.*, *Florence*, 556 U.S. at 326–30, 338–39; *Bell*, 441 U.S. at 558–60. Notably, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." *Florence*, 566 U.S. at 328 (citation and internal quotation marks omitted).

Turning to the case at bar, Defendants argue that all four *Bell* factors weigh in favor of granting their motion. With respect to the first two factors, Defendants claim that there is no evidence to suggest the scope or manner of the search was particularly invasive, as it was not a "manual body cavity search" or a "cross gender search." Defs.' Mem. at 21. Plaintiff does not appear to disagree with this. Rather, the Parties' disagreement focuses on the latter two *Bell* factors: the search's justification and location. The Court will address these in inverse order.

Defendants claim that the strip search of Plaintiff was routine and performed in accordance with Administrative Directive 6.7 "in the privacy of an office within the L-pod vestibule." *Id*. That directive dictates, in relevant part: "An inmate strip-search shall normally be conducted in an area out of view of individuals not involved in the search process and shall not normally require physical contact by staff." DOC Administrative Directive 6.7 § 7. According to Defendants, the search took place in a "private area," because the L-pod vestibule "contains multiple private officers ... to ensure the privacy of the inmates being searched." Defs.' 56(a) ¶¶ 57, 61.

Plaintiff disputes the privacy of the search, arguing that he was strip searched "in a room that wasn't private at all." Pl.'s 56(a), at 7 ¶ 57. Rather, according to Plaintiff, he was strip searched in the "second room to your left when you walk into the vestibule of [the] L-pod." *Id.* Plaintiff claims that there was "no privacy whatsoever" because that room contains "two big windows" and an additional "smaller window in the door." *Id.* As a result, Plaintiff claims that Ogando "peeked in the room several times while plaintiff was being strip searched," and that other officers and inmates could see Plaintiff undressing. *Id.*

The Parties' dispute regarding the privacy of the search is not, in and of itself, sufficient to defeat Defendants' motion for summary judgment. Although the Court sympathizes with Plaintiff because he may have felt embarrassment as a result of the search, many district courts in this Circuit have ruled that accusations of humiliation and embarrassment caused by strip searches, on their own, do not rise to the level of a Fourth Amendment violation, specifically recognizing that "neither the presence of cameras nor the presence of other inmates and employees of a correctional facility makes an otherwise constitutional strip search unconstitutional." *Smith v. City of New York*, No. 14 Civ. 5934 (JCF), 2015 WL 3929621, at *2 (S.D.N.Y. June 17, 2015) (collecting cases); *see also* *Dixon v. Santiago*, No. 15 Civ. 1575 (JAM), 2015 WL 9582729, at *2–3 (D. Conn. Dec. 30, 2015) (collecting cases); *cf.* *Green*, 2019 WL 2015849, at *4 (concluding, in the context of an initial review order, that the plaintiff failed to state a cognizable Fourth Amendment claim regarding a strip search, even though it occurred in a bathroom with the door open which allegedly permitted two female nurses to see him naked while they were walking by). Courts have repeatedly "acknowledged the degree to which strip searches may humiliate and 'invade the personal privacy of inmates,' and nonetheless upheld the use of strip searches where they further the legitimate interest of discovering contraband." *Walker v. Ponte*, No. 14 Civ. 8507 (ER), 2016 WL 4411415, at *4 (S.D.N.Y. Aug. 18, 2016) (quoting *Bell*, 441 U.S. at 560).

***15** Instead, as noted *supra*, a plaintiff must provide evidence that a strip search did not serve any legitimate penological purposes, or that a search was specifically "designed to intimidate, harass or punish." *See* *Davila v. Messier*, No. 13 Civ. 81 (SRU), 2014 WL 4638854, at * 6 (D. Conn. Sept. 17, 2014) (collecting cases). Plaintiff has raised a triable issue on this point.

Defendants claim Ogando ordered Plaintiff's strip search because of a penological purpose: "due to concerns over the smuggling of contraband." Defs.' Mem. at 21. They claim that Plaintiff was returning from work at the hospital where he had access to "a plethora of contraband including syringes" and that Ogando's "years of experience taught him that these items can be smuggled into the housing units and ... can be used as weapons." *Id.* at 21–22. In contrast, Plaintiff contends

that, "[t]here was not [a] reasonable security justification for the plaintiff to be strip searched." Pl.'s Mem. at 14. Rather, according to Plaintiff, Ogando had only received reports that inmates were removing items from the kitchen, yet Plaintiff lacked "access to the facility kitchen to in any way justify defendant Ogando having him strip searched." *Id.* at 13.

The Parties' disagreement is analogous to *Davila*, 2014 WL 4638854, in which Chief Judge Underhill denied the defendants' motion for summary judgment because there was a dispute regarding the penological basis for a strip search. *See id.* at *6. The manner of the search in *Davila* was significantly more egregious and involved abhorrent sexual allegations, but the plaintiff in that case similarly disputed that the defendants had any penological basis for the search: the plaintiff claimed that, contrary to the defendants' assertions, he had not misused his smudging supplies. *See id.* On the basis of the disputed facts in that case, this Court concluded that, "[b]ecause the parties' credibility must be determined by the trier of fact, the defendants' motion for summary judgment is denied on the Fourth Amendment claim regarding the strip search." *Id.*

The case at the bar is similar. Defendants claim that Ogando had a legitimate penological objective in ordering the strip search of Plaintiff—that Plaintiff may have smuggled contraband out of the hospital unit. Plaintiff disputes this, arguing that Ogando had no legitimate penological objective in ordering a strip search because he had only received reports of contraband smuggling from the kitchen, not the hospital. Plaintiff's theory is further supported by the statement that Ogando allegedly made regarding his purported true purpose for ordering the search—that Plaintiff liked filing lawsuits. The Court cannot resolve these credibility determinations on this motion. *Cf., e.g.*, *Holloway v. Dep't of Corr.*, No. 11 Civ. 1290 (VLB), 2013 WL 4834657, at *7 (D. Conn. Sept. 10, 2013) (denying the defendants' motion for summary judgment with respect to the plaintiff's Fourth Amendment strip search claim because the "conduct, verbal remarks and demeanor" of the plaintiff and prison official during the search caused "the court to question whether the controlled strip-search was undertaken with the intent to harass and intimidate the plaintiff rather than for a legitimate penological purpose"). [15]

***16** Construing the evidence in a light most favorable to Plaintiff, and making all reasonable inferences in his favor, he has raised a triable issue regarding Ogando's motivation for ordering the search.

**3. Qualified Immunity**

Even though the Court has concluded that Plaintiff has raised triable issues with respect to his retaliation and Fourth Amendment claims, Defendants argue that the claims should nonetheless be dismissed because they are entitled to qualified immunity. Defs.' Mem. at 27.

When public officials invoke qualified immunity at the summary judgment stage, courts must consider: "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Cugini v. City of New York*, 941 F.3d 604, 611 (2d Cir. 2019).

With respect to the first prong of the qualified immunity analysis, the Second Circuit has reminded district courts that they are "not to define clearly established law at a high level of generality." *Francis v. Fiacco*, 942 F.3d 126, 146 (2d Cir. 2019) (citation and internal quotation marks omitted). Instead, it must be "particularized to the facts of the case." *Id.* (citation and internal quotation marks omitted).

Additionally, with respect to the second prong, to determine if a right is "clearly established," courts consider "Supreme Court decisions ... [Second Circuit] decisions, and decisions from other circuit courts." *Simon v. City of New York*, 893 F.3d 83, 92 (2d Cir. 2018). As the Second Circuit has recently reemphasized, although the doctrine "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. That precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Francis*, 942 F.3d at 145–46 (citations and internal quotation marks omitted).

Courts have discretion to determine which prong of the analysis to address first. *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017). [16] Ultimately, though, defendants bear the burden of establishing that they are entitled to the qualified immunity defense. *See Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018) ("Qualified immunity is an affirmative defense on which the defendant has the burden of proof." (citations omitted)).

The Court now turns to the case at bar, and the Court will first analyze whether Ogando is entitled to qualified immunity on Plaintiff's retaliation claim.

***17** No Party has briefed, for purposes of a qualified immunity inquiry, whether Plaintiff has made out a violation of a constitutional right in connection with the strip search. However, it is clear from the evidence, viewed in the light most favorable to Plaintiff, that Plaintiff has made out a violation of a constitutional right, or he has at least raised a genuine issue of fact regarding a violation: that he has a constitutional right of access to the courts, and Ogando retaliated against him for his exercise of that right. As the Court discussed in detail *supra*, Plaintiff has presented evidence that Ogando learned of Plaintiff's prior lawsuit and took action—ordering plaintiff's strip search—in response to Plaintiff's protected activity. *See supra* Section III.A.1.

It is also beyond dispute that this right to be free from retaliation has been clearly established for many years. In *Franco v. Kelly*, 854 F.2d 584 (2d Cir. 1988), the Second Circuit observed the following regarding an inmate's access to the judiciary:

> In the prison context, we have held that inmates must be permit[ted] free and uninhibited access ... to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers.... Like the right of access to the courts, the right to petition is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied. Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that ... section 1983 [is] intended to remedy.

*Id.* at 589 (citations and internal quotation marks omitted).

Other courts in this Circuit have likewise recognized that it is "clearly established" that prison officials cannot retaliate against inmates for filing lawsuits. *See, e.g.*, *Farid v. Goord*, 200 F. Supp. 2d 220, 245 (W.D.N.Y. 2002) (ruling that the qualified immunity doctrine did not provide the defendants with a defense because "[a] prisoner's right against retaliation for engaging in protected First Amendment activities, such as petitioning the government for redress of grievances, has been clearly established since at least 1988"). Accordingly, Ogando is not entitled to qualified immunity with respect to Plaintiff's retaliation claim.

Defendants nonetheless try to distinguish this case, arguing that Plaintiff was subject to a "lawful and routine" strip search under the Fourth Amendment, and it is not "clearly established" that a lawful search can constitute a violation of the First Amendment. Defs.' Mem. at 30. In support of that argument, Defendants claim that the *Pizarro* case in the Southern District of New York, which the Court discussed *supra*, "demonstrates that whether a search that is lawful under the Fourth Amendment can constitute [an] adverse action under the First Amendment is at least an open question and therefore the law cannot be clearly established," because "*Pizarro* held that otherwise lawful and routine strip searches do not constitute adverse action." *Id.*

Defendants' argument is misguided because it relies on a faulty premise: that it is undisputed that the strip search of Plaintiff was lawful under the Fourth Amendment, similar to the search in *Pizarro.* In that case, the strip search at issue did not qualify as an adverse action because the plaintiff presented no evidence which demonstrated "why a routine and ordinarily lawful strip search would deter a typical prisoner from exercising his or her First Amendment rights," and the plaintiff "plead[ed] no facts indicating that the ... officer singled out Plaintiff." *Pizarro*, 2018 WL 3462512, at *6. In the case at bar, in contrast, Plaintiff *has* raised a triable issue regarding the legality of the strip search: he has proffered evidence tending to show that Ogando had *no* legitimate purpose for ordering the search and merely sought to retaliate against Plaintiff. Defendants' argument therefore does not alter the Court's analysis that it was "clearly established" at the time of Plaintiff's strip search that prison officials may not retaliate against inmates in response to their filing of lawsuits. *See, e.g.*, *Show v. Patterson*, 955 F. Supp. 182, 193 (S.D.N.Y. 1997) ("[A] material issue of fact exists as to whether the manner in which the search was conducted was objectively unreasonable and thus violative of the First and Fourth Amendments. Since this fact is material to the determination of qualified immunity, summary judgment on plaintiffs' First and Fourth Amendment claims cannot be granted on qualified immunity grounds."). [17]

***18** The Court now turns to the qualified immunity inquiry in connection with Plaintiff's Fourth Amendment claim. Once again, the analysis asks whether Plaintiff has made out a constitutional violation. And, once again, the Court concludes, for substantially the same reasons that were discussed *supra*, that Plaintiff has raised a triable issue regarding whether the strip search that Ogando ordered violated the Fourth Amendment. *See supra* Section III.A.2. As noted *supra*, Plaintiff has raised a material dispute about whether the search served any legitimate penological purpose, or if it was specifically designed to intimidate, harass, or punish Plaintiff. *See id.*

Turning to the second prong of the qualified immunity analysis, it is clear that Plaintiff's rights under the Fourth Amendment have been "clearly established" for a long period of time. In fact, just two years prior to Ogando's strip search order of Plaintiff, I explained that, "[c]learly established law at the time of the searches [in that case] recognized that searches conducted without legitimate penological purposes or designed to intimidate, harass or punish were unreasonable and unconstitutional." *Green*, 224 F. Supp. 3d at 166 (citation omitted). Other courts in this Circuit have made similar observations. *See, e.g.*, *George v. City of New York*, Nos. 12B6365, 13B3511, 13B3514, 2013 WL 5943206, at *10–11 (S.D.N.Y. Nov. 6, 2013) ("An unbroken line of authority in the Supreme Court and the Second Circuit has repeatedly affirmed that prison authority actions are not entitled to deference—and may be held unconstitutional—whenever they are not undertaken pursuant to any legitimate penological goal, or are designed to intimidate, harass, or punish.").

Defendants nonetheless argue that not "every reasonable official would have understood that ordering that kind of search violates the Fourth Amendment." Defs.' Mem. at 30 (citing *Taylor v. Barkes*, 575 U.S. 822 (2015)). This argument is not persuasive. The Court finds it difficult to believe that a reasonable official—who, if Plaintiff's account is to be believed, ordered a strip search in retaliation and without any legitimate purpose—would not have understood that it was a constitutional violation. That is particularly so given the Supreme Court and Second Circuit's decades-old case law barring the conduct.

Lastly, Defendants claim that in order for the law to be "clearly established," Plaintiff "would have to point to a Second Circuit or Supreme Court case wherein an inmate's Fourth Amendment rights were violated based on a private search, ordered by a male staff member, and where the inmate was returning from an area of the prison where weapons and contraband were easily accessible." *Id.*

The Court rejects this argument, as well. If that were the case, it would conveniently insulate Ogando from liability regardless of his true motivations for ordering the strip search. In fact, a variation of Defendants' argument was rejected in *George*, 2013 WL 5943206, an analogous case, albeit in a ruling resolving a motion to dismiss. In that case, the plaintiffs alleged that prison officials conducted strip searches "in order to humiliate the inmates and to 'make a spectacle' of the inmates." *Id.* at *7. After concluding that the plaintiffs adequately and plausibly alleged a Fourth Amendment violation, the court then addressed defendants' argument that they were entitled to qualified immunity. *See id.* at *11. The court framed the "clearly established" inquiry in the following way: "[t]he issue in this action is not whether inmates have a general right to be free from visual strip searches, but rather whether the challenged search was conducted with any legitimate penal purpose." *Id.* With that in mind, the court then ruled that the defendants' invocation of qualified immunity failed because, "clearly established law in the Second Circuit [at the time of the search] demonstrated that a strip search conducted without a legitimate penological purpose violated constitutional rights." *Id.*

***19** The case at bar is analogous. The issue is not whether "a private search, ordered by a male staff member, and where the inmate was returning from an area of the prison where weapons and contraband were easily accessible," violates "clearly established" law, as Defendants contend. Defs.' Mem. at 30. It is beyond doubt that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence*, 566 U.S. at 328. Rather, similar to *George*, the question is whether the challenged search of Plaintiff was conducted with *any* legitimate penological purpose. Because that is a disputed fact, Defendants' assertion of the qualified immunity defense must fail. *See Kelleher v. New York State Trooper Fearon*, 90 F. Supp. 2d 354, 361 (S.D.N.Y. 2000) ("It is well established that it is within the province of the jury to decide factual issues with respect to the defense of qualified immunity." (citing *Kim v. Hurston*, 182 F.3d 113 (2d Cir. 1999)).

Accordingly, Defendants are not entitled to qualified immunity on either of Plaintiff's claims related to the strip search, and Defendants' motion for summary judgment is

DENIED with respect to Plaintiff's retaliation and Fourth Amendment claims.

**B. Medical Treatment**

The Court next turns to Plaintiff's claims related to his medical treatment: that Dr. Naqvi was deliberately indifferent to Plaintiff's serious medical needs and was reckless under state law.

**1. Temporal Scope of Claims**

Before addressing the merits of Plaintiff's medical treatment claims, the Court must first address a preliminary argument made by Defendants: that Plaintiff signed a settlement agreement that released Defendants from liability from all claims based on conduct that occurred prior to February 8, 2018. Defs.' Mem. at 14. Defendants do not contend that this agreement bars Plaintiff's claims related to the strip search, which the Court has just addressed, because the search occurred in July 2018, after the settlement agreement's execution. Defs.' 56(a) ¶¶ 42–43.

As the Second Circuit has stated, "[a] settlement agreement is a contract that is interpreted according to general principles of contract law." *Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007). "The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002).

"Under Connecticut law, the enforceability of a settlement agreement is determined using general principles of contract law." *Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, No. 13 Civ. 293 (AWT), 2014 WL 1094451, at *2 (D. Conn. Mar. 19, 2014) (citing *Omega Engineering, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005)). "A contract is binding if the parties have mutually assented to the terms ... and where the terms of the agreement are 'clear and unambiguous.' " *Id.* (quoting *Audubon Parking Assoc. Ltd. P'ship v. Barclay & Stubbs, Inc.*, 225 Conn. 804, 811 (1993)).

The language used in a contract "must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Awdziewicz v. City of Meriden*, 317 Conn. 122, 129 (2015) (citation and internal quotation marks omitted). Additionally, "[w]here the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." *Id.* at 129–30. "Once entered into," a settlement agreement "is binding and conclusive." *Ruiz v. City of Bridgeport*, No. 15 Civ. 253 (AWT), 2017 WL 1202651, at *2 (D. Conn. Mar. 31, 2017) (quoting *Powell*, 497 F.3d at 128).

As the Court discussed *supra* in Section I, in February 2018, Plaintiff entered into a settlement agreement in *Johnson v. Trestman*, No. 14 Civ. 856 (SRU). Defs.' 56(a) ¶ 41. The agreement, which is dated and signed by Plaintiff on February 8, 2018, provided for the dismissal of that case with prejudice in exchange for a payment of $1300, among other provisions in his favor. *See* Doc. 21-4 ("Settlement Agreement"), at 1. In exchange, Plaintiff agreed to:

> ***20** [R]elease and forever discharge ... all other present and former ... employees of the State of Connecticut ... from all actions, causes of action, suits, claims ... whether known or unknown, whether accrued or not accrued ... which the Plaintiff ... ever had or now have ... from the beginning of the world up to the date of this Agreement only.... This release ... includes ... all causes of action alleging violations of the plaintiff's state and federal constitutional rights, his rights arising under the statutes and laws of the United States and/or the State of Connecticut, and such causes of action as may be available under the common law.

*Id.* at 3–4.

Defendants claim that Plaintiff has released Defendants —who are employees of the State of Connecticut—and forever discharged them from any medical treatment-related claims that preceded the agreement. *See* Defs.' Mem. at 8. According to Defendants, the settlement terms are "clear and unambiguous and therefore must be enforced." *Id.* at 14.

The Court agrees. The settlement agreement reached in *Johnson v. Trestman* clearly bars Plaintiff's claims related to conduct preceding February 8, 2018. The scope of the release is broad: it applies to all known *or unknown* causes of action, including federal claims, such as deliberate indifference, as well as common law claims, such as recklessness. *See id.* at 4.

The breadth of the settlement agreement in this case is distinctly different than the narrower release at issue in *Gulley v. Mulligan*, No. 18 Civ. 858 (SRU), 2019 WL 2062431 (D. Conn. May 9, 2019). In that case, the waiver applied only to claims "arising out of, or in any way related to the *incidents or circumstances which formed the basis for the above referenced civil action[s]*." *Id.* at *3 (emphasis added). Thus, when the plaintiff filed a subsequent lawsuit to litigate claims that were unrelated to the prior lawsuit, this Court determined that the plaintiff's release did not bar his new claims, because they "concerned events that took place at different dates against different DOC officials and appear entirely unrelated to the events that formed the basis of the instant case." *Id.* at *4. In contrast, in the case at bar, Plaintiff's settlement agreement is broader. It applies to, "*but [is] not limited to*, acts arising out of, or in any way related to the incidents or circumstances which formed the basis for the Suit." Settlement Agreement at 3 (emphasis added). The settlement agreement here therefore not only applies to claims that are connected to the circumstances that gave rise to *Johnson v. Trestman*, but also other, unrelated claims, such as Plaintiff's medical treatment prior to February 8, 2018, which has catalyzed the current lawsuit.

For his part, Plaintiff claims that the settlement agreement "has nothing to do with this present case and was only for the parties in that case." Pl.'s 56(a), at 6 ¶ 41. According to Plaintiff, his agreement covered only the "parties of that suit not parties of future suits." *Id.* at 6 ¶ 42.

The Court disagrees with Plaintiff. The agreement not only applies to the defendants of that case, but also, contrary to Plaintiff's assertion, to "*all other* present and former ... employees of the State of Connecticut." Settlement Agreement at 3 (emphasis added). Courts in this Circuit have rejected similar arguments where the settlement agreements at issue released claims against all state employees. *See, e.g.*, *Carter v. Ponte*, No. 17 Civ. 1830 (VSB), 2018 WL 4680995, at *5 (S.D.N.Y. Sept. 28, 2018) (awarding summary judgment to the defendants because a release plainly barred the plaintiff from bringing any claims against the City of New York or "*any of its officers* for any civil rises claims arising prior to the date it was executed" (emphasis added)); *Smickle v. City of New York*, No. 16 Civ. 3333 (VSB), 2018 WL 1578381, at *4 (S.D.N.Y. Mar. 29, 2018) (concluding, on a motion to dismiss, that an agreement barred the plaintiff from bringing any claims against "all past and present ... employees ... of the City of New York" for all claims that "occurred through the date of [the release]"); *Brown v. UConn Managed Health Care*, No. 13 Civ. 931 (JBA), 2016 WL 777888 (D. Conn. Feb. 26, 2016) ("The release specifically references future related claims and applies to claims against *any employees* of the Department of Correction or Correctional Managed Health Care. It is not restricted to any particular defendants. The fact that several defendants in this case were not named in the prior state case is irrelevant." (emphasis added)). The wording of the instant release, creating the broadest possible shield for the released party, is explicitly intended to achieve that result, and is expressed in terms now so familiar that they appear in printed forms of general releases available for sale from legal stationers.

***21** Accordingly, the Court concludes that Plaintiff's settlement agreement bars his claims related to his medical treatment that occurred prior to February 8, 2018. [18]

**2. Deliberate Indifference**

The Court now turns to Plaintiff's claim that that Dr. Naqvi was deliberately indifferent to Plaintiff's serious medical needs, based on Dr. Naqvi's alleged failure to treat Plaintiff's injuries stemming from a falling cabinet door.

The Eighth Amendment's prohibition on cruel and unusual punishment protects against deliberate indifference to a prisoner's serious medical needs by prison officials. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To demonstrate deliberate indifference to medical needs, a plaintiff must demonstrate harmful acts or omissions that deny or unreasonably delay access to needed medical care or wantonly cause infliction of unnecessary pain. *Id.* at 104–06. Accordingly, not all failures by prison staff to provide medical care rise to the level of a constitutional violation. *Id.*; *see also Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). "[A] prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability." *Smith*, 316 F.3d at 184.

***22** The deliberate indifference standard consists of two prongs: (1) the alleged deprivation must be, objectively, "sufficiently serious" to produce death, degeneration, or extreme pain; and (2) subjectively, the defendant must have

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

been aware of a substantial risk that the inmate would suffer serious harm by defendant's act or omission. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Salahuddin v. Goord*, 467 F.3d 263, 279B80 (2d Cir. 2006).

As to the first prong, "[a] 'serious medical need' exists where, objectively, the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Dotson v. Fischer*, 613 F. App'x 35, 38 (2d Cir. 2015) (quoting *Harrison v. Barkly*, 219 F. 3d 132, 136 (2d Cir. 2000)).

As to the second, subjective prong, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions, that is:

> [T]hat [the defendant] harbored the requisite mental state while he denied ... treatment. He must show that [the defendant] knew of and disregarded an excessive risk to [plaintiff]'s safety; that he not only was aware of facts from which a reasonable person would conclude [plaintiff] faced an excessive risk, but that he personally actually drew that inference.

*Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012) (*per curiam*). Thus, an allegation of mere negligence is insufficient. Instead, the subjective element requires that an inmate allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280.

The Court now turns to the case at bar, and in particular to the second element of Plaintiff's claim, which is dispositive. [19]

***23** The gravamen of Plaintiff's claim is that Dr. Naqvi was deliberately indifferent to Plaintiff's medical needs because Dr. Naqvi was aware of Plaintiff's extreme pain but "disregard[ed] [it] for months." Pl.'s Mem. at 13. Plaintiff contends that he "continuously told [Dr.] Naqvi that the pain medication he was issuing plaintiff did not help with his pain." *Id.*

As the Court discussed in its IRO, Plaintiff alleges that Dr. Naqvi was aware of Plaintiff's pain as soon as June 25, 2017, and he had continued knowledge of Plaintiff's pain because Plaintiff repeatedly submitted grievances to Dr. Naqvi regarding his condition. *See Johnson*, 2018 WL 6421059, at *8; *see also* Doc. 26, at 47–63 (Plaintiff's inmate request forms complaining about his shoulder pain). As the Court also explained in its IRO, the first action that Dr. Naqvi allegedly took to relieve Plaintiff of his pain was on March 21, 2018, when Dr. Naqvi prescribed naproxen to Plaintiff. *See id.*

As an initial matter, because Plaintiff in his settlement agreement released his claims against all DOC employees that preceded February 8, 2018—including those potentially against Dr. Naqvi—the Court need only focus on the alleged delay in treatment that took place from February 8, 2018 to March 21, 2018. *See supra* in Section III.B.1.

However, even if the Court were to examine the entire period during which Plaintiff alleges that Dr. Naqvi delayed providing Plaintiff with medical care, it is now clear on this motion for summary judgment, with an enhanced evidentiary record, that Plaintiff *had* an active prescription of some form of pain medication for the entirety of the relevant time period. Accordingly, regardless of the precise time frame, Defendants' motion for summary judgment should be granted with respect to Plaintiff's deliberate indifference claim.

As noted above, Plaintiff claims that Dr. Naqvi was aware of Plaintiff's pain as soon as June 25, 2017, and that he failed to treat plaintiff. But, as Defendants point out—and Plaintiff does not dispute—Dr. Naqvi issued Plaintiff a three-month long prescription for ibuprofen in May 2017. Defs.' Mem. at 18. The prescription lasted until August 2017, and it was renewed for an additional three months until November 2017. *See id.* Dr. Naqvi then authorized a three-month prescription of Elavil for Plaintiff for the treatment of neuropathic pain, which lasted until November 2017. *See id.* That prescription was then renewed for an additional three months until February 2018, and it was renewed again by a nurse practitioner until May 2018 (along with the renewal, the nurse practitioner also increased the dosage from twenty-five to fifty milligrams). *See id.* Lastly, in March 2018, Dr. Naqvi prescribed for Plaintiff two different pain medications: naproxen and again, ibuprofen. *See id.* Thus, contrary to Plaintiff's claims, Dr. Naqvi did not delay or fail to treat Plaintiff's pain; he consistently prescribed various types of pain relievers.

Plaintiff nonetheless argues that he disagreed with Defendants' pain management prescriptions: he apparently stopped taking Elavil because it made him sleepy, and Naproxen and Motrin "did absolutely nothing to help plaintiff's pain." *Id.* In response, Defendants claim that "an inmate's dissatisfaction with the type, strength, or amount of pain medication he received simply does not state a claim for deliberate indifference." Defs.' Mem. at 17.

***24** The Court agrees with Defendants. It is well established that an inmate's disagreement with his or her medical treatment does not state a claim for deliberate indifference. *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." (citation omitted)); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

The Second Circuit in *Hill* applied this principle in the context of an inmate's claim that he was not receiving a sufficiently high dose of a particular medication. *See Hill*, 657 F.3d at 123. In that case, which involved a motion to dismiss, the plaintiff alleged that he was denied medical care, "leaving him needlessly to suffer." *Id.* He contended that he repeatedly complained that the Motrin medication prescribed by a nurse practitioner "was insufficient" to treat the plaintiff's pain and that "stronger pain medication was required." *Id.* The court, nonetheless, concluded that the plaintiff's complaint failed to state a claim of deliberate indifference because there was "no allegation that either medical provider acted with a culpable state of mind." *See id.*

With that guidance in mind, courts in this circuit have come to a similar conclusion regarding a plaintiff's disagreement with the type, quantity, or strength of prescribed pain medication. *See, e.g.*, *Rawls v. Rosenfield*, No. 16 Civ. 582 (LEK) (CFH), 2017 WL 7050648, at *14 (N.D.N.Y. Nov. 28, 2017), *report and recommendation adopted*, 2018 WL 542249 (N.D.N.Y. Jan. 23, 2018) (concluding that the plaintiff's allegations that he requested and was denied Neurontin, even though he had already been prescribed Motrin, did not create a material issue of fact precluding summary judgment); *Hodges v. Northrup*, No. 10 Civ. 531 (GLS) (TWD), 2014 WL 316729, at *8 (N.D.N.Y. Jan. 28, 2014) (granting summary judgment and concluding that the plaintiff "may not have been given pain medication that was as strong as he wanted"—he was authorized to take over-the-counter Motrin or Tylenol, but he requested the pain killer Fioricet—"but the evidence establishe[d] that pain medication was made available to him for his knee injury"); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (awarding summary judgment to the defendants on the plaintiff's deliberate indifference claim on the basis of the plaintiff's claim that he was denied stronger pain medication because the plaintiff did "not offer any evidence or allegations that stronger medication was not provided for any reason other than a medical decision"), *aff'd*, 178 F. App'x 39 (2d Cir. 2006).

Turning to the case at bar, Plaintiff's dissatisfaction with his pain management program does not provide support for his deliberate indifference claim. Plaintiff's medical records demonstrate that he had an active prescription for some form of pain medication for the entirety of the relevant time period. Although Plaintiff disagreed with the type, quantity, or strength of the pain medication that Dr. Naqvi prescribed, that is insufficient to defeat Defendants' motion.

To be sure, the Court has sympathy for Plaintiff, whose submissions indicate that he is in a great amount of pain stemming from his shoulder injury. Nonetheless, there is no genuine dispute regarding a deliberate indifference claim, and therefore Defendants' motion for summary judgment with respect to that claim is GRANTED and the claim is DISMISSED.

**3. Recklessness**

***25** The Court now turns to Plaintiff's final claim: that Dr. Naqvi acted with recklessness in failing to provide Plaintiff with pain medication. According to Defendants, nothing in the record "even hints at a failure of Dr. Naqvi to satisfy the prevailing standard of care, let alone the heightened standard of recklessness." Defs.' Mem. at 19. Plaintiff does not address his recklessness claim in his brief, but he alleged in his Amended Complaint that by failing to treat Plaintiff, Dr. Naqvi "knowingly disregarded an excessive risk to the plaintiff's life health, safety, and well being." Am. Compl. at 10 & 58.

The Supreme Court of Connecticut has described the standard for common law recklessness in the following way:

> [W]e have described recklessness as a state of consciousness with reference to the consequences of one's acts.... It is more than negligence, more than gross negligence.... The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them.... Wanton misconduct is reckless misconduct.... It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action.

*Doe v. Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 382 (2015) (citation and internal quotation marks omitted).

This Court has previously applied the recklessness standard in *Clark v. Dowty*, No. 05 Civ. 1345 (WWE), 2007 WL 2022045 (D. Conn. July 9, 2007), in which the plaintiff alleged that police officers failed to provide him with immediate and adequate medical care when he was injured when he was arrested. In that case, when the officers subdued the plaintiff to conduct the arrest, they used pepper spray and a baton, and the plaintiff needed approximately thirteen staples to close a head laceration. *See id.* at *2. The core dispute in connection with the plaintiff's recklessness claim was the timeliness and adequacy of the subsequent medical care that the officers provided: the defendants asserted that they attended to the plaintiff's medical needs at the scene of the arrest. The plaintiff claimed, on the other hand, that he was not provided medical care until about thirty minutes later at a hospital; that the defendants had intentionally postponed the departure to the hospital to delay the plaintiff's medical care; and, that the defendants took a circuitous route to the hospital to cause further delay. *See id.* at *8–9. On the basis of that dispute, the Court concluded that summary judgment was inappropriate in connection with the plaintiff's recklessness claim:

> [T]here is a genuine issue of material fact as to the extent of ... the propriety and adequacy of the medical care [that the officers] provided to the plaintiff. From this, one may infer that the officers possessed the necessary "state of consciousness" to deem their conduct as reckless or malicious.

*Id.* at *15.

More recently, this Court denied summary judgment on a prisoner's recklessness claim involving allegations of sexual assault in *Tangreti v. Semple*, No. 17 Civ. 1420 (MPS), 2019 WL 4958053 (D. Conn. Oct. 8, 2019), *rev'd in part on other grounds sub nom. Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020). In that case, the plaintiff was subject to a number of acts of sexual abuse by prison officials. *See id.* at *2–3. The plaintiff reported the conduct, but the defendants did not take any precautions to reduce the risk of sexual assault to the plaintiff. *See id.* Although the Court did not analyze the issue in detail because the parties had not thoroughly briefed their arguments regarding the plaintiff's recklessness claim, the Court nonetheless concluded that summary judgment on the recklessness claim was inappropriate. *See id.* at *23. According to the Court, "[s]ince recklessness liability can attach to a failure to take precautions, and because [the plaintiff] has presented evidence to support that Defendants knew of the risk of sexual assault at [the prison], [the plaintiff] has conceivably stated a recklessness claim against all Defendants." *Id.*

***26** The case at bar is different from *Tangreti*, which involved a claim of recklessness on a failure to protect theory, rather than a failure to provide medical care. And, although *Clark* involved a recklessness claim involving the provision of medical care, the case at bar is distinguishable because Plaintiff in the instant case alleges that he was denied adequate medical care over the course of many months, rather than approximately thirty minutes. Yet, the principles remain the same: there must be a genuine dispute regarding Dr. Naqvi's "state of consciousness," "something more than a failure ... to take reasonable precautions to avoid injury"—he must have engaged in conduct that indicates a reckless disregard of Plaintiff's rights. *Doe*, 317 Conn. at 382.

Here, Defendants assert that there is no genuine dispute regarding Dr. Naqvi's "state of consciousness." The Court agrees. Although Plaintiff claims that he was not provided with adequate healthcare, his undisputed medical records tell a different story: that Dr. Naqvi repeatedly prescribed Plaintiff various forms of medication to relieve Plaintiff's pain, as the Court recounted *supra* in connection with its discussion of Plaintiff's deliberate indifference claim. Although Plaintiff asserts that the medication did not cause his pain to fully abate, that in and of itself does not indicate that Dr. Naqvi possessed a "state of consciousness" such that he recklessly disregarded Plaintiff's health and safety.

This case is also markedly different from *Clark* and *Tangreti*, where summary judgment was not warranted. In contrast to *Clark*, the evidentiary record does not indicate that Dr. Naqvi intentionally engaged in any conduct that shows recklessness, such as the *Clark* defendants' failure to provide medical care at the scene of the arrest, and their decision to take a circuitous route to the hospital. And, in contrast to *Tangreti*, where the defendants were allegedly aware of the plaintiff's claims of sexual assault—and failed to take any action—Dr. Naqvi in this case *repeatedly* prescribed medication and even changed the prescription on a number of occasions.

Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's recklessness claim is GRANTED, and Plaintiff's claim is DISMISSED.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. The Court makes the following Order:

1. Defendants' motion for summary judgment is DENIED with respect to Plaintiff's claims of retaliation against Ogando for a strip search without a penological purpose, and a Fourth Amendment violation against Ogando for the same strip search.

2. Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claims of deliberate indifference to serious medical needs against Dr. Naqvi regarding his failure to treat Plaintiff's injuries, and recklessness under state law against Dr. Naqvi based on his failure to treat Plaintiff.

3. The Parties are instructed to meet and confer for the purpose of proposing updated deadlines for all applicable remaining scheduling issues—*e.g.*, the date by which the joint trial memorandum will be filed, proposed dates for a pretrial conference after the joint trial memorandum is received, and the date by which the case will be ready for trial. *See* Form 26(f) Report of Parties' Planning Meeting, D. Conn. L. Civ. R. Civ. App'x. The Parties are instructed to then submit those dates to the Court by **May 21, 2021**. Thereafter, the Court will schedule a pretrial conference to discuss the joint trial memorandum and any other pending issues in this case.

It is SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1723773

## Footnotes

1 NSAIDs do not target a specific part of the body, but rather relieve pain to all portions of the body, meaning that if a patient took Motrin for a pain in one part of his body, it would still relieve pain to other parts of the body as well. Defs.' 56(a) ¶ 3.

2 According to Plaintiff, Defendants' description of KOP prescriptions is misleading because medication distribution has recently changed to once every month. Pl.'s 56(a), at 4 ¶ 6. It is unclear, however, how this impacts Plaintiff's underlying access to medication.

3 Plaintiff objects to a number of the facts in Defendants' Rule 56(a) submission, arguing, for example, that the citations to which Defendants refer "ha[ve] nothing to [do] with the facts defendants are asserting." Pl.'s 56(a), at 4 ¶¶ 14–16. The Court construes Plaintiff's argument as a reference to Local Rule 56, which requires


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

that "[e]ach material fact set forth in the Local Rule 56(a)1 Statement" must be "supported by the evidence." D. Conn. Local R. 56. However, contrary to Plaintiff's assertion, Defendants have made proper citations. For example, Defendants claim that "Plaintiff received a new Motrin prescription from a nurse practitioner on August 14, 2017." Defs.' 56(a) ¶ 14. Defendants then cite to page 212 of Exhibit A to their motion (Plaintiff's medical records), which indicates that Plaintiff was, in fact, prescribed Motion on that day. *See id.* Defendants' other citations are proper for similar reasons. Accordingly, the Court will not sustain an objection to the Defendants' facts on this basis.

4 Despite Plaintiff's claim that he complained to Dr. Naqvi about his shoulder pain on August 27, 2017, Dr. Naqvi's notes from that appointment do not reflect any such discussion. Pl.'s Med. Records at 212. This stands in contrast to Plaintiff's June 25, 2017 appointment with Dr. Naqvi, for example, where there is a notation regarding shoulder pain. *See id.*

5 Plaintiff claims that Defendants' assertions are misleading. Pl.'s 56(a), at 5 ¶ 25. Rather than explaining why Defendants' assertions are misleading, however, Plaintiff merely cites to various Inmate Request Forms that he attached to his opposition to Defendants' motion. *Id.* It is not clear from Plaintiff's citations why Defendants' assertions are misleading.

6 In connection with that lawsuit, Plaintiff brought an Eighth Amendment claim for deliberate indifference to mental health needs as well as state law claims. *See Johnson v. Trestman*, No. 14 Civ. 856 (SRU), Initial Review Order, Doc. 5, at 7 (D. Conn. Nov. 17, 2014).

7 According to Plaintiff, Defendants' assertions are misleading. Plaintiff claims that if items were missing from the kitchen, inmates would be strip searched *before* leaving the kitchen area. Pl.'s 56(a), at 6 ¶ 47. On the other hand, if items were missing from any area in the facility, the prison would be placed on lockdown per security protocol. *Id.*

8 *In Pizarro*, Judge Sullivan adopted Judge Furman's analysis in *Israel v. City of New York*, No. 11 Civ. 7726 (JMF), 2012 WL 4762082, at *3 (S.D.N.Y. Oct. 5, 2012), in support of his conclusion that a routine and ordinarily lawful strip search would not deter a typical prisoner from exercising his or her First Amendment rights. *See Pizarro*, 2018 WL 3462512, at *6. Judge Furman's analysis in *Israel* involved allegations that a strip search violated a plaintiff's Fourth Amendment right to privacy, not an inmate's First Amendment right to file lawsuits and grievances without retribution. Therefore, the *Israel* case is less relevant to this particular section of this Ruling. However, Plaintiff's Fourth Amendment claim is discussed *infra.*

9 Defendants also argue that the search was "conducted in a reasonable and lawful manner" and therefore it could not deter any individual from exercising his or her rights. Defs.' Mem. at 25. However, as the Court discusses *infra* in connection with Plaintiff's Fourth Amendment claim, Plaintiff has raised a triable issue regarding the reasonableness of the strip search. Accordingly, this argument does not alter the Court's adverse action analysis.

10 Plaintiff also claims that all departments at DOC are informed via email of an inmate's lawsuit either by the Commissioner or the Attorney General's Office. Pl.'s 56(a), at 8 ¶ 66. Plaintiff additionally claims that Ogando at one point had boasted about being the Shift Commander—who is the individual in charge of investigations—"so how could he not know plaintiff filed a previous action." *Id.* at 9 ¶ 66. These latter claims, aside from being speculative, do not support an argument that Ogando had personal knowledge of Plaintiff's previously-filed lawsuits.

11 Of course, the jury may ultimately conclude that Plaintiff's testimony regarding Ogando's remark is not credible. But that assessment is for the trier of fact—not this Court on a motion for summary judgment. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

12 When Plaintiff initially filed the instant lawsuit, he claimed that Ogando was a party to the *Johnson v. Trestman*, No. 14 Civ. 856 (SRU) action in this Court. After reviewing Defendants' motion for summary judgment, however, Plaintiff submitted to the Court a "Judicial Notice," in which he sought to withdraw this assertion. Doc. 28 ("Pl.'s Jud. Not."). According to Plaintiff, he "made a mistake/error when he filed his grievance by stating that plaintiff was retaliated a gainst by defendant Ogando for filing a lawsuit a gainst him (defendant Ogando)." *Id.* at 1 (internal quotation marks omitted). Plaintiff further explained that he "had not filed a lawsuit against defendant Ogando at that time, he had only filed the Civil Action No. 3:14-cv-856 (SRU) and plaintiff made an error by saying he filed a lawsuit against defendant Ogando which had not occurred yet (at the time of the grievance)." *Id.* Plaintiff requests that the Court "take notice of his error" and stresses that "he is not a lawyer, doesn't have any legal training, has no access to research and very limited access to the prisonlibrary —once per week." *Id.* The Court appreciates Plaintiff's efforts to correct the record. For the reasons stated herein, though, whether Ogando was a party to Plaintiff's previous lawsuit, or not, does not affect the Court's analysis because there is still a triable fact regarding Ogando's knowledge of the previous lawsuit, which is sufficient for purposes of a retaliation claim.

13 Defendants' citation to *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) also is distinguishable. The court in that case concluded that, "even assuming that [the defendant] knew about [the plaintiff's] grievance against [a separate defendant], he has failed to provide any basis to believe that [the unnamed defendant] retaliated for a grievance that she was not personally named in." *Id.* at 369. The court further explained that, unlike the Second Circuit's ruling in *Espinal*, the defendant had not made any "statement evincing [a] retaliatory intent"—such as the *Espinal* defendant's statement that "this is what happens to inmates when they submit law suits against us"—and therefore the court in *Roseboro* was unable to make a "legitimate inference" that the defendant "retaliated for a grievance she was not named in." *Id.* at 369 n.23 (internal quotation marks omitted). In contrast, in the case at bar and, as noted *supra*, Ogando *did* make the type of statement evincing a retaliatory intent contemplated by *Espinal.* Defendants' other citations fare no better for similar reasons. *See* Defs.' Mem. at 25 n.2.

14 Defendants have certified that they served Plaintiff with a "Notice to Self-Represented Litigant Concerning Motion for Summary Judgment," which warned Plaintiff about the rules governing Defendants' motion. *See* Doc. 21-8.

15 As noted *supra*, to defeat Defendants' motion, Plaintiff must provide evidence that the search did not serve any legitimate penological purpose, or that it was specifically "designed to intimidate, harass or punish." *See* *Davila*, 2014 WL 4638854, at * 6. In addition to raising a triable issue regarding the absence of a legitimate penological purpose in connection with the search, there also potentially is a triable issue regarding whether Ogando merely tried to intimidate or punish Plaintiff, for the reasons discussed in *supra* Section III.A.1, in connection with Plaintiff's retaliation claim. *See, e.g.*, *Holloway*, 2013 WL 4834657, at *6. However, the Court will not address this in detail because the Parties have not thoroughly briefed this issue.

16 In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court held that the initial inquiry must be whether "the facts alleged show the officer's conduct violated a constitutional right," and only after this step could a court determine "whether the right was clearly established." *Id.* at 201. In *Pearson v. Callahan*, 555 U.S. 223 (2009), however, the Supreme Court receded from this approach, having concluded that "the judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Id.* at 242.

17 For similar reasons, the Court rejects Defendants' related argument that, "the existence of *Pizarro* demonstrates that at the very least, there is a split amongst the district courts of this Circuit on this issue."

Defs.' Mem. at 30. In support of that argument, Defendants cite to *Gill v. DeFrank*, 8 F. App'x 35, 37 (2d Cir. 2001), where the Second Circuit affirmed a district court's grant of qualified immunity to prison officials on the basis of a "disagreement ... among district courts" regarding the law governing a plaintiff's Free Exercise claim. *Id.* at 37. The Second Circuit agreed with the district court's finding that, "it [could not] be said that the law was 'clearly established' at the time of the relevant events" because of the disagreement among district courts. *Id.* Turning to the case at bar, it is unclear which "disagreement" Defendants are referring to, as an initial matter: they have only cited to *one* district court case in this portion of their brief. Putting that aside, the possible disagreement to which Defendants refer is neither here nor there. Even if there is a divergence among district courts regarding whether a *lawful* search under the Fourth Amendment can state a claim for retaliation—on which this Court does not take a position in this Ruling—that does not alter the fact that the Court has concluded that Plaintiff *has raised a triable issue regarding the lawfulness of the search.* Accordingly, Defendants' additional argument is unpersuasive.

18 The Court notes that Plaintiff has not directly asserted, nor is there any indication in his submissions, that his release was not knowing or voluntary. The Second Circuit has made clear that, "the validity of a release is a peculiarly fact-sensitive inquiry" and courts should employ a "totality of the circumstances" test to determine whether a release was knowing and voluntary. *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437–38 (2d Cir. 1998). Factors relevant to that inquiry include: "1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds ... benefits to which the [plaintiff] was already entitled by contract or law." *Id.* at 438. Although the record does not appear to provide any evidence regarding the first three factors, the latter three factors point toward a knowing and voluntary waiver: the settlement agreement clearly releases Defendants from liability in connection with Plaintiff's federal and state constitutional and statutory, as well as common law claims, *see* Settlement Agreement at 4; Plaintiff was represented by an attorney, *see id.* at 2; and, Plaintiff received various benefits under the agreement, *see id.* at 1–3. *See also, e.g.*, *Valdiviezo v. City of New York*, No. 15 Civ. 3902 (AJN), 2020 WL 2793090, at *5 (S.D.N.Y. May 29, 2020) (awarding summary judgment to the defendants after ruling that the plaintiff's general release "constitute[d] a valid knowing and voluntary waiver of [the plaintiff's] constitutional rights" which he brought pursuant to section 1983).

19 Even if the Court were to analyze the objective element of Plaintiff's deliberate indifference claim, the Court doubts that Plaintiff would satisfy this element. It is true that an inmate's claim of extreme pain over the course of many months could satisfy the first prong of the analysis. *See* *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003) (reversing district court's determination on a motion for summary judgment that pain that fell somewhere between "annoying" and "extreme" was not objectively serious and noting that the court does not "require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one"); *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977) ("[T]he Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death, but also less serious denials which cause or perpetuate pain."). However, as Defendants point out, "due to the general release signed by Plaintiff, the only relevant time period for this Court to consider is between February 8, 2018 and March 11, 2018—the date when the alleged 'delay' in providing Plaintiff pain medication ended." Defs.' Mem. at 18. The record shows that Plaintiff was receiving pain medication during this time, but even if that were not the case, courts have held that delays involving the provision of pain medication for shorter periods of time do not satisfy the objective element of a deliberate indifference claim. *See* *Bilal*, 2010 WL 2506988, at *11 (collecting cases noting that a delay in pain medication for a few hours or days was not objectively serious for purposes of a deliberate indifference claim).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4006408
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eileen E. NUTT, Plaintiff,
v.
NEW YORK State; State Univ. of New York; and Upstate Med. Univ., Defendants.

No. 5:12–CV–0385 (GTS/TWD).
|
Sept. 12, 2012.

**Attorneys and Law Firms**

Eileen E. Nutt, Syracuse, NY, pro se.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

***1** Currently before the Court, in this *pro se* employment civil rights action filed by Eileen E. Nutt ("Plaintiff") against the three above-captioned entities ("Defendants"), is the ReportRecommendation of United States Magistrate Judge Therese Wiley Dancks recommending that Plaintiff's Complaint be *sua sponte* dismissed with leave to amend. No objections have been filed and the deadline by which to do so has expired. For the reasons set forth below, the Report–Recommendation is accepted and adopted in its entirety.

## I. RELEVANT BACKGROUND

Generally, liberally construed, Plaintiff's Complaint asserts the following three claims against Defendants arising from her employment Upstate Medical University Hospital between approximately August 15, 2008, and July 19, 2011: (1) a claim of disability discrimination in violation of the Americans with Disabilities Act ("ADA"); (2) a claim of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); and (3) a claim of gender discrimination in violation of Title VII. (*See generally* Dkt. No. 1.) Familiarity with the factual allegations supporting these claims (which are accurately summarized in Part I of Magistrate Judge Dancks' Report–Recommendation) is assumed in this Decision and Order, which is intended primarily for the review of the parties.

Generally, in her Report–Recommendation, Magistrate Judge Dancks bases her recommendation of dismissal (with leave to amend) on the following four findings: (1) because the doctrine of sovereign immunity under Eleventh Amendment protects Defendants from liability on Plaintiff's claims under the ADA and ADEA, Plaintiff's only recourse under the circumstances is to sue one or more state officials in their official capacity for prospective, injunctive relief (which she has not done); (2) in addition to being flawed due to the abovedescribed immunity issue, Plaintiff's claim under the ADEA is flawed because Plaintiff does not allege how old she is now or how old she was during the relevant time period; (3) any Title VII claim that Plaintiff is attempting to assert under a discrimination theory of liability is flawed because Plaintiff fails to allege facts plausibly suggesting the fourth element of that claim (i.e., that the adverse action occurred under circumstances giving rise to an inference of discrimination); and (4) any Title VII claim that Plaintiff is attempting to assert under a harassment (or hostile-work-environment) theory of liability is flawed because Plaintiff fails to allege facts plausibly suggesting either the first or third elements of that claim (i.e., that the complained-of conduct creates an environment that a reasonable person would find hostile or abusive, and that the complained-of conduct creates such an environment because of the plaintiff's sex). (Dkt. No. 3, at Part IV.)

## II. STANDARD OF REVIEW

When a *specific* objection is made to a portion of a magistrate judge's reportrecommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c).[1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance.[2]

***2** When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition.[3] Similarly,

when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review.[4] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*[5]

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

**III. ANALYSIS**

Because Plaintiff did not submit an objection to the Report–Recommendation, the Court reviews the Report–Recommendation only for clear error, as described in Section II of this Decision and Order. After carefully reviewing the relevant filings in this action, the Court can find no clear error in the Report–Recommendation. Magistrate Judge Dancks employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (Dkt. No. 3) As a result, Magistrate Judge Dancks' Report–Recommendation is accepted and adopted in its entirety for the reasons stated therein. (*Id.*) The Court would add only that Magistrate Judge Dancks' thorough and correct Report–Recommendation would survive even a *de novo* review.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 3) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is ***DISMISSED,*** and this action closed, unless, within **THIRTY (30) DAYS** of the date of this Decision and Order, Plaintiff submits an Amended Complaint that complies with the recommendations made in Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 3); and it is further

**ORDERED** that, in the event that Plaintiff files an Amended Complaint within thirty (30) days from the date of this Decision and Order, the Clerk of the Court is directed to return the file to Magistrate Judge Dancks for further review.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4006408

## Footnotes

1 *See also Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir.2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

2 *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

3 *See also* *Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).

4 *See* *Mario,* 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord,* *Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

5 *See also* *Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Johnson v. Naqvi, D.Conn., April 29, 2021

2018 WL 3462512
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jose PIZARRO, Plaintiff,
v.
BOARD OF CORRECTION; New York Police Department; N.Y.C.D.O.C. Comm. Joseph Ponte; Warden Monica Windley; Deputy Warden Security Caputo; C.O. Mayo; and C.O. Caucasian John Doe, Defendants.

No. 16-cv-2418 (RJS)
|
Signed 07/17/2018

**Attorneys and Law Firms**

Jose Pizarro, Mount Vernon, NY, pro se.

David Ferrari, Joseph Rizza, Karl Joseph Ashanti, Kavin Suresh Thadani, Philip Rudolph DePaul, Maria Fernanda DeCastro, New York City Law Department, New York, NY, for Defendants.

OPINION & ORDER

RICHARD J. SULLIVAN, UNITED STATES DISTRICT JUDGE

***1** *Pro se* plaintiff Jose Pizarro ("Pizarro" or "Plaintiff") brings this action under 42 U.S.C § 1983, alleging violations of his constitutional rights while he was an inmate at the George R. Vierno Center ("G.R.V.C.") on Rikers Island. Now before the Court is Defendants' motion for summary judgment on all of Plaintiff's claims. (Doc. No. 81.) For the reasons set forth below, the motion is GRANTED.

## I. BACKGROUND [1]

Plaintiff commenced this action on March 31, 2016 (Doc. No. 2), and on July 15, 2016, he filed an Amended Complaint (Doc. No. 18) asserting Section 1983 claims against the New York City Board of Correction ("BOC"), the New York Police Department ("NYPD"), New York City Department of Correction Commissioner Joseph Ponte ("former Commissioner Ponte"), Warden Monica Windley ("Warden Windley"), Deputy Warden Caputo, Correction Officer Mayo ("Officer Mayo"), and an unidentified Caucasian correction officer ("CO. Caucasian John Doe"). Specifically, Plaintiff alleges that on March 3, 2016, Officer Mayo performed a strip search of him in G.R.V.C.'s intake area, during which Officer Mayo made anti-Muslim remarks, instructed Plaintiff to "stick two fingers in [his rectum]," grabbed Plaintiff's "private parts," and choked Plaintiff. (Doc. No. 18 at 2-3.) Additionally, Plaintiff claims that five days later, on March 8, 2016, an unidentified correction officer conducted a strip search of Plaintiff and made harassing comments to Plaintiff in retaliation for his filing a grievance against Officer Mayo. (*Id.* at 3-4.)

Defendants filed the present motion for summary judgment on all of Plaintiff's claims on February 1, 2018. (Doc. No. 81.) In response, Plaintiff attempted to file his own motion for summary judgment (Doc. No. 87); however, because Plaintiff had failed to submit a pre-motion letter by the relevant deadline as required by the Court's Individual Rules and the case management plan and scheduling order entered in this case (Doc. No. 70), the Court denied Plaintiff's motion and announced that it would consider Plaintiff's submission only as an opposition to Defendants' motion. (Doc. No. 93.) Defendants' motion was fully briefed on March 27, 2018. (Docs. Nos. 96, 100.)

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable factfinder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); and/or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are

material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

***2** In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'—that is, point[s] out ...—that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Additionally, because Plaintiff proceeds *pro se* in this matter, the Court must "read his [submissions] liberally and interpret them to raise the strongest arguments that they suggest." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) ). However, "a *pro se* party's bald assertion, completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Carmona v. City of New York*, No. 13-cv-3273, 2016 WL 4401179, at *2 (S.D.N.Y. Mar. 1, 2016) (internal quotation marks omitted) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ).

## III. DISCUSSION

Section 1983 provides a civil cause of action for damages against any person who, acting under color of state law, deprives another of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). To prevail on a claim under Section 1983, a plaintiff must demonstrate (1) the deprivation of a right, privilege, or immunity secured by the Constitution or laws of the United States, (2) by a person acting under the color of state law. *Id.* The plaintiff must also establish that the defendant was "personally involved in the unconstitutional conduct." *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995). Here, Plaintiff raises an array of claims under Section 1983. The Court analyzes in turn the two incidents from which those claims arise.

### A. March 3, 2016 Incident

Plaintiff's first set of claims stem from his interaction with Officer Mayo on March 3, 2016. Defendants submit four separate video clips that they claim capture this interaction and the events that immediately precede and follow it. (Docs. Nos. 84-2 ("Def. Exhibit B"), 84-3 ("Def. Exhibit C"), 84-5 ("Def. Exhibit D"), 84-6 ("Def. Exhibit E").) When such video evidence is available as part of the record, a court should, at the summary judgment stage, "[view] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007). This shapes how a court should apply the relevant legal standards, because "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that [latter] version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

As an initial matter, it bears noting that although Plaintiff raises some objections to the videos, they are all immaterial as to the admissibility of the videos for purposes of this motion. Specifically, Plaintiff never argues that Defendants doctored or altered the videos; nor does he suggest that the inmate who appears in all four videos is anyone other than himself, that the correction officer seen in Defense Exhibit C is anyone other than Officer Mayo, or that the videos fail to capture the entirety of his interaction with Officer Mayo on March 3, 2016. Instead, Plaintiff's principal objections to the videos relate to time coding. (Pl. Opp'n 56.1 ¶ 3.) [2]

***3** By way of background, the four submitted clips all capture different views, angles, and areas within G.R.V.C. (Def. 56.1 at 1-4.) At the bottom of the frame in each of these clips is a thin black bar containing white text. (Def. Exhibits B, C, D, and E). Included in this text is a date. (*Id.*)

In three of the video clips—Defense Exhibits B, D, and E—that on-screen date reads "2016-03-03"; however, in Defense Exhibit C, the displayed date reads "2016-03-04." (*Id.*) In addition to these dates, each clip contains, as part of the white text displayed in the black bar, a running clock that refers to the time of day in each clip. In the very first frame of each of these videos, the on-screen clock bears a different time: Defense Exhibit B reads "19:40:01"; Defense Exhibit C reads "00:44:56"; Defense Exhibit D reads "19:40:02"; and, Defense Exhibit E reads "20:44:56." (*Id.*) The on-screen clocks then proceed to run from these listed times for the duration of the clips. (*Id.*) Defense Exhibit E is nearly ten minutes long, while the other three exhibits each last for nearly an hour and five minutes. (*Id.*)

Plaintiff raises two main objections concerning the video clips described above. First, Plaintiff repeatedly contests the time codes that Defendants cite in their Local Civil Rule 56.1 Statement when referring to the relevant sections of certain videos. Specifically, Plaintiff insists that the time codes cited by Defendants differ from the actual times at which the events they depict took place. (*Id.* at ¶¶ 3-12.) This contention, however, appears to be based on a misunderstanding, since Defendants clearly explain in their declaration that any citation to a time code in their Local Civil Rule 56.1 Statement reflects the elapsed time of the individual video clip, and not the time of day at which the depicted events took place. (Doc. No. 84 at 2 n.1.) A comparison of the videos and the specific sections cited by Defendants in their Local Civil Rule 56.1 Statement confirms as much, thereby defeating Plaintiff's objection in this regard. (Def. Exhibit C at 10:47-10:50; Def. 56.1 ¶ 3.)

Second, Plaintiff appears to object to the incorrect date and time that appear at the bottom of the frame in Defense Exhibit C. (Pl. Opp'n 56.1 ¶ 3.) Defendants themselves, however, acknowledge this inconsistency. (Reply at 2-3). That is, while the date and time codes seen at the beginning of the video show "00:44:57" on March 4, 2016 instead of the actual date and time of the incident—which all agree took place in the early evening of March 3, 2016 (Def. Exhibit C at 00:01)—Correction Officer Cynthia Chadwick, whose responsibilities involve extensive work with the New York City Department of Correction ("DOC") video surveillance system, confirmed in her testimony that the time and date reflected on Exhibit C was an error. (Doc. No. 84-4 ¶ 3.) [3] Additionally, and perhaps more importantly, Plaintiff never actually disputes that Defense Exhibit C accurately depicts the specific interaction between himself and Officer Mayo that took place on the night of March 3, 2016 and which forms the basis of his claims. Notably, Plaintiff's own deposition testimony forecloses the possibility that the events in the video could have taken place on March 4, 2016, as he testified that he did not go through intake at G.R.V.C. that day, which was his birthday. (Doc. No. 94-1 at 95.) Plaintiff also testified that the magnetometer room in G.R.V.C.'s intake area was the only room in which he was alone with Officer Mayo on March 3, 2016. (*Id.*)

Moreover, the time stamps that appear within the other video clips so clearly align that there can be no doubt that the events depicted in Defense Exhibit C occurred, as alleged, on the evening of March 3, 2016. For example, Defense Exhibit B shows Plaintiff exiting the frame when the on-screen time stamp reads 19:55:45. (Def. Exhibit B.) In Defense Exhibit C—which, as described above, bears an incorrect on-screen time code—Plaintiff is seen entering and remaining inside the magnetometer room with Officer Mayo from an elapsed time of 10:47 to 15:30, an interaction lasting nearly five minutes. (Def. Exhibit C.) At the end of Defense Exhibit C, Plaintiff can be seen, in the video's background, entering a cell. (Def. Exhibit C at 15:30-15:55.) This footage overlaps with that in Defense Exhibit D, in which Plaintiff enters the same cell when the on-screen time stamp reads 20:00:39. (Def. Exhibit D.) This five-minute period between the time when Plaintiff exits the frame in Defense Exhibit B and enters the frame in Defense Exhibit D is nearly identical to the total amount of time Plaintiff spent with Officer Mayo in the magnetometer room in Defense Exhibit C. The clear and inescapable conclusion from this evidence is that Defense Exhibit C captures that five-minute window. Combined, all of this evidence establishes that there are no genuine disputes of material fact concerning the events depicted in the video clips submitted by Defendants or the extent to which they reveal the entirety of the March 3, 2016 interaction between Plaintiff and Officer Mayo; therefore, the Court will rely on the videos in evaluating Plaintiff's claims.

### 1. Excessive Force

***4** Plaintiff appears to claim that Officer Mayo subjected him to excessive force during their interaction on March 3, 2016. (Doc. No. 18 at 3.) To succeed on a Section 1983 claim based on an allegation of excessive force, a pretrial detainee must establish that "force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). [4] According

to the Supreme Court, "objective reasonableness turns on the 'facts and circumstances of each particular case.' " *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989) ). Nevertheless:

> A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. A court must also account for the "legitimate interests that stem from the government's need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in the judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."

*Id.* (internal brackets omitted) (citing *Graham*, 490 U.S. at 396) (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979) ).

In his Amended Complaint, Plaintiff alleges that Officer Mayo choked him and "grab[bed] [his] private part[s]." (Doc. No. 18 at 3.) He fails, however, to present any evidence to substantiate this allegation. Moreover, Defense Exhibit C captures the entirety of Plaintiff's March 3, 2016 interaction with Officer Mayo in the magnetometer room at G.R.V.C., and at no point during their encounter does Officer Mayo make any physical contact with Plaintiff whatsoever. (Def. Exhibit C at 10:47-15:30.) Therefore, Plaintiff has presented no evidence to support a claim of excessive force.

Plaintiff also claims that Officer Mayo, during their interaction on March 3, 2016, made anti-Muslim remarks and instructed Plaintiff to "stick two fingers in [his rectum]." (Doc. No. 18.) Because the submitted videos do not contain sound, they cannot confirm or rule out this possibility. However, this lack of substantiating audio is ultimately immaterial, since "[a]llegations of threats or verbal harassment, without any injury or damage, do not state a[n excessive force] claim under 42 U.S.C. § 1983." *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996) (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) ). As a result, there remain no genuine issues of material fact, and Plaintiff's excessive force claim fails as a matter of law.

### 2. Illegal Search

***5** Plaintiff also seems to claim that Officer Mayo's strip search of him on March 3, 2016 was illegal. (Doc. No. 18 at 3-4.) This claim proceeds under the Fourth Amendment, which requires that searches of prison inmates be "reasonably related to legitimate security interests." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328 (2012) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987) ). Nevertheless, this determination is "peculiarly within the province and professional expertise of corrections officials." *Bell*, 441 U.S. at 548 (quoting *Pell v. Procunier*, 417 U.S. 817, 827, (1974) ).

Here, there can be no doubt that G.R.V.C. and Officer Mayo had a legitimate security interest in ensuring that an inmate returning to the facility did not sneak contraband inside its walls. *See Florence*, 566 U.S. at 328. This interest was compelling enough to justify a search during the intake process, even if the officer performing the search did not have a reasonable suspicion that the returning inmate was concealing any contraband. *See id.* at 330. Put simply, "[t]he general practice of strip searching a detainee during housing searches and on the way to and from court appearances is not unconstitutional." *Thompson v. City of New York*, No. 16-cv-824 (PKC), 2017 WL 1929552, at *2 (S.D.N.Y. May 9, 2017) (citing *Florence*, 566 U.S. at 324, 339). While "strip searches performed with no legitimate penological purpose but merely to intimidate, harass, or punish" may be impermissible, *George v. City of New York*, No. 12-cv-6365 (PKC) (JLC), 2013 WL 5943206, at *7 (S.D.N.Y. Nov. 6, 2013), strip searches of prisoners reentering correctional facilities clearly serve a legitimate security interest, and Plaintiff has failed to present any evidence suggesting that Officer Mayo searched him on March 3, 2016 solely for the purpose of harassment. Here, Defense Exhibit C establishes that Officer Mayo's search of Plaintiff, who had just returned from court (Doc. No. 84-1 at 30-31), consisted of nothing more than Plaintiff removing clothing items until he could successfully pass through a magnetometer. (Def. Exhibit C at 10:47-13:15.) Although it could be argued that this did not even rise to the level of a "strip search," there was clearly nothing illegal or unreasonable about what did occur.

### 3. Freedom of Religion Claim

Plaintiff also appears to allege that Defendants violated his freedom of religion under the First Amendment when they required him to be strip searched. In essence, Plaintiff states that his Muslim faith "forbids exposing his private parts" (Doc. No. 18 at 3), and that, consequently, he should not have been required to undergo a strip search. (*Id.* at 3-4.) This claim fails for two reasons. First, Defense Exhibit C incontrovertibly demonstrates that Plaintiff never did, in fact,

remove all of his clothing, and that he merely stripped down to an undergarment in order to successfully pass through the magnetometer before getting dressed again. (Def. Exhibit C at 11:00-13:15.) The video therefore contradicts Plaintiff's assertion that he was compelled to violate a tenet of his religious faith.

Nevertheless, even if Officer Mayo had required Plaintiff to remove all of his clothing, this claim would still fail. As noted above, a "regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.' " *Florence*, 566 U.S. at 326 (quoting *Turner*, 482 U.S. at 89). The Court has already found that Officer Mayo's search of Plaintiff served a legitimate interest —namely, ensuring that the returning inmate did not sneak contraband into the facility. Therefore, Plaintiff's freedom of religion claim fails for the same reason as his illegal search claim. Indeed, courts in this District have consistently rejected claims that standard strip searches violate the First Amendment rights of Muslim inmates whose religion might forbid them from being seen naked by other individuals. *See, e.g., Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 324 (S.D.N.Y. 2006); *Hurley v. Ward*, 549 F. Supp. 174, 186 (S.D.N.Y. 1982); *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460,473 (S.D.N.Y. 1998). Accordingly, this claim must be dismissed.

B. March 8, 2016 Incident

***6** Plaintiff's second set of claims arise from a second strip search that allegedly occurred in his cell on March 8, 2016 in retaliation for his filing a grievance against Officer Mayo. (Doc. No. 18 at 3-4.) In his deposition, Plaintiff testified that on that day, a search team conducted strip searches of all the inmates in his housing unit. (Doc. No. 84-1 at 61.) According to Plaintiff, one member of that search team, an unidentified Caucasian correction officer, entered Plaintiff's cell and performed a strip search of him. During this search, Plaintiff claims that the officer repeated Officer Mayo's instruction from their March 3 interaction—*i.e.*, to "put two fingers in [his rectum]"—and that the officer then referenced Officer Mayo's alleged strip search of Plaintiff, so as to "[let] [Plaintiff] know [that the officer] knew what happened." (*Id.* at 62.) At no time, however, did the officer specifically mention Plaintiff's filed grievance. (*Id.* at 61-63.) Plaintiff testified that he refused to comply, and the officer told him to "watch [him]self," but that the officer never made any physical contact with Plaintiff at any time during the strip search. (*Id.* at 62-63.)

1. First Amendment Retaliation Claim

Plaintiff appears to assert a First Amendment retaliation claim in connection with this incident, as he argues that the search and abusive language resulted from his filing a grievance against Officer Mayo in connection with their March 3 interaction. (Doc. No. 18 at 3-4.) To establish such a retaliation claim, a plaintiff must prove "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001).

With respect to the first element of Plaintiff's retaliation claim, the Second Circuit has held that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is [therefore] actionable under [Section] 1983." *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (citing *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ). Not surprisingly, Defendants concede that Plaintiff's filing of a grievance against Officer Mayo in this case qualifies as protected speech. (Mem. at 11.)

Nevertheless, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes*, 239 F.3d at 493. Moreover, the law is clear that "[p]risoners may be required to tolerate more ... than average citizens, before an action taken against them is considered adverse." *Id.* (citation and quotation marks omitted). Here, there are two potential actions that Plaintiff seems to believe should qualify as adverse: the strip search of Plaintiff in his cell, and the officer's comments to Plaintiff during that encounter.

Concerning the first, the Supreme Court has held that "wholly random searches are essential to the effective security of penal institutions" and therefore do not violate the Fourth Amendment rights of prison inmates. *Hudson v. Palmer*, 468 U.S. 517, 529(1984). Applying this principle, in conjunction with the requirement of deference to prison officials in devising search procedures, *Florence*, 566 U.S. at 328, Judge Furman concluded that random strip searches of inmates

while in their housing units in *the exact same facility* are lawful. *Israel v. City of New York*, No. 11-cv-7726 (JMF), 2012 WL 4762082, at *3 (S.D.N.Y. Oct. 5, 2012) (citing *Florence*, 566 U.S. at 328; *Hudson*, 468 U.S. at 529). The Court agrees.

Simply put, Plaintiff presents no evidence to demonstrate why a routine and ordinarily lawful strip search would deter a typical prisoner from exercising his or her First Amendment rights. Plaintiff pleads no facts indicating that the Caucasian officer singled out Plaintiff for strip searching; in fact, Plaintiff admits that his whole housing unit underwent strip searches. (Doc. No. 84-1 at 61.) Similarly, Plaintiff never provides any evidence to demonstrate why searches of all the inmates in a housing unit would prevent an inmate of ordinary firmness from freely asserting his or her First Amendment rights. In attempting to construe Plaintiff's claims liberally, one could perhaps conceive of a scenario wherein prison officials retaliated against an inmate for filing a grievance by searching his entire housing unit, thereby turning the other prisoners against the inmate in question and thus chilling the exercise of that inmate's First Amendment rights. But Plaintiff certainly never articulates anything close to this theory, and there is little reason to believe that the otherwise lawful and routine strip searches described here would somehow create a situation in which an inmate of ordinary firmness would be deterred from exercising his or her First Amendment rights. *See Dawes*, 239 F.3d 489, 493 (2d Cir. 2001) (prison official calling an inmate a "rat" and "informant" in front of other prisoners so as to create a fear of reprisals was not enough on its own to constitute an adverse action). Thus, the Caucasian officer's strip search of Plaintiff does not qualify as an adverse action.

***7** Nor do the alleged statements of the officer to Plaintiff during the strip search rise to the level of an adverse action. "Non-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim." *Ross v. Westchester Cty. Jail*, No. 10-cv-3937 (DLC), 2012 WL 86467, at *7 (S.D.N.Y. Jan. 11, 2012) (citing *Morales v. Mackalm*, 278 F.3d 126, 131–32 (2d Cir. 2002), *abrogated on other grounds, Porter v. Nussle*, 534 U.S. 516 (2002); *Dawes*, 239 F.3d at 493); *see also Amaker v. Annucci*, No. 14-cv-9692 (KMK), 2016 WL 5720798, at *5 n.8 (S.D.N.Y. Sept. 30, 2016), *aff'd*, 721 Fed.Appx. 82 (2d Cir. 2018); *Quezada v. Roy*, No. 14-cv-4056 (CM), 2015 WL 5970355, at *21 (S.D.N.Y. Oct. 13, 2015); *Edwards v. Horn*, No. 10-cv-6194 (RJS) (JLC), 2012 WL 760172, at * 15 (S.D.N.Y. Mar. 8, 2012). Here, the unidentified officer's alleged statement that Plaintiff should "watch [him]self" (Doc. No. 84-1 at 62) is not nearly "direct and specific enough to deter a prisoner from exercising his First Amendment rights." *Ross*, 2012 WL 86467, at *7; *see also Kemp v. LeClaire*, No. 03-cv-844S, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (threats including "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your ... ass kicked" did not qualify as adverse actions); *Bartley v. Collins*, No. 95-cv-10161 (RJH), 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action"); *Alicea v. Howell*, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) ("alleged statements ... that plaintiff would 'have to pay the consequences' for filing a grievance ... do not give rise to a First Amendment retaliation claim"). Additionally, the Caucasian officer's vulgar instruction to Plaintiff—though perhaps rude and mean-spirited—is the very sort of harassing comment and arguably hostile behavior that does not rise to the level of an adverse action for purposes of an inmate's retaliation claim. As a result, Plaintiff's retaliation claim fails.

2. Plaintiff's Additional Claims Related to March 8, 2016 Incident

Plaintiff also appears to assert that the March 8 incident constituted an illegal search, a violation of his freedom of religion, and discrimination based on his race and religion. (Doc. No. 18 at 4.) But as explained above, the random strip search of Plaintiff's entire housing unit was permissible and reasonably related to the compelling governmental interest of penological safety. *See Israel*, 2012 WL 4762082, at *3 (citing *Florence*, 566 U.S. at 328); *Hudson*, 468 U.S. at 529. Consequently, Plaintiff's illegal search and First Amendment claims fare no better than his other claims. As for Plaintiff's discrimination claim, while Plaintiff's legal theory is difficult to ascertain, the Court need not reach this point, because Plaintiff alleges no facts to demonstrate that, during this March 8 incident, he was singled out for any particular treatment, let alone subjected to injury or harm, based on his race or religion. *See Reynolds v. Barrett*, 685 F.3d 193, 201 (2d Cir. 2012); *Cole v. Fischer*, 379 Fed.Appx. 40, 43 (2d Cir. 2010) (summary order). As a result, Plaintiff's claim of racial and religious discrimination also fails.

C. Plaintiff's Derivative Claims Against Supervisory Individuals and Agencies

Because all of Plaintiff's underlying claims with respect to Officer Mayo and the unidentified Caucasian correction officer fail, his claims against former Commissioner Ponte, Warden Windley, Deputy Warden Caputo, the NYPD, and the BOC must also fail. *See* *Blyden*, 186 F.3d at 265 ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."). But even if the claims against Officer Mayo and CO. Caucasian John Doe survived, Plaintiff's claims against the named individual officials would still fail since Plaintiff never provides any evidence that these individuals were personally involved in any conduct that violated his constitutional rights, as the law requires. *Green*, 46 F.3d at 194. The only evidence Plaintiff provides in this regard is that he sent them letters related to the incidents, and that they never responded. (Doc. No. 88 ¶ 14.) But "it is well-settled that allegations regarding the mere receipt of a letter, complaint or grievance from an inmate, and the recipient's subsequent inaction, is insufficient to establish a claim of personal involvement by a correctional supervisor." *Harris v. Westchester Cty. Dep't of Corr.*, No. 06-cv-2011 (RJS), 2008 WL 953616, at *9 (S.D.N.Y. Apr. 3, 2008) (internal quotation marks omitted) (citing *Islam v. Fischer*, No. 07-cv-3225 (PKC), 2008 WL 110244, at *3 (S.D.N.Y. Jan. 9, 2008); *Rivera v. Goord*, 119 F.Supp.2d 327, 344 (S.D.N.Y. 2000); *Watson v. McGinnis*, 964 F.Supp. 127, 130 (S.D.N.Y. 1997) ). Moreover, agencies of the City of New York are generally not suable; this holds true for both the NYPD and BOC. *See* N.Y. City Charter ch. 17, § 396; *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *Colon-Rodriguez v. New York City Dep't of Correction*, No. 07-cv-8126 (GBD) (MHD), 2009 WL 995181, at *1 (S.D.N.Y. Apr. 13, 2009). As such, any claims against these agencies must be dismissed for this additional reason as well.

IV. CONCLUSION

***8** For the reasons set forth above, Defendants* motion for summary judgment is GRANTED, and all of Plaintiff's claims are dismissed. The Clerk of Court is respectfully directed to terminate the motion pending at docket number 81, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3462512

## Footnotes

1 In resolving this motion, the Court has considered Defendants' Local Civil Rule 56.1 Statement (Doc. No. 83 ("Def. 56.1") ), Plaintiff's Counterstatement (Doc. No. 90 ("Pl. Opp'n 56.1") ). Plaintiff's Local Civil Rule 56.1 Statement (Doc. No. 89 ("Pl. 56.1") ). Defendant's Counterstatement (Doc. No. 95 ("Def. Opp'n 56.1"), the declarations submitted in support of and in opposition to the motion and the exhibits attached thereto (Doc. Nos. 84, 88, 94), Defendants' memorandum of law in support of their motion (Doc. No. 85 ("Mem.") ), and Defendants' reply to Plaintiff's response (Doc. No. 96 ("Reply") ).

2 Plaintiff also appears to object to Defendants' characterization of his clothing in Def. Exhibit C. (Pl. Opp'n 56.1 ¶ 4.) Nevertheless, while the parties spend a considerable amount of time and ink on the color of Plaintiff's pants in the videos, none of this discussion seems to materially impact the videos' validity or authenticity, especially in light of the evidence and analysis explored in the remainder of this section.

3 Officer Chadwick's testimony refers to a "blue time stamp" that she claims correctly reflects the date and time of the depicted events. (Doc. No. 84-4 ¶¶ 3-4.) This blue time stamp does not appear in any of the videos currently before the Court; whether this is due to a technical error, a disparity between the videos before the Court and those she reviewed, or something else, the Court nevertheless finds that the difference is immaterial in light of Plaintiff's own testimony and the time stamps that do appear in the other videos.

4 There are different legal standards for excessive force claims brought by pretrial detainees and inmates already convicted of crimes and sentenced to prison terms. "[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999). Such claims proceed under the standard described above. *Kingsley*, 135 S. Ct. at 2475. By contrast, prisoners who have been convicted and are serving a prison term must proceed under the Eighth Amendment's Cruel and Unusual Punishment Clause. *Kingsley*, 135 S. Ct. at 2475. That standard is markedly higher than the Fourteenth Amendment standard for excessive force claims, since it defines excessive force as "force not applied in a 'good-faith effort to maintain or restore discipline.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) ). While the record in this case does not clearly establish Plaintiff's status on March 3, 2016. the fact that Plaintiff was returning to G.R.V.C. from court that day (Doc. No 84-1 at 30-31) suggests that Plaintiff was a pretrial detainee, and so the Court applies the Fourteenth Amendment standard. Because Plaintiff's claim fails to survive summary judgment under the more plaintiff-friendly Fourteenth Amendment pretrial-detainee standard, the Court concludes that it also would fail under the more rigorous Eighth Amendment convicted-prisoner standard, and therefore this factual issue is ultimately immaterial.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 2364085
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Derrick SPANN, Plaintiff,
v.
Captain ROMANA, Defendant.

26-CV-5483 (LLS)
|
Filed 08/12/2026
|
Signed August 11, 2026

**Attorneys and Law Firms**

Derrick I. Spann, Sonyea, NY, Pro Se.

ORDER OF DISMISSAL WITH LEAVE TO REPLEAD

LOUIS L. STANTON, United States District Judge:

***1** Plaintiff Derrick Spann, who is currently incarcerated at Groveland Correctional Facility, filed this action *pro se* while he was incarcerated at West Facility on Rikers Island as a convicted prisoner. Plaintiff asserts that Defendant Captain Romana violated his federal constitutional rights at the Eric M. Taylor Center ("EMTC"), another facility on Rikers Island. The Court understands Plaintiff's complaint as asserting claims under 42 U.S.C. § 1983 for an unconstitutional strip search. By order dated July 7, 2026, the court granted Plaintiff's application to proceed *in forma pauperis* ("IFP"), that is, without prepayment of fees. For the reasons set forth below, the Court dismisses the complaint, but grants Plaintiff 30 days' leave to replead his claims in an amended complaint.

## STANDARD OF REVIEW

The Prison Litigation Reform Act requires that federal courts screen complaints brought by prisoners who seek relief against a governmental entity or an officer or employee of a governmental entity. *See* 28 U.S.C. § 1915A(a). The Court must dismiss a prisoner's complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b); *see* *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). The Court must also dismiss a complaint if it lacks subject matter jurisdiction of the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obligated to construe pro se pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and to interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted). But the "special solicitude" in pro se cases is limited. *Id.* at 475 (citation omitted). To state a claim, *pro se* pleadings must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

Rule 8 requires a complaint to include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Id.* But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are legal conclusions. *Id.* (citing *Twombly*, 550 U.S. at 555). After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible, not merely possible, that the pleader is entitled to relief. *Id.* at 679.

## BACKGROUND

***2** The following facts are drawn from the complaint.[1] On June 10, 2026, at EMTC, correction officers told Plaintiff that he must be searched before being transferred to a different facility on Rikers Island. Plaintiff first went through a body scanner in the intake area in the presence of two officers. The complaint suggests that Defendant Captain Romana was one of the two officers. The officer accompanying Captain Romana asked Plaintiff if he had been shot before, and Plaintiff replied that he had, and that the bullet fragment is still lodged in his "right upper thigh." (ECF 1, at 4.) The officer then whispered to Defendant Romana,[2] but Plaintiff does not indicate in the complaint what the officer whispered. Defendant took off his body camera, "slammed the door," and told the Plaintiff to "give it to [him]." (*Id.*) Plaintiff said he

did not have any contraband. In response, Defendant told him, "it's in your dick area." (*Id.*) Plaintiff again said that he did not have anything. Defendant threatened to spray Plaintiff with a chemical agent, and Plaintiff continued to insist that he did not have any contraband.

Defendant brought Plaintiff back to the search room and directed him to remove his shorts and boxers. Defendant then pulled out his pepper spray and said, "show me your dick[,] lift your balls[,] give it to me or I'm going to spray you." (*Id.* at 5.) Defendant further directed Plaintiff to "pull the skin back on [his] dick." (*Id.*) Although Plaintiff repeatedly told Defendant that he did not have anything, Defendant continued to threaten him. Plaintiff was "in the corner scared" and naked while Defendant threatened him. (*Id.*)

Plaintiff seeks money damages and an order directing that Defendant and the other officer "be removed from their duties." (*Id.*)

## DISCUSSION

**A. Claims under the Fourth Amendment**

The Court understands Plaintiff to be asserting claims, under 42 U.S.C. § 1983, that Defendant violated his rights under the Fourth Amendment. The Fourth Amendment provides that people have a right "to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer*, 468 U.S. 517, 626 (1984), and "[t]here is a long-established principle that the routine, random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment," *Vann v. Griffin*, No. 16-CV-9903 (VB), 2018 WL 6199860, at *4 (S.D.N.Y. Nov. 28, 2018) (quoting *Vaughn v. Strickland*, No. 12-CV-2696 (JPO), 2013 WL 3481413, at *4 (S.D.N.Y. July 11, 2013) (internal quotation marks omitted)). The Second Circuit has nonetheless held, however, that "inmates do retain a limited right to bodily privacy under the Fourth Amendment." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (reaffirming *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992) ("[M]aintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy.")).

When evaluating a prisoner or detainee's claim that an officer violated his or her limited right to bodily privacy, the "court must [first] determine whether the inmate has 'exhibit[ed] an actual, subjective expectation of bodily privacy.' " *Id.* (quoting *Covino*, 967 F.2d at 77). Second, "the court must determine 'whether the prison officials had sufficient justification to intrude on [the individual's] [F]ourth [A]mendment rights.' " *Id.* (quoting *Covino*, 967 F.2d at 78).

With respect to the second question, where the claim challenges an "isolated search," rather than a regulation or policy, "courts typically apply the standard set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979)." *Id.* at 58. *Bell* sets out a four-factor "test of reasonableness," which "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider [1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted." *Bell*, 441 U.S. at 559.

***3** The first factor—the scope of the intrusion—varies with the type of search:

> A "strip search," though an umbrella term[,] generally refers to an inspection of naked individuals without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

*Cookish v. Powell*, 945 F.2d 441, 444 n.5 (1st Cir. 1991) (internal quotations and citation omitted). A visual body cavity search is generally considered invasive. *See Harris*, 818 F.2d at 58-59. The scope of the intrusion will also vary depending on who searches whom—*e.g.*, whether the officer conducting the search was of the same gender as the individual being searched. *See id.* at 59 ("[I]t is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." (internal quotation marks and citation omitted)).

With respect to the second factor—the manner in which the search was conducted—the Supreme Court has held that "searches must be conducted in a reasonable manner." *Bell*, 441 U.S. at 560. For example, "[a] strip search conducted in a

professional manner is more reasonable than one that is not." *Harris*, 818 F.3d at 59-60. Courts, however, have found that verbal threats alone do not make a search unreasonable. *See, e.g.*, *Jenkins v. City of New York*, No. 18-CV-7024 (LDH) (LB), 2020 WL 6700087, at *3 (E.D.N.Y. Nov. 12, 2020) ("While 'indefensible and unprofessional,' allegations of verbal threats and verbal abuse are not sufficient to transform an otherwise lawful strip search into one proscribed by the Constitution." (quoting *Jermosen v. Coughlin,* 878 F. Supp. 444, 449 (N.D.N.Y. 1995)).

As to the third factor—the justification for the search—"Supreme Court precedent suggests that officers must provide a justification that is supported by record evidence." *Harris*, 818 F.3d at 60. In particular, "whether an officer is searching for contraband is highly relevant to the reasonableness inquiry." *Id*.

Finally, with respect to the place where the search is conducted, "a strip search or body cavity search conducted in the presence of unnecessary spectators is less reasonable than one conducted in the presence of only those individuals needed to conduct the search." *Id.* at 62.

Here, Plaintiff's limited right to bodily privacy was not violated. First, in determining the first element of the analysis—whether Plaintiff exhibited a subjective expectation of bodily privacy–given the nature of the search and Plaintiff's reaction to it, the Court assumes, for the purposes of this order, that Plaintiff exhibited a subjective expectation of bodily privacy.

The facts as pleaded, however, do not suggest that Defendant lacked sufficient justification for the intrusion. First, although Plaintiff was subjected to a visual body cavity search, which is generally considered invasive, *Harris*, 818 F.2d at 58-59, the invasion of privacy was not as great because the search was conducted by a male officer rather than a female officer. *See id*. at 59. Even if the search was conducted by a female officer, "generally, the strip search of a male inmate in view of a female correction officer does not, by itself, rise to the level of a constitutional violation." *Holland v. City of New York*, 197 F. Supp. 3d 529, 543 (S.D.N.Y. 2016).

***4** With respect to the second factor—the manner in which the search was conducted—the complaint does not suggest the manner in which the search was conducted was unreasonable. While it may have been unprofessional for Defendant to threaten to pepper spray Plaintiff while conducting the visual cavity search, verbal threats alone do not make a search unreasonable. *See Jenkins*, WL 6700087, at *3.

Third, Plaintiff does not allege facts suggesting that the initiation of the search was unjustified. Rather, correction officers had a legitimate penological purpose in searching Plaintiff before he was transferred to a different facility. Furthermore, Plaintiff alleges that, prior to being strip searched, he was first sent through a body scanner, which detected possible contraband on or in Plaintiff's person. It was only after the body scanner identified possible contraband that Plaintiff was subjected to a strip search. Moreover, the intrusive nature of the search appears to have been justified based on the location of the potential contraband on Plaintiff's upper thigh, in the vicinity of Plaintiff's genital area.

Finally, with respect to the place in which the search was conducted, Plaintiff alleges that it was conducted in a designated search room and there is no indication that the search was conducted in the presence of unnecessary spectators.

In sum, Plaintiff does not allege facts indicating there was a violation of his Fourth Amendment rights. The Court therefore dismisses Plaintiff's Fourth Amendment claims against Captain Romana for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

**B. Claims under state law**

A district court may decline to exercise supplemental jurisdiction of state law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (footnote omitted). Having dismissed the federal claims of which the Court has original jurisdiction, the Court declines to exercise its supplemental jurisdiction of any state law claims Plaintiff may be asserting. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.' " (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997))).

### LEAVE TO AMEND GRANTED

Plaintiff proceeds in this matter without the benefit of an attorney. District courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Indeed, the Second Circuit has cautioned that district courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). Because Plaintiff may be able to allege additional facts to state a valid Section 1983 claim against Captain Romana, the Court grants Plaintiff 30 days' leave to amend his complaint to address the deficiencies identified above. If Plaintiff repleads his claims, he should allege facts showing that the search amounted to an unreasonable invasion of his privacy by addressing the standard set forth above.

***5** If Plaintiff does not file an amended complaint within the time allowed, the Court will direct the Clerk of Court to enter judgment in this action.

### CONCLUSION

The Court dismisses the complaint for failure to state a claim on which relief may be granted, *see* 28 U.S.C. § 1915(e)(2)(B)(ii), with 30 days' leave to replead.

The Court declines to exercise supplemental jurisdiction of any state law claims Plaintiff may be asserting. *See* 28 U.S.C. § 1367(c)(3).

The Court directs the Clerk of Court to hold this matter open on the docket until a civil judgment is entered.

SO ORDERED.

**All Citations**

Slip Copy, 2026 WL 2364085

## Footnotes

1 The Court quotes from the complaint verbatim. All spelling, grammar, and punctuation are as in the original unless noted otherwise.

2 In the complaint, Plaintiff refers to "the captain," which the Court understands to be a reference to Defendant Romana.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4483439
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

TEVAC, INC., Plaintiff,
v.
DYNAMICS ESHOP, INC., Defendant.

19-CV-3650(JS)(AYS)
|
Signed September 27, 2022

**Attorneys and Law Firms**

For Plaintiff: Linda S. Agnew, Esq., HARRIS BLOOM & ARCHER LLP, 445 Broad Hollow Road, Suite 127, Melville, New York 11747.

For Defendant: Peter T. Shapiro, Esq., Adam T. Hoffman, Esq., LEWIS BRISBOIS BISGAARD & SMITH LLP, 77 Water Street, Suite 2100, New York, New York 10005.

ADOPTION ORDER

SEYBERT, District Judge:

***1** Plaintiff Tevac, Inc. ("Plaintiff" or "Tevac") commenced this breach of contract action on June 21, 2019 against Defendant Dynamics eShop, Inc. ("Defendant" or "Dynamic"), which arises out of the Agreement between the parties by which Defendant would create and furnish Plaintiff with an e-commerce website platform. [1] (See Compl., ECF No. 1.) Dynamic brought counterclaims for breach of contract and unjust enrichment. (See Answer & Counterclaim, ECF No. 15.) After the close of discovery, the parties cross-moved for summary judgment. (See Def. Mot., ECF No. 44; see also Def. Support Memo, ECF No. 45; Def. Opp'n/Reply, ECF No. 48; see also Pl. X-Mot., ECF No. 47; Pl. Support Memo/Opp'n, ECF No. 47; Pl. Reply, ECF No. 49.) Dynamic seeks summary judgment with respect to its breach-of-contract counterclaim, as well as Tevac's claims for breach-of-contract and consequential damages. Similarly, Plaintiff seeks summary judgment in its favor on its breach-of-contract claim and Dynamic's counterclaim for breach of contract.

Pending before the Court is the Report and Recommendation ("R&R") by the Honorable Anne Y. Shields, which, among other things: (1) provides a thorough factual background of the parties' business interactions, including an examination of the subject Agreement, which in the absence of any objections is incorporated herein, familiarity with which is assumed; (2) outlines the procedural history of the case; and (3) identifies the relevant applicable law. (See R&R, ECF No. 53.) The Magistrate Judge recommends denial of the cross-summary judgment motions as to the breach-of-contract claims, since "the crux of th[ose claims] is whether the parties each performed their respective obligations under the Agreement," but "there are numerous questions of fact as to whether the parties each performed their respective contractual obligations, necessitating a determination by the factfinder." (R&R at 8, 9.) However, based upon "the plain language of the parties' Agreement, and the fact that there is no dispute that the contract was negotiated as part of an arm's length business transaction between two sophisticated business entities," Magistrate Judge Shields further recommends that summary judgment be awarded in Dynamic's favor with respect to Plaintiff's recovery of consequential damages in the form of lost profits because, as a matter of law, such recovery is barred by the terms of the Agreement. (R&R at 11; see also id. at 9-11.)

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); see also FED. R. CIV. P. 72(b)(3). The district judge must evaluate proper objections de novo; however, where a party "makes only conclusory or general objections, or simply reiterates [the] original arguments, the Court reviews the Report and Recommendation only for clear error." Pall Corp. v. Entegris, Inc., 249 F.R.D. 48, 51 (E.D.N.Y. 2008) (quoting Barratt v. Joie, No. 96–CV–0324, 2002 WL 335014, at *1 (S.D.N.Y. Mar. 4, 2002)); FED. R. CIV. P. 72(b)(3). Further, by failing to timely object, a party waives any further judicial review of a magistrate judge's findings. See Mejia v. Roma Cleaning, Inc., 751 F. App'x 134, 136 (2d Cir. Oct. 5, 2018).

***2** Tevac timely objected to the R&R (see Obj., ECF No. 54), which objections Dynamic oppose (see Opp'n to Obj., ECF No. 55). Of import: Neither party objects to the Magistrate Judge's recommendation that the Summary Judgment Motions be denied as to the parties' respective breach-of-contract claims. Nor have the parties objected to Magistrate Judge Shield's finding that they are both "sophisticated business entities." (R&R at 11.) Rather, Plaintiff objects to the recommendation that it be barred from recovering its lost profits.

Plaintiff's objection arises from the "Warranty" provision of the Agreement, i.e., Paragraph 11, which states:

> [Defendant] warrants that customizations and/or modifications made solely by [Defendant] shall be free of defects for a period of one year from the date of implementation. Customizations or program modifications made by [Defendant] can be of such complexity that they may have errors. It is agreed by [Plaintiff] that as [Defendant's] sole liability and [Plaintiff's] sole remedy, that [Defendant] will provide reasonable and timely programming to correct documented code errors which were caused by a defect in unaltered software customizations or modifications authored by [Defendant]. Such remedy would be at no charge to [Plaintiff].
>
> [Defendant] makes no representation, express or implied, to [Plaintiff] with respect to profit or loss, installation or any future modifications that may be made to the software, either by any third party software or another party. In no event shall [Defendant] be responsible for any special or consequential damages or lost profits even if informed of same occurring out of or in connection with the delivery, use or performance of software.
>
> The above express warranties are the only warranties made and shall be in lieu of any other warranty, express or implied. You are advised to test the software thoroughly before relying on it and assume the risk of using the software.

(R&R at 3-4 (quoting Def. 56.1 Stmt. ¶ 15 (quoting Agreement)) (emphasis added).) Plaintiff contends that "reading Paragraph 11 as a whole, and giving effect to every term, Paragraph 11 cannot bar recovery of consequential damages – here in the form of lost profits – for breaches unrelated to software." (Obj. at 4.) Yet, Plaintiff anchors its objection to the single sentence in Paragraph 11 that "[i]n no event shall [Dynamic] be responsible for any special or consequential damages or lost profits even if informed of same occurring out of or in connection with the delivery, use or performance of software" (hereafter, the "Disclaimer Sentence"), specifically zeroing in on its concluding phrase, i.e., "occurring out of or in connection with the delivery, use or performance of software." (See id. (quoting Agreement ¶ 11).) Plaintiff argues:

> [this] language certainly relates to and modifies the "[i]n no event shall [Dynamic] be responsible for any special or consequential damages or lost profits ..." as well as "even if informed of same," [with] the "even if" language being the focus of the [R&R]'s holding that Paragraph 11 bars recovery of lost profits by Tevac. That is simply not the case because the "occurring out of or in connection with the delivery, use or performance of the software" language specifically limits the situations where any such limitation on recovery of lost profits would apply.

(Obj. at 4-5.) In its moving papers, in a cursory manner, Tevac similarly relied upon the concluding phrase of the Disclaimer Sentence when it argued "a review of the plain language of the Agreement confirms that there is no such prohibition" to awarding it damages for lost profits. (See Pl. Support Memo, ECF No. 47-11, at 6.) As this objection is little more than a rehashing of Tevac's argument set forth in its original papers, it is insufficient to invoke de novo review. See Meehan v. VIPKid, No. 20-CV-6370, 2021 WL 4272512, *2 (E.D.N.Y. Sept. 21, 2021). Accordingly, the portion of the R&R addressing consequential damages (see R&R, Discussion, Part III, at 9-11) is reviewed for clear error. The Court finds none.

***3** As an initial matter, Dynamics stated "Tevac had an opportunity to negotiate the terms of the Agreement and obtained a revision to the proposed payment schedule which the parties implemented." (Def. Rule 56.1 Stmt., ECF No. 46-1, ¶ 6.) For two reasons, the Court finds Tevac has admitted this statement. First, without citation to the record, Plaintiff responded: "Admits that Tevac proposed a payment schedule modification but denies that it had the opportunity to negotiate the design and implementation because it was relying upon the claimed expertise of Dynamics." (Pl. Rule 56.1 Response Stmt., ECF No. 47-9, ¶ 6.) Failing to cite to record evidence to support this purported disputed fact, see Local Civil Rule 56.1(d), it is deemed admitted. See Genova v. County of Nassau, No. 17-CV-4959, 2020 WL 813160, *4 (E.D.N.Y. Feb. 19, 2020) ("[T]o specifically controvert a statement of material fact, a nonmovant is required to do so with specific citation to admissible evidence."), aff'd 851 F. App'x 241 (2d Cir. Mar. 24, 2021) ("Plaintiffs who ignore their obligations under Local Rule 56.1 do so at their own peril."); see also Ezagui v. City of N.Y., 726 F. Supp.2d 275, 285 n.8 (S.D.N.Y. 2010) (noting statements which a nonmovant does "not specifically deny–with citations to supporting evidence–are deemed admitted for purposes of [movant's] summary judgment motion") (collecting cases).

Second, even if Tevac's responsive statement about design and implementation terms was deemed true, the statement fails to address the negotiation of other terms, such as consequential damages. In other words, Tevac's purported

reliance upon Dynamics' expertise as to design and implementation did not forestall it – an undisputed sophisticated business entity – from engaging in negotiating other terms of the Agreement, as it admittedly did. Hence, there was no clear error in Magistrate Judge Shields' finding that the language in Paragraph 11 of the Agreement, and, specifically, the Disclaimer Sentence, is plain and binds the parties such that "the lost profits Plaintiff seeks to recover are barred, as a matter of law." (R&R at 11 (quoting Markborough California, Inc. v. Superior Court, 227 Cal. App. 3d 705, 716 (1991) ("When the parties are dealing in an arm's length transaction with an opportunity to accept, reject or modify the terms of the agreement ... [t]he parties are bound by the terms of the contract....")).) Indeed, the Disclaimer Sentence's preamble phrase, "[i]n no event", is plainly absolute; contrary to Tevac's objection arguing that the addition of the concluding phrase, "even if informed ...," "limits the situations where any such limitation on recovery of lost profits would apply" (Obj. at 5), that phrase emphasizes the expansiveness of this term of the Agreement. As a sophisticated business entity, Tevac's time to address any purported ambiguity was during negotiations. Given the parties' dispute arises from a "contract [that] was negotiated as part of an arm's length business transaction between two [undisputed] sophisticated business entities" (R&R at 11), Tevac will not be heard to object about the plain language of the Agreement.

To the extent Plaintiff further objects to the R&R on the basis that Dynamics was the Agreement's drafter and, therefore, that ambiguities in Paragraph 11 of the Agreement are to be construed against Dynamics (see Obj. at 5), especially as the Agreement is a "form contract" (see id. at 6), those objections are overruled. Other that stating baldly that Dynamics drafted the Agreement (see Pl. Support Memo, ECF No. 47-11, at 6), Plaintiff did not make such an argument in its moving papers. "[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not." Zhao v. State Univ. of N.Y., No. 04-CV-0210, 2011 WL 3610717, at *1 (E.D.N.Y. Aug. 15, 2011) (cleaned up); see also Hubbaard v. Kelley, 752 F. Supp. 2d 311, 312-13 (W.D.N.Y. 2009) (same). Thus, these arguments in support of Plaintiff's objections will not be considered now.

In sum, upon careful review and consideration, the Court finds Magistrate Judge Shields' R&R to be comprehensive, well-reasoned, and free of clear error.

***4** Accordingly, **IT IS HEREBY ORDERED** that the R&R (ECF No. 63) is ADOPTED in its entirety, with:

I. Plaintiff's Summary Judgment Motion (ECF No. 47) being DENIED in its entirety; and

II. Defendant's Summary Judgment Motion (ECF No. 44) being:

A. DENIED IN PART, such that the issue of whether there has been a breach of the Agreement remains to be resolved; and

B. GRANTED IN PART, such that Plaintiff's claim for consequential damages, including lost profits, is DISMISSED.

**IT IS FURTHER ORDERED** that by no later than 60 days from date of this Adoption Order, the parties are to comply with Rule VI(A) of the undersigned's Individual Rules regarding the filing of a proposed Joint Pre-Trial Order (available at https://www.nyed.uscourts.gov/pub/rules/JS-MLR.pdf). Thereafter, a pre-trial conference will be scheduled.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4483439

## Footnotes

1 The Court assumes the parties' familiarity with the terms of art defined in the R&R, which are incorporated herein. The Agreement is docketed as ECF No. 44-13.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 7602181
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jose TORRES, Plaintiff,
v.
CITY OF NEW YORK, Captain Johnson, individual, Officer Lewis, individual, and Officer Durity, individual, Defendants.

17cv6604 (GBD) (DF)
|
Signed 08/14/2019

**Attorneys and Law Firms**

Jose M. Torres, Coxsackie, NY, pro se.

Carolyn Kay Depoian, Samantha Rena Millar, NYC Law Department Office of the Corporation Counsel, New York, NY, for Defendants.

**REPORT AND RECOMMENDATION**

DEBRA FREEMAN, United States Magistrate Judge

**TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:**

***1** In this action, *pro se* plaintiff Jose Torres ("Plaintiff"), asserts claims against defendants City of New York (the "City"), Captain Timothy Johnson ("Johnson"), Officer Junior Lewis ("Lewis"), and Officer Dave Durity ("Durity" and, together with Johnsen and Lewis, the "Officer Defendants") (all, collectively, "Defendants") under 42 U.S.C. § 1983, based on alleged deprivations of Plaintiff's constitutional rights in connection with a March 1, 2016 body-cavity search (with the forcible removal of contraband from his rectum) to which Plaintiff was subjected while he was in custody at the Anna M. Kross Center (the "AMKC") on Rikers Island. (Complaint, dated Aug. 16, 2017 ("Compl.") (Dkt. 2).) Currently before the Court is a motion by Defendants for summary judgment, seeking dismissal of all of the claims asserted against them. (Dkt. 38.) For the reasons discussed below, I recommend that Defendants' motion be granted.

## BACKGROUND

### A. Factual Background [1]

#### 1. The First Search on March 1, 2016

On February 25, 2016, Plaintiff began serving a two-to-four year sentence at the AMKC. [2] (Def. 56.1 Stmt. ¶¶ 1, 2.) On the previous night, prior to entering into the custody of the New York City Department of Correction ("DOC"), Plaintiff swallowed 10 to 12 balloons (made out of plastic surgical gloves) containing various types of contraband, including marijuana, K2, tobacco, matches, a match striker, and rolling papers. (*Id.* ¶¶ 3, 4, 7.) The balloons exited Plaintiff's system over the following three days. (*Id.* ¶ 6.)

During the afternoon of March 1, 2016, an AMKC Security Team (the "Security Team") – comprised of Johnson, Lewis, and Durity, in addition to approximately five to seven other officers – conducted a search of Dorm 4, where Plaintiff was then being housed. (*Id.* ¶¶ 11, 13-14.) At that time, Plaintiff had a balloon containing K2 that he had inserted into his rectum, additional K2 that was rolled up into a piece of paper and hidden in the groin area of his pants, and U.S. currency and matches that were being held in the waistband of his underwear. (*Id.* ¶¶ 11-12.) When the Security Team entered, Plaintiff reached toward the front of his pants to determine whether the K2 that he had hidden in the groin area of his underwear had fallen. (*Id.* ¶ 15.) Upon observing this motion, Johnson and Lewis instructed Plaintiff to go to the bathroom, where Plaintiff was then instructed to remove his clothing in order to be strip searched. (*Id.* ¶¶ 16-17.) According to Plaintiff, in addition to Defendants, there were two other unidentified officers present in the bathroom, one of whom was holding a video camera that, although turned on, was not recording at the time. (*See* Pl. 56.1 Stmt. ¶ 12; Millar Decl., Ex. B (Transcript of deposition of Jose Torres ("Pl. Dep.")), at 97:3-98:13, 108:13-19.)

***2** After recovering K2, matches, and U.S. currency from Plaintiff's clothing during the strip search, Lewis instructed Plaintiff to squat, and Plaintiff complied. (Def. 56.1 Stmt. ¶¶ 18-20.) At that point, Lewis observed an object protruding from Plaintiff's anus. (*Id.* ¶ 20.) An officer then touched Plaintiff's buttocks for "a couple of seconds" (Pl. Dep., at 107:14-20; *see* Def. 56.1 Stmt. ¶ 22), causing Plaintiff to jump up and turn around (Def. 56.1 Stmt. ¶ 23), which led another

officer to bring Plaintiff to the floor through a chokehold (*id.* ¶ 24; Pl. Dep., at 102:2-14). According to Plaintiff, he then began resisting the officers, and, by "tussling" his body, he attempted to push himself away from the officers in order to prevent them from touching his buttocks. (Pl. Dep., at 101:12-18, 105:5-20.)

As to which officer allegedly engaged in the particular acts that Plaintiff described, Plaintiff testified at his deposition that, at the time of the incident, he did not know which officer, or how many officers, initially touched his buttocks, but that he later learned from another inmate that it had been Johnson who engaged in that conduct. (*Id.*, at 106:15-21, 107:4-13.) Regarding the chokehold, Plaintiff at first testified that he did not recall if Lewis or another officer had brought him to the ground through a chokehold (*id.*, at 102:17-20), but he later testified that Lewis was the officer who had done so (*id.*, at 110:25-111:2). In addition, although Plaintiff initially testified that Durity "did not intervene" and "just watched what happened" (*id.*, at 110:18-25), he later testified to his assumption, given Durity's proximity to him during the commotion, that, at some point in the course of events, Durity had pinned him down on the ground, also through a chokehold (*id.*, at 111:4-112:2).

Plaintiff testified that, after these events, he ultimately calmed down and put his clothes back on, once Johnson told him that the officers were "not going to touch [him] no more." (*Id.*, at 108:25-109:5.) Plaintiff suffered no injuries as a result of this search. (Def. 56.1 Stmt. ¶ 32.)

### 2. The Second Search on March 1, 2016

After dressing himself, Plaintiff was handcuffed by Lewis, and was then brought by Johnson and Lewis into a secondary room in the housing area, where, after other inmates were escorted away from the area, only Johnson, Lewis, and Plaintiff were present. (*Id.* ¶¶ 31, 33-34; *see* Pl. Dep., at 118:1-4, 120:1-5.) Johnson and Lewis then instructed Plaintiff to surrender the contraband, which was still inserted in his rectum (Def. 56.1 Stmt. ¶¶ 35-36), but Plaintiff denied having it and repeatedly refused to comply with the officers' orders (Pl. Dep., at 121:10-122:19, 123:4-25). Following Plaintiff's refusal to surrender the contraband, his handcuffs were removed by Lewis (*id.*, at 124:3-7), and he was then ordered to remove his clothing, and to bend over and squat (*id.*, at 124:18-125:6).

According to Plaintiff, while he was bending over and spreading his butt cheeks, Lewis reached for and touched his buttocks for several seconds, which caused Plaintiff to "jump[ ]" and "turn[ ] around quick" (*id.*, at 125:1-15, *see id.*, at 126:23-127:4), and then led Lewis to take Plaintiff down through a chokehold (*id.*, at 125:15-17, 126:22-127:8). Plaintiff testified that Johnson then held his shoulders down such that Plaintiff was forced to lie on his back, and, despite Plaintiff's kicking Lewis several times on the ground, Lewis "spread[ ] [Plaintiff's] legs apart, st[uck] his hand in [his] anus, and pull[ed] a balloon out." (*Id.*, at 125:21-25, *see id.*, at 127:9-128:6.) Plaintiff further testified that Lewis, upon pulling the balloon out of his rectum, "threw it on the floor" and told Plaintiff that he "should have just g[iven] it up." (*Id.*, at 128:7-10.)

### 3. Plaintiff's Injury and Medical Treatment

***3** On March 3, 2016, Plaintiff visited the AMKC medical clinic, complaining of pain in his rectum caused by the incident that had taken place two days earlier. (Def. 56.1 Stmt. ¶ 48; *see* Millar Decl., Ex. C (Plaintiff's health records), at 1-2.) According to the medical record from Plaintiff's visit, Plaintiff stated to the examining physician that "he had pushed K2 wrapped in a plastic up his rectum, ... [that] it was taken out on search by the DOC officer who put his finger up his rectum to take it out, and [that] he ... felt sexually assaulted." (Millar Decl., Ex. C, at 1.) The medical record further reflects that Plaintiff, upon examination was found to have a "small pinkish mass outside his anus," but was not found to be bleeding. (*Id.*, at 2.) Plaintiff was examined for a second time later that day, and he again complained of having pain in his rectum. (Millar Decl., Ex. C, at 2, 8.) According to the medical record from that examination, Plaintiff's rectum was tender to palpation, and he was evaluated as having a rectal mass and no bleeding. (*Id.*, at 9.) [3]

Plaintiff was also seen by a psychologist on March 3 for the purpose of a "mental health intake." (Millar Decl., Ex. C, at 10-14.) According to the psychologist's notes from that session, Plaintiff again stated that he had attempted to hide contraband in his rectum, but that, during the process of being strip searched, "someone stuck their finger up into his rec[tu]m." (*Id.*, at 10.) The psychologist, in his assessment of Plaintiff's mental condition, noted that Plaintiff felt "traumatized" by the incident, and that, although "[h]e in no way view[ed] this as a sexual assault," "he [was] very upset over this incident." (*Id.*, at 13.)

**B. Procedural History**

On August 29, 2017, Plaintiff commenced this action against the City, DOC, Johnson, Lewis, and Durity. (*See generally* Compl.) In claiming that the body-cavity search and recovery of contraband violated his constitutional rights, Plaintiff cited, in his Complaint, to the First, Fourth, Eighth, and 14th Amendments. (*Id.* ¶ 11.) Shortly thereafter, in an Order dated October 16, 2017, Judge Daniels dismissed Plaintiff's claims against DOC on the basis that "an agency of [the City] is not an entity that can be sued." (Dkt. 9, at 2.)

On September 27, 2018, after the completion of discovery, Defendants filed a motion for summary judgment (Dkt. 38), accompanied by a supporting memorandum of law (Memorandum of Law in Support of Defendants' Motion for Summary Judgment Pursuant to [Rule] 56, dated Sept. 27, 2018 ("Pl. Mem.") (Dkt. 42)); a Rule 56.1 Statement (Def. 56.1 Stmt.), and a counsel declaration (Millar Decl.), with exhibits thereto. On January 15, 2019, Plaintiff filed an opposition memorandum (Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment [Pursuant to Rule] 56, dated Dec. 28, 2018 ("Pl. Mem.") (Dkt. 49)), accompanied by a responsive Rule 56.1 Statement (Pl. 56.1 Stmt.), with exhibits thereto.[4] On February 21, 2019, Defendants filed a reply memorandum. (Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment Pursuant to [Rule] 56, dated Feb. 21, 2019 ("Def. Reply") (Dkt. 52).)

**DISCUSSION**

**I. SUMMARY JUDGMENT STANDARDS**

**A. Rule 56**

***4** Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996). The moving party bears the burden of showing that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). This burden may be satisfied "by pointing out the absence of evidence to support the non-movant's claims." *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991) (citing *Celotex*, 477 U.S. at 325). Where the party opposing summary judgment "fails to properly address [the moving] party's assertion of fact ..., the court may ... consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

While a party opposing summary judgment must generally "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment," *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 322-23), summary judgment may not be granted on default, *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). "[T]he district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001). If that burden is not met, summary judgment must be denied, "even if no opposing evidentiary matter is presented." *Id.* (emphasis removed) (internal quotation marks and citation omitted).

In reviewing the evidentiary record, the court "must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his [or her] favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001). If, even when viewed in this light, there is not "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," or if the "evidence is not significantly probative," summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

When the non-moving party is proceeding *pro se*, the Court must read that party's papers liberally and interpret them "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and citation omitted). Even a *pro se* plaintiff, however, cannot defeat a motion for summary judgment by relying merely on the allegations of his or her complaint. *See* *Champion v. Artuz*, 76 F.3d 483, 485 (2d Cir. 1996). Rather, when confronted with evidence of facts that would support summary judgment, a *pro se* plaintiff, like any other party, must come forward with evidence in admissible form that is capable of refuting those facts. *See* *Jermosen v. Coughlin*, 877 F. Supp. 864, 867 (S.D.N.Y. 1999) (in order to defeat summary judgment, a *pro se* plaintiff must present "concrete

evidence from which a reasonable juror could return a verdict in [his or her] favor" (internal quotation marks and citation omitted)); *see also* Fed. R. Civ. P. 56(c).

**B. Local Civil Rules 56.1 and 56.2**

Under this Court's rules, a party moving for summary judgment must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," Local Civ. R. 56.1(a), and the opposing party must submit a correspondingly numbered statement in response, additionally setting out, if necessary, material facts showing genuine triable issues, *see* Local Civ. R. 56.1(b). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Local Rule 56.1, however, does not relieve the party seeking summary judgment of the burden of establishing that it is entitled to judgment as a matter of law. *Id.* Thus, the Court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement; it also must be satisfied that the moving party's assertions are supported by the record. *See Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Zerafa v. Montefiore Hosp. Hous. Co.*, 403 F. Supp. 2d 320, 329 n.12 (S.D.N.Y. 2005).

***5** Under this Court's rules, a party moving for summary judgment against a *pro se* litigant must submit "a separate document, together with the papers in support of the motion, a 'Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment.' " Local Civ. R. 56.2. Additionally, "the moving party shall inform the *pro se* litigant of the consequences of failing to respond to the summary judgment motion." *Id.*

**II. PLAINTIFF'S CLAIMS AGAINST THE OFFICER DEFENDANTS**

Section 1983 permits a plaintiff whose federal constitutional rights have been violated to sue any person who acted to deprive him of those rights, under color of state law. 42 U.S.C. § 1983. Plaintiff claims that the chokeholds that were allegedly used to restrain him constituted excessive uses of force, and that the alleged "abusive body cavity search" that was used to remove contraband from Plaintiff's rectum constituted both excessive force and sexual assault. (*See* Pl. Mem., at 2-18.) Based on this Court's understanding of Plaintiff's memorandum of law, Plaintiff is asserting these claims against each of the Officer Defendants by virtue of the individual roles that they allegedly played in the March 1 searches. (*Id.*) In interpreting Plaintiff's papers "to raise the strongest arguments that they suggest" in light of his *pro se* status, *see McPherson*, 174 F.3d at 280, this Court understands that his claims against the Officer Defendants are grounded in the Eighth Amendment's proscription against cruel and unusual punishment and/or in the limited right to bodily privacy afforded to inmates under the Fourth Amendment. [5] Defendants have addressed Plaintiff's Eighth Amendment claims at length (*see generally* Def. Mem.; Def. Reply), but they have given little attention to Plaintiff's potential Fourth Amendment claims (*see* Def. Mem., at 11-12 (arguing only that Plaintiff's claims "would also fail even under the less onerous standards of the Fourth and Fourteenth Amendments for evaluating sexual assault allegations brought by pre-trial detainees," and not discussing how the Fourth Amendment might apply in Plaintiff's case)).

In addressing Plaintiff's claims under the Eighth Amendment standard, Defendants contend that, as a matter of law, Plaintiff cannot establish any excessive-force claim against Lewis, based on either his use of a chokehold in restraining Plaintiff or his removal of the contraband from Plaintiff's rectum (*see* Def. Mem., at 13-19), and, in addition, that Plaintiff cannot establish a constitutional claim based on allegations that the removal of the contraband constituted a sexual assault (*see id.*, at 6-13). Defendants also contend that Plaintiff's Eighth Amendment claims against Johnson and Durity necessarily fail, as a matter of law, based on a lack of evidence that either was "personally involved in any sexual assault or use of excessive force against [P]laintiff." (*See id.*, at 19-22.) Finally, Defendants argue that all of the Officer Defendants are entitled to qualified immunity on Plaintiff's claims. (*See id.*, at 22-23.)

***6** This Court will first review Defendants' arguments under the Eighth Amendment standards that Defendants' correctly cite, and will then turn separately to Plaintiff's potential Fourth Amendment claims. Despite the fact that Defendants did not set out or address the applicable standards for evaluating Plaintiff's allegations in the Fourth Amendment context, this Court finds that Defendants are, in fact, entitled to summary judgment in their favor on all of Plaintiff's claims. As discussed below, this Court finds that Plaintiff's Eighth Amendment claims cannot survive because the evidentiary record shows that Plaintiff's injury was, at most, *de minimus* and that the officers' conduct was not sufficiently "egregious" to render them liable for an Eighth Amendment violation. While Plaintiff's Fourth Amendment claims present a closer

call, they ultimately fail because, regardless of whether the Officer Defendants may have violated Plaintiffs' limited right to bodily privacy, they are entitled to qualified immunity on those claims.

### A. Plaintiff's Eighth Amendment Claims

#### 1. Applicable Legal Standards

Given Plaintiff's status as a convicted prisoner at the time of the March 1 searches, his excessive-force (and sexual assault) claims implicate the Eighth Amendment's Cruel and Unusual Punishment Clause. *See Whitley v. Albers*, 475 U.S. 312, 327 (1986). A prison official's use of force violates the Eighth Amendment when, objectively, "the alleged punishment [was] ... sufficiently serious," and, subjectively, "the prison official ... [had] a sufficiently culpable state of mind." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (internal quotation marks and citations omitted). The objective component "focuses on the harm done, in light of 'contemporary standards of decency,' " and thus, "[i]n assessing this component, the court must ask whether 'the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation.' " *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quoting *Hudson*, 503 U.S. at 8). Further, the Eighth Amendment "does not extend to '*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.' " *Id.* (quoting *Hudson*, 503 U.S. at 10).

The subjective component of the Eighth Amendment excessive-force analysis "requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances...." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (internal quotation marks and citation omitted). "The test for wantonness 'is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)). In answering this question,

> a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as "the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

*Id.* (quoting *Scott*, 344 F.3d at 291).

In addition to these components, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite' " to a Section 1983 claim. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). For this reason, the doctrine of *respondeat superior* does not establish liability under Section 1983. *Parris v. New York State Dep't of Corr. Servs.*, 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013).

#### 2. Use of a Chokehold

As an initial matter, while Plaintiff testified unequivocally that Lewis was the officer who placed him in a chokehold during the second contraband search in the secondary room, it is not entirely clear from Plaintiff's deposition testimony who he believes placed him in a chokehold during the first search in the dormitory bathroom. As noted above, while Plaintiff initially testified that he did not recall which officer had brought him to the ground through a chokehold at that time (*see* Pl. Dep., at 102:17-20), he later appeared to change his testimony to assert that it was Lewis who had done so then, as well (*id.*, at 110:25-111:2). In any event, even if Plaintiff could testify credibly at trial that Lewis used a chokehold against him twice, such acts would not constitute unconstitutional uses of force, in light of the circumstances.

***7** As discussed above, "the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to '*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.' " *Wright*, 554 F.3d at 269 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " (quoting *Hudson*, 503 U.S. at 10)). While an inmate is not required to demonstrate a minimum threshold of injury to bring a claim of excessive force, the "the extent of injury suffered is relevant to the Eighth Amendment inquiry insofar as it indicates the amount of force applied." *Rodriguez v. City of New York*, 802 F. Supp. 2d 477, 481 (S.D.N.Y. 2011). Thus, courts in this Circuit routinely find that minimal injuries and pain are "insufficient to satisfy the objective prong for claims of Eighth Amendment violations." *Perry v. Stephens*, 659 F. Supp. 2d 577, 582 (S.D.N.Y. 2009) (collecting cases).

In particular, the use of chokeholds, where they do not cause more than minimal injury, are generally not considered sufficiently harmful to satisfy the objective component of an Eighth Amendment claim. *See, e.g.*, *Rodriguez*, 802 F. Supp. 2d at 480-81 (dismissing plaintiff's excessive-force claim alleging that officers punched him in the head and arm, and then placed him in an extended chokehold rendering him unconscious, where medical records showed only minor facial swelling); *Perry*, 659 F. Supp. 2d at 582 (dismissing plaintiff's excessive-force claim alleging that officers both slapped and choked him, where plaintiff testified that he suffered only "minor pain that abated after about four days"); *Yearwood v. LoPiccolo*, No. 95cv2544 (DC), 1998 WL 474073 (S.D.N.Y. Aug. 10, 1998) (dismissing plaintiff's excessive-force claim alleging that he was rendered unconscious by an officer choking him, while another officer hit him on the side of his head, where medical records showed that he had "suffered only a minor bump to the side of his head and slight bleeding in his groin area").

Viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find that Lewis's use of a chokehold on Plaintiff was sufficiently harmful to satisfy the objective prong of the Eighth Amendment, even assuming that a chokehold was used on two separate occasions, and even assuming the maneuver represented a greater use of force than was necessary or reasonable under the circumstances. Plaintiff testified that he was not injured in any way as a result of the first contraband search in dormitory bathroom. (*See* Pl. Dep., at 113:4-6.) As to the second search that was conducted in the secondary room, while Plaintiff claims that he suffered certain injuries from the extraction of the contraband from his rectum, he does not appear to claim that he sustained any injury as a result of the chokehold, and the medical records from his subsequent visit to the AMKC medical clinic reflect no such injury. (*See* Millar Decl., Ex. C.) Given the absence of any claim or evidence of an injury relating to Lewis's alleged uses of a chokehold in restraining Plaintiff, this Court concludes that Plaintiff cannot prevail on his claim that his Eighth Amendment rights were violated in this respect, and that Defendants are therefore entitled to summary judgment on the claim.

### 3. Forceable Removal of Contraband

Plaintiff also claims that Lewis's removal of the contraband from Plaintiff's rectum constituted an excessive use of force in violation of his Eighth Amendment rights (*see* Pl. Mem., at 8-12), but this claim, too, cannot survive summary judgment, as the evidence in the record demonstrates that any physical injury to Plaintiff caused by the removal of contraband was *de minimis*, and thus insufficient to satisfy the objective prong of the applicable standard. [6]

***8** As noted above, and as asserted by Defendants (*see* Def. 56.1 Stmt. ¶¶ 49-50), the medical record reflects that, two days after the events of March 1, Plaintiff complained of having pain in his rectum, and was assessed as having a "small pinkish mass outside his anus" (Millar Decl., Ex. C, at 2, 8-9). Although Plaintiff asserts that he had also suffered from "rectal bleeding" during this period (Pl. 56.1 Stmt. ¶ 35), the record does not contain any evidence demonstrating that this was the case, and indeed, Plaintiff's medical records reflect that he was, in fact, not experiencing any bleeding in his rectal area (Millar Decl., Ex. C, at 2, 9). There is also no evidence in the record demonstrating that Plaintiff suffered any continued pain thereafter.

Based on the evidence contained in the record, this Court concludes that no reasonable jury could find that Plaintiff suffered anything beyond a *de minimis* physical injury, such that Lewis's removal of the contraband could be found to have been objectively 'harmful enough' to establish a violation of Plaintiff's constitutional rights. As discussed above, "[c]ourts in this Circuit have consistently held that an injury is *de minimis* when it is temporary and/or minor in severity." *Smith v. City of New York*, No. 04cv3286 (TPG), 2010 WL 3397683, at *10 (S.D.N.Y. Aug. 27, 2010), *aff'd sub nom. Smith v. Tobon*, 529 F. App'x 36 (2d Cir. 2013). While Plaintiff evidently experienced some pain, and was observed as having a "small pinkish mass" following the removal of contraband, there is no evidence that those symptoms were anything more than "minor in severity," or lasted for more than a few days, or even that they were caused by Lewis's conduct (given that Plaintiff had admittedly swallowed and passed multiple balloons in the days just before the events at issue, and had apparently reinserted one into his rectum).

Further, while causing an inmate to bleed may, in certain circumstances, be suggestive of more than *de minimis* injury, *see Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 509 (S.D.N.Y. 2008) (evidence that correctional officer caused plaintiff to suffer "swelling on the left side of his face, a cut to the inside of his mouth, his ear to bleed, and hearing impairment," by striking plaintiff several times without provocation, was sufficient to survive summary judgment), *aff'd sub nom. Jean-Laurent v. Wilkerson*, 461

F. App'x 18 (2d Cir. 2012), modest bleeding is generally insufficient to demonstrate the necessary severity, *see, e.g.*, *Strange v. Westchester Cty. Dep't of Corr.*, No. 17cv9968 (NSR), 2018 WL 3910829, at *2 (S.D.N.Y. Aug. 14, 2018) (dismissing excessive-force claim where allegations that prison nurse "examined [plaintiff's] body in a very rough manner and ... caus[ed] [his] toe to bleed and swell" indicated a *de minimis* amount of force). Moreover, Plaintiff's claim of rectal bleeding here is not even supported – and, in fact, is contradicted – by his medical records, which reflect that, at least by the time he was examined, he was not bleeding. In light of those records, Plaintiff's assertion that he was made to bleed does not raise a genuine issue of fact as to whether his claimed injury was sufficiently severe. *See White v. Williams*, No. 9:12-CV-1775, 2016 WL 4006461, at *9 (N.D.N.Y. June 22, 2016) (dismissing claim upon finding that plaintiff's injuries were *de minimis* where the plaintiff's "claim that he was bleeding profusely," as a result of correctional officer's striking him, was "belied by the medical records"), *report and recommendation adopted*, 2016 WL 4005849 (July 25, 2016).

Accordingly, even viewed most favorably to Plaintiff, the record shows that any physical injuries caused by Lewis's removal of the contraband from Plaintiff's rectum were *de minimis*, and thus insufficient to meet the Eighth Amendment standard. Additionally, given this Court's finding that Plaintiff cannot prevail on his excessive-force claims (both with respect to the chokehold and the removal of the contraband), this Court finds that Plaintiff's claims against Johnson and Durity for their alleged personal involvement in Lewis's acts (*i.e.*, for their alleged failure to intervene to prevent those acts), must necessarily fail as well. *Coleman v. City of New York*, No. 07cv1051 (CM), 2010 WL 571986, at *5 (S.D.N.Y. Feb. 2, 2010) (holding that, in the absence of a constitutional violation against certain officers, failure-to-intervene claims against other officers must be dismissed as well). This Court therefore recommends the dismissal of Plaintiff's excessive-force claims against all of the Officer Defendants.

#### 4. Claimed Sexual Assault

***9** Plaintiff also claims that Lewis's forcible removal of contraband from Plaintiff's rectum in the secondary room constituted sexual assault in violation of his Eighth Amendment rights. (*See* Pl. Mem., at 2-8.) Plaintiff further claims that Johnson, by both failing to intervene in the alleged sexual assault and by "join[ing] in to aide [Lewis] in the assault," was personally involved in this alleged constitutional violation. (*Id.*, at 14-18.) As discussed below, this Court finds that no reasonable jury could find that Plaintiff's Eighth Amendment rights were violated in this regard.

"[P]rison officials looking for contraband may subject inmates to reasonable strip searches and cavity searches," and, "[i]ndeed[,] prison security and safety may require frequent searches of an intensely personal nature." *Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) (citing *Bell v. Wolfish*, 441 U.S. 520, 560 (1979)). In determining whether a prison official has violated an inmate's Eighth Amendment rights by committing a sexual assault during a search, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.* In making this determination, courts look to the "timing" of the search, the "comments made" during the search, and "subsequent comments made by the officers." *Shepherd v. Fisher*, No. 08cv9297 (RA), 2017 WL 666213, at *18 (S.D.N.Y. Feb. 16, 2017) (citing *Crawford*, 796 F.3d at 258-59). Courts in this circuit generally require that the plaintiff demonstrate that the defendants "engaged in egregious conduct" to prevail on a challenge to a contraband search, *Holland v. City of New York*, 197 F. Supp. 3d 529, 545 (S.D.N.Y. 2016), and "[e]ven where inmates allege aggressive or inappropriate behavior during strip searches, courts are reluctant to find that such activity rises to the objectively serious level of an Eighth Amendment violation." *Vaughn v. Strickland*, No. 12cv2696 JPO, 2013 WL 3481413, at *3 (S.D.N.Y. July 11, 2013).

Thus, where correctional officers are shown to have had a legitimate interest in searching for contraband and a reasonable belief as to the presence of secreted contraband, and where the plaintiff has not demonstrated that the search was conducted for purposes of sexual gratification or humiliation, courts generally will not find that the officers' conduct constituted a violation of the plaintiff's Eighth Amendment rights. *See, e.g.*, *LaRocco v. N.Y.C. Dep't of Corr.*, No. 99cv9759 (SHS) (RLE), 2001 WL 1029044, at *5 (S.D.N.Y. Aug. 31, 2001) (allegations that correctional officer forced inmate to "undergo a routine where he had to lift his penis and spread his buttocks about three times" were "not severe enough to be considered objectively, sufficiently serious" under the Eighth Amendment (internal quotation marks omitted)), *report and recommendation adopted*, Sept. 26, 2001 (Dkt. No. 31); *cf. Frazier v. Ward*, 426 F. Supp. 1354, 1366 (N.D.N.Y. 1977) (finding that body-cavity search

violated the Eighth Amendment where it was "not based on reasonable belief standards [ ] and [was] extremely dehumanizing in its method of conduct"). This applies in instances in which the correctional officers make contact with the plaintiff's buttocks and rectum in the course of conducting a cavity search. *See, e.g.*, *Sankara v. O'Hara*, No. 15cv7761 (PKC) (JLC), 2017 WL 6001841, at *6 (S.D.N.Y. Dec. 4, 2017) (allegations that correctional officers strip searched and then "digitally penetrated" plaintiff could not constitute an Eighth Amendment violation where officers had a "legitimate interest in locating drugs or weapons," and there was "no allegation that the search occurred for purposes of sexual gratification or humiliation"), *appeal dismissed*, No. 17-4052 (L), 2018 WL 3031132 (2d Cir. May 17, 2018), *cert. denied*, 139 S. Ct. 328 (2018); *Morrison v. Cortright*, 397 F. Supp. 2d 424, 425 (W.D.N.Y. 2005) (allegations that correctional officer "shone a flashlight up [plaintiff's] anus and r[a]n his middle finger between plaintiff [sic] buttocks" did not constitute sexual assault in violation of the Eighth Amendment (internal quotation marks omitted)); *Castro-Sanchez v. N.Y.S. Dep't of Corr. Servs.*, No. 10cv8314 (DLC), 2012 WL 4474154, at *3 (S.D.N.Y. Sept. 28, 2012) (groping of plaintiff's buttocks by correctional officers during a strip search did not constitute an Eighth Amendment violation).

***10** The core facts concerning Lewis's removal of contraband from Plaintiff's rectum are not in dispute, and cannot lead a reasonable jury to conclude that Lewis (or Johnson, the other officer present in the secondary room) engaged in the type of "egregious" conduct necessary to find that the officers violated Plaintiff's Eighth Amendment rights by engaging in sexual assault. In particular, Plaintiff does not dispute that Lewis's manual search for contraband was based on a reasonable belief that Plaintiff had secreted contraband in a body cavity. Indeed, as discussed above, upon conducting an initial search of Plaintiff's dormitory, the Officer Defendants observed Plaintiff make certain motions in his dormitory that led them to believe that Plaintiff had hidden contraband in his pants (*see* Def. 56.1 Stmt. ¶ 15), and upon conducting a strip search, they observed that Plaintiff had been hiding various items of contraband in his clothing, and that an object was protruding from his anus (*id.* ¶¶ 18-20). Further, the record is devoid of evidence that the removal of the contraband from Plaintiff's rectum was done to "arouse or gratify" the Officer Defendants or to "humiliate" Plaintiff. *Crawford*, 796 F.3d at 257-58. Although Plaintiff reported during his visit to the AMKC medical clinic that he "felt sexually assaulted" (*see* Millar Decl., Ex. C, at 1), Plaintiff does not allege that the Officer Defendants said anything of a sexual nature during the course of the search, or exhibited any conduct that could reflect that Lewis, or Johnson for that matter, undertook the cavity search "for purposes of sexual gratification or humiliation." *See* *Sankara*, 2017 WL 6001841, at *6.

In sum, regardless of the severity of an emotional trauma that Plaintiff claims to have suffered as a result of Lewis's removal of the contraband from his rectum, or his potential perception of the event as having constituted a sexual assault, the undisputed facts do not demonstrate that Lewis, as a matter of law, committed sexual assault so as to render his conduct a violation of Plaintiff's Eighth Amendment rights. Plaintiff's claim against Lewis is therefore subject to dismissal. In light of this finding, Plaintiff's claim against Johnson for his alleged personal involvement in Lewis's alleged sexual assault should also be dismissed. *Coleman*, 2010 WL 571986, at *5.

### B. Plaintiff's Fourth Amendment Claim

As suggested by Plaintiff's opposition papers, his Complaint may also be read to raise a Fourth Amendment claim against the Officer Defendants based on the cavity search to which Plaintiff was subjected. (*See* Pl. Mem., at 7 ("The abusive body cavity search Plaintiff was subjected to ... violated Plaintiff's Eighth Amendment as well as [ ] Fourth Amendment [rights]."); *see also* Compl. ¶ 11.) Even though Defendants do not appear to acknowledge that a convicted inmate in custody, like Plaintiff, may possess Fourth Amendment rights (*see* Def. Mem., at 11-12), this Court finds that, to a limited extent, Plaintiff did have a right to bodily privacy under the Fourth Amendment. As discussed below, however, even though that right may have been violated by the Officer Defendants, the law is not well developed in the particular context presented by this case. For this reason, this Court cannot find that the Officer Defendants would have reasonably understood that their actions may have been unlawful, and thus concludes that they are entitled to qualified immunity for their actions.

#### 1. Applicable Legal Standards

The Fourth Amendment provides that people have a right "to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. While the Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer*, 468 U.S. 517, 626 (1984), and while "[t]here is a long-established

principle that the routine, random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment," *Vann v. Griffin*, No. 16cv9903 (VB), 2018 WL 6199860, at *4 (S.D.N.Y. Nov. 28, 2018) (quoting *Vaughn*, 2013 WL 3481413, at *4), the Second Circuit has held nonetheless that "inmates do retain a limited right to bodily privacy under the Fourth Amendment," *Harris*, 818 F.3d at 57 (2d Cir. 2016) (reaffirming *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992) ("maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy")).

When evaluating an inmate's claim that an officer violated his or her limited right to bodily privacy, the "court must [first] determine whether the inmate has 'exhibit[ed] an actual, subjective expectation of bodily privacy.' " *Id.* (citing *Covino*, 967 F.2d at 77). Second, "the court must determine 'whether the prison officials had sufficient justification to intrude on [the inmate's] [F]ourth [A]mendment rights." *Id.* (citing *Covino*, 967 F.2d at 78). Where the inmate's claim challenges an "isolated search," rather than a regulation or policy, "courts typically apply the standard set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979)." *Harris*, 818 F.3d at 58. *Bell* sets out a four-factor "test of reasonableness," which

> ***11** requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider [1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted.

*Bell*, 441 U.S. at 559.

The first factor, the scope of the intrusion, "varies with the type of search" (*i.e.* strip search, visual-cavity search, or manual body-cavity search), and "also varies depending on who searches whom, i.e., whether the search involved an officer of the same gender as the inmate." *Harris*, 818 F.3d at 58.

With respect to the second factor, the manner in which the search is conducted, the Supreme Court has emphasized that "searches must be conducted in a reasonable manner." *Bell*, 441 U.S. at 560. Thus, "[a] strip search conducted in a professional manner is more reasonable than one that is not." *Harris*, 818 F.3d at 59-60 (suggesting that visual body-cavity search at issue was unreasonable where the record did not explain "why the visual body cavity search was conducted in such a violent and forceful manner").

As to the third factor, the justification for the search, "Supreme Court precedent suggests that officers must provide a justification that is supported by record evidence." *Harris*, 818 F.3d at 60. In particular, "whether an officer is searching for contraband is highly relevant to the reasonableness inquiry." *Id.* at 60 (citing *Lee v. Downs*, 641 F.2d 1117, 1120 (4th Cir. 1981) (female nurse's manual body-cavity search of female inmate for matches was reasonable where "plaintiff had set her paper dress afire" and "there was a reasonable necessity for a search of sufficient thoroughness to give assurance that she had no more matches")). Further, the Supreme Court has cautioned that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities," and thus officers' actions are entitled to deference by the court, unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response...." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328 (2012) (quoting *Block v. Rutherford*, 468 U.S. 576, 584 (1984)); *see also Covino*, 967 F.2d at 79 (noting that, "although inmates do possess a limited right to bodily privacy, some aspects of that right must yield to searches for contraband ..., so that prison administrators may maintain security and discipline in their institutions (citation omitted)).

As to the final factor, the place in which the search is conducted, "a body cavity search conducted in the presence of unnecessary spectators is less reasonable than one conducted in the presence of only those individuals needed to conduct the search." *Harris*, 818 F.3d at 62.

If an evaluation of these four factors indicates that the need for the particular search did not outweigh the invasion of the inmate's right to bodily privacy, then the search was unreasonable and the inmate's Fourth Amendment rights were violated. *See Bell*, 441 U.S. at 558.

### 2. Body-Cavity Search and Removal of Contraband

#### a. Subjective Expectation of Bodily Privacy

As a threshold matter, this Court considers whether the evidence demonstrates that Plaintiff had, or lacked, "an actual, subjective expectation of bodily privacy" with respect to the type of body-cavity search that was performed on him. *Covino*, 967 F.2d at 77. On this question, Plaintiff testified at his deposition that, upon being escorted to the secondary room, he had expected that he would be placed in a "dry cell" [7] until he expelled the contraband. (*See* Pl. Dep., at 118:10-15.) Further, from Plaintiff's apparently surprised reaction to each instance in which his buttocks were touched by an officer – *i.e.*, in the dormitory bathroom (*see* Pl. 56.1 Stmt. ¶ 23 (Plaintiff "jumped up" and "stood straight")), and in the secondary room (*id.* ¶ 40 (Plaintiff "jumped")) – a reasonable inference may be drawn that he did not expect that any officers would make contact with his buttocks as part of a search for contraband. The record therefore contains evidence that Plaintiff did have a subjective expectation that his bodily privacy would be respected, requiring the Court to proceed to consider whether there is also evidence that could support a jury determination that Plaintiff's body-cavity search was, in this instance, an "unreasonable" intrusion on his rights, under the four-factor test articulated in *Bell*.

**b. Factors Relating To Reasonableness**

***12** Most of the core facts underlying Lewis's removal of contraband from Plaintiff's rectum are not in dispute. Those facts, however, do not all point to the same conclusion as to whether the body-cavity search in question was "reasonable" under *Bell*. Rather, the first two *Bell* factors weigh in favor of a finding that the search was unreasonable, while the last two factors weigh to the contrary.

**i. Scope of the Intrusion**

With respect to the first factor (the scope of the intrusion), there is no cause for concern here as to the gender of the participants in the search, *see Harris*, 818 F.3d at 59, as the only AMKC correction officers who were involved in the secondary room search, *i.e.*, Lewis and Johnson, were male, and there is no evidence in the record that anyone but men were present at any point when Plaintiff's clothes were removed during the course of the events at issue.

The type of search to which Plaintiff was subjected, however – *i.e.*, a manual body-cavity search – is the most invasive type of search used in the prison context. Although the parties appear to dispute whether Lewis digitally penetrated Plaintiff's anus (*see* Def. 56.1 Stmt. ¶ 39; Pl. 56.1 Stmt. ¶ 25), Plaintiff testified that he did (*see* Pl. Dep., at 125:21-22 (testifying that Lewis "st[uck] his hand in [Plaintiff's] anus")), and Defendants do not dispute that Lewis at least made physical contact with Plaintiff's anal area in the course of removing the contraband (*see* Def. 56.1 Stmt. ¶¶ 39, 41). Although the fact that a manual body-cavity search was conducted does not mean that the search was *per se* unreasonable, *see Corley v. City of New York*, No. 14cv3202-GHW, 2017 WL 4357662, at *16 (S.D.N.Y. Sept. 28, 2017) (noting, in the pre-trial detainee context, that "body cavity searches, which are arguably a more intrusive way of searching prisoners for contraband, have withstood Fourth Amendment challenges"), the highly intrusive nature of the search, even if conducted by male correction officers, weighs in favor of a finding that the search was unreasonable.

**ii. Manner in Which the Search Was Conducted**

The second factor (the manner in which the search was conducted), similarly suggests a lack of reasonableness. It is true that Plaintiff concedes that he repeatedly denied having any contraband (Pl. Dep., at 121:10-122:19, 123:4-25), that he refused to comply with the officers' orders to surrender it (*id.*), and that, upon being restrained by Lewis, he kicked Lewis several times (*see id.*, at 128:5-6). Nonetheless, the parties do not dispute that, in order for the Officer Defendants to recover the contraband, they not only restrained Plaintiff, but forced him to the ground, held him down, spread his legs, and forcibly removed the contraband from inside his body. (*See* Def. 56.1 Stmt. ¶¶ 40-42; Pl. 56.1 Stmt. ¶¶ 26, 28; Pl. Dep., at 127:5-128:10.) The Officer Defendants have offered no legitimate penological justification for recovering the observed contraband in this manner, when alternatives were likely available to recover it without the use of force. On this point, Plaintiff specifically contends that, upon determining that he had partially inserted contraband into his rectum, the Officer Defendants could have placed him in a dry cell to permit him to expel the contraband, without any use of force at all. (*See* Pl. Mem., at 9.) Although the record does not reflect whether a dry cell was, in fact, available at the AMKC, this Court notes that the use of dry cells in prisons located within this Circuit is "not unusual." *Porter*, 2019 WL 1428431, at *16 (collecting cases involving the use of dry cells where inmates are suspected of possessing contraband). The officers also presumably could have taken Plaintiff to see medical personnel for purpose of removing the contraband

from inside his body. The degree of force that, by Defendants' own admission, was used in this instance, when alternatives were likely available, suggests that the method of the search was unreasonable. [8]

### iii. Justification for the Search

***13** As to the third *Bell* factor (the officer's justification for the search), the record plainly establishes that, even if the *means* that the Officer Defendants ultimately used to recover the contraband from Plaintiff was unjustified, the officers had a legitimate penological reason for conducting a body-cavity search in the first instance. As discussed above, it is undisputed that, during the initial search of Plaintiff's dormitory, the Officer Defendants observed Plaintiff make certain motions that led them to believe that he was in possession of contraband (*see* Def. 56.1 Stmt. ¶ 15), and soon thereafter, upon conducting a strip search, they found that Plaintiff had indeed been hiding various contraband in his clothing (*id.* ¶ 18). Further, it is undisputed that the officers observed an object protruding from Plaintiff's anus that Plaintiff repeatedly refused to surrender to them (*see id.* ¶¶ 20, 35-36; Pl. Dep., at 121:10-122:19, 123:4-25). On this record, it is apparent that Lewis and Johnson would have had a reasonable belief that Plaintiff was in possession of contraband, and that no reasonable jury could find that the Officer Defendants lacked a legitimate justification for conducting a cavity search.

### iv. Place in Which the Search Was Conducted

Finally, the fourth *Bell* factor (the place in which the search was conducted), also weighs in favor of a finding of reasonableness. According to Plaintiff, the search during which the contraband was removed took place in an isolated part of a cell block (*see* Pl. Dep., at 113:21-114:2), and the only individuals present in the area, other than Plaintiff, were Lewis and Johnson (*see id.*, at 118:1-4, 120:1-5). Indeed, Plaintiff testified that other inmates were escorted away from the area upon Plaintiff's arrival, and prior to the search's being conducted. (*See id.*, at 114:17-18, 120:4-5.) The fact that the search was "conducted in the presence of only those individuals needed to conduct the search" supports the reasonableness of the search.

The four relevant factors are therefore in tension, and do not unequivocally answer the question of whether the intrusion on Plaintiffs' limited Fourth Amendment rights was sufficient to constitute a violation of those rights. Indeed, while this Court leans toward the conclusion that, given the intrusiveness of the rectal search and the unnecessary use of physical force to remove the contraband, the search was unduly intrusive, reasonable minds could differ as to whether Lewis and, by failing to intervene, the other Officer Defendants were constitutionally prohibited from acting as they did. The very closeness of the question, however, combined with the fact that neither the Supreme Court nor the Second Circuit has addressed whether an inmate's Fourth Amendment rights would be violated in the particular context at issue here, demonstrates that the Officer Defendants are entitled to qualified immunity on this claim.

### c. Entitlement of the Officer Defendants to Qualified Immunity

Qualified immunity is an affirmative defense that "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In determining whether a right was clearly established at the time defendants acted, [courts] examine whether the right was defined with reasonable specificity; whether the decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts were unlawful." *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995) (citation omitted). The Supreme Court has cautioned that "clearly established law" may not be defined at a "high level of generality," but instead it must be " 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted) (reversing circuit court's decision where it "failed to identify a case where an officer acting under similar circumstances" was held to have committed a constitutional violation). Thus, while courts "do[ ] not require a case directly on point," for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 551 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)); *see Peek v. City of New York,* No. 13cv4488 (AJN), 2014 WL 4160229, at *3 (S.D.N.Y. Aug. 18, 2014) ("For a right to be clearly established, there must be either controlling law on point or a 'robust consensus of

cases of persuasive authority.' " (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011)); internal quotation marks omitted).

***14** Further, even where it has been shown that the official violated a clearly established right, the defense of qualified immunity is nevertheless available to the officer "if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Berg v. Kelly*, 897 F.3d 99, 109 (2d Cir. 2018) (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010)). Thus, "qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.' " *Powlette v. Morris*, No. 13cv7378 (KPF), 2016 WL 3017396, at *6 (S.D.N.Y. May 23, 2016) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)).

Defendants generally contend that the Officer Defendants are entitled to qualified immunity here, "given the circumstances surrounding [the Officer Defendants'] searches of [P]laintiff," and the absence of any controlling case law providing that their actions were unconstitutional in light of those circumstances. (Def. Mem., at 22-23.) The Court need not reach the issue with respect to Plaintiff's Eighth Amendment claims, as Plaintiff has not, in any event, demonstrated a genuine issue of material fact that warrants a trial on the merits of those claims. As to Plaintiff's Fourth Amendment claims, however, this Court is constrained to agree with Defendants that, at the time of the conduct at issue, Plaintiff's right to be free from the type of search that was conducted was not sufficiently established to enable him to proceed against the Officer Defendants, even if the Court were to determine that the *Bell* factors, on balance, weigh in Plaintiff's favor.

In this regard, Plaintiff has not pointed to, and this Court is not aware of, any case law providing that correction officers who have a legitimate penological justification for conducting a body-cavity search of an inmate for suspected contraband, and who conduct such a search in a private setting and with officers of the same gender as the inmate, are then constitutionally prohibited from using force to remove an object observed to be protruding from the inmate's anus. Even if this Court were to conclude that this constituted a violation, this Court is persuaded that it was "objectively reasonable" for the Officer Defendants to believe that their actions in recovering the contraband were lawful, such that they are entitled to qualified immunity from any civil liability. *See Berg*, 897 F.3d at 109.

Accordingly, I recommend that the Officer Defendants be granted summary judgment in their favor on Plaintiff's Fourth Amendment claims, as well as on his Eighth Amendment claims.

## III. PLAINTIFF'S CLAIMS AGAINST THE CITY

Finally, Plaintiff asserts a claim against the City under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), contending that the City was aware of, but failed to respond to, a pattern of constitutional conduct that led to the violation of his constitutional rights (*see* Pl. Mem., at 21-25). As discussed below, this Court finds that Plaintiff cannot prevail on his *Monell* claim against the City, whether that claim is premised on the alleged deprivation of Plaintiff's Eighth Amendment rights, or his Fourth Amendment rights.

Under *Monell*, a municipality may, in certain circumstances, qualify as a "person" under Section 1983, such that it may be subject to suit. *See Monell*, 436 U.S. at 690-91. To bring a municipality within the reach of Section 1983, a plaintiff must show "(1) the existence of an officially-adopted 'policy, custom, or practice' and (2) a direct and deliberate causal connection between that 'policy, custom, or practice' and the violation of plaintiff's federally-protected rights." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Board of Cnty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403-04 (1997); *Monell*, 436 U.S. at 694). A municipality may only be held liable where the entity itself commits a wrong; it "cannot be held liable under [Section] 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

***15** The Supreme Court has held that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To prove that a municipality's failure to train its employees amounted to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact," *id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)), it is "ordinarily necessary" to demonstrate a "pattern of similar constitutional violations by untrained employees," *id.* at 62 (citation omitted). Thus, a single incident of excessive force cannot, without more, "establish a municipal policy of failing to properly train and supervise [ ] officers," *Walker v. City of New York*, 974 F.2d 293, 296 (2d Cir. 1992), because it would "unduly threaten [a municipality's] immunity from *respondeat superior* liability,"

*id.* (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 830 (1985)).

Plaintiff alleges that the City's "failure to train, supervise, and discipline its employee[s] in the appropriate use of physical force [and] executing searches" led to the violation of his constitutional rights, and that this failure amounted to "deliberate indifference." (*See* Pl. Mem., at 21.) In support of this claim, Plaintiff relies on incident reports involving Lewis that, according to Plaintiff, "point[ ] to numerous inmates who were subjected to excessive force by [Lewis] prior to [the] March 2016 incident." (*See id.*, at 23 (citing Pl. 56.1 Stmt., Ex. D)). Plaintiff contends that these reports "establish that there is a long history of which [Lewis] mishandled situations in which force was necessary to subdue inmates." (*Id.*, at 23.) Yet, as Defendants correctly point out (Def. Reply, at 9-10), the incident reports merely describe incidents in which Lewis used force in recovering contraband from inmates, and do not reflect that Lewis used an unconstitutional level of force in those incidents or otherwise engaged in any conduct determined to be unlawful (*see* Pl. 56.1 Stmt., Ex. D). Nor do the incident reports describe the conduct of any other correction officers employed by the City. (*Id.*)

Plaintiff also points to an investigation report, dated September 18, 2016, which concluded that the Security Team that conducted the search of Plaintiff violated an "Operations Order" by failing to capture the events on videotape. (*See* Pl. Mem., at 24 (citing Pl. 56.1 Stmt., Ex. C, at D00152).) According to Plaintiff, the fact that "no action was taken in regards to this violation after an internal investigation ... establishes a policy [of the City] of failing to train [its] employees." (*Id.*)[9]

Overall, the evidence on which Plaintiff relies is insufficient to create a genuine issue of material fact on his *Monell* claim. First, and fundamentally, for the reasons discussed above, the evidence of record is insufficient to support his underlying claims against the Officer Defendants. Second, even if Plaintiff's individual claims could survive summary judgment, the evidence he has offered of a policy or practice by the City is lacking. The incident reports involving Lewis, and the investigation report concerning the purported failure of the Security Team to record Plaintiff's body-cavity search on videotape, fail to demonstrate any "pattern of similar constitutional violations." *See Connick*, 563 U.S. at 61. Accordingly, the City is entitled to summary judgment dismissing Plaintiff's *Monell* claim.

## CONCLUSION

***16** For all of the foregoing reasons, I respectfully recommend the Defendants' motion for summary judgment (Dkt. 38) be granted in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 7(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. Such objects, and any responses, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, United States Courthouse, 500 Pearl Street, Room 1310, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007. Any requests for extension of time for filing objections must be directed to Judge Daniels. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 7602181

## Footnotes

1 The facts summarized herein are primarily drawn from the parties' statements pursuant to Local Civil Rule 56.1, and the evidence referenced therein. (*See* Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated Sept. 27, 2018 ("Def. 56.1 Stmt.") (Dkt. 40); Plaintiff's Statement in Opposition to

Defendants' Statement of Undisputed Facts [Pursuant to] Local Rule 56.1, dated Jan. 1, 2019 ("Pl. 56.1 Stmt.") (Dkt. 46).) Unless otherwise noted in this Court's discussion, citations herein to one party's Rule 56.1 Statement, without cross-reference to the other party's response, indicate that the cited factual assertion is not in dispute. Where the parties' Rule 56.1 Statements suggest that the relevant facts are in dispute, this Court has consulted the record and considered the parties' cited evidence.

2 On January 7, 2016, upon a guilty plea, Plaintiff had been convicted of burglary in the third degree. (*See* Declaration of Samantha Rena Millar in Support of Defendants' Motion for Summary Judgment, dated Sept. 27, 2018 ("Millar Decl.") (Dkt. 41), Ex. E, at 3-4 (Plaintiff's criminal history).)

3 In his Rule 56.1 statement, Plaintiff asserts that he did, in fact, have rectal bleeding, and in support of that assertion, he relies upon his own Complaint, as well as various email communications sent by representatives of the Legal Aid Society to DOC immediately after the March 1 incident that state that Plaintiff had been experiencing rectal bleeding. (Pl. 56.1 Stmt. ¶ 35 (citing *id.*, Ex. E; Compl., at 3).) As Plaintiff's Complaint and letters from counsel do not constitute admissible evidence, this Court does not consider them for purposes of reviewing this summary judgment motion. *See* Local Civ. R. 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible.").

4 On January 22, 2019, this Court granted Defendants' motion to seal Plaintiff's memorandum of law and the exhibits attached to his Rule 56.1 Statement, on the basis that those documents contained information subject to the Confidentiality Stipulation and Protective Order that had previously been entered in this case. (Dkt. 48; *see* Dkt. 47.)

5 Although, as noted above, Plaintiff also referenced the First and 14th Amendments in his Complaint (*see* Compl. ¶ 11 (alleging that his "free speech" and "due process" rights were violated)), this Court, even construing the Complaint and his other submissions liberally, does not perceive Plaintiff as having a potentially colorable First or 14th Amendment claim. As for the First Amendment, Plaintiff has not alleged, for example, that Defendants in any way burdened his right to raise a complaint about the conduct of the body-cavity search or retaliated against him for doing so, *see* *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004), and, while the Due Process Clause of the 14th Amendment governs excessive-force claims brought by pretrial detainees, *see* *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015), Plaintiff's excessive-force claim is instead governed by the Eighth Amendment, as he was not awaiting trial at the time in question, but rather had entered the AMKC to commence serving a custodial sentence, following his conviction, *see id.*

6 This Court will separately consider, below, whether this act violated Plaintiff's Eighth Amendment rights by amounting to sexual assault, which, according to Plaintiff, caused him emotional, as well as physical injury.

7 Although the parties do not define a "dry cell" in their submissions, this Court understands it to mean a cell in which the toilet has no running water, so that the inmate can expel suspected contraband without being able to flush it away. *See* *Porter v. Bunch*, No. 16cv5935 (KMK), 2019 WL 1428431, at *16 (S.D.N.Y. Mar. 29, 2019); *Patterson v. Patterson*, No. 1:16-CV-00844, 2019 WL 1284346, at *1, n.1 (W.D.N.Y. Mar. 20, 2019).

8 The availability at the AMKC, at the relevant time, of alternative methods for removing an item observed as protruding from an inmate's anus would be more evident, had Defendants produced any policy statement or internal directive regarding the procedures that correction officers at the AMKC were supposed to follow in such circumstances, and had such statement or directive indicated, for example, that the inmate should be taken to a dry cell or to medical personnel. While Plaintiff has repeatedly argued that, by forcibly removing the contraband from his rectum, the Officer Defendants violated a Directive of the New York State Department of Corrections and Community Supervision ("DOCCS") (*see, e.g.*, Pl. Mem., at 4, 5 (citing DOCCS Directive No. 4910)), Plaintiff has offered no explanation as to why this New York *State* Directive would have been

applicable at the AMKC, which is a New York *City* facility (*see* Def. Reply, at 2). This Court notes, however, that, even if the AMKC had a policy prohibiting the type of body-cavity search that occurred here, this, at most, would be relevant to the reasonableness of the manner in which the search was conducted – a factor which this Court has already found weighs in Plaintiff's favor. Standing alone, the violation of a prison directive or regulation would not go so far as to demonstrate a constitutional violation. *See* *Whitley v. Bowden*, No. 17cv3564 (KMK), 2018 WL 2170313, at *10, n.15 (S.D.N.Y. May 10, 2018) (noting that "the law is settled that the failure to follow a [prison] [d]irective or prison regulation does not give rise to a federal constitutional claim.") (quoting *Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002)); *Doe v. Connecticut Dep't of Child & Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990) ("[A] violation of state law neither gives [plaintiffs] a [Section] 1983 claim nor deprives defendants of the defense of qualified immunity to a proper [Section] 1983 claim." (citation omitted)).

9 As Defendants point out (*see* Def. Reply, at n.5), the AMKC Warden later found, as is reflected in subsequent correspondence relating to the internal investigation, that the Security Team had not, in fact, violated the Operations Order (*see* Pl. 56.1 Stmt., Ex. C, at D00151). On that basis, the Warden determined that "no further action [was] warranted." (*Id.*)

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 936297
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ulysses WILLIAMS, Plaintiff,
v.
Robert MULLER, Defendant,

No. 98 CIV. 5204(BSJ).
|
Aug. 17, 2001.

**Attorneys and Law Firms**

Ulysses Williams, Pro Se, Orleans Correctional Facility, Albion, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York, Of Counsel: Susan H. Odessky, New York, for Defendant.

MEMORANDUM AND ORDER

DUFFY, D.J.

***1** Plaintiff, Ulysses Williams ("Williams" or "plaintiff"), proceeding *pro se,* is currently an inmate at Orleans Correctional Facility in Albion, New York. From late 1997 until early 1998, the time period relevant for this lawsuit, plaintiff was incarcerated at Fishkill Correctional Facility ("Fishkill"). On December 12, 1997, plaintiff filed a grievance alleging that Officer C. Madura ("Madura") and Officer Robert Muller ("Muller" or "defendant") "spread malicious rumors to the inmate population that [plaintiff] was illegally selling Inmate Liaison Committee ("ILC") supplies" in retaliation against prior grievances that plaintiff had allegedly filed against the officers. *See* Ex. A. On January 15, 1998, the Superintendent of the Inmate Grievance Program denied plaintiff's grievance seeking suspension of the two officers.

Plaintiff's complaint in this action, dated February 20, 1998, reasserts his December 12, 1997 retaliation claim against Muller, pursuant to 42 U.S.C. § 1983. In addition, plaintiff complains of a second act of retaliation under § 1983 by Muller, allegedly made in response to plaintiff's filing of the December 12, 1997 grievance. On January 9, 2001, Muller moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Because plaintiff has failed to establish either of his retaliation claims, defendant's motion for summary judgment is granted in its entirety. [1]

*FACTS*

On December 12, 1997, plaintiff filed a grievance against correction officers Madura and Muller, alleging that they had spread rumors that plaintiff had been illegally selling supplies from the ILC—an inmate organization within the facility—to other inmates. *See* Ex. A. Furthermore, plaintiff claims that he "encountered several confrontations with other inmates due to such rumors; in which could have ended in physical conflict." *See* Pl.'s Aff. at 7. Plaintiff alleges that defendant spread such rumors with the intention of provoking such "confrontations." *Id.* Plaintiff does not deny that he was found in possession of ILC supplies, but he alleges that he was in charge of issuing such supplies and that therefore his possession was lawful.

On January 15, 1998, the Superintendent of Fishkill ruled that plaintiff's grievance was baseless. *See* Ex. A. The Superintendent stated that prison officials had found "excessive ILC supplies" in plaintiff's locker. *Id.* Plaintiff appealed the Superintendent's findings, and on January 28, 1998, the New York State Department of Correctional Services ("DOCS") Central Office Review Committee ("CORC") upheld the Superintendent's denial of the grievance.

Plaintiff alleges that a little over a month after he filed the December 12, 1997 grievance, Muller retaliated against him by filing a meritless Inmate Misbehavior Report. *See* Ex. F. Muller contends that on January 14, 1998, while stationed on the stairwell of Fishkill's A–Floor monitoring inmate traffic, he questioned plaintiff as to the contents of the bag which plaintiff was carrying. Allegedly, plaintiff refused to answer his questions. Furthermore, Muller contends that plaintiff yelled at him. According to defendant, this confrontation blocked inmate traffic in the hallway for fifteen minutes. *See* Ex. G. Muller alleges that he gave plaintiff a direct order to step to the side and to stop yelling. Plaintiff allegedly refused to do so and demanded to see a sergeant "right now." A sergeant was notified and plaintiff was escorted to the Special Housing Unit ("SHU"). *Id.*

***2** In his deposition, plaintiff denied all allegations that he behaved inappropriately. As a result of plaintiff's alleged conduct, however, Muller filed an Inmate Misbehavior Report against plaintiff, charging him with failure to comply with search procedures, disobeying a direct order, threatening an

officer, and creating a disturbance. *Id.* Plaintiff plead "not guilty" to these charges, and a hearing was held on January 19, 1998. At the conclusion of the hearing, plaintiff was found guilty of all charges and sentenced to thirty days of keeplock, under which he lost his right to receive packages, his commissary privileges, and his telephone privileges. *See* Ex. E.

On January 20, 1998, plaintiff appealed from this disciplinary action. According to defendant, plaintiff appealed on the grounds that the thirty day period of loss of privileges should have begun on the date of his confinement on January 14, 1998, rather than on the date of the hearing on January 19, 1998. *See* Ex. F. Although evidence exists that plaintiff wrote in his appeal that he was not challenging the merits of the disciplinary report itself, plaintiff disputes this finding and claims he appealed the merits of the misbehavior report as well as the length of his confinement. *See* Ex. F. Plaintiff's appeal was denied. *See* Ex. A.

One month later, on February 20, 1998, plaintiff filed the instant complaint. On July 22, 1998, Chief Judge Thomas P. Griesa, U .S.D.J., partially dismissed the complaint filed *in forma pauperis* under 28 U.S.C.1915(a) as to defendants Commissioner Glenn S. Goord and Superintendent Wayne L. Strack, and under 28 U.S.C.1915(d) as to defendant Lieutenant Officer Iacovino.

Muller moved to dismiss the remaining claims and on April 25, 2000, Judge Barbara S. Jones, U.S.D.J., dismissed the first five of plaintiff's claims because plaintiff had failed to exhaust administrative remedies within the prison grievance system before filing suit in a federal court, as required by the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a). *See* *Williams v. Muller,* 2000 WL 487954 at *3 (S.D.N.Y. Apr. 25, 2000). Judge Jones denied defendant's motion to dismiss with respect to claims six and seven stating § 1983 claims for retaliation because plaintiff had succeeded in exhausting the administrative remedies for these claims. Muller now moves for summary judgment as to both retaliation claims. For the reasons set forth below, his motion is granted in its entirety.

*LEGAL STANDARD*

*A. Summary Judgment* [2]

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the moving party has the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If satisfied, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). While the court must construe all evidence and inferences in favor of the nonmoving party, to sustain its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). "Mere conclusory allegations or denials will not suffice."[3] *Williams,* 781 F.2d at 323.

*B. Standard for Retaliation Claims*

***3** Prisoners have a constitutional right to "petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Nonetheless, courts recognize that retaliation claims may be easily fabricated and that some prisoners file such claims with frequency. Thus, courts must examine prisoner retaliation claims with "scepticism and particular care." *Id.*

To prevail on a retaliation claim, a plaintiff must demonstrate that he 1) engaged in constitutionally protected conduct and that 2) such conduct was a "substantial or motivating factor" behind the prison official's allegedly retaliatory acts. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). Constitutionally protected conduct has been broadly defined, and may include not only the filing of prison grievances, but even the wearing of religious headgear. *See* *Nicholas v. Tucker,* 89 F.Supp.2d 475, 477 (2d Cir.2000). Retaliatory acts have been defined as "otherwise routine administrative decisions [that] are made in retaliation for the exercise of constitutionally protected rights." *Smith v. Deckelbaum,* 2000 WL 1855128 at *3 (S.D.N.Y. Dec. 19, 2000) (citations omitted). While courts have broadly defined actionable retaliation in a prison setting, not every response to a prisoner's exercise of a constitutional right is actionable. *See* *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions: (1) the outcome of any hearing concerning the allegedly retaliatory

charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and, (4) the temporal proximity between the protected activity and the defendant's adverse action. *See Colon,* 58 F.3d at 872–73. Finally, even if a prison official acts with retaliatory intent, as long as his act is motivated by both "proper and improper reasons," a plaintiff's retaliation claim will fail. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

*DISCUSSION*

*A. Plaintiff's Retaliation Claim for "Spreading Rumors"*

Plaintiff has failed to establish his first retaliation claim. According to this claim, Muller violated plaintiff's constitutional rights when he spread rumors about plaintiff in retaliation for grievances that plaintiff had filed previously against Muller. *See* Ex. D. Plaintiff further alleges that such rumors incited his fellow prisoners to "confront" him. *See* Pl.'s Aff. at 7. Although plaintiff has not specifically identified or produced copies of any such prior grievances, Muller admits that plaintiff had filed the "same complaint" against him twice before. *See* Ex. A. Because I must construe all inferences in favor of the nonmoving party, I posit for the purpose of this discussion that plaintiff has established that he engaged in "protected activity."

***4** However, even accepting that plaintiff did in fact file a prior grievance which motivated Muller to spread rumors about him, plaintiff's retaliation claim still must fail as the spreading of rumors alone does not amount to a constitutional violation.

As indicated above, courts treat prisoners' claims of retaliation with great skepticism, and such claims typically must include an administrative action against a prisoner that is improperly motivated. *See Dawes,* 239 F.3d at 492; *see also Graham,* 89 F .3d at 80. The retaliatory action must be sufficient to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional right." *Dawes,* 239 F.3d at 493.

If the alleged retaliatory act does not inhibit or punish an inmate's right of free speech it is considered *de minimis. Id.* "Many verbal responses by officials of resentment or even ridicule" are not actionable. *Id.* at 493 (citing *Riley v. Coutu,* 172 F.R.D. 228, 235 (E.D.Mich.1997)). In the instant case, the alleged spreading of rumors constitutes just such a "verbal response." Although plaintiff claims the rumors were intended to incite the inmates to harm plaintiff, no physical harm occurred. Therefore, even if Muller did indeed spread rumors about plaintiff, such actions on his part do not give rise to a retaliation claim.

For the reasons set forth above, plaintiff has failed to establish the second element of his first retaliation claim. This claim, therefore, is dismissed.

*B. Plaintiff's Retaliation Claim for the a "False" Misbehavior Report*

Plaintiff's second claim asserts that Muller filed a "false" misbehavior report against him in retaliation for plaintiff's December 12, 1997 grievance. *See* Ex. E. Plaintiff succeeds in establishing the first prong of this retaliation claim, in that the filing of his December 12, 1997 grievance was indeed protected activity. However, a retaliation claim must also establish a causal link between the protected activity and the alleged retaliatory act. Plaintiff has failed to prove such a connection exists.

According to Muller, he issued the misbehavior report against plaintiff because plaintiff violated prison disciplinary rules. Muller alleges that plaintiff failed to obey his direct orders, threatened him, and failed to comply with search procedures. *See* Exs. E, G. Plaintiff contends that he complied with Muller's search of his person and of his bag, that he did not yell or threaten Muller, and that Muller issued a report against him solely as an act of retaliation. [4] *See* Ex. H at 127–28.

As discussed above, a court can consider four factors in determining whether a causal connection exists between a plaintiff's protected activity and a prison official's action. The first factor a court can examine is the outcome of any hearing concerning the allegedly retaliatory charges. *See Colon,* 58 F.3d 865 at 872. In the instant case, plaintiff faced a disciplinary hearing on January 15, 1998 where he was charged with creating a disturbance, refusing a direct order, making threats, and refusing to be searched. *See* Ex. E. Plaintiff was found guilty of all charges and sentenced to thirty days of keeplock. Plaintiff then appealed the length of his confinement and, as he alleges, the merits of the report as well. [5] *See* Ex. F, H at 138–40. Plaintiff's appeal was denied. *See* Ex. A. This outcome strongly suggests the existence of proper reasons for Muller's actions, and raises an inference of non-retaliation.

***5** The second factor that a court can look to is an inmate's prior disciplinary record. In the instant case, plaintiff had been

disciplined previously at Fishkill for making illegal copies, for smuggling, and for stealing.[6] *Id.* at 58–62. Plaintiff's disciplinary record further weakens his retaliation claim.

The third factor a court can evaluate is any statement made by the defendant concerning his motivation for his allegedly retaliatory acts. In the instant case, plaintiff has offered no evidence, besides conclusory allegations, of statements made by Muller concerning his motivation for filing the report. The final factor a court can review is the temporal proximity between the protected activity and the retaliatory action. Muller issued his report four weeks after plaintiff filed his grievance. Although such a time period could conceivably be considered as evidence of temporal proximity, such evidence is merely circumstantial and, standing alone, is not enough for a retaliation claim to survive summary judgment. *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000).

Thus, even if temporal proximity is established, plaintiff's second retaliation claim cannot survive Muller's motion for summary judgment. *See Crawford v. Braun,* 2001 WL 127306 at *6 (S.D.N.Y. Feb. 9, 2001). Plaintiff's second retaliation claim, therefore is dismissed.

*CONCLUSION*

For the foregoing reasons, Williams has failed to factually support either of his retaliation claims pursuant to 42 U.S.C.A. § 1983. Therefore, Muller's motion for summary judgment is granted. The Clerk of the Court is hereby ordered to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 936297

## Footnotes

1 Because plaintiff's retaliation claims are dismissed on the merits, I find it unnecessary to address defendant's allegations that plaintiff failed to show physical injury to support his claim of emotional damages pursuant to 42 U.S.C. § 1997e(e) or that defendant is shielded from liability under the Eleventh Amendment.

2 When a party proceeds *pro se,* he is entitled to some form of notice of the requirements necessary to oppose summary judgment. *See McPherson v. Coombe,* 174 F.3d 276, 280–82 (2d Cir.1999). In the instant case, defendant's filing of his “Notice to Pro Se Litigant” adequately informed plaintiff of his pleading requirements.

3 Because Williams is proceeding *pro se,* however, I have given the allegations in his pleadings a particularly liberal construction. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972).

4 Plaintiff originally claimed that a corrections officer and an inmate, “Barnet,” witnessed this incident. However, in his deposition, plaintiff alleged that he forgot the name of the officer and he reaffirmed his withdrawal of Barnet as a witness. *See* Ex. H at 133–37.

5 As indicated *supra,* there is some dispute as to whether plaintiff actually appealed the merits of the misbehavior report. *See* Pl.'s Aff. at 8. However, a determination as to whether he did, or did not, appeal the merits of the report has no bearing on this decision.

6 Plaintiff's disciplinary record includes behavior prior to his arrival at Fishkill. Notably, plaintiff was disciplined for a “movement violation” and for disobeying a direct order at Coxsackie Correctional Facility. *See* Ex. H at 56–57. Furthermore, plaintiff was disciplined for fighting with another inmate at Auburn Correctional Facility. *Id.* at 63. Finally, at Orleans Correctional Facility, plaintiff was disciplined for giving an officer “the birdie.” *Id.* at 64.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3610717
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Dr. Jin ZHAO, Plaintiffs,
v.
STATE UNIVERSITY OF
NEW YORK et al., Defendant.

No. 04–CV–0210 (KAM)(RML).
|
Aug. 15, 2011.

**Attorneys and Law Firms**

Ming Hai, Law Offices of Ming Hai P.C., Flushing, NY, Susan C. Warnock, New York, NY, for Plaintiffs.

Michael R. Klekman, Steven Leon Banks, State of New York Office of the Attorney General, Cathleen Ann Giannetta, Rebecca R. Embry, Landman, Corsi, Ballaine & Ford P.C., Michael J. D'Angelo, Pitta & Giblin LLC, New York, NY, for Defendants.

***MEMORANDUM AND ORDER***

MATSUMOTO, District Judge.

***1** Susan Warnock, Esq. ("Warnock"), previously-retained counsel for plaintiff Dr. Jin Zhao ("plaintiff"), seeks a charging lien on plaintiff's award from her January 10, 2011 settlement with defendants State University of New York, SUNY Downstate Medical Center, The Research Foundation of the State University of New York, and Dr. Olcay Batuman (collectively, "defendants"). (*See* ECF No. 124, Letter Motion for Attorney Fees, dated 1/19/2011; ECF No. 128, Motion for Attorney Fees, dated 2/16/2011.)

On April 19, 2011, Magistrate Judge Robert M. Levy issued a Report and Recommendation ("R & R") recommending that Warnock's motion be granted in part and that she be awarded a $56,758.78 lien on plaintiff's settlement award. (ECF No. 135, Report and Recommendation ("R & R") at 11.) [1] On May 2, 2011, plaintiff filed timely objections to the R & R. (ECF No. 136, Appeal/Objection to Magistrate Judge Robert M. Levy's Report and Recommendation ("Zhao Obj.").) On May 3, 2011, Warnock filed a declaration supporting Judge Levy's Report and Recommendation and responding to plaintiff's objections. (ECF No. 137, Declaration In Support of Report & Recommendations ("Warnock Resp.").) On May 24, 2011, plaintiff submitted an unauthorized response further objecting to the R & R. [2] (*See* ECF No. 138, Affidavit/Affirmation in Reply to Attorney Susan Warnock's Declaration of 5/3/11 ("Zhao Sur–Reply").) After a *de novo* review of the record in light of plaintiff's objections pursuant to 28 U.S.C. § 636(b)(1), the court incorporates the R & R by reference and adopts it in its entirety.

***STANDARD OF REVIEW***

**I. Review of Report and Recommendation**

To the extent that a party makes specific objections to a magistrate judge's findings, the court must make a *de novo* determination. *Arista Records LLC v. Doe,* 604 F.3d 110, 116 (2d Cir.2010); Fed.R.Civ.P. 72(b). In reviewing a Report and Recommendation, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). *See also* Fed.R.Civ.P. 72(b)(3). "In this district and circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not." *Illis v. Artus,* No. 06–CV–3077, 2009 U.S. Dist. LEXIS 77596, at *3, 2009 WL 2730870 (E.D.N.Y. Aug. 27, 2009) (quoting *Scientific Components Corp. v. Sirenza Microdevices, Inc.,* No. 03–CV–1851, 2006 U.S. Dist. LEXIS 61872, *2, 2006 WL 2524187 (E.D.N.Y. Aug. 30, 2006)).

***BACKGROUND***

**I. The Underlying Dispute**

The relevant facts in this matter are set forth in detail in Judge Levy's thorough R & R. (*See* R & R at 1–4.) Briefly, the pertinent facts are as follows. On July 24, 2003, plaintiff retained Warnock to represent her in a wrongful termination suit against her former employer. (*See* ECF 128–3 at 1, [3] Retainer Agreement dated 7/24/2003 ("Retainer").) The parties executed a retainer agreement in which plaintiff agreed to pay Warnock and Weizhong "Rachel" Yu, Esq. ("Yu") "1/3 of any monies which [plaintiff] might recover as a contingent fee less any monies [plaintiff] ha[s] disbursed to [Warnock and Yu] for costs and expenses." (*Id.* at 1.)

The retainer agreement also provided that "[s]hould [plaintiff] terminate [Warnock and Yu] as [her] attorneys and hire new counsel prior to receiving a settlement from [plaintiff's] employer, [Warnock and Yu] shall be entitled to a lien on the proceeds of such settlement commensurate with the time [they] have spent on [plaintiff's] matter." (*Id.* at 2.) Between July 2003 and January 2011, Warnock took numerous actions on plaintiff's behalf, including drafting and filing the complaint, attending several court conferences, drafting a memorandum in opposition to defendants' motion for summary judgment, and preparing for trial.

***2** On January 3, 2011, a week before trial was scheduled to begin, Warnock advised the court in an *ex parte* status report and subsequent *ex parte* conference that she believed her continued representation of plaintiff was at risk. (*See* ECF No. 115, Status Report Request for *Ex Parte* Conference; ECF No. 130, Sealed Transcript of Proceedings held on January 3, 2011 before Judge Levy at 3.)

On January 6, 2011, four days before the scheduled trial, plaintiff informed Warnock's associate, Yu, by telephone that plaintiff "was thinking about changing her attorneys" or even "defending" herself at trial. (ECF No. 128–2, Declaration of Weizhong Yu dated 2/16/2011 ("Yu Decl.") ¶¶ 21, 22. *See also* ECF No. 136, Zhao Obj. ¶ 3–1c.) When Yu pressed plaintiff regarding how she wanted to proceed, plaintiff told her in Mandarin, "please release your heart, I will handle myself. I will appear to the Court on Monday and I will have an interpreter with me." (ECF No. 128–2, Yu Decl. ¶ 22.) At 1:09 p.m., Warnock sent plaintiff an e-mail stating that it had come to her attention "that you intend to proceed with the trial of this action on your own" and asking plaintiff to reply by 3:00 p.m. to inform Warnock whether she wished to terminate her as her counsel. (ECF No. 128–4 at 4, E-mail from Susan Warnock to Zhao Xiaopin dated 1/6/2011 at 1:09 p.m. ("1:09 p.m. Warnock Email").) At 4:36 p.m., Warnock sent a follow-up e-mail stating, "if I do not hear from you by 5:00 PM today, I will have no alternative but to notify Judge Matsumoto and opposing counsel that you have discharged my firm as your counsel ...." (ECF No. 128–4 at 5, E-mail from Susan Warnock to Zhao Xiaopin dated 1/6/2011 at 4:36 p.m. ("4:36 p.m. Warnock E-mail").) Yu attempted to call plaintiff shortly after 5:00 p.m. on January 6 and again at around 9:30 a.m. on January 7; no one answered the phone on either occasion. (ECF No. 128–2, Yu Decl. ¶ 25. *See also* ECF No. 128–4 at 3, Telephone Records for Weizhong Yu.)

At 11:40 a.m. on January 7, 2011, plaintiff faxed Warnock a letter stating, "[t]his is to confirm that I have informed you verbally that you and your law office have been discharged as my attorney ...." (ECF. No. 128–4 at 6, Fax case filing system. from Jin Zhao to Susan Warnock dated 1/7/2011 at 11:40 a.m. ("11:40 a.m. Zhao Fax").) She also requested that Warnock "immediately inform all parties and the court that you are no longer my attorney ...." (*Id.*) That day, plaintiff retained Ming Hai, Esq. as her new attorney. (ECF No. 129, Affidavit/ Declaration of Ming Hai in Opposition, filed 2/17/2011, at 1.) Nevertheless, because Warnock had not yet been relieved as counsel, she spent the weekend preparing for trial, and she appeared for trial at 9:00 a.m. on January 10, 2011. (ECF No. 128, Declaration of Susan Warnock, dated 2/16/2011 ("Warnock Decl.") ¶¶ 24–25.) Prior to jury selection, the court relieved Warnock as counsel and substituted Ming Hai, Esq. and Suhail Amar, Esq. as counsel for plaintiff. (Minute Entry dated 1/10/2011.) That afternoon, plaintiff settled her claim with defendants for $70,000. (*See* ECF No. 141–2, Trial Transcript, dated 1/10/2011, at 13–14.)

***3** Warnock now seeks to impose a charging lien on the proceeds of plaintiff's settlement with defendants pursuant to New York Judiciary Law Section 475 ("Section 475"), asserting that she is entitled to $84,110.00 in fees for the time she expended on plaintiff's case, as well as $650.78 in disbursements, for a total of $84,766.78. (ECF No. 128, Warnock Decl. ¶¶ 4–7. *See also* ECF No. 124, Letter Motion for Attorney Fees.)

### II. The Report and Recommendation

As Judge Levy noted in the R & R, "[t]he Second Circuit has made clear that Section 475 [of the New York Judiciary Law] governs attorneys' charging liens in federal courts sitting in New York, and such liens are enforceable in federal courts in accordance with its interpretation by New York courts." [4] (R & R at 5 (quoting *Stair v. Calhoun,* 722 F.Supp.2d 258, 267 (E.D.N.Y.2010) (internal quotation marks and citation omitted)).) Under Section 475, an attorney is entitled to a charging lien on any monetary recoveries obtained by the former client in the proceedings in which the attorney rendered legal services, provided that the attorney has not withdrawn without "good cause" and has not been terminated "for cause." *Melnick v. Press,* No. 06–CV–6686, 2009 U.S. Dist. LEXIS 77609, at *9, 2009 WL 2824586 (E.D.N.Y. Aug. 28, 2009) ("[A]ttorneys who terminate their representation are still entitled to enforce their charging liens, as long as the

attorney does not withdraw without 'good cause' and is not discharged for 'good cause.' ").

Therefore, the first question in determining whether a charging lien is appropriate here is whether Warnock was terminated or whether she withdrew. In the R & R, Judge Levy carefully reviewed the record and concluded that the sequence of events leading up to the replacement of Warnock as plaintiff's counsel "clearly indicates that plaintiff discharged Warnock." (R & R at 7.) The R & R notes that Warnock had "repeatedly—and as early as January 3, 2011—expressed to the court her concerns that plaintiff was considering discharging her, and, prior to Warnock's drafting of the second January 6 Demail, plaintiff informed Yu that she would 'handle [the case] myself.' " (*Id.* at 6–7.) [5] The court, upon *de novo* review of the record, also finds that plaintiff discharged Warnock as counsel.

Next, Judge Levy considered whether Warnock was dismissed "for cause." (*Id.* at 7.) The R & R noted plaintiff's complaint that Warnock failed to subpoena two witnesses for trial and did not seek to adjourn the trial at plaintiff's request. (*Id.*) It also noted that one of those witnesses could not be located and the second witness sought to be presented by plaintiff had warned Warnock that his testimony at trial would be unfavorable to plaintiff's case. (*Id.*) Judge Levy therefore concluded that "plaintiff has neither demonstrated that she discharged Warnock for cause, nor shown 'impropriety or misconduct on the part of the attorney.' " (*Id.* (quoting *Simon v. Unum Grp.,* No. 07–CV–11426, 2010 U.S. Dist. LEXIS 62661, at *3, 2010 WL 2541145 (S.D.N.Y. June 23, 2010)).) Accordingly, he found that Warnock was entitled to a charging lien pursuant to Section 475. (*Id.* at 8.) Again, the court agrees, upon *de novo* review, that plaintiff did not demonstrate good cause for discharging Warnock or that Warnock had engaged in impropriety or misconduct.

***4** Judge Levy next turned to the amount at which the charging lien should be fixed. (*Id.* at 8.) The R & R first noted that the parties' retainer agreement "fixes the charging lien for the same amount it would be without such an agreement —'commensurate with the time [Warnock and Yu] have spent on the matter.' " (*Id.* (quoting ECF No. 128–3 at 1, Retainer at 2).) The R & R next considered Warnock's contemporaneous billing records to determine the reasonable value of Warnock's services. (*Id.* at 8–9. *See also* ECF No. 128–3 at 3, Billing Records.) After a careful review of Warnock's submissions, Judge Levy recommended that Warnock's fees be reduced by thirty percent to account for various vague and excessive entries in her billing records. (*Id.* at 9–10.) In addition, Judge Levy found that the charging lien should relate only to services rendered after the action was commenced on November 28, 2003. (*Id.* at 10.) In conclusion, Judge Levy recommended that Warnock be granted a lien against plaintiff's settlement for $56,131.25 in fees and $627.53 in costs. (*Id.* at 9–11.)

### III. Plaintiff's Objections [6]

Although plaintiff has filed two lengthy submissions in opposition to the R & R, few of her arguments directly address the R & R's reasoning or findings. Instead, plaintiff summarily alleges that the R & R is "arbitrary and unreasonable." (ECF No. 136, Zhao Obj. ¶ 4–6.) Plaintiff objects to the R & R on the ground that "Judge Levy's discussion was based on not fully [sic] background and not fully [sic] facts showed in his Report." (*Id.* ¶ 3–4a.) She further states that "Judge Levy's Report was based on the incomplete [ ] facts and ignore some l[a]w that should be referred here clearly" and that "[t]he facts and the relevant Laws that ignored in the Report are all do not support Susan and Judge Levy's Report." (*Id.* ¶¶ 4–2, 4–3.) Rather than providing additional facts, however, plaintiff's objections merely reiterate the three general arguments she raised in her initial opposition, all of which Judge Levy carefully considered and rejected.

Plaintiff's first objection is that Warnock is not entitled to attorney's fees because she did not terminate Warnock. (*See id.* ¶¶ 1–3, 1–4, 3–1; ECF No. 138, Zhao Sur–Reply ¶¶ 1g, 1h; ECF No. 134, Letter dated 2/9/2011 from Jin Zhao to Judge Levy ("2/9/11 Zhao Opp.") at 2–3; ECF No. 133, Letter dated 2/17/2011 from Jin Zhao to Judge Levy ("2/17/11 Zhao Opp.") ¶¶ 2, 4.) Instead, plaintiff insists that Warnock withdrew as her attorney by e-mail on January 6, 2011. (*See* ECF No. 136, Zhao Obj. ¶¶ 1–4, 3–1; ECF No. 134, 2/9/11 Zhao Opp. at 3.) Plaintiff points to Warnock's 1:09 p.m. e-mail, in which Warnock noted her belief that plaintiff "intend[ed] to" terminate her as counsel, and not that she had already done so. (ECF No. 136, Zhao Obj. ¶¶ 3–1b, 3–1c. *See also* ECF No. 128–4 at 4, 1:09 p.m. Warnock E-mail.) Similarly, plaintiff emphasizes that Yu's Declaration noted that plaintiff was "thinking" of terminating Warnock, and not that she had already decided to do so. (ECF No. 136, Zhao Obj. ¶ 3–1c.) Moreover, plaintiff argues that Warnock effectively withdrew as her attorney by sending her e-mails when Warnock knew plaintiff was not at home and giving plaintiff insufficient time to respond. (*Id.* ¶¶ 1–3d, 3–2a, 3–5; ECF No. 138, Zhao Sur–Reply ¶ 6; ECF No. 134, 2/9/11

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Zhao Opp. at 2.) The court notes, however, that by letter dated and sent by facsimile on January 7, 2011 to Warnock, plaintiff confirmed that she had earlier verbally informed Ms. Warnock that "you and your law office have been discharged as my attorney ...." (ECF No. 128–4 at 6, 11:40 a.m. Zhao Fax.)

***5** Plaintiff further objects to the R & R on the ground that Warnock "did not do her work well," thereby giving plaintiff good cause to terminate her. (ECF No. 136, Zhao Obj. ¶ 1–2.) Plaintiff alleges that Warnock (1) withdrew certain claims from the lawsuit against plaintiff's wishes;[7] (2) failed to challenge several reassignments of the case to different judges;[8] (3) pressured plaintiff to accept inadequate settlement offers;[9] (4) warned plaintiff that she was likely to lose her case due to discrimination in the judicial system;[10] (5) failed to follow up on another incident of racism at SUNY;[11] (6) refused to subpoena certain witnesses for trial;[12] (7) failed to seek an adjournment of the trial;[13] and (8) asked a witness to sign a declaration containing a legal conclusion that made the witness uncomfortable.[14]

Finally, plaintiff reiterates her request that Warnock's fees, if any, should be limited to $11,879.37, which represents one third of plaintiff's total settlement award, after the fees she paid her new attorney and the fees she already paid Warnock are subtracted from her recovery. (ECF No. 136, Zhao Obj. ¶¶ 2–3, 2–4, 2–5, 2–6, 2–7, 4–1c, 5; ECF No. 138, Zhao Sur–Reply ¶ 10. *See also* ECF No. 134, 2/9/11 Zhao Opp. at 3–4; ECF No. 133, 2/17/11 Zhao Opp. ¶¶ 2, 9.) She asserts that the R & R violates public policy and that "Judge Levy did not discuss the issue that whether a client shall pay more to [a] former attorney than the retainer agreement provide[s] merely because [the] client changes lawyer[s]." (ECF No. 136, Zhao Obj. ¶¶ 4–1a, 4–5. *See also* ECF No. 133, 2/17/11 Zhao Opp. at 1.)

Additionally, plaintiff demands that Warnock return her files. (*See* ECF No. 134, 2/9/11 Zhao Opp. at 4; ECF No. 136, Zhao Obj. ¶ 6–2.)

**IV. Warnock's Response**

Warnock responds to plaintiff's objections, arguing that "[p]laintiff has failed to allege any factual or legal basis for her Objection to the Report and Recommendation of Magistrate Judge Levy." (ECF No. 137, Warnock Resp. ¶ 3.) She notes that she withdrew a retaliation claim because it was not supported by the evidence. (*Id.* ¶ 3 n. 1.) She further asserts that she never—and could not have—forced plaintiff to accept any settlement offers because due to plaintiff's refusal to engage in settlement discussions, "there were no settlement negotiations with the Defendants during the course of this litigation." (*Id.* ¶¶ 5–7.) Warnock affirmatively denies threatening or coercing plaintiff or warning her about discrimination in the judicial system. (*Id.* ¶¶ 9–12.) Finally, Warnock acknowledges that insofar as the time records she submitted to the court were insufficiently detailed, "the Court took this into consideration and recommended a lower amount in accordance with the law." (*Id.* ¶ 16.)

***DISCUSSION***

In light of plaintiff's objections, the court has undertaken a *de novo* review of the full record, including the applicable law, the underlying record, the parties' submissions on the instant motion, the R & R, plaintiff's objections to the R & R, and Warnock's submission in support of the R & R. *See* 28 U.S.C. § 636(b)(1) (C).[15]

***6** The court finds that plaintiff's objections to the R & R merely repeat the arguments she submitted to Judge Levy, who thoroughly reviewed, considered, and rejected them for the sound reasons provided in the R & R. Further, to the extent that plaintiff's objections raise new arguments that could have been raised before, the court need not consider them. *See* *Gutman v. Klein,* No. 03–CV–1570, 2010 U.S. Dist. LEXIS 124707, at *16, 2010 WL 4916722 (E.D.N.Y. Nov. 24, 2010) ("Filing objections to a report and recommendation is not the tool for mopping up any inadvertent omissions."); *Scientific Components Corp.,* 2006 U.S. Dist. LEXIS 61872, at *6–7, 2006 WL 2524187.

Moreover, plaintiff's arguments are meritless. It is clear from the record that plaintiff dismissed Warnock, and not the other way around. In addition, plaintiff's allegations of Warnock's misbehavior are unsupported and lack substance. The retainer agreement that the parties entered into clearly prescribed the amount of fees to which Warnock would be entitled in the event that plaintiff discharged her, and Warnock is entitled to compensation in accordance with the terms of the retainer agreement and commensurate with her work in plaintiff's case. Finally, under common law, Warnock is entitled to a retaining lien on plaintiff's files as security for the payment of her fees. *See Saafan v. Mem'l Sloan Kettering Cancer Ctr.,* No. 07–CV–2605, 2008 U.S. Dist. LEXIS 17751, at *6–7

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(S.D.N.Y. Feb. 25, 2008); *Casper v. Lew Lieberbaum & Co., Inc.,* No. 97–CV3016, 1999 U.S. Dist. LEXIS 7779, at *16, 1999 WL 335334 (S.D.N.Y. May 26, 1999).

Accordingly, after *de novo* review and upon careful consideration of plaintiff's objections, the objections are overruled. This court, fully concurring with Judge Levy in all material respects, hereby adopts, in its entirety, the findings and rationale articulated in the detailed, thorough and well-reasoned R & R, which embodies a correctly grounded analysis of the factual record and legal authorities. Specifically, the court agrees with and fully adopts Judge Levy's conclusion that, pursuant to New York Judiciary Law Section 475, Warnock is entitled to a charging lien on plaintiff's settlement award in the amount of $56,758.78.

### *CONCLUSION*

For the reasons set forth above, Magistrate Judge Levy's well-reasoned and thorough Report and Recommendation is incorporated by reference and adopted in its entirety as the opinion of the court, and plaintiff's objections are overruled. Accordingly, Warnock is entitled to a charging lien in the amount of $56,131.25 plus costs of $627.53, for a total of $56,758.78 against the settlement proceeds in this action. Interest will not begin to accrue on any unpaid amounts under the settlement agreement until 100 days after the date of this Order. Plaintiff's counsel of record, Ming Hai, Esq., shall serve a copy of this Memorandum and Order on plaintiff and file a declaration of service on the docket no later than August 16, 2011.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3610717

## Footnotes

1 The R & R also recommends that interest on the $35,000 settlement contribution of defendants State University of New York and Dr. Olcay Batuman begin to accrue 100 days from the date of the instant Order. (R & R at 11.)

2 Because plaintiff's May 24, 2011 submission was unauthorized and tardy, the court need not consider it. However, in the interest of addressing plaintiff's objections to the fullest extent possible, the court has considered any additional issues raised by plaintiff's tardy submission, as noted herein.

3 The page numbers cited herein are those assigned by the court's electronic

4 Section 475 provides, in pertinent part:

> From the commencement of an action ... the attorney who appears for a party has a lien upon his client's cause of action ... which attaches to a verdict, report, determination, decision, judgment or final order in his client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination. The court upon the petition of the client or attorney may determine and enforce the lien.

N.Y. Judiciary Law § 475.

5 The R & R further notes that even after Warnock received plaintiff's e-mail notifying her that plaintiff had retained new counsel, Warnock "spent the weekend preparing for trial," (R & R at 4), demonstrating that she had not withdrawn and did not intend to do so without the court's approval.

6 In a letter to the court dated February 9, 2011, plaintiff also requested the court to correct the transcript of the court proceedings on January 10, 2011, which reflects that plaintiff uttered numerous obscenities. (*See*

ECF No. 141, Letter from Jin Zhao dated 2/9/2011. *See also* ECF No. 136, Zhao Obj. ¶ 6.) The court defers to the court reporter's expertise in transcribing the proceedings. Further, the requested corrections would have no effect on the outcome of the pending dispute. *See Wynn v. AC Rochester Gen. Motors Corp.,* 303 F. App'x 26, 27 (2d Cir.2008). Accordingly, plaintiff's request to correct the transcript of the proceedings on January 10, 2011 is denied.

7 Warnock withdrew a retaliation claim and breach of contract and New York State Human Rights Law claims against defendant SUNY. (ECF No. 136, Zhao Obj. ¶ 1–2a.)

8 Plaintiff's action was originally filed in New York Supreme Court. In January 2004, defendants removed the case to federal court and it was assigned to U.S. District Judge Nina Gershon. (*See* ECF No. 1, Notice of Removal dated 1/20/2004.) In February 2006, the case was reassigned from Judge Gershon to U.S. District Judge Joseph Bianco. (*See* Minute Entry dated 2/10/2006.) In December 2008, the case was reassigned from Judge Bianco to U.S. District Judge Kiyo Matsumoto. (*See* Minute Entry dated 12/18/2008.) Plaintiff argues that as a result of these reassignments, she “lost [a] chance to make appeals.” (ECF No. 136, Zhao Obj. ¶ 1–2b.)

9 Plaintiff claims that Warnock “force[d] me to receive the settlement conditions from even $10k with the excuse of there exist[s] discrimination in the U.S. c[o]urt system ... so I will lose the case.” (ECF No. 136, Zhao Obj. ¶ 1–2c; ECF No. 138, Zhao Sur–Reply ¶ 1c. *See also* ECF No. 133, 2/17/11 Zhao Opp. ¶ 5.)

10 Plaintiff argues that prior to the December 23, 2010 settlement conference, Warnock told her that “due to the Japanese Judge I will lose my case,” causing Zhao to “lose faith in the U.S. judicial system.” (ECF No. 136, Zhao Obj. ¶¶ 1–2c, 1–2e, 3–4b; ECF No. 138, Zhao Sur–Reply ¶ 1c 2/17/11 Zhao Opp. ¶¶ 5–7.)

11 Plaintiff notes that Warnock did not follow up on the case of a Chinese man who had committed suicide, which Zhao insisted would show bad working conditions at SUNY. (ECF No. 136, Zhao Obj. ¶ 1–2d.)

12 Warnock did not subpoena two witnesses to testify during plaintiff's trial. (ECF No. 136, Zhao Obj. ¶ 3–4c; ECF No. 138, Zhao Sur–Reply ¶ 3; ECF No. 134, 2/9/11 Zhao Opp. at 1.)

13 Warnock did not seek an adjournment of the trial, as Zhao requested. (ECF No. 136, Zhao Obj. ¶ 1–2f; ECF No. 134, 2/9/11 Zhao Opp. at 1.)

14 Warnock asked a witness to sign a declaration that stated, “at times, I felt that Dr. Batuman was behaving in a discriminatory manner toward Dr. Zhao because she was very condescending.” (ECF No. 136, Zhao Obj. ¶¶ 1–2g, 1–2h; ECF No. 138, Zhao Sur–Reply ¶ 3. *See also* ECF No. 136 at 18, Unsigned Declaration of Sunming Luo.)

15 Although plaintiff's new attorney, Ming Hai, Esq., continues to represent her and has adopted and supported her submissions (*see* ECF No. 140, Notice by Ming Hai, Esq. dated 5/25/2011), plaintiff's opposition and objections to Warnock's motion appear to have been drafted without the assistance of counsel. Therefore, the court has afforded her objections the leniency appropriate for a *pro se* plaintiff. *See Raghavendra v. Trustees of Columbia Univ.,* 686 F.Supp.2d 332, 335 (S.D.N.Y.2010).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.